Case No. 24-6703

## THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

AMERICAN ENCORE, *et al.*,

*Plaintiffs-Appellees,*

*v.*

ADRIAN FONTES, *et al.*,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Arizona

No. 2:24-cv-01673-MTL

## OPENING BRIEF OF DEFENDANTS-APPELLANTS

Nathan T. Arrowsmith (No. 031165)   Karen J. Hartman-Tellez (No. 021121)
Joshua M. Whitaker (No. 032724)      Kara Karlson (No. 029407)
Luci D. Davis (No. 035347)           Kyle Cummings (No. 032228)
Nathan.Arrowsmith@azag.gov           Karen.Hartman@azag.gov
Joshua.Whitaker@azag.gov             Kara.Karlson@azag.gov
Luci.Davis@azag.gov                  Kyle.Cummings@azag.gov
ACL@azag.gov                         AdminLaw@azag.gov

*Attorneys for Defendant/Appellant*   *Attorneys for Defendant/Appellant*
*Arizona Attorney General*            *Arizona Secretary of State*
*Kristin K. Mayes*                    *Adrian Fontes*

OFFICE OF THE ARIZONA
ATTORNEY GENERAL (Firm #14000)
2005 North Central Ave.
Phoenix, Arizona 85004
(602) 542-3333

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................... iv

INTRODUCTION ................................................................................. 1

STATEMENT OF JURISDICTION ........................................................ 2

STATEMENT OF ISSUES .................................................................... 3

ADDENDUM ....................................................................................... 4

STATEMENT OF THE CASE ............................................................... 4

I.    Legal Background ......................................................................... 4

    A.    The Secretary promulgates election-related rules and guidance in an official manual. ........................................ 4

    B.    The EPM is addressed to election officials, not the general public, and some parts have the force of law. ............... 5

    C.    The Secretary timely published the 2023 EPM. ............. 6

        1.    The Canvass Provision summarizes the Secretary's canvassing duties. ............................... 7

        2.    The Voter Intimidation Guidance summarizes statutory prohibitions and helps election officials identify potentially unlawful conduct. ................. 9

II.   Procedural Background ............................................................. 12

    A.    The Attorney General disavowed prosecutions under the Voter Intimidation Guidance, but Plaintiffs sued anyway. ................................................................... 12

    B.    A state court issued a preliminary injunction against the Voter Intimidation Guidance, but Plaintiffs sought a duplicative injunction in federal court. ..................... 14

C. The Secretary committed to using "all lawful means" to include votes if a county fails to provide election results, but Plaintiffs sought to enjoin the Canvass Provision anyway...............................................................16

D. The district court issued preliminary injunctions against the Canvass Provision and the Voter Intimidation Guidance.................................................17

STANDARD OF REVIEW ...............................................................20

SUMMARY OF ARGUMENT ...........................................................20

ARGUMENT .......................................................................................22

I. This Court should vacate the preliminary injunction against the Canvass Provision............................................................22

A. Plaintiffs failed to show a concrete non-hypothetical injury. .........................................................................23

B. Plaintiffs failed to show injury that is fairly traceable to the Secretary's conduct........................................................29

C. Plaintiffs failed to show injury that is redressable by their requested injunction, because they did not challenge the underlying canvassing statutes. ...........................31

II. This Court should vacate the preliminary injunction against the Voter Intimidation Guidance. ...........................................38

A. Plaintiffs did not make the clear showing of standing required for a preliminary injunction. ...........................................39

1. Plaintiffs did not specify the conduct in which they intended to engage.......................................................40

2. Plaintiffs did not show that their intended conduct is proscribed by the Voter Intimidation Guidance.................................................................43

3.    Plaintiffs did not show a credible threat that the Voter Intimidation Guidance would be enforced against them. .......................................................................... 48

B.    Alternatively, the district court should have abstained from reviewing the Voter Intimidation Guidance in light of the parallel State Case. ......................................................... 54

C.    At a minimum, the district court should have denied the preliminary injunction because Plaintiffs failed to satisfy the traditional four-factor test. ........................................... 61

1.    Plaintiffs did not establish likelihood of success on the merits. .......................................................................... 61

2.    Plaintiffs did not establish likelihood of irreparable harm absent an injunction. .............................. 66

3.    Plaintiffs did not establish that the equities or the public interest favors an injunction. ................................... 67

CONCLUSION ................................................................................................... 69

ADDENDUM…………………………………………………………………………………71

CERTIFICATE OF COMPLIANCE ................................................................... 76

CERTIFICATE OF SERVICE ............................................................................. 77

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Almodovar v. Reiner*,
  832 F.2d 1138 (9th Cir. 1987) ...................................................59

*Ariz. All. for Retired Ams. v. Mayes*,
  117 F. 4th 1165 (9th Cir. 2024) .................................................23

*Ariz. Pub. Integrity All. v. Fontes*,
  475 P.3d 303 (Ariz. 2020) ................................................... 6, 46

*Arizona v. Yellen*,
  34 F.4th 841 (9th Cir. 2022) ......................................... 39, 43, 46, 47

*Astaire v. Best Film & Video Corp.*,
  116 F.3d 1297 (9th Cir. 1997) ...................................................33

*Babbitt v. United Farm Workers National Union*,
  442 U.S. 289 (1979) ......................................................... 58, 59

*Barnum Timber Co. v. U.S. E.P.A.*,
  633 F.3d 894 (9th Cir. 2011) ...................................................22

*Beavers v. Ark. State Bd. of Dental Exam'rs*,
  151 F.3d 838 (8th Cir. 1998) ...................................................59

*Burson v. Freeman*,
  504 U.S. 191 (1992) ...........................................................68

*Cedar Shake & Shingle Bureau v. City of Los Angeles*,
  997 F.2d 620 ..................................................................20

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ......................................................... 24, 29

*Courtney v. Goltz*,
  736 F.3d 1152 (9th Cir. 2013) ...................................................60

iv

*Crosby v. Fish*,
2024 WL 5250102 (Ariz. Ct. App. Dec. 31, 2024) ............................ 28, 29, 32

*Deitrick v. Greaney*,
309 U.S. 190 (1940) ...................................................................... 45, 63

*Drake v. Obama*,
664 F.3d 774 (9th Cir. 2011) ..................................................................24

*E. Bay Sanctuary Covenant v. Biden*,
993 F.3d 640 (9th Cir. 2021) ..................................................................64

*Elrod v. Burns*,
427 U.S. 347 (1976) ..................................................................................66

*Gearing v. City of Half Moon Bay*,
54 F.4th 1144 (9th Cir. 2022) ........................................................... 55, 60

*Hohe v. Casey*,
868 F.2d 69 (3d Cir. 1989) ......................................................................66

*Isaacson v. Mayes*,
84 F.4th 1089 (9th Cir. 2023) ........................................................... 52, 53

*Italian Colors Rest. v. Becerra*,
878 F.3d 1165 (9th Cir. 2018) ................................................................51

*Laird v. Tatum*,
408 U.S. 1 (1972) .....................................................................................49

*Lake v. Fontes*,
83 F.4th 1199 (9th Cir. 2023) ........................................................ 22, 25, 28

*Lopez v. Candaele*,
630 F.3d 775 (9th Cir. 2010) .......................................................... passim

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ..................................................... 22, 23, 24, 28

*M.S. v. Brown*,
902 F.3d 1076 (9th Cir. 2018) ................................................................31

v

*Maya v. Centex Corp.,*
    658 F.3d 1060 (9th Cir. 2011) ...............................................................47

*McKenna v. Soto,*
    481 P.3d 695 (Ariz. 2021) ............................................................. 6, 46

*Merrill v. Milligan,*
    142 S. Ct. 879 (2022) ...........................................................................69

*Moore v. Hosemann,*
    591 F.3d 741 (5th Cir. 2009) .......................................................... 56, 59

*Murthy v. Missouri,*
    603 U.S. 43 (2024) ......................................................................... 30, 54

*Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.,*
    810 F.3d 631 (9th Cir. 2015) ...............................................................20

*Peace Ranch, LLC v. Bonta,*
    93 F.4th 482 (9th Cir. 2024) ................................................................41

*Porter v. Jones,*
    319 F.3d 483 (9th Cir. 2003) ...............................................................57

*Presbytery of N.J. of the Orthodox Presbyterian Church v. Whitman,*
    99 F.3d 101 (3d Cir. 1996) ..................................................................59

*Purcell v. Gonzalez,*
    549 U.S. 1 (2006) .................................................................................69

*Railroad Commission of Texas v. Pullman Co.,*
    312 U.S. 496 (1941) .............................................................................54

*Republican Nat'l Comm. v. Democratic Nat'l Comm.,*
    589 U.S. 423 (2020) .............................................................................69

*Rushia v. Town of Ashburnham,*
    701 F.2d 7 (1st Cir. 1983) ....................................................................66

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) ....................................................................... 23, 24

*Susan B. Anthony List v. Driehaus,*
 573 U.S. 149 (2014) ............................................................. 39, 47

*Thomas v. Anchorage Equal Rts. Comm'n,*
 220 F.3d 1134 (9th Cir. 2000) ........................................... 40, 48

*Tovar v. Sessions,*
 882 F.3d 895 (9th Cir. 2018) .....................................................64

*United Pub. Workers of Am. v. Mitchell,*
 330 U.S. 75 (1947) ........................................................ 40, 43, 49

*Virginia v. Am. Booksellers Ass'n, Inc.,*
 484 U.S. 383 (1988) ..................................................................64

*Wash. State Grange v. Wash. State Republican Party,*
 552 U.S. 442 (2008) ..................................................................62

*Winter v. Natural Resources Def. Council, Inc.,*
 555 U.S. 7 (2008) ....................................................... 22, 61, 66, 68

*Wreal, LLC v. Amazon.com, Inc.,*
 840 F.3d 1244 (11th Cir. 2016) ................................................66

**Statutes**

3 U.S.C. § 5(a)(1) .............................................................................34

18 U.S.C. § 241..................................................................................44

18 U.S.C. § 594..................................................................................44

42 U.S.C. § 1985(3) ..........................................................................44

52 U.S.C. § 10101(b) ........................................................................44

52 U.S.C. § 20302(a)(8) ...................................................................34

52 U.S.C. § 20511..............................................................................44

A.R.S. § 16-168 ...................................................................................5

A.R.S. § 16-246 ...................................................................................5

A.R.S. § 16-407.03 ................................................................ 30, 33, 34

A.R.S. § 16-411 ...................................................................................5

A.R.S. § 16-452(A) ......................................................................... 5, 56

A.R.S. § 16-452(B) ......................................................................... 4, 56

A.R.S. § 16-452(C) ................................................................... 6, 46, 56

A.R.S. § 16-642 ...........................................................................passim

A.R.S. § 16-642(A) (2023) .................................................................7

A.R.S. § 16-643 .................................................................................32

A.R.S. § 16-646 .................................................................................37

A.R.S. § 16-648 ...........................................................................passim

A.R.S. § 16-648 (2023) .................................................................. 7, 26

A.R.S. § 16-661 .................................................................................35

A.R.S. § 16-672 .................................................................................35

A.R.S. § 16-676 .................................................................................35

A.R.S. § 16-1006 ...............................................................................44

A.R.S. § 16-1013 ...............................................................................44

Ariz. Const. art. V, § 9......................................................................36

Ariz. Const. art. V, § 10....................................................................37

**Other Authorities**

17A Charles Alan Wright & Arthur R. Miller, Federal Practice and
    Procedure § 4242 (3d ed., updated July 12, 2024)........................55

2022 Ariz. Sess. Laws. Ch. 230, § 1 (55th Leg., 2nd Reg. Sess.) .....................35

2024 Ariz. Sess. Laws. Ch. 1 (56th Leg., 2nd Reg. Sess.) (H.B. 2785) .. 7, 33, 36

## INTRODUCTION

Arizona's Secretary of State must issue biennially a manual containing rules and guidance for the administration of elections, known as the "Elections Procedures Manual" or "EPM." This appeal concerns two parts of the 2023 EPM.

The first part summarizes the Secretary's statutory duties to canvass statewide election results. This part describes what would happen in the possible situation (which hopefully will never occur) where a county fails to provide the Secretary election results from voters in the county, by the time the Secretary is required to canvass statewide election results. In that hypothetical situation, assuming the Secretary has exhausted all lawful means to attempt to include that county's votes, the Secretary would "proceed with the state canvass without including the votes of the missing county." This part is referred to here as the "Canvass Provision."

The second part summarizes, for the benefit of election workers, statutory prohibitions against voter intimidation. The purpose of this part is to help election workers identify potentially unlawful conduct so that they can address it, such as by reporting to law enforcement. This part is referred to here as the "Voter Intimidation Guidance."

1

The district court preliminarily enjoined enforcement of both parts. This Court should vacate both injunctions.

As for the Canvass Provision, Plaintiffs failed to show that this provision will injure them, that any injury is fairly traceable to this provision, or that such injury is redressable in this case.

As for the Voter Intimidation Guidance, Plaintiffs failed to show that the guidance will injure them. Alternatively, the district court should have abstained from review until after a parallel state court case is complete. In all events, the district court's injunction rests on a misinterpretation of the guidance and other errors.

## STATEMENT OF JURISDICTION

The district court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arise under the U.S. Constitution. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1) to review the district court's order granting preliminary injunctions, which was entered on September 27, 2024. 1-ER-002-51. Defendants timely filed their notice of interlocutory appeal on October 28, 2024. 5-ER-426-27.

## STATEMENT OF ISSUES

1.    To have standing for a preliminary injunction against the Canvass Provision, Plaintiffs needed to make a clear showing that this provision will injure them, that such injury is fairly traceable to the provision, and that their alleged injury is redressable in this action.  The Canvass Provision, however, pertains to a situation that has never occurred and hopefully will never occur, and the Secretary has committed to using all lawful means to ensure it never occurs.  Did Plaintiffs make a clear showing of standing?

2.    To have standing for a preliminary injunction against the Voter Intimidation Guidance, Plaintiffs needed to make a clear showing that the guidance will injure them.  Plaintiffs claimed that the guidance makes them fear they will be prosecuted because of their speech.  That fear, however, is based on a misinterpretation of the guidance that no enforcing official has adopted and that the Attorney General disavowed.  Did Plaintiffs make a clear showing of standing?

3.    One of the Plaintiffs challenged the Voter Intimidation Guidance in state court months before suing in federal court, and the state court issued its own preliminary injunction against the guidance while the present

3

lawsuit was in its infancy. The key question in the state case is whether Plaintiffs' interpretation of the guidance is correct. Should the district court have abstained from reviewing the guidance until the state case is complete?

4.    Federal courts should resolve textual ambiguity in ways that avoid constitutional problems. The district court, however, interpreted the Voter Intimidation Guidance in a way that creates constitutional problems, contrary to the text and contrary to how the drafter and enforcing official understand it. Did the district court abuse its discretion by issuing a preliminary injunction based on that misinterpretation?

## ADDENDUM

This case concerns two parts of the 2023 EPM. Both parts are included in full in the addendum filed concurrently with this brief. 9th Cir. R. 28-2.7.

## STATEMENT OF THE CASE

### I.    Legal Background

#### A.    The Secretary promulgates election-related rules and guidance in an official manual.

In "each odd-numbered year immediately preceding the general election," Arizona's Secretary of State must prescribe "an official instructions and procedures manual" with approval by the Governor and Attorney General. A.R.S. § 16-452(B). That manual is the EPM.

4

The EPM includes rules promulgated by the Secretary pursuant to A.R.S. § 16-452(A).  Those rules relate to "procedures for early voting and voting," as well as "producing, distributing, collecting, counting, tabulating and storing ballots."  *Id.*

The EPM also includes rules promulgated by the Secretary pursuant to other statutes.  Those rules relate to other topics, such as procedures for protecting and updating voter registration information and enabling voters to join an early voting list.  *See, e.g.*, A.R.S. §§ 16-168(I), 16-246(G), 16-411(B)(5)(b), 16-542(A), 16-542(I), 16-544(B).

### B.    The EPM is addressed to election officials, not the general public, and some parts have the force of law.

The EPM helps election officials carry out elections.  The goal is to maximize "correctness, impartiality, uniformity, and efficiency" in election procedures.    A.R.S. § 16-452(A).   For this reason, the Secretary must "consult[] with" each county officer in charge of elections when drafting the EPM.  *Id.*  In the introductory page of the 2023 EPM, the Secretary confirms that election officials are the intended audience, stating that the EPM is provided "to county, city, and town election officials throughout Arizona." 4-ER-365.

5

The Arizona Supreme Court has generally observed that "the EPM has the force of law." *Ariz. Pub. Integrity All. v. Fontes*, 475 P.3d 303, 308 ¶ 16 (Ariz. 2020). This general observation was based on A.R.S. § 16-452(C), which makes it a misdemeanor to violate certain rules in the EPM—namely, those rules promulgated pursuant to A.R.S. § 16-452(A). *See id.* (citing A.R.S. § 16-452(C)).

However, the Arizona Supreme Court has clarified that, to the extent the EPM deals with topics that "fall outside the mandates of A.R.S. § 16-452 and do not have any other basis in statute," the EPM "simply acts as guidance." *McKenna v. Soto*, 481 P.3d 695, 699-700 ¶¶ 20-21 (Ariz. 2021).

Here, the parts of the EPM at issue are guidance. As explained below, both the Canvass Provision and the Voter Intimidation Guidance are attempts to summarize existing statutory requirements, not expand statutory requirements or otherwise bind the Secretary or the public.

**C.    The Secretary timely published the 2023 EPM.**

The 2023 EPM was approved on December 30, 2023. 4-ER-366-67. Two parts are at issue here. The first is Chapter 13, section II(B)(2), or the Canvass

Provision. 4-ER-409. The second is Chapter 9, section III(D), or the Voter Intimidation Guidance. 4-ER-384-86.[1]

### 1. The Canvass Provision summarizes the Secretary's canvassing duties.

Chapter 13, section II(B) of the 2023 EPM summarizes the Secretary's canvassing duties under state law as they existed in 2023. 4-ER-409. The relevant statutes were amended in early 2024, *see* 2024 Ariz. Sess. Laws. Ch. 1 (56th Leg., 2nd Reg. Sess.) (hereafter "H.B. 2785"), but the 2023 EPM has not been updated to reflect those changes.

At issue is subsection (B)(2), titled "Scope of Duty to Canvass." 4-ER-409. Before February 2024, a statute required the Secretary to conduct the statewide election canvass on "the fourth Monday following a general election," but allowed him to "postpone" the statewide canvass "from day to day, not to exceed thirty days from" Election Day if he had not yet received official canvass results from a county. *See* A.R.S. § 16-648 (2023).[2]

_____

[1] The district court referred to Chapter 9, section III(D) as the "Speech Provision." This label is inaccurate.

[2] In addition, a statute required counties to canvass general election results within 20 days after the election. *See* A.R.S. § 16-642(A) (2023).

7

Accordingly, the first two sentences of subsection (B)(2) summarize this (now-amended) statute. 4-ER-409.

The next sentence—which is the only portion that Plaintiffs challenged—explains what would happen if, after postponing the statewide canvass as long as the statute allowed, the Secretary *still* had not received official canvass results from a county. 4-ER-409; *see also* 1-ER-218 (showing that Plaintiffs challenged only this sentence). In that hypothetical situation, statutes would require the Secretary to proceed with the statewide canvass. 4-ER-409. Here is the full paragraph:

> **2. Scope of Duty to Canvass**
>
> The Secretary of State may postpone the canvass on a day-to-day basis for up to three days if the results from any county are missing. A.R.S. § 16-648(C). All counties must transmit their canvasses to the Secretary of State, and the Secretary of State must conduct the statewide canvass, no later than 30 days after the election. A.R.S. § 16-648(C). If the official canvass of any county has not been received by this deadline, the Secretary of State must proceed with the state canvass without including the votes of the missing county (i.e., the Secretary of State is not permitted to use an unofficial vote count in lieu of the county's official canvass).

*Id.* The next paragraph makes clear that the Secretary is simply explaining his statutory duties, which he must follow absent "a court order":

> The Secretary of State has a non-discretionary duty to canvass the returns as provided by the counties and has no authority to change vote totals, reject the election results, or delay certifying the results without express statutory authority or a court order.

8

*Id.*[3]

Pursuant to H.B. 2785, statutes now require counties to canvass general election results by "the third Thursday after the election" (the "County Canvass Deadline"). A.R.S. § 16-642(A). In addition, statutes now require the Secretary to conduct the statewide election canvass on "the third Monday following a general election" (the "Statewide Canvass Deadline") and no longer permit him to postpone it. A.R.S. § 16-648. This shortens the time between when counties must provide election results to the Secretary and when the Secretary must conduct the statewide canvass.

### 2. The Voter Intimidation Guidance summarizes statutory prohibitions and helps election officials identify potentially unlawful conduct.

Chapter 9, section III of the 2023 EPM is titled "Preserving Order and Security at the Voting Location." 4-ER-383. Subsections A, B, and C summarize statutory prohibitions against certain conduct at voting

---

[3] Last month, a state court declared the entirety of Chapter 13, § II(B)(2) "invalid and unenforceable" and permanently enjoined its enforcement. *Petersen v. Fontes*, No. CV2024-001942, Under Advisement Ruling, at 13-14 (Ariz. Super. Ct. Maricopa Cnty., Dec. 19, 2024). That court has not yet entered a final, appealable judgment.

locations, such as electioneering and photography. 4-ER-383-384. Here is an

example:

> **B. Enforcing Photography Ban**
>
> No photography or video recording is permitted within the 75-foot limit at a voting location. A.R.S. § 16-515(G). There is no exception for members of the media.
>
> A voter, however, may display on the internet an image, that was not taken in a voting location, of their own ballot that was received by mail. A.R.S. § 16-1018(4).

4-ER-383.

Subsection D is titled "Preventing Voter Intimidation." 4-ER-384. Like

the preceding subsections, Subsection D begins by summarizing statutory

prohibitions against voter intimidation, then identifies the election official

responsible for relevant training and policies:

> **D. Preventing Voter Intimidation**
>
> Any activity by a person with the intent or effect of threatening, harassing, intimidating, or coercing voters (or conspiring with others to do so) inside or outside the 75-foot limit at a voting location is prohibited. A.R.S. § 16-1013. The officer in charge of elections has a responsibility to train poll workers and establish policies to prevent and promptly remedy any instances of voter intimidation.

*Id.* Subsection D then directs the relevant election official to publicize

guidelines "as applicable" to preserve order, such as using "sound judgment

to decide whether to contact law enforcement":

10

> The officer in charge of elections should publicize and/or implement the following guidelines as applicable:
>
> - The inspector must utilize the marshal to preserve order and remove disruptive persons from the voting location. The inspector and/or marshal must use sound judgment to decide whether to contact law enforcement, and any higher-level decisions should be raised through the officer in charge of elections.
>
>   . . .

4-ER-385.

Finally, Subsection D lists examples of conduct that *may* be considered intimidating:

> In addition to the potentially intimidating conduct outlined above, the following may also be considered intimidating conduct inside or outside the polling place:
> - Aggressive behavior, such as raising one's voice or taunting a voter or poll worker;
> - Using threatening, insulting, or offensive language to a voter or poll worker;
> - Blocking the entrance to a voting location;
> - Disrupting voting lines;
>
>   . . .
>
> *See* A.R.S. § 16-1013(A); A.R.S. § 16-1017.

4-ER-385-386.

Subsection D first appeared in the 2019 EPM and remained largely unchanged in the 2023 EPM. *Compare* 4-ER-423-24 (2019 EPM) *with* 4-ER-384-86 (2023 EPM).

## II.    Procedural Background

### A.    The Attorney General disavowed prosecutions under the Voter Intimidation Guidance, but Plaintiffs sued anyway.

In February 2024, a nonprofit corporation (Arizona Free Enterprise Club) sued in state court, challenging the Voter Intimidation Guidance.[4] This lawsuit is hereafter called the "State Case."

In April 2024, another nonprofit corporation (America First Policy Institute ("AFPI")), which is one of the Plaintiffs here, joined the State Case as a co-plaintiff in an amended complaint. 3-ER-332.

In May 2024, AFPI's counsel sent a letter to the Attorney General and the Secretary, asking them to "disavow" enforcement of the Voter Intimidation Guidance by clarifying that any prosecutions for voter intimidation would be brought "under A.R.S. §§ 16-1013 and -1017 or other applicable statutes, and not under A.R.S. § 16-452(C) for alleged violations of the" EPM. 2-ER-281.

_____

[4] *See Ariz. Free Enter. Club v. Fontes*, No. CV2024-002760 (Ariz. Super. Ct. Maricopa Cnty., filed Feb. 9, 2024). Around that time, other parties challenged other parts of the 2023 EPM. *See Petersen v. Fontes*, No. CV2024-001942 (Ariz. Super. Ct. Maricopa Cnty., filed Jan. 31, 2024); *Republican Nat'l Comm. v. Fontes*, No. CV2024-050553 (Ariz. Super. Ct. Maricopa Cnty., filed Feb. 9, 2024).

In response, the Attorney General pointed out that AFPI's counsel did not "identify any specific conduct in which your clients intend to engage," but nevertheless disavowed prosecutions under the Voter Intimidation Guidance as requested. 2-ER-278-79. The Attorney General confirmed that any prosecutions for voter intimidation would be brought "under A.R.S. §§ 16-1013 and -1017 or other applicable statutes, and not under A.R.S. § 16-452(C) for alleged violations of the" EPM. 2-ER-279.

The Secretary concurred, explaining that he "does not enforce criminal laws" but believed that AFPI's concerns "hav[e] been addressed" by the Attorney General's response. 2-ER-276.

Nevertheless, in July 2024, AFPI and two other plaintiffs—a nonprofit organization (American Encore) and an individual (Karen Glennon)—filed the present lawsuit. 2-ER-246. Count II of their complaint alleges that the Voter Intimidation Guidance "criminalizes" constitutionally protected speech and that "Plaintiffs face a real threat of prosecution" under the guidance—despite the Attorney General's disavowal of such prosecutions (and the Secretary's concurrence), and without specifying the conduct in which Plaintiffs intend to engage. 2-ER-273-74 ¶¶ 150-51.

13

**B. A state court issued a preliminary injunction against the Voter Intimidation Guidance, but Plaintiffs sought a duplicative injunction in federal court.**

The relief sought in the State Case regarding the Voter Intimidation Guidance is functionally equivalent to the relief sought in Count II here. The defendants in both cases are the Attorney General and the Secretary. *Compare* 3-ER-333 *with* 2-ER-246.[5] The key allegations are identical. For example:

| Amended Complaint in State Case (3-ER-358) | Complaint in Present Lawsuit (2-ER-273) |
|---|---|
| "The 2023 EPM criminalizes otherwise protected free speech inside or outside a 75-foot limit of a voting location . . . ." (¶ 150.) | "The 2023 EPM criminalizes otherwise protected free speech inside or outside a 75-foot limit of a voting location . . . ." (¶ 150.) |
| "Plaintiffs face a real threat of prosecution because the Attorney General signed off on this version of the 2023 EPM, meaning that there is a threat of prosecution for violations of the 2023 EPM." (¶ 151.) | "Plaintiffs face a real threat of prosecution because the Attorney General and Governor approved this version of the 2023 EPM, meaning that there is a threat of prosecutions for violations of the 2023 EPM." (¶ 151.) |
| "But under the current 2023 EPM, such conduct would be considered criminal. Therefore, Plaintiffs' members face an actual threat of | "But under the current 2023 EPM, such conduct would be considered criminal. Therefore, Plaintiffs' members face an actual threat of |

[5] The federal complaint initially named Arizona's Governor as a third defendant, but the parties quickly agreed to dismiss the Governor. Doc. 25.

14

| prosecution from the Attorney General . . . ." (¶ 155.) | prosecution from the Attorney General . . . ." (¶ 154.) |

In addition, the plaintiffs in the State Case include AFPI (which is a Plaintiff here), and plaintiffs' counsel in the State Case are nearly identical to Plaintiffs' counsel here. *Compare* 3-ER-332 *with* 2-ER-246.

At a status conference on July 19, 2024, defense counsel informed the district court that, in the State Case, the Voter Intimidation Guidance was already being litigated and an evidentiary hearing was already scheduled. 2-ER-185, -187.

On August 5, 2024, the trial court in the State Case issued a preliminary injunction against enforcement of the Voter Intimidation Guidance. 3-ER-309; *see also* 3-ER-290 (clarification of ruling). Defendants appealed to the Arizona Court of Appeals and sought a stay of the preliminary injunction pending appeal. *See* Doc. 52 (describing this development). On September 27, 2024, the Arizona Court of Appeals partially granted and partially denied the requested stay. 3-ER-286.

In the present lawsuit, the Attorney General and the Secretary kept the district court apprised of the State Case and asked the district court to abstain from reviewing Count II until the State Case was resolved. Docs. 27, 49, 52,

15

58, 61. Plaintiffs, however, asked the district court to issue a duplicative preliminary injunction against the Voter Intimidation Guidance. *See* Docs. 14, 32, 41, 47, 50.

### C. The Secretary committed to using "all lawful means" to include votes if a county fails to provide election results, but Plaintiffs sought to enjoin the Canvass Provision anyway.

The Canvass Provision was not at issue in the State Case. In the present lawsuit, Plaintiffs challenged the Canvass Provision in Count I of their complaint, alleging that it would have "the effect of disenfranchising every voter in any county that does not timely certify its election results with the Secretary." 2-ER-272 ¶ 143.

After suing, Plaintiffs' counsel sent a letter to the Secretary, asking him to "disavow" the Canvass Provision by "commit[ting] to some other mechanism for ascertaining the vote counts of a county whose results are not certified." 2-ER-214. In response, the Secretary explained that he has a "nondiscretionary statutory duty to canvass without delay" and cannot make specific promises "based on factual circumstances that are unknown and may never arise," but nevertheless assured Plaintiffs that he "is committed to enfranchising all Arizona voters" and "intends to use all lawful means to do so as the circumstances require, including seeking

16

judicial remedies if a county fails to timely carry out its duty to canvass." 2-ER-162-63.

After receiving this response, Plaintiffs sought a preliminary injunction against any potential enforcement of the Canvass Provision—despite the Secretary's assurance that he would use "all lawful means" to enfranchise voters if a county fails to canvass election results, and without identifying any county that was likely to fail to canvass election results. *See* Docs. 26, 34, 47, 51.

### D. The district court issued preliminary injunctions against the Canvass Provision and the Voter Intimidation Guidance.

On September 27, 2024, the district court entered an order declining to abstain from reviewing the Voter Intimidation Guidance (despite the pending State Case) and granting a preliminary injunction against both the Canvass Provision and the Voter Intimidation Guidance. 1-ER-002-51.[6]

At the outset, the district court categorized the Canvass Provision and the Voter Intimidation Guidance as "rules" (1-ER-002-04), without

---

[6] The Secretary and Attorney General had also moved to dismiss Plaintiffs' complaint. Docs. 31, 33. The district court dismissed the Attorney General as a defendant as to Count I and dismissed American Encore as a plaintiff as to Count I (1-ER-015, -30-31, -50), but otherwise denied those motions.

explaining the statutory basis for this categorization or specifying whom they bind. *See* Statement of the Case § I.B, above (explaining distinction between "rules" and "guidance").

The district court then addressed standing. As to the Canvass Provision, the court found that Glennon and AFPI had pleaded an "actual or imminent" injury because they "alleged a substantial risk of enforcement" of the provision, and that this alleged injury was sufficiently particularized because Glennon and AFPI had alleged that the provision "affects [them] personally by making their votes subject to disqualification." 1-ER-011. The court also found that such injuries were "traceable to" the Canvass Provision and "redressable." 1-ER-012. The court also found that AFPI, but not American Encore, had met the requirements for representational standing because AFPI's members "would have standing to challenge" the Canvass Provision "in their own right," the "interests at stake are germane to AFPI's purpose," and "AFPI's members need not participate in this action" because their claims "do not require individualized proof." 1-ER-014.

As to the Voter Intimidation Guidance, the district court found that all Plaintiffs had standing. Concluding that it must "accept as true Plaintiffs' construction" of the guidance "for standing purposes," the court found that

18

Plaintiffs had alleged that they "intend to engage in protected speech," that their conduct was "arguably [] proscribed" by the Voter Intimidation Guidance, and that they had "alleged a credible threat of enforcement." 1-ER-019-24.

The district court then declined to abstain from reviewing the Voter Intimidation Guidance despite the pendency of the State Case. The court concluded that if it abstained, "there is a risk that protected speech would be chilled, especially if the Arizona Court of Appeals stays the superior court's injunction in the state proceedings." 1-ER-028-29.[7]

The district court then issued preliminary injunctions against both the Canvass Provision and the Voter Intimidation Guidance, concluding that each of the preliminary injunction factors (likelihood of success on the merits, irreparable harm, balance of equities, and public interest) favored Plaintiffs. 1-ER-034-50.

Defendants timely appealed. 5-ER-427.

---

[7] The district court was apparently unaware that the Arizona Court of Appeals had partially granted and partially denied a stay of the trial court's preliminary injunction earlier that day. 3-ER-286.

19

## STANDARD OF REVIEW

This Court reviews "a district court's grant or denial of a preliminary injunction for an abuse of discretion." *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 635 (9th Cir. 2015). "A decision based on an erroneous legal standard or a clearly erroneous finding of fact amounts to an abuse of discretion." *Id.* (citation omitted).

This Court reviews "*de novo* the district court's determination that [a plaintiff] has standing." *Lopez v. Candaele*, 630 F.3d 775, 784–85 (9th Cir. 2010).

This Court reviews "the district court's decision not to abstain" under *Pullman* "for an abuse of discretion," but this standard "does not preclude" this Court from "invoking abstention in cases in which there exist compelling reasons to allow state courts to resolve issues of state law." *Cedar Shake & Shingle Bureau v. City of Los Angeles*, 997 F.2d 620, 622 (9th Cir. 1993) (citation omitted). Whether the three requirements for *Pullman* abstention are met "is reviewed de novo." *Id.*

## SUMMARY OF ARGUMENT

This Court should vacate the preliminary injunction against the Canvass Provision because Plaintiffs failed to make a clear showing that the

provision will injure them. The Canvass Provision pertains to a situation that has never occurred and hopefully will never occur, and the Secretary has committed to using all lawful means to ensure it never occurs.

Similarly, this Court should vacate the preliminary injunction against the Voter Intimidation Guidance because Plaintiffs failed to show that the guidance will injure them. Plaintiffs claimed that the guidance makes them fear they will be prosecuted based on their speech, but that fear is based on a misinterpretation of the guidance that no enforcing official has adopted and that the Attorney General disavowed.

Alternatively, this Court should vacate the preliminary injunction against the Voter Intimidation Guidance and instruct the district court to stay proceedings as to that guidance until the State Case is resolved, in an exercise of *Pullman* abstention. The State Case is farther along than this case and will resolve whether Plaintiffs' interpretation of the guidance is correct.

At a minimum, this Court should vacate the preliminary injunction against the Voter Intimidation Guidance because Plaintiffs failed to show likelihood of success on the merits or other eligibility for injunctive relief. The district court's injunction is based on a misinterpretation of the guidance that unnecessarily invites constitutional problems rather than avoids them.

21

## ARGUMENT

### I.   This Court should vacate the preliminary injunction against the Canvass Provision.

Standing "is a core component of the Article III case or controversy requirement." *Barnum Timber Co. v. U.S. E.P.A.*, 633 F.3d 894, 897 (9th Cir. 2011). The party invoking federal jurisdiction bears the burden of establishing each element of standing. *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010). In particular, a plaintiff must show that it has (1) suffered an injury in fact, (2) that is fairly traceable to the defendant's conduct, and (3) that is likely to be redressed by a decision in its favor. *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)); *see also Lake v. Fontes*, 83 F.4th 1199, 1202-03 (9th Cir. 2023).

The "manner and degree of evidence required" for standing changes with each successive stage of litigation. *Lopez*, 630 F.3d at 785 (quoting *Lujan*, 504 U.S. at 561). Here, because Plaintiffs were seeking a preliminary injunction, they needed to make a "clear showing" of each element of standing. *Id.* (quoting *Winter v. Natural Resources Def. Council, Inc.*, 555 U.S.

22

7 (2008)); *see also Ariz. All. for Retired Ams. v. Mayes*, 117 F. 4th 1165, 1171-72 (9th Cir. 2024) ("*AARA*") (reiterating the "clear showing" standard).[8]

The district court concluded that Plaintiffs' allegations regarding the Canvass Provision were sufficient to meet all three elements of standing, but that conclusion was based on speculation about hypothetical situations, a misinterpretation of the Canvass Provision, and a misunderstanding of Arizona statutes governing canvassing duties (which Plaintiffs did not challenge). When the Canvass Provision is properly interpreted, Plaintiffs failed to make a clear showing on any of the three elements of standing, so the injunction against the Canvass Provision must be vacated. *See Lopez*, 630 F.3d at 785.

## A. Plaintiffs failed to show a concrete non-hypothetical injury.

To establish injury in fact, "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560).

---

[8] A petition for rehearing en banc is currently pending in the *AARA* case.

A "concrete" and "particularized" injury must be "real," not "abstract." *Id.* at 340. And it "must affect the plaintiff in a personal and individual way." *Id.* at 339 (quoting *Lujan*, 504 U.S. at 560 n.1).

To be "actual or imminent," an injury must have already occurred or be "certainly impending"—"allegations of possible future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (cleaned up).

In the district court, Plaintiffs offered two theories of injury—(1) that the mere existence of the Canvass Provision "downgraded" their right to vote to a conditional right, and (2) that "enforcement" of the Canvass Provision would wholly disenfranchise the voters of a county that failed to comply with its statutory duty to canvass. Doc. 26 at 4-9.

The district court properly rejected the first theory. 1-ER-006-08. But its acceptance of the second theory was legal error. The claimed specter of mass disenfranchisement both depends on a misinterpretation of the Canvass Provision and is purely hypothetical. Thus, it was "far too speculative and conjectural" to establish standing for a federal injunction against government officials. *Drake v. Obama*, 664 F.3d 774, 781 (9th Cir. 2011). Far from showing imminent harm to their right to vote, Plaintiffs

24

offered a flawed interpretation of the Canvass Provision and a "long chain of hypothetical contingencies that have never occurred in Arizona." *Lake*, 83 F.4th at 1204 (cleaned up).

Plaintiffs argued that the Canvass Provision would have "the effect of disenfranchising every voter in any county that does not timely certify its election results," because the "Secretary's duty to disenfranchise these voters is mandatory under the [Canvass] Provision." 2-ER-272 ¶¶ 143-144. The district court, without analysis, interpreted the Canvass Provision the same way, concluding that it "textually mandates the Secretary to exclude votes from a county that does not timely canvass." 1-ER-009.

That interpretation is wrong for two reasons. First, the district court overlooked H.B. 2785, which removed the specific "deadline" referred to in the Canvass Provision and amended other canvassing deadlines. *See* Statement of the Case § I.C.1, above (explaining H.B. 2785). The court interpreted the Canvass Provision as "mandating" that the Secretary exclude a county's votes from the statewide canvass "where a county Board of Supervisors refuses or fails to certify election results by the *applicable deadline*," 1-ER-010 (emphasis added), but the court apparently was referring to the County Canvass Deadline (*see* A.R.S. § 16-642), not the Statewide

25

Canvass Deadline.  This view misunderstands the Canvass Provision, which pertains only to situations where the Secretary would otherwise miss the *Statewide* Canvass Deadline.

Second, the Canvass Provision does not "mandate" anything.  It does not impose duties on the Secretary or purport to grant him authority. Rather, the provision explains the Secretary's *statutory* (and non-discretionary) duty to canvass by the Statewide Canvass Deadline, which prior to February 2024 was "thirty days from the date of the election," A.R.S. § 16-648(C) (2023), and is now "the third Monday after the election," A.R.S. §§ 16-642(A)(2)(b); -648(A).

Specifically, the Canvass Provision explains to counties the Secretary's view of his own statutory obligations on the day of the Statewide Canvass Deadline if (and only if) the following events were to occur:

(1) a county fails to meet the County Canvass Deadline, *and*

(2) that county also fails to complete its canvass before the Statewide Canvass Deadline, *and*

(3) the Secretary is also unable to obtain a court order on or before the Statewide Canvass Deadline to remedy the situation, such as by

26

delaying the statewide canvass or authorizing the Secretary to canvass the county's election results himself.

Under that specific (and extraordinarily unlikely) set of circumstances, the Secretary believes that statutes would require him to proceed with the statewide canvass.

The district court's interpretive errors infected its analysis of whether Plaintiffs had shown an imminent injury. Specifically, the court cited the Cochise County Board of Supervisors' initial refusal to certify election results following the 2022 general election, to support its conclusion that Plaintiffs' asserted future injury did not depend on "hypothetical contingencies." 1-ER-010. The court concluded that had "the Canvass Provision been implemented a few years earlier," the Secretary would have had "a right to exclude all Cochise County's votes" from the statewide canvass in 2022. *Id.*

The district court's discussion of the Cochise County 2022 canvass demonstrates its misunderstanding of the current relevant deadlines. In 2022, Cochise County missed the *County* Canvass Deadline, but completed its canvass before the *Statewide* Canvass Deadline. In response to the Cochise County Board's initial intransigence, the Secretary promptly "brought a special action in the superior court," and the court "ordered the Board to

27

convene later that day to canvass the election and present it to the Secretary of State as required"—which the Board then did. *Crosby v. Fish*, No. 1 CA-SA 24-0206, 2024 WL 5250102, at *2 ¶ 7 (Ariz. Ct. App. Dec. 31, 2024). Thus, the Secretary was able to timely complete the statewide canvass, including Cochise County votes, in 2022. *See id.* So even if the Canvass Provision had been in the EPM in 2022, and even assuming it has any independent legal effect, it would not have been applicable in 2022 because the Secretary successfully ensured that Cochise County *provided* election results before the Statewide Canvass Deadline.

The district court's effort to distinguish this case from *Lake* therefore falls flat. In *Lake*, the plaintiffs lacked standing because their asserted injury—"hacking by non-governmental actors who intend to influence election results"—relied on a "long chain of hypothetical contingencies that have never occurred in Arizona." 83 F.4th at 1202-04 (cleaned up). Such injuries are "the kind of speculation that stretches the concept of imminence 'beyond its purpose.'" *Id.* at 1204 (quoting *Lujan*, 504 U.S. at 564 n.2). The same is true here. There is no allegation or evidence that an Arizona county will miss the County Canvass Deadline *and* that the county will fail to complete its canvass before the Statewide Canvass Deadline *and* that the

28

Secretary will be unable to obtain a court order to remedy the situation. Indeed, as the Secretary explained to the district court, the Secretary and others "have the ability to initiate a mandamus action to ensure a county canvass is timely completed," and the Cochise County situation "shows that the Secretary and others will take immediate, extraordinary steps to prevent a county's votes from not being included in the state canvass." Doc. 34 at 6, 8.[9]

Accordingly, Plaintiffs did not show that disenfranchisement of a county's voters is "certainly impending" (or even probably impending). *Clapper*, 568 U.S. at 409. Rather, Plaintiffs merely alleged "possible future injury," which is not sufficient to show the injury in fact that standing requires. *Id.*

## B. Plaintiffs failed to show injury that is fairly traceable to the Secretary's conduct.

Even if Plaintiffs' feared injury of countywide disenfranchisement were sufficiently concrete and imminent to satisfy the first element of standing, they did not show that such disenfranchisement would be fairly

---

[9] The Arizona Court of Appeals recently confirmed that a county's "duty to canvass the election" is "not discretionary." *Crosby*, 2024 WL 5250102, at *3 ¶ 16.

29

traceable to the *Secretary's* inclusion of the Canvass Provision in the EPM, as opposed to a *county's* failure to comply with statutory canvassing duties.

It is "a bedrock principle that a federal court cannot redress 'injury that results from the independent action of some third party not before the court.'" *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (citation omitted). Here, the Canvass Provision simply explains that the Secretary must conduct his statewide canvass by the statutory deadline and that, without a court order, the statute does not authorize him to use something other than each county's official canvass to compile the statewide canvass. 4-ER-409. But as explained, the Secretary would not even face the possibility of canvassing without a county's official canvass unless, at the outset, a county failed to carry out its own statutory duty to canvass. Indeed, that failure by a county could be criminal. *See* A.R.S. § 16-407.03. In that situation, the county would be the cause of any harm to that county's voters, not the Secretary.

Thus, the district court erred not only when it concluded that Plaintiffs had shown a concrete and non-hypothetical injury in fact, but also when it concluded that Plaintiffs had satisfied the traceability prong of the standing analysis. *See* 1-ER-012.

C.    **Plaintiffs failed to show injury that is redressable by their requested injunction, because they did not challenge the underlying canvassing statutes.**

The district court's order enjoining the Canvass Provision did not and could not redress Plaintiffs' alleged harms, because Plaintiffs did not challenge Arizona's canvassing statutes. It is those mandatory statutory provisions that, in the hypothetical situation described above, could lead to the omission of a county's votes from the statewide canvass. The Canvass Provision itself does not compel the Secretary to exclude votes from the statewide canvass; it simply explains the consequences of counties' failure to meet their statutory duties if the Secretary is unable to obtain a court order to address the situation. Accordingly, "a favorable judicial decision would not require the [Secretary] to redress [Plaintiffs'] claimed injury" and Plaintiffs therefore failed to establish the third prong of Article III standing. *M.S. v. Brown*, 902 F.3d 1076, 1083 (9th Cir. 2018).

Plaintiffs did not challenge any of the statutes that govern canvassing Arizona elections. Certification of statewide elections is a multi-step process. First, the county boards of supervisors, which are responsible for most aspects of carrying out an election (including printing ballots, running polling places, and tabulating election results), approve the election canvass

31

at a public meeting. A.R.S. § 16-643. This is a non-discretionary, ministerial duty. *See Crosby*, 2024 WL 5250102, at *3 ¶ 16 (holding that duty to canvass election is "not discretionary"). After approving the county canvass, the boards transmit their respective canvasses to the Secretary. A.R.S. §§ 16-645(B) (primary elections), -646(B)-(C) (general elections). The Secretary then compiles the results for federal, statewide, and legislative candidates and statewide ballot measures into the state canvass. A.R.S. § 16-648. Then, in the presence of the Governor, Attorney General, and Chief Justice, the Secretary approves the canvass. *Id.* This is likewise a non-discretionary, ministerial duty.

The Canvass Provision explains a consequence of the statutes that govern both counties' and the Secretary's duty to timely canvass, yet Plaintiffs did not challenge those statutes. Specifically, A.R.S. § 16-642(A) sets firm deadlines for county boards of supervisors and the Secretary to carry out their canvassing duties for primary and general elections. The statute uses the mandatory "shall" and provides that each must canvass "not later than" a date certain. *Id.* Indeed, even if the returns from a polling place are missing, a county board of supervisors has no discretion to postpone its canvass. *See* A.R.S. § 16-642(C) (providing that cities and towns, but not

32

county boards of supervisors, may postpone their canvasses).  Notably, a previous version of the law permitted the Secretary to postpone the statewide canvass for up to 30 days after the election "until canvasses from all counties are received," but that section was repealed in February 2024. *See* H.B. 2785, § 16 (removing A.R.S. § 16-648(C)); *see also Astaire v. Best Film & Video Corp.*, 116 F.3d 1297, 1303 (9th Cir. 1997), *amended*, 136 F.3d 1208 (1998) (stating that Legislature's removal of language from statute "is a telling clue as to the Legislature's intent").  And in any event, that version of the statute gave the Secretary no discretion to postpone the statewide canvass past the 30-day mark, and consistent with that provision, the Canvass Provision explains that the Secretary would proceed with the statewide canvass after that 30-day period has elapsed.

If the clear deadlines dictated by A.R.S. § 16-642(A) were not enough, A.R.S. § 16-407.03 reinforces them with a potential criminal penalty.  It provides that "no officer or agent of this state, a political subdivision of this state or any other governmental entity in this state may modify or agree to modify any deadline, filing date, submittal date or other election-related date that is provided for in statute."  A.R.S. § 16-407.03.  The only exception

33

is if a modified deadline is "prescribed by a court of competent jurisdiction."

*Id.* A person who violates this section is guilty of a class 6 felony. *Id.*

The statutory deadlines are not arbitrary. As noted above, the Arizona Legislature amended them in 2024, to ensure that Arizona election results would be final in time to comply with certain federal deadlines. In particular, the Uniformed and Overseas Citizens' Voting Act ("UOCAVA") requires that ballots be sent to qualifying voters no fewer than 45 days before an election. 52 U.S.C. § 20302(a)(8). For the November general election, that 45-day deadline for sending ballots falls in mid-September, which means the results of the primary election must be settled well before then. In addition, in 2024, the Electoral Count Act, as modified by the Electoral Count Reform Act, requires that each state's governor issue certificates of ascertainment of appointment of Presidential electors by December 11, 2024—36 days after the November 5, 2024 general election. *See* 3 U.S.C. § 5(a)(1). This meant that the results of the general election needed to be settled before then.

Impacting the state's ability to meet these federal deadlines are two post-election actions governed by state law: automatic recounts and election contests. In 2022, the Arizona Legislature amended A.R.S. § 16-661 to make automatic recounts more likely, by increasing the margin of vote difference

34

between the top candidates that is sufficient to trigger a recount. *See* 2022 Ariz. Sess. Laws ch. 230, § 1 (55th Leg. 2d Reg. Sess.). In the three regular federal elections since that amendment, there have been recounts in each one, including recounts of two statewide offices in 2022.[10] In addition, Arizona law permits any elector to file an action contesting an election on certain statutory bases. *See* A.R.S. § 16-672(A). Election contests are decided by courts on an expedited basis, but such contests may still take up to 20 days. *See* A.R.S. § 16-676(A)-(B). These post-election actions—recounts and contests—cannot be commenced until the election is canvassed by counties (for recounts) and the Secretary (for contests). *See* A.R.S. §§ 16-661(A) (requiring recount based on margin of vote difference shown in "canvass"); -672(A) (providing for contest of "the election of any person *declared elected* to a state office") (emphasis added).

---

[10] *See In the Matter of the November 8, 2022 General Election*, No. CV2022-015915 (Ariz. Super. Ct. Maricopa Cnty.) (recount of races for Attorney General, Superintendent of Public Instruction, and Arizona House District 13); *In the Matter of the July 30, 2024 Primary Election*, CV2024-021570 (Ariz. Super. Ct. Maricopa Cnty.) (Congressional District 3); *In the Matter of the November 5, 2024 General Election*, CV2024-033532 (Ariz. Super. Ct. Maricopa Cnty.) (Arizona House District 2).

35

In view of the likelihood of post-election recounts and contests, in early 2024 the Legislature enacted H.B. 2785 as noted above. With respect to election deadlines, H.B. 2785 made three important changes. It moved the 2024 Primary Election from August 6 to July 30, it changed the deadlines for both county boards of supervisors and the Secretary to canvass elections, and it removed statutory provisions permitting delay of a county canvass or the statewide canvass. *See* H.B. 2785, §§ 13-16 (amending A.R.S. §§ 16-642, -645, -646, - 648); § 20 (changing the primary date).

The district court acknowledged these statutory deadlines but asserted that they merely govern "*when* the Secretary must canvass, but not *how*." 1-ER-012. As such, the court declared that the Secretary has discretion to implement alternative non-statutory means of conducting the statewide canvass, even without a court order, in the hypothetical situation where a county maintains a refusal to canvass results; according to the court, such alternatives include "allowing the Secretary to certify the county canvass in lieu of" the county's own board. *See* 1-ER-039. But this view ignores both the general principle that state executive officers must act only as permitted by law and the specific canvassing statutes. *See* Ariz. Const. art. V, § 9 (providing that the "powers and duties of [Secretary] shall be as prescribed

36

by law"); Ariz. Const. art. V, § 10 ("The returns of the election for all state officers shall be canvassed, and certificates of election issued by the secretary of state, in such manner as may be provided by law."). In particular, by statute, the Secretary uses a copy of counties' "*official canvass* from the board of supervisors . . . to conduct and issue the statewide canvass." A.R.S. § 16-646(C) (emphasis added). In addition, the Secretary "shall canvass all proposed constitutional amendments and initiated or referred measures, as shown by the electronic or certified copies of the *official canvass* received from the several counties, and forthwith certify the result to the governor." A.R.S. § 16-648(B) (emphasis added). In short, statutes do not give the Secretary discretion to include a county's votes in a statewide canvass without the county's official results absent a court order.

Taken together, the foregoing statutes, *which Plaintiffs have not challenged*, lead to the same result contemplated by the Canvass Provision—absent a court order, the Secretary must conduct the statewide canvass by the Statewide Canvass Deadline, regardless of whether all counties have timely carried out their statutory duties to canvass. Of course, the Secretary will use "all lawful means" to enfranchise voters "as the circumstances require." 2-ER-163. And the Canvass Provision does not require otherwise.

37

Contrary to the district court's characterization, the Canvass Provision does not "*expressly* direct[] the Secretary to inflict" disenfranchisement. 1-ER-012. Instead, it explains to county election officials why it is important to timely comply with their statutory duties, to help guarantee that the (remote) risk of disenfranchisement is avoided.

Accordingly, enjoining the Canvass Provision does not redress Plaintiffs' claimed injury. This is an independent reason why Plaintiffs did not make the requisite clear showing of standing.

## II. This Court should vacate the preliminary injunction against the Voter Intimidation Guidance.

Plaintiffs did not make a clear showing of standing as required for a preliminary injunction against the Voter Intimidation Guidance. *See* Argument § II.A, below. Even had they done so, the district court should have abstained from reviewing until after the parallel State Case is resolved. *See* Argument § II.B, below. And even if abstention is unwarranted, the district court was wrong to issue a preliminary injunction based on a misinterpretation of the guidance that unnecessarily invites constitutional problems rather than avoids them. *See* Argument § II.C, below.

38

### A. Plaintiffs did not make the clear showing of standing required for a preliminary injunction.

As explained above, Plaintiffs had the burden of establishing standing as the parties invoking federal jurisdiction. *See* Argument § I, above. To obtain a preliminary injunction against the Voter Intimidation Guidance, they needed to make a "clear showing" of injury in fact, causation, and redressability. *See id.*

The district court concluded that Plaintiffs made this showing based on their assertions of "a credible threat of enforcement" of the Voter Intimidation Guidance against them based on their speech, even though such enforcement had never occurred. 1-ER-018-24. This conclusion was mistaken.

"Three factors must exist for a plaintiff to have standing to bring a pre-enforcement challenge to a law." *Arizona v. Yellen*, 34 F.4th 841, 849 (9th Cir. 2022). The plaintiff must (1) intend "to engage in a course of conduct arguably affected with a constitutional interest," (2) the intended conduct must be "proscribed by" the law, and (3) "there must be 'a credible threat of prosecution'" under the law. *Id.* (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)).

Plaintiffs failed to make a clear showing on any of these elements, much less all three. They did not specify the "course of conduct" in which they intended to engage. Nor did they show that their intended conduct is "proscribed" by the Voter Intimidation Guidance. Nor did they show a "credible threat" that the guidance would be enforced against them. Each failure independently requires vacating the preliminary injunction.

### 1. Plaintiffs did not specify the conduct in which they intended to engage.

A plaintiff who claims a threat of enforcement based on future conduct must specify what they intend to do. "Because 'the Constitution requires something more than a hypothetical intent to violate the law,' plaintiffs must 'articulate[ ] a concrete plan to violate the law in question' by giving details about their future speech such as 'when, to whom, where, or under what circumstances.'" *Lopez v. Candaele*, 630 F.3d 775, 787 (9th Cir. 2010) (quoting *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc)). The details "must be specific enough so that a court need not 'speculate as to the kinds of political activity the [plaintiffs] desire to engage in or as to the contents of their proposed public statements.'" *Id.* (quoting *United Pub. Workers of Am. v. Mitchell,* 330 U.S. 75, 90 (1947)).

40

Here, Plaintiffs merely offered vague statements of general concern about their speech. *See, e.g.*, 2-ER-224 ¶ 14 (expressing "concern" about various hypothetical situations such as wearing an "All Lives Matter" hat); 2-ER-240 ¶ 8 (expressing "fear" of prosecution and stating vaguely that "[t]here are things I have not, and will not, say, that I otherwise would be comfortable saying"); 2-ER-244 ¶ 6 (expressing general plan to "engage in voter contact in Arizona for the upcoming 2024 election cycle and beyond").

To make matters worse, the district court disregarded the specificity requirement. Despite acknowledging Defendants' argument that "Plaintiffs fail to allege *with specificity* any intent" to engage in lawful speech, the district court brushed aside the argument by declaring: "But this is *not required*." 1-ER-019.

The district court erred in disregarding the specificity requirement. The court reasoned that Plaintiffs need not show a "plan to break the law" but need only show that they "would have" intended to do something that breaks the law, were it not for the law. 1-ER-019 (quoting *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 488 (9th Cir. 2024)). But this distinction misses the point of the specificity requirement. Regardless of whether Plaintiffs phrase their intent in a factual way (e.g. "I plan to do Act X.") or a counterfactual

41

way (e.g. "I would do Act X but for the Voter Intimidation Guidance."), the point is that Plaintiffs must be specific about what "Act X" is. That way, courts can evaluate the claimed threat of enforcement in a specific context, rather than speculate about what Plaintiffs might do.

Specific facts are especially important when considering potential voter intimidation. For example, there is a difference between declaring one's feelings for a candidate (e.g. "I love Trump!") and pressuring people at a voting location to vote for a candidate (e.g. "You better vote for Trump or else!"). But, because Plaintiffs never specified what they intended to do, the district court lacked context in which to evaluate the claimed threat of enforcement.

Instead, after disregarding the specificity requirement, the district court deemed Plaintiffs' *vague* statements of intent sufficient. *See* 1-ER-019-20 (crediting Plaintiffs' statements that they do "voter engagement and election integrity activities," "discuss[] politics, voting, and many government-related topics," and engage in "voter contact").

These vague statements of intent are not enough. *See, e.g.*, *Lopez*, 630 F.3d at 790-91 (vacating preliminary injunction where plaintiff "has given us few details about his intended future speech" and "fails to allege, let alone

offer concrete details . . . , regarding his intent to engage in conduct expressly forbidden"). Plaintiffs cannot claim a threat of enforcement based on their future speech without specifying, at minimum, "the contents of their proposed public statements." *Id.* at 787 (quoting *Mitchell,* 330 U.S. at 90).

For this reason, Plaintiffs failed to make a clear showing of standing for a preliminary injunction.

### 2. Plaintiffs did not show that their intended conduct is proscribed by the Voter Intimidation Guidance.

Even if Plaintiffs had specified what they planned to say, they did not show that such conduct is "proscribed by" the Voter Intimidation Guidance. *Yellen*, 34 F.4th at 849.

In evaluating this factor, courts "must determine whether [the] intended future conduct is proscribed" by the law being challenged. *Id.* Courts consider, among other things, "whether the challenged law is inapplicable to the plaintiffs, either by its terms or as interpreted by the government." *Lopez*, 630 F.3d at 786.

Here, Plaintiffs argue that the Voter Intimidation Guidance criminally prohibits a wide variety of speech. *E.g.*, 2-ER-247-48 ¶¶ 3-4. But in reality, the guidance does not proscribe *any* speech.

Plaintiffs focus on the first sentence of the Voter Intimidation Guidance, but that sentence merely paraphrases (for lay election officials) statutory prohibitions against voter intimidation. The sentence reads:

> Any activity by a person with the intent or effect of threatening, harassing, intimidating, or coercing voters (or conspiring with others to do so) inside or outside the 75-foot limit at a voting location is prohibited. A.R.S. § 16-1013.

4-ER-384.

Plaintiffs misconstrue this sentence, arguing that it is a "criminal prohibition" that broadens criminal liability for members of the public. *E.g.*, 2-ER-247-48 ¶¶ 3-4. But that is not what the sentence does. The sentence merely attempts to summarize criminal prohibitions created by the Legislature—as shown by the statutory citation at the end of the sentence. To the extent the sentence is broader than language in criminal statutes, that might mean the summary is imprecise, but it does not mean an expansion of criminal liability.[11]

---

[11] Notably, Plaintiffs do not challenge the constitutionality of any *statute* regarding voter intimidation. This includes Arizona statutes. *See, e.g.*, A.R.S. §§ 16-1006, -1013, -1017(3). It also includes federal statutes. *See, e.g.*, 18 U.S.C. §§ 241, 594; 42 U.S.C. § 1985(3); 52 U.S.C. §§ 10101(b), 20511.

By analogy, consider the Supreme Court's description of a provision in the National Bank Act in *Deitrick v. Greaney*, 309 U.S. 190 (1940):

> Impairment of capital of an association through its withdrawal by payment of dividends or otherwise is prohibited, R.S. s 5204, 12 U.S.C. s 56, 12 U.S.C.A. s 56.

*Id.* at 194. Although the Court used the word "prohibited," the Court was merely attempting to summarize a prohibition created by Congress, not creating or expanding a prohibition. The same is true here.

Plaintiffs also suggest that the list of behaviors at the end of the Voter Intimidation Guidance is overly broad, but that list merely provides examples of behaviors that, depending on the situation, "*may* also be considered intimidating conduct." 4-ER-385 (emphasis added). Like the first sentence of the Voter Intimidation Guidance, the list ends with statutory citations. 4-ER-386. The list does not purport to be a prohibition itself.

It is worth emphasizing the absurdity of Plaintiffs' construction of the Voter Intimidation Guidance. Plaintiffs claim, for example, that the guidance makes it a crime for members of the public to do things like "raising one's voice" and using "insulting or offensive language" anywhere in Arizona. *E.g.*, 1-ER-269-70 ¶ 131. The Secretary plainly did not create this outrageously broad crime, merely by summarizing criminal statutes in a

45

manual intended for election officials, much less in a chapter concerning conduct at voting locations. Indeed, he lacks the authority to create such a crime, as A.R.S. § 16-452(C) only makes it a misdemeanor to violate *certain rules* in the EPM—namely, rules promulgated pursuant to A.R.S. § 16-452(A), which lists specific election topics. A.R.S. § 16-452(C).[12]

The district court should have critically examined Plaintiffs' construction of the Voter Intimidation Guidance when deciding whether Plaintiffs' intended conduct "is proscribed" by the guidance. *Yellen*, 34 F.4th at 849. Instead, however, the court ruled that it was required to "accept[] as true" Plaintiffs' construction when evaluating standing. 1-ER-020. This is because, according to the court, standing "in no way depends on the merits," and the meaning of the Voter Intimidation Guidance is a "merits" question. 1-ER-019 (quoting *Yellen*, 34 F.4th at 849, 853).

---

[12] Although the Arizona Supreme Court has generally observed that the EPM "has the force of law," the Arizona Supreme Court has clarified that the EPM "simply acts as guidance" when it deals with topics that fall outside the mandates of A.R.S. § 16-452 and other statutes. *Compare Ariz. Pub. Integrity All. v. Fontes*, 475 P.3d 303, 308 ¶ 16 (Ariz. 2020), *with McKenna v. Soto*, 481 P.3d 695, 695-700 ¶¶ 20-21 (Ariz. 2021). Here, the EPM language that Plaintiffs challenge is simply guidance.

This rationale was wrong for two reasons. First, Plaintiffs were seeking a preliminary injunction, so they needed to make a "clear showing" of standing. *Lopez*, 630 F.3d at 785 (quoting *Winter*, 555 U.S. at 7). This procedural posture differs sharply from *Yellen*, where this Court was evaluating whether a plaintiff had standing to survive a *motion to dismiss* and therefore took "as true all material allegations in the complaint and construe[d] the complaint in favor of the plaintiff." 34 F.4th at 849. When, as here, courts evaluate whether a plaintiff has standing to obtain a *preliminary injunction* against a policy, courts should consider what the policy means, including whether it is "inapplicable to the plaintiffs, either by its terms or as interpreted by the government." *Lopez*, 630 F.3d at 786.

Second, even when evaluating standing at the motion-to-dismiss stage, courts still conduct legal interpretation. It is well-established that, when evaluating a motion to dismiss, courts must credit a plaintiff's "factual assertions" but not "legal conclusions." *Maya v. Centex Corp.*, 658 F.3d 1060, 1067-68 (9th Cir. 2011). Indeed, when the Supreme Court considers whether plaintiffs have standing to challenge a law at the motion-to-dismiss stage, the Court asks whether the plaintiffs' intended conduct is "arguably proscribed" by the law or policy at issue. *Susan B. Anthony List v. Driehaus*,

47

573 U.S. 149, 162 (2014). This inquiry necessarily involves legal interpretation. If it is clear that a law or policy does *not* proscribe a plaintiff's intended conduct, then such conduct is not even "arguably proscribed.". Such is the case here.

Plaintiffs' failure to show that the Voter Intimidation Guidance proscribes (or even arguably proscribes) their intended conduct is an independent reason why the preliminary injunction must be vacated.

### 3. Plaintiffs did not show a credible threat that the Voter Intimidation Guidance would be enforced against them.

Even if Plaintiffs had specified their intended conduct *and* had shown that such conduct is proscribed by the Voter Intimidation Guidance, they still lacked standing for preliminary injunction. This is because they failed to show a credible threat that the guidance would be enforced against them.

The credible-threat factor can be satisfied if a government has made "preliminary efforts to enforce a speech restriction," has engaged in "past enforcement of a restriction," or has "'communicated a specific warning or threat to initiate proceedings' under the challenged speech restriction." *Lopez*, 630 F.3d at 786 (quoting *Thomas*, 220 F.3d at 1139).

However, "'general threat[s] by officials to enforce those laws which they are charged to administer' do not create the necessary injury in fact." *Id.* at 787 (quoting *Mitchell*, 330 U.S. at 88).

Moreover, mere "'[a]llegations of a subjective chill are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm.'" *Id.* (quoting *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972)).

In addition, this Court has held that "plaintiffs did not demonstrate the necessary injury in fact where the enforcing authority expressly interpreted the challenged law as not applying to the plaintiffs' activities." *Id.* at 788 (collecting cases).

Here, the relevant language in the Voter Intimidation Guidance has been in the EPM since 2019. *Compare* 4-ER-423-24 (2019 EPM) *with* 4-ER-384-86 (2023 EPM); *see also* 1-ER-003 n.1 (taking judicial notice of this fact). Yet Plaintiffs identified no instance where this guidance has been enforced against *anyone*, much less someone similarly situated to themselves. Nor did Plaintiffs identify any preliminary efforts to enforce this guidance. Nor did Plaintiffs identify any communication of a threat or a warning to initiate enforcement of this guidance.

49

Moreover, Plaintiffs admit that the Attorney General is the relevant enforcing official. 2-ER-251-52 ¶ 33 (explaining that the Attorney General "has the statutory authority to enforce and prosecute election violations"). And, when Plaintiffs asked the Attorney General to disavow their own broad misinterpretation of the Voter Intimidation Guidance, the Attorney General did exactly what they asked, confirming that any relevant prosecutions for voter intimidation "would be brought under A.R.S. §§ 16-1013 and -1017 or other applicable statutes, and not under A.R.S. § 16-452(C) for alleged violations of the" EPM. 2-ER-279, -281. The Secretary, though not an enforcing official, concurred with the Attorney General. 2-ER-276.

All these facts are undisputed. Yet the district court nevertheless concluded that Plaintiffs had shown a credible threat of enforcement. 1-ER-020-24. To reach that conclusion, the court misread both the governing legal standard and the factual record.

First, the district court subtly shifted the burden of proof to the defense. The court began its analysis by quoting parts of Ninth Circuit cases and then declaring: "None of Defendants' arguments undermine the credibility of Plaintiffs' fear of enforcement." 1-ER-021. But it was not Defendants' burden to *undermine* the credibility of Plaintiffs' fear of

50

enforcement.  Rather, it was Plaintiffs' burden to *substantiate* the credibility of their fear of enforcement.  This is because "self-censorship alone is insufficient to show injury."  *Lopez*, 630 F.3d at 792; *see also Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1171 (9th Cir. 2018) ("Even in the First Amendment context, a plaintiff must show a credible threat of enforcement.").

Having incorrectly shifted the burden of proof, the district court then faulted the Secretary for "fail[ing] to modify" the Voter Intimidation Guidance after "members of the Arizona Legislature commented that the rule violates the First Amendment."  1-ER-021.  But those comments from legislators rested on their mistaken view that the guidance "augment[s] criminal statutes" governing speech.  2-ER-235.  As explained above, the guidance does *not* augment or otherwise expand criminal liability for speech; rather, it attempts to summarize existing criminal liability created by the Legislature.  And in any event, the fact that the Secretary did not modify the guidance in response to incorrect criticism in no way suggests that he intended to enforce it against Plaintiffs.

Astoundingly, the district court then stated that the Attorney General and Secretary "refus[ed] to disavow enforcement" of the Voter Intimidation Guidance against Plaintiffs.  1-ER-021-22.  It is hard to understand how the

51

district court arrived at this view. As explained above, the Attorney General made the exact disavowal that Plaintiffs had requested. 2-ER-279, -281. And the Secretary concurred, explaining that he "does not enforce criminal laws" but believed that Plaintiffs' concerns "ha[d] been addressed" by the Attorney General's response. 2-ER-276. If Plaintiffs desired more clarity from the Secretary, they could have sent him a follow-up letter. Instead they sued.[13]

The district court then made a strained analogy to *Isaacson v. Mayes*, 84 F.4th 1089 (9th Cir. 2023). *See* 1-ER-022-23. But *Isaacson* was a very different situation. In that case, although the Attorney General disavowed enforcement of the law at issue, there was affirmative "reason to believe that one or more county attorneys . . . *will* attempt to enforce" the law. *Id.* at 1100 (emphasis added). Specifically, a county attorney had publicly declared that

---

[13] The district court also noted that "Plaintiffs allege that the Secretary will make criminal referrals to the Attorney General for violations of the [Voter Intimidation Guidance]." 1-ER-022. Nothing in the record supports this allegation. Plaintiffs identified no criminal referral that the Secretary made or planned to make. And even if the Secretary were to make such a referral, the Attorney General would be the one deciding whether to do anything about it. *See* 2-ER-251-52 ¶ 33. In other words, the Attorney General is the relevant "enforcing authority." *Lopez*, 630 F.3d at 788.

he "intends to enforce" the law. *Id.* at 1100–01. In addition, other state agencies with express enforcement power had publicly declared that they "comply with the laws that are in effect and will continue to do so when regulating." *Id.* at 1101. Moreover, the law at issue contained a "private right of action," opening the door to millions of other potential enforcers. *Id.*

Here, while it is true (as the district court observed) that Arizona's county attorneys "are not bound by" the Attorney General's interpretation of the Voter Intimidation Guidance (*see* 1-ER-023), there is no indication that any county attorney actually plans to enforce the guidance against Plaintiffs. And regardless, the speculative possibility of enforcement by county attorneys does not give Plaintiffs standing to obtain a preliminary injunction against the Attorney General or the Secretary. If Plaintiffs were truly concerned about enforcement by county attorneys, they could have named county attorneys as defendants (as occurred in *Isaacson*). They did not.

For similar reasons, the district court's speculation that the Voter Intimidation Guidance would likely be "enforced by election officials and poll workers at voting locations" (*see* 1-ER-023) does not establish a credible threat either. There is no indication that any election official or poll worker plans to enforce the guidance against Plaintiffs in the absurd way that

Plaintiffs interpret it. And regardless, Plaintiffs have not sued such individuals, and any possibility of enforcement by those third parties does not give Plaintiffs standing to obtain an injunction against the Attorney General or the Secretary. *See Murthy*, 603 U.S. at 57 (explaining that independent acts of third parties do not support standing).

Plaintiffs' failure to show an actual threat of enforcement is another independent reason why the preliminary injunction should be vacated.

**B.  Alternatively, the district court should have abstained from reviewing the Voter Intimidation Guidance in light of the parallel State Case.**

Apart from deficiencies in Plaintiffs' standing, the district court should have refrained from issuing a preliminary injunction for another reason: the issue was already being litigated in the State Case. *Compare, e.g.*, 3-ER-358 ¶¶ 150-57 (State Case amended complaint) *with* 2-ER-273 ¶¶ 150-56 (federal complaint). Indeed, the trial court in the State Case had already issued a preliminary injunction against the same defendants (the Attorney General and Secretary) regarding the same thing (the Voter Intimidation Guidance). 3-ER-309; *see also* 3-ER-290 (clarification of ruling).

Specifically, the district court should have abstained under *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941). Under *Pullman*

54

abstention, "a federal court may, and ordinarily should, refrain from deciding a case in which state action is challenged in federal court as contrary to the federal constitution if there are unsettled questions of state law that may be dispositive of the case and avoid the need for deciding the constitutional question." 17A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 4242 (3d ed., updated July 12, 2024) (collecting cases). A "factor that will tip the scales in favor of abstention is if there is already pending a state court action that is likely to resolve the state questions without the delay of having to commence proceedings in state court." *Id.*

This Court has explained that *Pullman* abstention "serves the interests of both federalism and judicial economy." *Gearing v. City of Half Moon Bay*, 54 F.4th 1144, 1147 (9th Cir. 2022). In particular, *Pullman* abstention is appropriate when "(1) the federal constitutional claim 'touches a sensitive area of social policy,' (2) 'constitutional adjudication plainly can be avoided or narrowed by a definitive ruling' by a state court, and (3) a 'possibly determinative issue of state law is doubtful.'" *Id.* (citation omitted). All three factors were met here.

First, the Voter Intimidation Guidance touches a sensitive area of social policy. The guidance has been part of the EPM since 2019 (*see* 1-ER-003 n.1) and the EPM guides elections in Arizona. *See* A.R.S. § 16-452(A), (B). Moreover, elections are widely considered a sensitive area of social policy. *Accord Moore v. Hosemann*, 591 F.3d 741, 745 (5th Cir. 2009) (observing that "*Pullman* abstention is appropriate" regarding claim that secretary of state violated First Amendment right to political participation).

Second, the constitutional adjudication requested by Plaintiffs plainly could be avoided or narrowed by a definitive ruling in the State Case. As explained above, Plaintiffs argue that the Voter Intimidation Guidance "criminalizes" speech. *E.g.*, 2-ER-247-48 ¶¶ 3-4. This legal conclusion rests on an expansive (and mistaken) interpretation of both the guidance itself and the statute that makes it a crime to violate certain rules in the EPM. *See* A.R.S. § 16-452(C). The correctness of this interpretation is squarely at issue in the State Case, as the Attorney General and Secretary explained to the district court. *See, e.g.*, Doc. 27 at 2-4; Doc. 49 at 9.

Third, whether Plaintiffs have correctly interpreted the Voter Intimidation Guidance is very much in doubt. Again, Plaintiffs' interpretation is not only contrary to the language and history of the

56

guidance but also opposed by the Attorney General (the relevant enforcing authority) and the Secretary (the primary drafter of the EPM). And if Plaintiffs' interpretation is wrong, their constitutional challenge fails. This, too, was explained to the district court. *See, e.g.*, Doc. 27 at 4; Doc. 49 at 7-8.

Nevertheless, the district court declined to abstain under *Pullman* because, in its view, "the first *Pullman* factor is not met." 1-ER-027-29. The court relied primarily on this Court's warning that "[i]t is rarely appropriate for a federal court to abstain under *Pullman* in a First Amendment case, because there is a risk in First Amendment cases that the delay that results from abstention will itself chill the exercise of the rights that the plaintiffs seek to protect by suit." *Porter v. Jones*, 319 F.3d 483, 486-87 (9th Cir. 2003). The court also reasoned that the Arizona Court of Appeals might stay the preliminary injunction in the State Case, which Plaintiffs claimed would increase the risk of chilling speech. 1-ER-028.[14]

It is true that this Court has deemed *Pullman* abstention "rarely appropriate" in First Amendment cases. *Porter*, 319 F.3d at 486-87. But this

---

[14] The district court was apparently unaware that the Arizona Court of Appeals had partially granted and partially denied a stay of the trial court's preliminary injunction earlier that day. 3-ER-286.

57

is that rare case. Plaintiffs' own counsel had already been litigating a constitutional challenge to the same EPM guidance in state court, on behalf of one of the same plaintiffs, against the same defendants, and had already obtained the same preliminary injunctive relief they sought in federal court. *See* Statement of the Case § II.B, above (explaining these similarities). Although the district court was concerned that the Arizona Court of Appeals might stay the preliminary injunction in the State Case, that is how our federalist judicial system is supposed to work. If, for example, Arizona's courts decide that the Voter Intimidation Guidance does not criminalize speech, this decision would confirm that Plaintiffs' expansive interpretation of the guidance (and thus their challenge in the present lawsuit) is meritless.

The Supreme Court has required abstention in a First Amendment case in similar circumstances. In *Babbitt v. United Farm Workers National Union*, 442 U.S. 289 (1979), the Supreme Court held that the "District Court should have postponed resolution" of a challenge to an Arizona law when a state court interpretation could "significantly alter the constitutional questions requiring resolution," and the "District Court should have abstained" from deciding a challenge to a related Arizona law when the law "might fairly be

58

construed by an Arizona court" more narrowly than the challengers suggested. *Id.* at 307-12. The same is true here.

Similarly, this Court has approved abstention in a First Amendment case in similar circumstances. *See Almodovar v. Reiner*, 832 F.2d 1138, 1139–41 (9th Cir. 1987) (affirming abstention when "constitutional claims would be moot if the state supreme court decides that the statutes do not apply").[15] So have other courts. *See, e.g., Moore*, 591 F.3d at 745-46 (observing that "*Pullman* abstention is appropriate" regarding claim that secretary of state violated First Amendment right to political participation, when claim was "entirely contingent on an unresolved interpretation of [state] law"); *Beavers v. Ark. State Bd. of Dental Exam'rs*, 151 F.3d 838, 840–41 (8th Cir. 1998) (affirming abstention when issue was "fairly subject to" statutory decision by state courts that could "obviat[e] federal constitutional inquiry"); *Presbytery of N.J. of the Orthodox Presbyterian Church v. Whitman*, 99 F.3d 101, 106–07 (3d Cir. 1996) (affirming abstention when it was "quite possible" that

---

[15] The district court declined to follow *Almodovar* because, in that case, the state-law questions "were already before the state supreme court." 1-ER-028. But nothing in the *Almodovar* opinion suggests the result would have been different if, as here, the state-law questions had been in the state intermediate appellate court instead.

59

state courts "would construe the challenged language so as to avoid reaching the type of conduct in which [plaintiffs] engage").

Moreover, the district court's refusal to abstain here will incentivize gamesmanship. To recap what happened: Plaintiffs' counsel challenged the Voter Intimidation Guidance in state court, litigated for months, then decided to challenge the same guidance in federal court. *See* Statement of the Case §§ II.A and II.B, above (summarizing this history). This strategy meant that, if Plaintiffs' counsel lost their bid for a preliminary injunction in state court, they might still convince a federal judge to disregard the state court ruling and issue a preliminary injunction. But this strategy runs contrary to "the interests of both federalism and judicial economy." *Gearing*, 54 F.4th at 1147.

Accordingly, if this Court does not vacate the preliminary injunction for lack of standing, this Court should still heed the *Pullman* abstention doctrine, vacate the preliminary injunction, and instruct the district court to stay proceedings until the State Case is resolved, consistent with *Babbitt* and *Almodovar*. *See Courtney v. Goltz*, 736 F.3d 1152, 1164 (9th Cir. 2013) (explaining that the proper procedure under *Pullman* abstention is to stay and retain jurisdiction).

60

**C.    At a minimum, the district court should have denied the preliminary injunction because Plaintiffs failed to satisfy the traditional four-factor test.**

Even if this Court concludes that Plaintiffs made a clear showing of standing and that *Pullman* abstention is unwarranted, this Court should still vacate the preliminary injunction because Plaintiffs failed to show a likelihood of success on the merits or otherwise satisfy the traditional four-factor test for injunctive relief.

A "preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  Rather, a "plaintiff seeking a preliminary injunction must establish

[1] that he is likely to succeed on the merits,

[2] that he is likely to suffer irreparable harm in the absence of preliminary relief,

[3] that the balance of equities tips in his favor, and

[4] that an injunction is in the public interest."

*Id.* at 20.  Plaintiffs did not establish any of these factors, much less all.

**1.    Plaintiffs did not establish likelihood of success on the merits.**

Plaintiffs challenge the constitutionality of the Voter Intimidation Guidance on its face, not as it has been applied.  Thus, to succeed on the

61

merits, Plaintiffs would need to show that the guidance is "unconstitutional in all of its applications," or at minimum, that it has no "plainly legitimate sweep." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (citation omitted).[16] "Facial challenges are disfavored for several reasons," including that they "often rest on speculation" and "run contrary to the fundamental principle of judicial restraint." *Id.* at 449-51.

The central premise of Plaintiffs' challenge is the idea that the first sentence of the Voter Intimidation Guidance is, itself, a broad criminal prohibition—not just an attempt to summarize criminal prohibitions created by the Legislature. As a reminder, the sentence reads:

> Any activity by a person with the intent or effect of threatening, harassing, intimidating, or coercing voters (or conspiring with others to do so) inside or outside the 75-foot limit at a voting location *is prohibited*. A.R.S. § 16-1013.

4-ER-384 (emphasis added).

The district court sided with Plaintiffs on this issue, reasoning that the sentence "is a prohibition" because, by "its plain terms," it "expressly says

---

[16] To the extent Plaintiffs make a First Amendment overbreadth challenge, they would need to show that a "substantial number" of applications of the Voter Intimidation Guidance are unconstitutional, judged in relation to its plainly legitimate sweep. *Id.* at 449 n.6 (citation omitted).

certain activities are 'prohibited.'" 1-ER-041-42. The court then declared, without citation, that "a violation of" this sentence "can be prosecuted." 1-ER-042. The district court also declared that, because the "first sentence broadly prohibits speech," the "list of examples" at the end of the Voter Intimidation Guidance "also regulate Plaintiffs' speech." 1-ER-044.

The district court's interpretation is wrong for the reasons explained above. *See* Argument § II.A.2, above. Two reasons are worth emphasizing here.

First, the fact that the first sentence of the Voter Intimidation Guidance uses the word "prohibited" does not mean the sentence is, itself, a prohibition. The Secretary simply used this word to describe the fact that the *Legislature* prohibited certain conduct. This is a common usage of the word "prohibited." *See* Argument § II.A.2, above (citing *Deitrick v. Greaney*, 309 U.S. 190, 194 (1940)). Just as the Supreme Court was not creating its own prohibition when summarizing a provision in the National Bank Act in *Deitrick*, neither was the Secretary creating his own prohibition here.

Second, under the doctrine of constitutional avoidance, federal courts should resolve textual ambiguity in ways that avoid constitutional problems. It "has long been a tenet of First Amendment law that in

63

determining a facial challenge," a law "will be upheld" if it is "'readily susceptible' to a narrowing construction that would make it constitutional." *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 397 (1988) (citations omitted). Similarly, courts normally "avoid absurd results" when interpreting statutes, *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 670 (9th Cir. 2021), especially when "alternative interpretations consistent with the legislative purpose are available," *Tovar v. Sessions*, 882 F.3d 895, 904 (9th Cir. 2018).

Here, the district court refused to apply the doctrine of constitutional avoidance because, it said, doing so would "rewrite" the sentence at issue. 1-ER-043-44. But that is not true. Reading the first sentence of the Voter Intimidation Guidance as an attempted summary of statutes, rather than an independent criminal prohibition, is not a "rewrite," but is consistent both with the text and with how the Attorney General (the relevant enforcing authority) and the Secretary (the primary drafter) already understand it. Indeed, there is no indication that *any* enforcing official has interpreted the sentence as a criminal prohibition in the way Plaintiffs fear.

Similarly, it is not a "rewrite" to read the list of behaviors at the end of the Voter Intimidation Guidance as examples of conduct that, depending on

64

the situation, *may* be considered intimidating. Indeed, the list expressly states that such behaviors "*may* also be considered" intimidation. 4-ER-385 (emphasis added). It was the district court who rewrote the list by characterizing it as "regulat[ing] Plaintiffs' speech." 1-ER-044.

Notably, the Attorney General and Secretary offered to *stipulate* to a narrow construction of the Voter Intimidation Guidance to ease Plaintiffs' alleged concerns. But Plaintiffs insisted on construing the guidance in a way that, in their view, would subject them to prosecution for speech. Defense counsel explained this baffling dynamic at oral argument:

> [W]e'd be happy to resolve the case by stipulating that Section III(D) of the 2023 EPM cannot and does not regulate the plaintiffs or ordinary voters or member[s] of the public, and it does not . . . expand or amend criminal statutes. . . . Again, it seems, though, that the plaintiffs won't accept that from the Attorney General and the Secretary of State, and they insist on reading Section III(D) in a way that creates constitutional problems. Their reading really has no basis in reality. And so because they won't accept our offer of stipulation, I'll press forward.

2-ER-085.

The district court's acceptance of Plaintiffs' construction when evaluating the merits was error, regardless of whether the court was justified in presuming Plaintiffs' construction when evaluating their standing.

65

## 2. Plaintiffs did not establish likelihood of irreparable harm absent an injunction.

While "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373 (1976), a mere "assertion of First Amendment rights does not automatically require a finding of irreparable injury," *Hohe v. Casey*, 868 F.2d 69, 72–73 (3d Cir. 1989) (citing *Rushia v. Town of Ashburnham*, 701 F.2d 7, 10 (1st Cir. 1983)). To obtain a preliminary injunction, Plaintiffs needed to "demonstrate that irreparable injury is *likely* in the absence of an injunction"—not just possible. *Winter*, 555 U.S. at 22 (emphasis in original).

Here, Plaintiffs' claim of irreparable injury was belied by their delay in bringing the lawsuit and seeking injunctive relief. "A delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm." W*real, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016).

Plaintiffs' delay here was lengthy and inexcusable. The relevant language in the Voter Intimidation Guidance had been part of the EPM since 2019. *See* 1-ER-003 n.1. Yet Plaintiffs did not ask the district court for a

preliminary injunction against that language until *years* later, in July 2024. *See* Doc. 14.

Moreover, Plaintiffs offered no evidence of any harm to anyone arising from the challenged language during that *several-year* period. To the extent Plaintiffs censored themselves during this period out of fear of prosecution, that decision was attributable to their own misinterpretation of the Voter Intimidation Guidance, not any actual threat of prosecution.

The district court did not grapple with these facts when evaluating the likelihood of irreparable harm. Instead the court stated that Plaintiffs had shown a likelihood of irreparable harm because they had "established a colorable First Amendment claim and sufficiently alleged that they have self-censored their speech as a result." 1-ER-048-49. This cursory conclusion was premised on a misinterpretation of the Voter Intimidation Guidance and was error.

> **3.   Plaintiffs did not establish that the equities or the public interest favors an injunction.**

Even when a plaintiff establishes likelihood of irreparable injury, that injury may be "outweighed" by consideration of the equities and the public

67

interest. *Winters*, 555 U.S. at 23-24. These two remaining factors "are pertinent in assessing the propriety of any injunctive relief." *Id.* at 32.

Here, the State has strong interests not only in protecting speech, but also in protecting the ability of voters to vote safely and securely, free of intimidation. *See, e.g.*, *Burson v. Freeman*, 504 U.S. 191, 211 (1992) (finding that 100-foot electioneering-free zone around polling places survived strict scrutiny, and that the right to free speech must yield to the right to vote free from intimidation). The Voter Intimidation Guidance serves this interest by helping election officials identify and address potential instances of intimidation, such as by reporting to law enforcement officials (who can then decide, based on statutory text, whether the conduct at hand is unlawful).

Moreover, as mentioned, Plaintiffs' counsel had already convinced a state court to issue a preliminary injunction against enforcement of the Voter Intimidation Guidance. The public interest is not served by having a duplicative federal injunction on the same subject.

Finally, the timing here weighed against an injunction given the public interest in having clear rules before an election. The EPM is intended to guide election officials, yet the district court issued its ruling on September 27, 2024. 1-ER-051. Early voting for the November 5 General Election began

68

shortly afterward, on October 9. *See* Doc. 32 at 14-15 (warning district court about timing).[17] The Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020) (citing *Purcell v. Gonzalez*, 549 U.S. 1 (2006)); *see also Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring) ("[F]ederal courts ordinarily should not enjoin a state's election laws in the period close to an election."). The eleventh-hour injunction Plaintiffs sought violated the *Purcell* doctrine and was not in the public interest.

## CONCLUSION

This Court should vacate the district court's preliminary injunctions.

Respectfully submitted this 6th day of January, 2025.

> KRISTIN K. MAYES
>   ARIZONA ATTORNEY GENERAL
>
> By */s/ Joshua M. Whitaker*
> Nathan T. Arrowsmith
> Joshua M. Whitaker
> Luci D. Davis
> OFFICE OF THE ARIZONA
>   ATTORNEY GENERAL
> 2005 N. Central Ave.

---

[17] *See* Ariz. Sec'y of State Election Calendar 2023-2024, pg. 16 (available at https://apps.azsos.gov/election/2024/2024_Election_Calendar.pdf).

Phoenix, AZ 85004
(602) 542-3333
Nathan.Arrowsmith@azag.gov
Joshua.Whitaker@azag.gov
Luci.Davis@azag.gov
ACL@azag.gov

*Counsel for Defendant/Appellant Arizona*
*Attorney General Kristin K. Mayes*

By */s/ Karen J. Hartman-Tellez*
Karen J. Hartman-Tellez
Kara Karlson
Kyle Cummings
OFFICE OF THE ARIZONA
    ATTORNEY GENERAL
2005 N. Central Ave.
Phoenix, AZ 85004
(602) 542-3333
Karen.Hartman@azag.gov
Kara.Karlson@azag.gov
Kyle.Cummings@azag.gov
AdminLaw@azag.gov

*Counsel for Defendant/Appellant Arizona*
*Secretary of State Adrian Fontes*

70

# ADDENDUM

## ADDENDUM TABLE OF CONTENTS

| Description | Page |
| --- | --- |
| 2023 EPM, Chapter 9, section III(D) | 73 |
| 2023 EPM, Chapter 13, section II(B)(2) | 75 |

## 2023 EPM, Chapter 9, section III(D)

## D. Preventing Voter Intimidation

Any activity by a person with the intent or effect of threatening, harassing, or intimidating, or coercing voters (or conspiring with others to do so) inside or outside the 75-foot limit at a voting location is prohibited.  A.R.S. § 16-1013.  The officer in charge of elections has a responsibility to train poll workers and establish policies to prevent and promptly remedy and instances of voter intimidation.

The officer in charge of elections should publicize and/or implement the following guidelines as applicable:

- The inspector must utilize the marshal to preserve order and remove disruptive persons from the voting location. The inspector and/or marshal must use sound judgment to decide whether to contact law enforcement, and any higher-level decisions should be raised through the officer in charge of elections.

- Persons who witness problems at a voting location should not speak to or accost a voter in an attempt to "enforce" the law, but rather inform the inspector or marshal to allow them to resolve the issue.

- Private citizens are prohibited from bringing weapons into a polling place (including the 75-foot limit), even if the voter is properly licensed to carry such weapons.  Openly carrying a firearm outside the 75-foot limit may also constitute unlawful voter intimidation depending on the context.  In order to keep voting locations safe and free of potential intimidation, therefore, observers at voting locations should leave weapons at home or in their vehicles.  A.R.S. § 13-3102(A)(11) (exceptions apply for military and peace officers in the performance of official duties, *see* A.R.S. § 13-3102(C)).

In addition to the potentially intimidating conduct outline above, the following may also be considered intimidating conduct inside or outside the polling place:

- Aggressive behavior, such as raising one's voice or taunting a voter or poll worker;

- Using threatening, insulting, or offensive language to a voter or poll worker;

- Blocking the entrance to a voting location;

- Disrupting voting lines;

- Following voters or poll workers coming to or leaving a voting location, including to or from their vehicles;

- Intentionally disseminating false or misleading information at a voting location, such as flyers or communications that misstate the date of the election, hours of operation for voting locations, addresses for voting locations, or similar efforts intended to disenfranchise voters;

- Impersonating a law enforcement officer or otherwise wearing clothing, uniforms or official-looking apparel intended to deter, intimidate, or harass voters (*see also* A.R.S. § 26-170, prohibiting unauthorized wearing of national guard or U.S. armed forces uniform).

- Directly confronting, questioning, photographing, or videotaping voters or poll workers in a harassing or intimidating manner, including when the voter or poll worker is coming to or leaving the polling location;

- Asking voters for "documentation" or other questions that only poll workers should perform;

- Raising repeated frivolous voter challenges to poll workers without any good faith basis, or raising voter challenges based on race, ethnicity, national origin, language, religion, or disability; or

- Posting signs or communicating messages about penalties for "voter fraud" in a harassing or intimidating manner.

*See* A.R.S. § 16-1013(A); A.R.S. § 16-1017.

## 2023 EPM, Chapter 13, section II(B)(2)

## 2. Scope of Duty to Canvass

The Secretary of State may postpone the canvass on a day-to-day basis for up to three days if the results from any county are missing. A.R.S. § 16-648(C). All counties must transmit their canvasses to the Secretary of State, and the Secretary of State must conduct the statewide canvass no later than 30 days after the election. A.R.S. § 16-648(C). If the official canvass of any county has not been received by this deadline, the Secretary of State must proceed with the state canvass without including the votes of the missing county (i.e., the Secretary of State is not permitted to use an unofficial vote count in lieu of the county's official canvass).

The Secretary of State has a non-discretionary duty to canvass the returns as provided by the counties and has no authority to change vote totals, reject the election results, or delay certifying the results without express statutory authorization or a court order.

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Circuit Rule 32-1(a) because it contains 13,861 words, including text appearing in screenshots, according to the word-processing system used to prepare the brief.

2.  This brief complies with the typeface and typestyle requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in fourteen-point Book Antiqua type style.

Dated this 6th day of January, 2025.

By /s/ Joshua M. Whitaker

## CERTIFICATE OF SERVICE

I certify that I presented the above and foregoing for filing and uploading to the ACMS system which will send electronic notification of such filing to all counsel of record.

Dated this 6th day of January, 2025.

*/s/ Joshua M. Whitaker*