**Case No. 24-6703**

---

## THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

AMERICAN ENCORE, *et al.*,

*Plaintiffs-Appellees*,

*v.*

ADRIAN FONTES, *et al.*,

*Defendants-Appellants*.

---

On Appeal from the United States District Court
for the District of Arizona

No. 2:24-cv-01673-MTL

---

### APPELLANTS' EXCERPTS OF RECORD – VOLUME 2 OF 5

---

Nathan T. Arrowsmith (No. 031165)   Karen J. Hartman-Tellez (No. 021121)
Joshua M. Whitaker (No. 032724)     Kara Karlson (No. 029407)
Luci D. Davis (No. 035347)          Kyle Cummings (No. 032228)
Nathan.Arrowsmith@azag.gov          Karen.Hartman@azag.gov
Joshua.Whitaker@azag.gov            Kara.Karlson@azag.gov
Luci.Davis@azag.gov                 Kyle.Cummings@azag.gov
ACL@azag.gov                        AdminLaw@azag.gov

*Attorneys for Defendant/Appellant*   *Attorneys for Defendant/Appellant*
*Arizona Attorney General*            *Arizona Secretary of State*
*Kristin K. Mayes*                    *Adrian Fontes*

OFFICE OF THE ARIZONA
ATTORNEY GENERAL (Firm #14000)
2005 North Central Ave.
Phoenix, Arizona 85004
(602) 542-3333

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| **American Encore, et al.,** | ) |
| | ) No. 2:24-cv-01673-MTL |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) Phoenix, Arizona |
| **Adrian Fontes, et al.,** | ) September 12, 2024 |
| | ) 9:11 a.m. |
| Defendants. | ) |
| _____ | ) |

**BEFORE:  THE HONORABLE MICHAEL T. LIBURDI, JUDGE**

<u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

<u>**HEARING ON PENDING MOTIONS**</u>

Official Court Reporter:
**Cathy J. Taylor, RMR, CRR, CRC**
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 31
Phoenix, Arizona 85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

(3 of 232), Page 3 of 232    Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 3 of 232
Case 2:24-cv-01673-MTL    Document 56    Filed 09/17/24    Page 2 of 86

2

<u>**A P P E A R A N C E S**</u>

For the Plaintiff:
    HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK, PLLC
    By:  **Mr. Drew C. Ensign, Esq.**
       **Mr. Andrew Gould, Esq.**
       **Mr. Brennan Bowen, Esq.**
    2575 East Camelback Road, Suite 860
    Phoenix, Arizona  85016

For the Defendant Adrian Fontes:
    OFFICE OF THE ATTORNEY GENERAL
    By:  **Ms. Karen J. Hartman-Tellez, Esq.**
       **Ms. Kara Karlson, Esq.**
       **Mr. Kyle Cummings, Esq.**
    2005 North Central Avenue
    Phoenix, Arizona 85004

For the Defendant Kris Mayes:
    OFFICE OF THE ATTORNEY GENERAL
    By:  **Mr. Nathan T. Arrowsmith, Esq.**
       **Mr. Joshua Michael Whitaker, Esq.**
       **Ms. Luci Danielle Davis, Esq.**
       **Ms. Shannon Mataele, Esq.**
    2005 North Central Avenue
    Phoenix, Arizona  84004

(4 of 232), Page 4 of 232     Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 4 of 232
Case 2:24-cv-01673-MTL     Document 56     Filed 09/17/24     Page 3 of 86

3

1                   **P R O C E E D I N G S**

2          (Court was called to order by the courtroom deputy.)

3          (Proceedings begin at 9:11 a.m.)

4          THE COURTROOM DEPUTY:  Civil Case 24-1673, American

5     Encore vs. Adrian Fontes.  This is the time set for hearing on

6     pending motions.

7          Please announce your presence for the record starting

8     with the plaintiff.

9          MR. ENSIGN:  Good morning, Your Honor.  Drew Ensign

10    for plaintiffs.  With me is Andrew Gould and Brennan Bowen.

11         THE COURT:  Good morning.

12         MR. ENSIGN:  Good morning, Your Honor.

13         MS. HARTMAN-TELLEZ:  Good morning, Your Honor.  The

14    Karen Hartman-Tellez from the Attorney General's Office on

15    behalf of Secretary of State Adrian Fontes.  With me in the

16    courtroom are my colleagues Kara Carlson and Kyle Cummings.

17         THE COURT:  Okay.  Good morning.

18         MR. ARROWSMITH:  Good morning, Your Honor.  Nathan

19    Arrowsmith from the Attorney General's Office on behalf of

20    Attorney General Kris Mayes.  Also in the courtroom with me are

21    my colleagues, Josh Whitaker, Luci Davis, and Shannon Mataele.

22         THE COURT:  Good morning.  You made the wise choice of

23    keeping Mr. Barr as far as way from counsel table as possible.

24    I mean, he -- he hasn't been practicing law for a couple years

25    now.  Probably rusty.

(5 of 232), Page 5 of 232    Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 5 of 232
Case 2:24-cv-01673-MTL    Document 56    Filed 09/17/24    Page 4 of 86

4

1          No comment.

2          MR. ARROWSMITH:  Yes.  No comment, Your Honor.

3          THE COURT:  He always teases me.  I get to tease him

4    now.

5          Okay.  Well, welcome.

6          Is Mr. Barton here?

7          MS. HARTMAN-TELLEZ:  I don't see him, and I don't -- I

8    don't believe that he will be here since you -- the motion to

9    intervene was denied.

10         THE COURT:  Okay.  Well, I got an email from somebody

11   at his office to chambers yesterday morning, and it says,

12   "Mr. Barton will be attending the hearing in person, but is

13   there a way for co-counsel to observe the hearing online?"

14         And there isn't a way to observe the hearing online.

15   And I typically grant motions to appear telephonically, but

16   they didn't move to appear telephonically.  And I didn't see

17   this email until 6:00 o'clock last night, so I couldn't act on

18   it.

19         So I don't know.  I regret Mr. Barton not being able

20   to appear, but I was told he was going to come here.  So I

21   thought at least somebody would be here, but I suppose that's

22   not the case.

23         Okay.  Well, I have -- as you could see from this

24   enormous binder, I have all your briefs.  I understand that

25   both sides submitted some supplements.  I've been able to go

(6 of 232), Page 6 of 232    Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 6 of 232
Case 2:24-cv-01673-MTL    Document 56    Filed 09/17/24    Page 5 of 86

5

1    through all of it.  I have a few questions for you.  I was

2    thinking maybe we could spend about two hours on the motions,

3    if you think that's necessary.  If not, we'd get out a little

4    earlier.  But I do want to let you know I have a hard stop.  I

5    need to be out at noon, so we cannot go past noon whatsoever.

6         Do -- what do you think?  Do you think about two hours

7    is sufficient?

8         MR. ENSIGN:  That certainly seems adequate for

9    plaintiffs, Your Honor.

10        THE COURT:  Okay.  Good.

11        What do you think, Ms. Hartman-Tellez?

12        MS. HARTMAN-TELLEZ:  Same for defendants.

13        THE COURT:  Okay.

14        MR. ARROWSMITH:  Yes, Your Honor.

15        THE COURT:  Okay.  Good.

16        Mr. Ensign, do you want to combine a trial on the

17   merits with your briefs, or do you want to just focus on the

18   preliminary injunction motion along with the motions to

19   dismiss?

20        MR. ENSIGN:  Your Honor, we don't see any reason why

21   they shouldn't be consolidated.  Certainly everything's been

22   presented fulsomely and -- you know, so we would certainly

23   defer to the Court's preference on that.  But as to our

24   preference, consolidation on the merits certainly makes sense

25   to us.

UNITED STATES DISTRICT COURT

**ER-057**

1          THE COURT:  Okay.  And I was just thinking that exact

2   outcome.  I mean, if motions to dismiss are denied, and

3   regardless of whatever way the preliminary injunction goes, is

4   there anything left for plaintiffs to do in terms of discovery?

5          MR. ENSIGN:  Your Honor, not from our perspective.

6          THE COURT:  Okay.  All right.  And, of course, if I

7   grant the preliminary injunction motion and I deny the motion

8   or motions to dismiss and the case is ongoing, you -- the

9   defendants can still appeal an order on a preliminary

10  injunction motion that's disfavorable to them.

11         So do any of you have any concern if I consolidated

12  this for trial on the merits today?

13         MR. ARROWSMITH:  Your Honor, we would object to that

14  because the plaintiffs haven't asked for that, and we were not

15  considering that as a possibility for today.  So we would

16  object.

17         THE COURT:  Okay.  All right.  Well, I'll review the

18  rule a little later and see which way I should go.

19         Do you want to say something, Ms. Hartman-Tellez?

20         MS. HARTMAN-TELLEZ:  No, Your Honor.  I agree with my

21  co-counsel.

22         THE COURT:  Okay.  All right.  Well, thank you.

23         Okay.  Is there any other preliminary matters that I

24  should consider before we move on to the motions?  Anybody?

25         MS. HARTMAN-TELLEZ:  Your Honor, I think just the --

(8 of 232), Page 8 of 232    Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 8 of 232
Case 2:24-cv-01673-MTL    Document 56    Filed 09/17/24    Page 7 of 86

7

```
 1   sort of the order of -- of how the Court will -- wants to hear

 2   from the parties on the motions.  I think that we have a

 3   different view than the plaintiffs as to how things should

 4   progress.

 5          THE COURT:  Let me guess.  They want to go first, but

 6   you want to go first?

 7          MS. HARTMAN-TELLEZ:  Not so much that.

 8          THE COURT:  No?

 9          MS. HARTMAN-TELLEZ:  More to do with sort of how we

10   break up the -- the four motions -- or five -- I guess five

11   motions.  I'm sorry.

12          You know, we have two separate motions to dismiss, two

13   separate motions for preliminary injunction, and the motion for

14   Pullman abstention on Count 2.  So --

15          THE COURT:  Do you want to do jurisdiction first?

16          MS. HARTMAN-TELLEZ:  I think that makes sense, Your

17   Honor.

18          THE COURT:  Let's do jurisdiction first.

19          MS. HARTMAN-TELLEZ:  So -- and who --

20          THE COURT:  Which one -- is it both of you or --

21          MS. HARTMAN-TELLEZ:  Your Honor, so we have them

22   broken up by the two counts of the complaint.

23          THE COURT:  Okay.

24          MS. HARTMAN-TELLEZ:  I will be arguing on Count 1.  So

25   if you want me to address the motion to dismiss on Count 1 --
```

(9 of 232), Page 9 of 232    Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 9 of 232
Case 2:24-cv-01673-MTL    Document 56    Filed 09/17/24    Page 8 of 86

8

1          THE COURT:  Come on up.

2          MS. HARTMAN-TELLEZ:  -- we'll start there.

3          THE COURT:  And try to be mindful of the time.

4          MS. HARTMAN-TELLEZ:  Thank you, Your Honor.  I will.

5          So, good morning, Your Honor.  Plaintiffs' complaint,

6  Count 1, involves a challenge to a provision of the Arizona

7  Election Procedures Manual that accurately reflects Arizona law

8  and governs the Secretary of State's duty to canvass elections

9  in the case of a contingency that has never occurred in the

10 past and should never occur in the future.  But because the

11 existence of the canvass provision alone does not work a

12 present injury to plaintiffs, nor a likelihood of future harm

13 that is concrete and particularized, plaintiffs do not have

14 standing to challenge the canvass provision.

15         To obtain the relief they seek, an injunction striking

16 down the canvass provision and requiring the Secretary to issue

17 a new Election Procedures Manual that, quote, complies with the

18 First and Fourteenth Amendment, plaintiffs must des- --

19 demonstrate harm at increasing levels.

20         And I won't -- right now I will only talk about the

21 harm at -- since we're starting with jurisdiction, just the

22 first level, the standing --

23         THE COURT:  Okay.

24         MS. HARTMAN-TELLEZ:  -- argument.  But let me just lay

25 out the three levels.

(10 of 232), Page 10 of 232  Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 10 of 232
Case 2:24-cv-01673-MTL   Document 56   Filed 09/17/24   Page 9 of 86

9

1          For standing they must prove concrete and

2    particularized harm.  A concrete and particularized harm must

3    be actual or imminent, not conjectural or hypothetical.  It

4    also cannot be an abstract theoretical concern or an interest

5    that is shared generally with the public.

6          So -- and I will hold to the -- the other two levels

7    of -- of injury that plaintiffs must prove until the later

8    portion of the argument.

9          But the plaintiffs have not met the requirement for

10   standing here.  As this Court knows, standing under Article III

11   is an irreducible constitutional minimum, and it's simply not

12   present here because plaintiffs' claim fails at every sort of

13   internal step of the standing analysis.

14         First, injury.  The Secretary of State agrees with the

15   plaintiffs on one point.  The right to vote is a legally

16   protected interest.  It's one that is foundational to our

17   system of government.  But the existence of that right, shared

18   generally by all citizens, is only the beginning of the

19   analysis.

20         And in this case the plaintiffs sort of have

21   alternative framing -- two -- two alternative framings of their

22   injury, but in neither case can -- do they support standing.

23         So, first, they say that the canvass provision

24   disenfranchises plaintiffs completely.  But at present the --

25   the plaintiff -- the one individual named plaintiff, who is an

1    Apache County resident, as well as every voter -- other voter

2    in Arizona, has the same right to cast their ballot, have their

3    votes tabulated and certified by the board of supervisors in

4    the county, and have the county's results included in the

5    statewide canvass.  The canvass provision doesn't change that

6    right in any way.  The contingency that would change that right

7    is remote.

8         They've -- the plaintiffs have pointed to no instance

9    in the history of Arizona elections where that has happened.

10   And, in fact, they -- you know, they discuss at length the

11   Cochise County Board of Supervisors failure to timely canvass

12   in 2022, but the complaint leaves out that the Secretary

13   obtained mandamus relief a couple of days after the county's

14   deadline in that -- in 2022, and the Secretary timely canvassed

15   the election with all 15 counties' results included in 2022.

16        And they also -- they cite a bunch of hypotheticals.

17   They -- they sort of dream up the situation where a quorum of

18   the Maricopa County Board of Supervisors is in a fatal car

19   accident a day or two before the election -- or before the

20   canvass -- sorry -- or that they're kidnapped or, quote,

21   more -- they're prevented from canvassing by, quote, more fatal

22   means.

23        I find that particularly galling given the number of

24   death threats that the Maricopa County Board of Supervisors has

25   faced for the last couple of years.

1         THE COURT:  What if, for example -- this is a

2    hypothetical -- Maricopa County in the next election votes

3    overwhelmingly in favor of the Democrat president candidate?

4    And, as you know, there are four Republican members of the

5    five.

6         What if relying on this, three of the Republican

7    members decide that if they didn't show up to the canvass, the

8    Secretary of State would nullify, what is it, 4 million people

9    or something in this county --

10         MS. HARTMAN-TELLEZ:  I mean --

11         THE COURT:  -- the number of voters?

12         MS. HARTMAN-TELLEZ:  -- the registered voters are

13    2.4 million in Maricopa County.

14         THE COURT:  2.4.

15         MS. HARTMAN-TELLEZ:  Yeah.

16         THE COURT:  So nullify the votes of 2.4 voters, and

17    then that could tip the results in favor of the Republican

18    candidate.

19         MS. HARTMAN-TELLEZ:  Well, Your Honor, the

20    hypothetical that you have proposed, there's nothing erroneous

21    about it.  It is, however, merely a hypothetical.  And that is

22    not sufficient to demonstrate the harm --

23         THE COURT:  So if this --

24         MS. HARTMAN-TELLEZ:  -- of the plaintiff.

25         THE COURT:  -- is all -- Ms. Hartman-Tellez, if this

UNITED STATES DISTRICT COURT

**ER-063**

1     is all hypothetical, why do we even need this?  Why do we even

2     need the vote -- vote nullification remedy when there is a

3     remedy in state law?  It's called mandamus, and it's effective.

4          MS. HARTMAN-TELLEZ:  Your Honor, that -- that is

5     correct.  I mean, it's correct that mandamus is effective and

6     has been effective in recent past history.  There are a number

7     of -- of reasons why the canvass provision is there.  And I

8     would -- I would not call it a vote nullification provision.

9     That is what the plaintiffs have called it.  It is, in fact,

10    the provision in the EPM that tells the Secretary what he has

11    to do to canvass.

12          But, more importantly, it serves to notify -- so

13    the -- the Election Procedures Manual, the purpose of it is to

14    provide uniform practices and give guidance to election

15    officials around the state at the county -- at the -- you know,

16    city, town, and county level.  And the provision notifies the

17    counties of the consequence of their failure, should it happen,

18    to carry out their nondiscretionary statutory duty.

19          It -- and, you know, you have mentioned that the --

20    the state law remedy of mandamus, and I -- you know, I

21    submitted to this Court during our status conference earlier in

22    this case that the Secretary would take steps to seek to compel

23    a county to canvass if -- if they didn't carry out their

24    statutory duty.

25          And the plaintiffs sent a letter after they filed

UNITED STATES DISTRICT COURT

**ER-064**

1    their complaint demanding that the Secretary disavow this

2    provision in the EPM.  And the Secretary said that the -- that

3    the -- the Secretary can't disavow his -- a duty -- a statutory

4    duty because there -- there is an independent statutory duty to

5    canvass by a date certain, and there's no exception.  There's

6    no provision in the statutes that allow for delay.

7            And that, you know, sort of --

8            THE COURT:  So that's interesting, because that is not

9    consistent with what Mr. Arrowsmith is going to argue to me

10   about the poll worker provision --

11           MS. HARTMAN-TELLEZ:  Well, it --

12           THE COURT:  -- because -- because he's arguing that

13   the Secretary -- that maybe -- it might be your boss.  That the

14   attorney -- I can't keep this straight.  Somebody has --

15           MS. HARTMAN-TELLEZ:  That's okay.

16           THE COURT:  -- disavowed the plain language of the

17   threats, intimidation, and coercion.

18           MS. HARTMAN-TELLEZ:  Your Honor, and I don't want

19   to -- I don't want to steal the thunder of my colleague over

20   here, but I think there is a -- a qualitative difference

21   between the canvass provision and the speech provisions that

22   the -- that are addressed in Count 2.

23           The -- the -- the issue with the speech provisions is

24   that -- or the disavowal of it has happened with respect to the

25   speech provisions is a disavowal of enforcement -- criminal

1    enforcement the way that the plaintiffs are arguing the -- the

2    provision allows.  That is a duty that the Attorney General has

3    discretion in.  The Attorney General can decide to exercise

4    prosecutorial discretion.

5           This canvassing duty is a different thing.  It is a

6    mandatory statutory duty that the Secretary cannot -- I mean,

7    the Secretary could be subject to a mandamus action if he

8    failed to canvass the election by a date certain.  And so

9    that's -- that's the sort of -- the difference between those

10   two.

11          But -- so just sort of coming back to the -- the

12   injury.  What we have here on the sort of argument that this --

13   that the canvass provision works a total disenfranchisement is

14   hypothetical -- is sort of a couple of -- or one kind of close

15   call and a bunch of hypotheticals.  And hypotheticals are not

16   well-pled facts.

17          And I would command to the Court the -- the district

18   court's decision and the Ninth Circuit's decision in the

19   *Lake vs. Hobbs* case.  This is a case that challenged on

20   constitutional grounds the use of electronic tabulation

21   equipment for elections in Arizona.  And the -- sort of the

22   factual basis of those claims was that the -- that the

23   electronic tabulation machines are vulnerable to hacking and

24   other, you know, failure to accurately tabulate votes.  And one

25   of your colleagues, as -- and then affirmed by the Ninth

1  Circuit, determined that that involves a long chain of

2  contingencies that have never come to pass in Arizona; and,

3  therefore, the plaintiffs had -- did not have standing to make

4  that claim.

5       That's exactly what we have here, a long chain of

6  contingencies.

7       THE COURT:  There might be a difference, though,

8  because the plaintiffs in -- in -- in the *Lake* case, their

9  hypothetical end result was an inaccurate vote count.  But here

10  we -- we know what the contin- -- we know what the end result

11  is because it's in the statute -- or it's in the EPM.  The end

12  result is people's votes don't get counted.

13       MS. HARTMAN-TELLEZ:  Well, I think there's a --

14  there's a slight nuance there.  The votes will be counted.

15  They won't be included in the final --

16       THE COURT:  Tabulation, yeah.

17       MS. HARTMAN-TELLEZ:  -- the final canvass.

18       THE COURT:  Canvass.

19       MS. HARTMAN-TELLEZ:  And the plaintiffs do spend a lot

20  of time sort of coming up with ideas about what could happen if

21  a member -- if a board of supervisors lost their elections and

22  decided they just didn't want to canvass and they get to stay

23  in office forever.

24       That's -- that isn't what happened.  But, more

25  importantly, boards of supervisors are not included in the

1    state canvass.  The state canvass is only federal, elective,

2    and statewide races.

3          But setting that aside, I think that this -- this --

4    the -- I don't think that the *Lake* case and this case really

5    are that different.  If the -- if the -- if the plaintiffs were

6    right, that, you know, the electronic tabulation machines

7    could, you know, have some third-party nefarious action that

8    makes the results different, well, then the voters' votes

9    wouldn't be counted -- accurately counted and included in

10   the -- in the final result.  And that's the same hypothetical

11   harm here.  And, simply put, the -- the harm that plaintiffs

12   are complaining about with respect to total disenfranchisement

13   is hypothetical, it is not imminent, so it doesn't make the

14   grade for standing.

15         They have another formulation of their injury, which

16   is that the -- sort of the existence of the canvass provision.

17   And, therefore, the potential of votes of a county not being

18   included in the final canvass works a current harm on them,

19   that their vote has been -- that their right to vote has been

20   degraded, to use their term.  But all election regulations

21   involve some condition on the right to vote:  Registration

22   requirements.  Deadlines for submitting -- for registering to

23   vote.  Deadlines for submitting an early ballot so that it will

24   be counted.  The signature verification process.

25         All of these things affect the right to vote, and the

1    courts have held over and over again that in order to have

2    orderly election administration there has to be some

3    regulation.  And that's what this is at the -- sort of at the

4    outside.  It's not enough to work a current harm.

5            And, also, one of the other requirements of standing

6    is that it be particularized to the plaintiffs.  The only harms

7    that have been alleged here are harms that affect every single

8    Arizona voter.  They affect me.  They affect Your Honor.  They

9    affect everyone in this courtroom who's a registered Arizona

10   voter and everyone throughout the state.  That's a generalized

11   injury.

12           It's the same -- in the *Bowyer* case, the Court in

13   another election case regarding the 2020 election said:  These

14   claims of harm are not sufficiently particularized.  They're a

15   general grievance.  They cannot support standing.

16           THE COURT:  So if the Arizona Legislature passed a law

17   that said every citizen can only speak on public issues between

18   the hours of 7:00 a.m. and 8:00 a.m., no exceptions, that's a

19   generalized grievance?

20           MS. HARTMAN-TELLEZ:  Well, Your Honor, I would -- I --

21   I -- I think that that's a different -- I mean, that's a

22   different situation.  That's a First Amendment speech

23   restriction.  I think my colleague can better address speech

24   restrictions, but that's not -- it's -- that simply isn't the

25   case that we have here.

UNITED STATES DISTRICT COURT

**ER-069**

1          And I think it's important that this sort of brings up

2     the redressability issue, because you said something about

3     the -- you know, the legislature passing a law.  Plaintiffs

4     have challenged only the EPM.  They have not challenged the

5     state statute that says canvassing -- counties must canvass by

6     a date certain.  It's the third Thursday after the general

7     election.  That's November 21st this year.  And the state must

8     canvass by the 25th.

9          THE COURT:  I don't think they have to, because

10    that's -- that's just the process.  What they're challenging

11    is, is a remedy in case of -- of an event occurring.

12          MS. HARTMAN-TELLEZ:  Well, Your Honor, I think

13    there's -- there's a little more to it, to the state law,

14    because the state law says that this canvassing is mandatory by

15    that date.  It -- there -- it makes no allowance for waiting

16    for a recalcitrant county to do its duty to carry out its own

17    mandatory statutory duty.

18          And there used -- the -- there used to be an allowance

19    for delays in the canvass.  And in February of this year, this

20    legislature removed those, and that needs to have meaning here.

21    And we contend that the meaning is that there is no allowance

22    for delay.

23          THE COURT:  Okay.  Well, Ms. Hartman-Tellez, is there

24    anything else you want to say about standing?  And then I want

25    to hear from the plaintiffs, and we could move on to the next

(20 of 232), Page 20 of 232 Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 20 of 232
Case 2:24-cv-01673-MTL     Document 56     Filed 09/17/24     Page 19 of 86

19

1    matter.

2         MS. HARTMAN-TELLEZ:  Sure.  No, I -- I mean, Your

3    Honor, we also have a -- an Eleventh Amendment argument.  I

4    don't know if you want to hear that now or if you want to hear

5    that after.

6         THE COURT:  Well, it's jurisdictional, so you could

7    tell me about it.

8         MS. HARTMAN-TELLEZ:  Okay.  Just briefly.  And, again,

9    I'm going to refer the Court back to the *Lake* case, which also

10   was dismissed on -- on Eleventh Amendment sovereign immunity

11   grounds.

12        What's really happening here is that the plaintiffs

13   are asking the Court to get involved in determining a question

14   of state law.  Your Honor highlighted it right from the get-go.

15   Isn't there a state law remedy here?  There is.  A mandamus

16   action, or there may be other remedies under state law.  The

17   one that -- that seems most likely would be a mandamus action.

18   That makes this a suit against the state.  It's not subject to

19   the ex parte *Young* exception, because this is really just about

20   what the state law requires.

21        And so unless the Court has questions on that point, I

22   will --

23        THE COURT:  I don't -- I don't think I agree with you

24   on ex parte *Young*.  Isn't this a 1983 case?  Did plaintiffs

25   assert this under 1983?

UNITED STATES DISTRICT COURT

**ER-071**

(21 of 232), Page 21 of 232  Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 21 of 232
Case 2:24-cv-01673-MTL    Document 56    Filed 09/17/24    Page 20 of 86

20

1          Mr. Gould?  Mr. Ensign?

2          MR. ENSIGN:  Yes, Your Honor.  We are seeking relief

3     purely as a matter of federal law.  We are not seeking any

4     relief that is predicated on them misinterpreting state law.

5     As far as we are concerned, the parties are agreed that as a

6     matter of state law, absent an injunction from this Court, if

7     the vote nullification provision is triggered, the Secretary

8     will enforce it.  And the only applicable question is, is that

9     burden constitutional under the United States Constitution?

10          THE COURT:  Okay.  So the state isn't named.  They're

11     not seeking money damages.  They're seeking an injunction for

12     prospective relief against the state officer in his or her

13     official capacity.

14          How is that not within ex parte *Young*?

15          MS. HARTMAN-TELLEZ:  Because the ex parte *Young*

16     exception applies to an ongoing violation of federal rights.

17     And there's no ongoing violation here.  There's the remote

18     possibility of some potential future harm.

19          THE COURT:  Okay.  Thank you, Ms. Hartman-Tellez.

20          Mr. Ensign.

21          MR. ENSIGN:  Good morning, Your Honor.

22          Before turning to standing specifically, there's just

23     a little bit of table setting that's useful to illustrate our

24     controversy here.

25          The vote nullification provision is utterly without

(22 of 232), Page 22 of 232 Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 22 of 232
Case 2:24-cv-01673-MTL    Document 56    Filed 09/17/24    Page 21 of 86

21

1    precedent either in our 112-year history or in any of Arizona's

2    49 sister states.  All 50 states have to canvass election

3    results.  But the Secretary has not identified a remotely

4    equivalent provision anywhere else in the United States.  The

5    vote nullification provisions result in mass

6    disenfranchisement.  To short-circuit the canvassing process is

7    both wanton and gratuitous.

8            Notably, the Secretary concedes here that if the vote

9    nullification provision were ever triggered, that it would

10    impose a severe burden on the right to vote.  And that's a --

11    at page 10 of the reply brief.  And the Secretary has never

12    made any attempt to argue that the provision could survive

13    under strict scrutiny, which is what applies when there is a

14    severe burden.  So if the vote nullification provision is ever

15    triggered, it will concededly be unconstitutional.  But despite

16    effectively conceding that the provision would be

17    unconstitutional if it were ever triggered, the Secretary,

18    nonetheless, promises to enforce it if it were.  He has refused

19    to disavow enforcement of it, and his brief makes clear that

20    he's compelled to do it.  So even while conceding that the

21    burden imposed by the vote nullification provision would be

22    unconstitutional if it were ever imposed, the Secretary,

23    nonetheless, promises to enforce it, notwithstanding his oath

24    to -- to serve the U.S. Constitution.  And so that's where this

25    controversy arises from.

1          So on standing here, plaintiffs have stand --

2     Article III standing on two bases:  First, the present

3     diminution of the right to vote; and, second, the the future

4     credible threat of the vote nullification provision.

5          As to the former, the Secretary's responses are

6     exceptionally evasive and fail to respond meaningfully to

7     plaintiffs' argument.  Plaintiffs here explain how they had

8     standing under three distinct lines of standing precedent.

9     Defendants did not contend that even a single one of those line

10    of cases was wrongly decided, and they offered only facile

11    distinctions for why they didn't apply here, many of which were

12    quickly and quietly dropped in their reply brief.

13         The reply brief really dispenses with any attempt to

14    engage with that and, instead, relies solely on a single case

15    for the proposition that diminution of the right to vote is not

16    cognizable.  And that's the Supreme Court decision in *Burdick*.

17    The Supreme Court cites that case and no others on page 5 and 7

18    for that proposition.  But that reliance on *Burdick* is sorely

19    misplaced.  Notably, that case did not address standing

20    whatsoever.  You can't even find the word "standing" anywhere

21    in that decision.  It simply assumed that plaintiffs there had

22    it.  And *Burdick* merely recognized that many electoral

23    regulations are constitutional.  And, indeed, the one in

24    *Burdick* was held to be.  But the fact that the statute in

25    *Burdick* was ultimately constitutional after exercising judicial

1    review hardly meant that the plaintiffs didn't have standing to

2    challenge it in the first instance.  And that's what the

3    Secretary is trying to twist *Burdick* here to mean.

4         And, notably, standing in *Burdick* was so obvious it

5    wasn't even discussed.  Moreover, the challenged law in *Burdick*

6    is actually pretty instructive here.  It was a Hawaii law that

7    banned all voters from writing in candidates on their ballots

8    and instead insisted that they vote on people on the ballot.

9         Under the Secretary's current arguments, that would

10   easily qualify as a generalized grievance because it applied to

11   every single voter in the state of Hawaii.  But, nonetheless,

12   the Supreme Court felt that standing was so obvious in that

13   instance that it -- you know, it simply did not address

14   standing whatsoever.  So *Burdick* hardly establishes that

15   widespread diminution of the right to vote is categorically

16   noncognizable.  In fact, the Supreme Court explicitly noted

17   otherwise.

18        Plaintiffs here also have standing based on a credible

19   threat of enforcement.

20        Maybe I should pause there, Your Honor, if you have

21   questions about the present injury or --

22        THE COURT:  I think you're going into what I do have

23   questions about --

24        MR. ENSIGN:  Okay.

25        THE COURT:  -- is -- is the Secretary's argument that

24

```
 1    I think the -- your phrase was downgrading the right to vote;
 2    is that right?
 3               MR. ENSIGN:  Yes.
 4               THE COURT:  How is that a cognizable injury?
 5               MR. ENSIGN:  Your Honor, I think under the three
 6    different lines of cases that we've identified, and let me kind
 7    of go through those.
 8          The first is we think that there's a fairly close
 9    analogy here to felony disenfranchisement laws.  You know,
10    without those laws, people -- citizens have a right to vote.
11    That as long as they follow all applicable requirements, their
12    votes will be counted.  And the effect of those statutes are to
13    transform the right to vote from if unconditional to
14    conditional, because the governor can restore that.  But
15    whether or not you get your voting rights back depend --
16    depends on how the governor, you know, exercises his authority.
17          And so in those instances, the fact that your right to
18    vote has been downgraded from one that was previously
19    unconditional to one that now depends on how a governmental
20    official exercises his -- his, you know, authority, that -- the
21    courts have recognized that that creates cognizable injury to
22    challenge the felony disenfranchisement provisions.  Those all
23    lose on the merits, because the Fourteenth Amendment allows it.
24    But, nonetheless, that is injury that supports Article III
25    standing.
```

(26 of 232), Page 26 of 232 Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 26 of 232
Case 2:24-cv-01673-MTL    Document 56    Filed 09/17/24    Page 25 of 86

25

1          Second, I think you can point -- look to the signature

2    mismatch cases that are very common in election law where that,

3    you know, no individual has any particular likelihood of being

4    disenfranchised.  But the possibility that a government and

5    someone exercising -- you know, a poll worker or some other

6    governmental official exercising governmental power could

7    wrongfully disenfranchise you, even though that probability is

8    well less than 1 percent, creates cognizable injury.

9          THE COURT:  Is that the subject matter of the case

10   that Judge Bolton has?  What -- the *Mi Familia Vota* case?  Is

11   that what's going on?

12         MR. ENSIGN:  I don't believe, Your Honor.  That case

13   involves proof of citizenship.

14         Judge Rayes in 2020 had a challenge involving

15   Arizona's requirement that you either sign your ballot or cure

16   that, your failure to sign your ballot, by when polls close.

17   That was challenged.  Under also *Anderson-Burdick* doctrine.

18   And this Court held both that plaintiff had standing and that

19   it violated the Constitution.  We took that up on appeal.  Got

20   a state-pending appeal, and ultimately the Ninth Circuit

21   reversed.  Not as to standing, but said that under

22   *Anderson-Burdick* doctrine, even though it was concedingly a

23   minimal burden, that -- that the state had satisfied its burden

24   of -- that that minimal burden on the right to vote was

25   constitutional.

(27 of 232), Page 27 of 232 Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 27 of 232
Case 2:24-cv-01673-MTL    Document 56    Filed 09/17/24    Page 26 of 86

26

1        And so similarly here, signature matching requirements
2   create the risk that a governmental official will wrongfully
3   disenfranchise you.  And throughout all of those cases, courts
4   have routinely recognized that voters have standing to
5   challenge that because it creates the risk of wrongful
6   disenfranchisement because it downgrades your right to vote
7   otherwise being unconditional to one that's conditional on how
8   governmental officials conduct their duties.  And because they
9   could wrongfully disenfranchise you, the creation of that risk
10  is cognizable injury.

11       You know, finally, we pointed to the First Amendment
12  permitting cases where when you take speech, you -- where your
13  right to, you know, speak was previously unconditional and the
14  government changes that by imposing a permit requirement in
15  order to speak, thus changing your right to speak from
16  unconditional to one being conditional on whether -- on whether
17  or not you get the permit, the Ninth Circuit has readily
18  recognized that you have standing in that requirement -- in
19  that instance to challenge the permit requirements, even if the
20  permit requirement might ultimately be constitutional.  And
21  notably, the Secretary's only distinction of those permitting
22  cases were to say those cases were problematic because there
23  was boundless discretion with the permits.  That's a merits
24  question.  The fact that you were exposed to the permitting
25  requirement at all is the cognizable injury that gives you

(28 of 232), Page 28 of 232  Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 28 of 232
Case 2:24-cv-01673-MTL    Document 56    Filed 09/17/24    Page 27 of 86

27

1   Article III standing because it degrades your right to speak

2   from one that was unconditional to one that's conditional on

3   how they exercise their duties, even if you may ultimately get

4   the permit.

5           And so similarly here, by interposing the board of

6   supervisors able to, you know, take your vote and degrade it

7   such that it depends on them exercising their duties in a

8   particular way, we think that creates present cognizable

9   injury.

10          And so under all those three lines of cases, we think

11  we have present cognizable injury now, because our right to

12  vote has been degraded from an unconditional one to a

13  conditional one.

14          THE COURT:  Okay.  Thank you.  Anything else?

15          MR. ENSIGN:  A whole second basis for standing, Your

16  Honor, as well, which is the credible threat of future

17  enforcement.

18          THE COURT:  Okay.  Why don't you go through that

19  quickly, please.

20          MR. ENSIGN:  Let me do that very quickly.

21          Here the Secretary has not only refused to disavow the

22  provision if it's ever enforced, but promised to do so.

23  Indeed, you know, this threat is demonstrated very powerfully

24  by last election cycle where there was a refusal to certify,

25  and a crisis was only narrowly avoided at the last minute.

(29 of 232), Page 29 of 232 Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 29 of 232
Case 2:24-cv-01673-MTL   Document 56   Filed 09/17/24   Page 28 of 86

28

1          So we think the fact that you don't even have to look

2   one -- more than one election cycle back to see something that

3   got very near to being this threat already demonstrates that

4   it's a credible threat.  Pre-enforcement challenges do not

5   require certainty that it will occur.  They only require a

6   credible threat.  And the fact that it occurred last election

7   cycle is alone enough to establish that credible threat.

8          But we have much more than that here.  I mean,

9   we've -- we also have the vote nullification provision itself.

10  The only reason that was -- exists and that the Secretary

11  created it was that he judged the risk that this could recur to

12  be material.  And, indeed, that's his whole merits defense.

13  That merits defense is wholly at odds with their -- with their

14  standing arguments.  They both say, we need this in order to

15  get -- you know, discharge our duties, but then simultaneously

16  say, this will never happen.

17         So there's a mismatch there as well.  But more than

18  just that, this cycle alone already, in just the primary

19  election, you had flirtation with noncertification in Pinal

20  County.  And that's likely because there was only one

21  supervisor who had lost his primary willing to do that.  If

22  there was a second vote not to certify, I don't think it would

23  have been flirtation.  I think it would have been the first

24  implication of the vote nullification provision.

25         You know, in just looking a bit further outside there,

(30 of 232), Page 30 of 232 Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 30 of 232
Case 2:24-cv-01673-MTL    Document 56    Filed 09/17/24    Page 29 of 86

29

```
 1      you know, beyond Arizona -- so you have last cycle happened in
 2      Cochise County.  This county -- this cycle you have very close
 3      in Pinal County.  And, furthermore, this is -- we've seen
 4      similar trends in multiple other states, such as Colorado,
 5      Georgia, Michigan, Nevada, and Pennsylvania.  And the DNC is
 6      presently suing in Georgia because it fears the same risk of
 7      noncertification.  And it's suing something about a lot more
 8      innocuous than we throw out every single vote if the votes
 9      aren't certified.
10              So for all of those reasons, we also think we have a
11      credible threat here.  So whether it's based on the present
12      injury based on the degradation of the right to vote or a
13      standing based on the credible threat of future enforcement,
14      which gives standing for pre-enforcement challenge, either of
15      those two bases suffices to establish standing.
16              THE COURT:  Thank you, Mr. Ensign.
17              MR. ENSIGN:  And unless Your Honor has questions on ex
18      parte Young, I'm happy to rest, Your Honor, on our briefs on
19      that.
20              THE COURT:  No, thank you.
21              MR. ENSIGN:  Thank you, Your Honor.
22              THE COURT:  Quick rebuttal, please.
23              MS. HARTMAN-TELLEZ:  Thank you, Your Honor.  I will be
24      very quick.  I just wanted to go through some of the cases that
25      plaintiffs' counsel has mentioned regarding felon
```

(31 of 232), Page 31 of 232   Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 31 of 232
Case 2:24-cv-01673-MTL    Document 56    Filed 09/17/24    Page 30 of 86

30

1    disenfranchisement or signature verification.

2          So there are five or six of those cited in their

3    papers.  The first two, the felon disenfranchisement cases,

4    involved people who have been convicted of felonies who were

5    disenfranchised because of the state law provision.  It's not

6    that they could be.  It's that they were felons, and they were

7    not prevented to vote.  They had standing.

8          When it comes to the signature verification cases, all

9    of those cases either involved organizational standing, which

10   plaintiffs are not arguing here, that they -- that their

11   clients have spent money to deal with the vote nullification

12   provision that would give them standing.  They are -- they are

13   essentially arguing either that standing of their individual

14   voter plaintiff or representational standing on behalf of other

15   voters that they say are members of their organizations.

16         So the signature verification cases.  The first one,

17   *Democratic Executive Committee of Florida vs. Lee* involved

18   affidavits -- had affidavits from Democratic voters who had

19   attempted to vote from mail and had their ballots rejected.  So

20   they had actual individuals who'd been harmed.

21         *Martin vs. Kemp*.  That was the organizational standing

22   case.

23         *Frederick vs. Lawson*.  All of the individual

24   plaintiffs in that case had voted absentee, had their ballot

25   rejected due to signature matching, and the county did not

(32 of 232), Page 32 of 232 Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 32 of 232
Case 2:24-cv-01673-MTL    Document 56    Filed 09/17/24    Page 31 of 86

31

1  inform them about that until months after the election, so they

2  were unable to secure that.

3         And then the final case that is the one that counsel

4  mentioned regarding the -- the Judge Rayes heard is *Arizona*

5  *Democratic Party vs. Hobbs* about the deadline for ballots that

6  didn't have any signature on them, not a -- not a mismatch.

7  And that was also a representational standing case, and the

8  Court said in -- the district court said:  In past elections,

9  there has been at least one ADP member whose ballot was

10  rejected due to a missing signature.

11         So in all of those cases, there were actual individual

12  voters who had been affected and disenfranchised by the laws as

13  challenged.

14         And I know time is tight, and so I don't want to -- I

15  want to make -- I want to make one other point about sort of

16  the purpose of the canvass provision in the EPM.  This may go a

17  little bit beyond standing, but I want to -- I think it's

18  important that this be on the record.

19         In addition to encouraging the counties to meet

20  their -- their statutory duties and deadlines, the canvass

21  provision is important because if -- if the Secretary delays

22  canvassing and getting final results because one county has

23  been left out, then it is possible that none of Arizona's votes

24  for all 15 counties would be finalized and, therefore, that the

25  state would not be able to issue the certificates of

UNITED STATES DISTRICT COURT

**ER-083**

1    ascertainment for the presidential election.

2         So it's a -- sort of a -- I mean, it's a terrible

3    balance.  And it's -- the Secretary will do everything within

4    his power not to have this happen.  But one of the reasons that

5    that provision exists is to -- to -- to make it less likely

6    that all 2.5 million or 4 million votes for the state are not

7    effective at all when it comes to the presidential election.

8         Thank you, Your Honor.

9         THE COURT:  Thank you.

10        MR. ARROWSMITH:  Again, Your Honor --

11        THE COURT:  Good morning.

12        MR. ARROWSMITH:  -- Nathan Arrowsmith on behalf of the

13   Attorney General, Kris Mayes.

14        I just want to start with a housekeeping.  We did

15   provide to your courtroom deputy a bound copy of a visual aid.

16        THE COURT:  I have it.  Does the plaintiffs' counsel

17   have it?

18        MR. ARROWSMITH:  Yes, they do.

19        THE COURT:  Okay.

20        MR. ARROWSMITH:  The front page of that is just a

21   version of the decision tree that we had in page 2 of our PI

22   response.  I'll just be talking about that first question now,

23   obviously --

24        THE COURT:  Okay.

25        MR. ARROWSMITH:  -- whether the Court should dismiss

1    for lack of standing.

2         But before I get into that, I just want to note that

3    I'm really not sure why we can't just resolve the case.

4    Although we don't think the plaintiffs have standing and we

5    think there are many defects with their complaint, we did say

6    in our penultimate page of our reply, Doc 50, page 12, we'd be

7    happy to resolve the case by stipulating that Section III(D) of

8    the 2023 EPM cannot and does not regulate the plaintiffs or

9    ordinary voters or member of the public, and it does not and

10   cannot amend criminal statutes -- or, excuse me -- expand or

11   amend criminal statutes.

12        I think that stipulation would address the, you know,

13   future harms that plaintiffs purportedly fear.  And, again,

14   even though we think that they haven't met their burden to

15   establish standing, we'd be willing to make that stipulation to

16   resolve the case.

17        Again, it seems, though, that the plaintiffs won't

18   accept that from the Attorney General and the Secretary of

19   State, and they insist on reading Section III(D) in a way that

20   creates constitutional problems.  Their reading really has no

21   basis in reality.  And so because they won't accept our offer

22   of stipulation, I'll press forward.

23        Before we can look to whether plaintiffs have

24   standing, we really have to see whether Section III(D)

25   regulates them.  If it doesn't, then the plaintiffs can't have

(35 of 232), Page 35 of 232 Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 35 of 232
Case 2:24-cv-01673-MTL    Document 56    Filed 09/17/24    Page 34 of 86

34

1    an injury.  And we think the language of Section III(D) and --

2    and, really, all of Chapter 9 is clear on its face.  It isn't

3    directed at the plaintiffs or any other member of the voting

4    public.

5           So if you'll -- if the Court will turn to page -- the

6    second page of the visual aid.  Which we've got the -- the

7    docket number at the top, and I'll refer to those page numbers.

8           THE COURT:  Page 144?

9           MR. ARROWSMITH:  Yes.  That first page is just --

10   it's, actually, from Chapter 8, just to flag that

11   electioneering is expressly permitted outside of the 75-foot

12   limited voting location.

13          But turning on to the next page, which is the first

14   page of Chapter 9.  And, of course, plaintiffs complaint covers

15   Chapter 9, Section III(D).  Chapter 9 is called Conduct of

16   Elections, Election Day Operations.  And we see some textural

17   markers as to who this is directed to in the first sentence

18   there.  "Upon arriving at the voting location, the election

19   board, at the direction of the officer in charge of the

20   election, must."

21          We have a long list here on page 188 on to page 189 of

22   tasks for the election board to complete.  It goes on on

23   page 190 to display some notices that the election board must

24   post at polling locations.

25          Same thing with page 191, another notice that must be

1   posted at the polling place.

2          And on page 192, the same.  Additionally, it notes at

3   the bottom that county recorders must post notices of write-in

4   and withdrawn candidates.

5          On to page 193, Additional Instructions.  And we see

6   in the first sentence there of Roman Numeral II, "The election

7   board should arrive."

8          The next paragraph in the first sentence, "Upon

9   arrival at the polling place, members of the election board

10  must take their oath of office."

11         So those are some key textural markers that this is

12  directed to the election board.

13         And then on to Section III.  Section III(A) describes

14  for these members of the election board, who are oftentimes lay

15  people who have -- you know, are -- they're normally working a

16  couple of days a year as a poll worker.  Describing the -- the

17  state of Arizona law with respect to electioneering.  So these

18  sentences here under III(A) are intended to explain in layman's

19  terms Arizona law with respect to electioneering ban.

20  Section III(B), same description as to the photographer ban.

21  Section III(C) then talks about the access restrictions,

22  because, of course, only certain individuals are -- are

23  permitted to be within the 75-foot limit at a voting location.

24         So, again, these sections are -- are directed to the

25  election board and poll workers.

1        So then on to Section III(D).  And there's no textual

2    indicator and nothing in the text that indicates that the

3    audience for this has changed, that this is directed at anyone

4    other than the election board.  Again, we do see in the second

5    sentence there, "The officer in charge of elections has a

6    responsibility to train poll workers."

7        So that first sentence is simply describing the state

8    of the law with respect to voter intimidation and harassment.

9        On page 196, there -- the first sentence there talks

10   about the officer in charge of elections and lists some things

11   that that person must do.

12        And then, finally, the bulleted list there on page 196

13   that continues on to page 197 gives examples, again, intended

14   for lay election workers, of conduct that might be considered

15   intimidating.  And the reason for that -- and I believe in our

16   motion to dismiss we -- we walked through -- that's Document 31

17   at page 3.  We walk through in more detail, you know, what

18   Section III(D) means and why it exists, but it's -- it's

19   intended for those members of the election board, those folks

20   who are running a polling place, to give them an understanding

21   of things that they should be on the lookout for, whether they

22   should -- when they should, you know, perhaps escalate

23   something to the inspector or the marshal.  Those are

24   specifically identified poll workers.  And the marshal,

25   obviously, is the one who is charged with preserving order and

(38 of 232), Page 38 of 232 Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 38 of 232
Case 2:24-cv-01673-MTL    Document 56    Filed 09/17/24    Page 37 of 86

37

1    contacting law enforcement, if necessary.  So these are

2    intended as examples for those lay election workers.

3           Nothing from -- nothing in the -- the plain text of

4    Chapter 9 of Section III or Section III(D) indicates that this

5    is directed at members of the public or is purporting to create

6    some sort of binding prohibition on members of the public.  And

7    because of that, plaintiffs cannot have standing.  This section

8    of the EPM simply does not regulate them or members of the

9    public.

10          And that really should be enough to dispose of

11   plaintiffs' claims, but they insist on -- that they insist that

12   the Court adopt a reading of Section III(D) that would lead to

13   a number of absurd results.  Of course, courts avoid absurd

14   results when there's -- when interpreting statutes or

15   regulations, particularly when there's a reasonable

16   construction that's consistent with legislative intent.

17          There is a reasonable construction available here

18   that's consistent with -- with legislative intent, which is

19   that Section III(D) is directed at election officials, and it

20   provides them with a combination -- combination of guidance and

21   instructions.  It simply does not regulate members of the

22   public.

23          So that's relevant to plaintiffs' standing, because

24   when a plaintiff is, again, you know, relying on a future harm,

25   he must show that he intends to engage in a future course of

1    conduct that's arguably prescribed by statute and that he faces

2    a credible threat of prosecution.

3         So I've walked through what -- what Section III(D)

4    means.  And because it doesn't regulate plaintiffs or their

5    members, whatever conduct that they allege cannot be prescribed

6    by Section III(D).  But they've hardly alleged any conduct.

7    American Encore alleges that it will engage in voter conduct in

8    Arizona, paragraph 14 of their complaint.  The

9    Plaintiff Glennon doesn't actually allege that she intends to

10   do anything.  Plaintiff America First Policy Institute alleges

11   that it engages in communications with Arizona voters and that

12   it communicates with adults throughout Arizona.

13        So those allegations are certainly not enough.  The

14   Ninth Circuit -- and *Lopez* is a good case on this.  The Ninth

15   Circuit has said that we need some detail about what they

16   intend to do; what, when, where, to whom, under what

17   circumstances.

18        Plaintiffs haven't alleged any of that.  And -- and

19   their allegations regarding potential criminal prosecutions,

20   the idea that someone could be prosecuted for raising their

21   voice anywhere in Arizona anytime, on any day of the year,

22   those are just too imaginary and too speculative to support

23   standing in the exercise of jurisdiction.

24        And then as to the credible threat of enforcement,

25   plaintiffs haven't made any allegation of any past enforcement

(40 of 232), Page 40 of 232   Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 40 of 232
Case 2:24-cv-01673-MTL   Document 56   Filed 09/17/24   Page 39 of 86

39

1    of any provision of the EPM against any member of the public.

2    Certainly no allegation as to any plaintiff or any member of

3    any plaintiff organization.  And they haven't made any

4    allegation that there is any threat of enforcement.

5            And this is important because plaintiffs say that

6    they've been engaging in this conduct and the same conduct that

7    would supposedly subject them to criminal liability, but they

8    don't point to any prosecutions or even threats.  There's no

9    allegation of any of those.  They ask the Attorney General to

10   disavow prosecutions, but they specifically asked that the

11   Attorney General confirm that any prosecutions for voter

12   intimidation would be brought under A.R.S. 16-1013, 16-1017, or

13   applicable criminal statutes, and not under A.R.S. 16-452(C).

14           The Attorney General said exactly that.  Any

15   prosecution for voter intimidation or harassment would be

16   brought under A.R.S. 16-1013, 16-1017, or applicable statutes

17   in Title 13 and would not be brought under A.R.S. 16-452 for

18   purported violation of -- of Section III(D).  So the Attorney

19   General said essentially exactly what plaintiffs wanted.  She

20   has disavowed the enforcement of this provision in the way that

21   they fear.  And that should be -- should be dispositive.

22           The -- the injury in fact doesn't turn on the strength

23   of plaintiffs' fears.  It turns on the credibility of the

24   threat that the challenged provision will be enforced against

25   them.  Their -- their idea that the Attorney General is -- is

1    misreading or misinterpreting the statute cannot create a

2    controversy, nor can speculative fears that a county attorney

3    may read the -- the EPM in this case.  That can't create a

4    controversy with the Attorney General.  Plaintiffs haven't

5    alleged that any county attorney has that view or would read

6    the EPM in that way.  They did not name any county attorneys.

7    They did not send a disavowal letter, to our knowledge, to any

8    county attorneys.  So any sort of allegation that a county

9    attorney could -- could read the EPM in this way is -- is

10   speculative and cannot create a controversy with the Attorney

11   General or the Secretary.

12        I also want to touch on compliance costs.  The

13   organizational plaintiffs refer to this idea that they've

14   incurred compliance costs and that that's a -- a cognizable

15   injury.  Of course, compliance costs is kind of a term of art,

16   and it's used to refer to costs incurred as a -- as a result of

17   compliance with a regulation.  A necessary prerequisite is that

18   the -- the party spending money is the object of the

19   regulation.  And the United States Supreme Court gave us some

20   additional clarity on that this summer with the *Alliance for*

21   *Hippocratic Medicine* case.  They said organizations cannot

22   spend their way into standing by saying that they've spent

23   money to oppose an action or to educate their members about a

24   particular government action.  And that's really all that the

25   organizational plaintiffs have alleged here.

1          And I also want to touch on traceability as to that

2   point.  The organizational plaintiffs haven't established that

3   any training that they are doing as -- assuming that they're,

4   you know, engaging in training, is fairly traceable to the

5   2023 EPM.  Again, the language in Section III(D) is the same.

6   There's minor changes from the 2019 EPM that was in place from

7   2019 through 2023 when the 2023 EPM was adopted.

8          So, again, we don't think that the plaintiffs have

9   sufficiently alleged compliance costs.  They are not the object

10  of the regulation here.  Again, Section III(D) doesn't regulate

11  plaintiffs or any members of the public.

12          I'm happy to take the Court's questions on standing.

13          THE COURT:  No.  Thank you.  You'll have a bit of time

14  for rebuttal, if you'd like --

15          MR. ARROWSMITH:  Okay.

16          THE COURT:  -- Mr. Arrowsmith.

17          MR. ARROWSMITH:  Thank you.

18          MR. ENSIGN:  Your Honor, strictly speaking, the

19  statutory claims really aren't even part of the standing

20  inquiry here, although I'm certainly happy to turn to them

21  next.

22          Ninth Circuit decision in *Arizona vs. Yellen* makes

23  clear that to resolve the standing inquiry, this Court must,

24  quote, view the challenge provision through plaintiffs' eyes.

25          And that's the *Yellen* case, 34 F.4th at 89.  The

(43 of 232), Page 43 of 232 Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 43 of 232
Case 2:24-cv-01673-MTL    Document 56    Filed 09/17/24    Page 42 of 86

42

1    Supreme Court embarks and will explain that standing in no way

2    depends on the merits, end quotes.

3         And, you know, obviously, what this means is part of

4    the merits.

5         And the D.C. Circuit has explained that in resolving

6    standing, this Court should, quote, assume arguendo the merits

7    of plaintiffs' legal claims, end quote.  And that's the *Parker*

8    case, 478 F.3d 377, which was ultimately affirmed by the

9    Supreme Court in *Heller* vs. -- *D.C. vs. Heller*.

10        So to resolve standing, this Court should assume the

11   correction of the speech restriction of our interpretation.

12   Doing so essentially eliminates all of defendants' standing

13   objections.  In particular, under plaintiffs' correct reading

14   of the speech restriction, plaintiffs are plainly the objects

15   of the regulation, which means they have self-evidence

16   standing.

17        Defendants do not even intend -- you know, attempt to

18   engage with that long line of cases that recognizes that

19   objects of the regulation have self-evidence standing.  Their

20   only argument is that we're not the object of the regulation

21   because it doesn't regulate the public.  They're wrong about

22   that, and I'll turn to that next.

23        But, in addition, similarly, their arguments about

24   costs and self-censorship are all premised on the idea that

25   these are self-inflicted injuries because we're wrong about the

```
 1   speech restriction.  And, similarly, the plaintiffs face no
 2   credible threat of enforcement because we're supposedly wrong
 3   about the restriction.  But those are merits questions which
 4   this Court should -- you know, cannot resolve before resolving
 5   jurisdiction.  But even if those merits and interpretive
 6   questions were fairly part of the standing inquiry, defendants
 7   arguments flail under the plain text and context of the speech
 8   restriction.
 9           Actually, if you don't mind, Your Honor, I'm going to
10   grab one.
11           You know, and the first sentence of the speech
12   restriction is the key here, and three of those words are
13   critical.  And so that's at page 181.  The sentence beginning,
14   "Any activity."
15           So there are three keywords here.  The first is the
16   word "prohibit," which absolutely precludes defendants'
17   arguments that this provision is nonbinding guidance.  Prohibit
18   can mean only one thing, a prohibition.
19           THE COURT:  It also cites Section 16-1013, which is --
20   doesn't that have criminal penalty associated with it?  Am I
21   remembering that correctly?
22           MR. ENSIGN:  It does, Your Honor.  And, actually,
23   that's another key part of this.
24           So the second keyword is the word "person."  And it --
25   and "person," there's absolutely no dispute that for purposes
```

1    of A.R.S. 16-1013, which is the provision cited, that person in

2    Section 1013 means any and all people.  Not just poll workers,

3    but every single person in Arizona's territory.

4            So "person" in Section 1013 means all persons.  And

5    there's no reason to believe that a provision that purports to

6    implement Section 13 -- 1013 should silently swap out what

7    person means for a more limited definition.

8            And that's particularly true under the third keyword

9    here, which is the word "any," which modifies "person."

10           So to the extent that "person" means anything

11   different in the speech restriction than it does in

12   Section 1013, which is the statute that it implements, it's

13   modified by the word "any."  That could only expand its

14   meaning.  It cannot contract it.  "Any" means any.  And so

15   because "person" in 1013 means any and all persons, it

16   necessarily means any and all persons here in this first

17   sentence, too.

18           THE COURT:  So what if -- what if there's somebody

19   with a big sign that says, stop voter fraud, and they're

20   outside the 75-foot limit?

21           MR. ENSIGN:  Your Honor, the speech restrictions --

22           THE COURT:  What happens?  Or what's the concern?

23           Go on.

24           MR. ENSIGN:  Well, Your Honor, the speech restriction

25   does not have a geographical limitation.  By its plain text it

 1    says that it applies inside or outside the 75-foot limit.

 2    That -- the combined universe of -- of locations, both inside

 3    and outside 75 feet, is the entire territory of Arizona.

 4         And if there was any doubt about whether or not it's

 5    intended to be everywhere, the speech restriction goes on to

 6    use that inside or outside 75 -- the 75-foot limit a second

 7    time.  So you not only have its plain text, you have repetition

 8    to underscore that that's exactly what it meant.

 9         And, similarly, Section 1013 has no geographic

10    limitation, so --

11         THE COURT:  Do you remember -- do you remember when we

12    talked at the last hearing about -- about T-shirts?  T-shirts

13    are permitted.

14         Am I remembering that correctly?

15         MR. ENSIGN:  T-shirts may be permitted.  And certainly

16    if they ran afoul of these examples --

17         THE COURT:  I'm just wondering if somebody wore a

18    T-shirt that said voter fraud is illegal, arrest perpetrators

19    or arrest violators, and they wore that T-shirt to vote at a --

20    at a voting location, what -- what do you think?

21         MR. ENSIGN:  I think that could easily fall within the

22    speech restriction.  And one of the problems is under the

23    Supreme Court's decision in *Mansky*, it has to be capable of

24    reasoned application.  And this is not.  And, indeed, you

25    cannot find the phrase "reasoned application" in their briefs,

46

 1   and they don't cite the *Mansky* case even once.

 2         And, specifically, there's a greater danger here

 3   because the mens rea requirement has been read out of

 4   Section 1013.  It specifically allows liability on the basis

 5   of, quote, intent or effect, end quote.  So whatever has the

 6   effect of harassing someone, presumably, you know, the most

 7   sensitive snowflake, that falls within the scope of the speech

 8   restriction here.

 9         So I -- you know, I think if you had a -- if you had

10   people that were wearing T-shirts that said, you know, maybe

11   Israel has a right to exist, or from the river to the sea,

12   Palestine shall be free, it's certainly possible that that will

13   have the effect in producing in people that they feel harassed.

14   And we think that that falls readily within the scope here.

15         And so, you know, it -- within the plain text alone --

16   and, you know, there's something fairly extraordinary here.

17   I'm not aware of any instance where defendants have attempted

18   to use the absurdly canon against text they drafted themselves,

19   but they seem to concede that reading this provision under its

20   plain text would somehow be absurd.  It's not.  It's

21   unconstitutional, but it's not absurd.  I mean, the Secretary

22   has made multiple statements to the public defending it on its

23   merits, so he clearly doesn't think it's absurd.  But that is

24   what its plain text says, and there's just no other way to read

25   that combination of prohibit, person, and any.

1         But even if the plain text left any doubt, the context

2    strongly supports us for four separate reasons.  And the first

3    is what I've already discussed.  It purports to implement

4    Section 1013 where a person has a clear and undisputed meaning,

5    meaning all persons.

6         Second, multiple other provisions refer to poll

7    workers or other similar terms.  So the Secretary's specific

8    use of the broader word "person" here should be given effect.

9    And that's just the straightforward application of the canon

10   that the use of different words should be given different

11   effects.  In fact, you don't have to look further than the next

12   sentence to say -- you know, to where they referred to the

13   officer in charge of elections.  They presumably used "person"

14   in the first sentence and "officer in charge" of elections in

15   the second because they meant it -- they intended a different

16   meaning.

17        THE COURT:  Then they also use the phrase "the

18   election board" and other -- in other parts of the manual.

19        MR. ENSIGN:  Yes, Your Honor.  And, you know, they

20   seem to be trying to rely on section titles or context that

21   this couldn't possibly apply to voters.  But, you know, just on

22   a quick skim here, if you turn to page 175, it refers to

23   instructions to voters and election officials.  So voters are

24   included.

25        The next page at the top, on 176, it refers to

(49 of 232), Page 49 of 232 Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 49 of 232
Case 2:24-cv-01673-MTL    Document 56    Filed 09/17/24    Page 48 of 86

48

1    "instructions to voters."

2         At the top -- near the top of page 178, it says

3    "notice to voters."

4         And, you know, immediately preceding page 80,

5    "enforcing an electioneering ban," that applies to voters.

6    "Enforcing a photography ban," that applies to voters.

7         THE COURT:  So presumably the word "person" as used in

8    part D could apply to all these people; an election board

9    worker, a supervisor, a voter --

10        MR. ENSIGN:  Absolutely.

11        THE COURT:  -- a kid who's with their parents to

12   observe the  -- the mom or dad voting.

13        MR. ENSIGN:  Absolutely, Your Honor.

14        THE COURT:  It has the broadest meaning possible.

15        MR. ENSIGN:  And it's intended to, because it's

16   modified by the word "any."  The word -- by modifying it by the

17   word "any," it's intended to have as broad as possible meaning.

18        THE COURT:  I think "any" modifies "activity."

19        MR. ENSIGN:  Your Honor, I think it modifies that

20   whole phrase, "any activity by a person."  I think that's one

21   phrase that "any" modifies all of.  Though, I take your point

22   that it could be the -- it could just be that word, but we

23   specifically argued that it modified everything, and I don't

24   think we drew any response at all from -- from defendants on

25   that.

1            THE COURT:  Okay.

2            MR. ENSIGN:  In fact, I don't think their brief

3    engages in the use of the word "any" at all.

4            THE COURT:  Okay.  Anything else to say about

5    standing, Mr. Ensign, here?

6            Briefly.

7            MR. ENSIGN:  Very --

8            THE COURT:  Briefly.

9            MR. ENSIGN:  Very briefly on context.

10           You know, the history here also strongly supports

11   this.  The legislative leaders specifically complained that

12   this violates the First Amendment.  If the Secretary and the

13   Attorney General then believe their current interpretation of

14   the statute, the easiest thing in the world would have been to

15   amend it to match their intent.  I mean, clearly the text here

16   does not match their intent.  But they're the drafters.  They

17   could have changed it.  If they actually thought that it was

18   nonbinding and affected anyone, they could simply have

19   redrafted it to match that and, thereby, satisfied the

20   legislative leaders.

21           You also have the Secretary's multiple statements that

22   he believes that this is a binding prohibition.  You also have

23   that the Secretary, unlike the Attorney General, did not

24   disavow enforcement of it.  You can search his response for any

25   disavowal.  It does not exist.  And, moreover, as we've gone

1    through this case, the -- the -- the defendant's briefs

2    themselves make clear that they think this is a binding

3    prohibition.

4         So at page 7 -- and here's what -- this was confusing

5    to me at first, and I think I finally figured it out.  I think

6    their view is that if there's no criminal charges, that the

7    First Amendment can't be triggered, that there's no

8    enforcement.  So, you know, they say, for example, but for any

9    of these -- or other examples, calling the police or asking

10   disruptive people to desist and leave is not election

11   official's and, quote, enforcing power against the public or

12   enforcing a prohibition on speech and expressive conduct.

13        So I think their view is unless there's criminal

14   charges, it's not enforcement.  But their examples and their

15   briefs make clear that they intend to enforce this at polling

16   locations.  They simply don't intend to enforce it by criminal

17   charges.

18        But the application of any coercive power by the state

19   violates the First Amendment.  In *Mansky* it was enough to tell

20   people that they couldn't wear political attire.  You didn't

21   have to arrest them for that for them to have standing to

22   challenge it.  And, you know, similarly, you have absolutely no

23   constitutional right to a driver's license, but if the state

24   tries to deny you a driver's license based on the content of

25   your speech, that certainly violates the First Amendment, even

(52 of 232), Page 52 of 232 Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 52 of 232
Case 2:24-cv-01673-MTL    Document 56    Filed 09/17/24    Page 51 of 86

51

1    though there's no criminal charges involved.

2         So because there's any application of coercive power

3    by the state triggered the First Amendment.  And between the

4    Secretary's statements and defendants' own briefs here, it

5    seems reasonably clear to us that they actually intend to

6    enforce the examples in the speech restriction at polling

7    locations.  And if there's another way to read their briefs,

8    you know, I'm not sure how to do so.

9         THE COURT:  Okay.  Thank you, Mr. Ensign.

10        MR. ENSIGN:  Thank you, Your Honor.

11        THE COURT:  I want to have a short rebuttal, and then

12   let's take a short break, and we'll shift gears into the

13   preliminary injunction motion.  And then when the defendants

14   respond, you could argue the rest of your motions to dismiss as

15   part of those -- as that response.

16        MR. ENSIGN:  Thank you.

17        THE COURT:  So, Mr. Arrowsmith, I do think it's

18   important to note that the intimidation provision uses

19   different terminology.  And I also find it significant that

20   there's the citation to 16-01 -- excuse me -- 16-1013.  And as

21   I look at that statute, Subsection B does classify this conduct

22   as a Class 1 misdemeanor.

23        So, I mean, I -- I mean, I need you to respond to

24   that.

25        MR. ARROWSMITH:  Yes, Your Honor.

(53 of 232), Page 53 of 232 Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 53 of 232
Case 2:24-cv-01673-MTL    Document 56    Filed 09/17/24    Page 52 of 86

52

 1          So -- so, again, this -- that text is a summary of the

 2    law for lay people.  And the summary is not the law.  It's --

 3    plaintiffs are -- are reading -- are trying to convert the

 4    summary of the law to statutory law, and that's just an absurd

 5    result.  And Mr. Ensign also said something about this is --

 6          THE COURT:  Well, the -- pardon me for interrupting,

 7    but the next sentence under D says, "The officer in charge of

 8    elections has a responsibility to train poll workers and

 9    establish policies to prevent and promptly reply any instances

10    of voter intimidation."

11          And then it goes on to say, "The officer in charge of

12    elections shall implement the following guidelines."  And it

13    goes on.

14          So it's clearly giving a directive to the officer in

15    charge of elections, whoever that person might be.  And it's

16    not only summarizing Section 1013, but it -- but also by citing

17    it, it's incorporating the notion that a violation can be

18    prosecuted as a Class 1 misdemeanor.

19          Am I stating that incorrectly?

20          MR. ARROWSMITH:  Well, I think it's -- it's obviously

21    an -- you know, summarizing the -- the state of -- of criminal

22    law, and it's referencing one statute there.  But there are

23    other statutes that would be applicable just generally

24    applicable criminal statutes in Title 13, federal statutes that

25    prohibit voter intimidation.

1     So it's, again, just trying to summarize for these lay

2  election workers.  And by providing instructions to the

3  officer in charge of elections, that's who is -- who this

4  section is directed at and who it is regulating.  It is --

5     THE COURT:  And don't you -- don't you agree with me

6  that there's an awful lot of discretion that this language

7  vests in an election worker or a person who's charged with

8  overseeing this kind of conduct?

9     MR. ARROWSMITH:  I'm -- I'm not sure I -- I do agree

10  with that, Your Honor.  And I want to point out that

11  plaintiffs' claim here is about prosecution only.  They claim

12  that they have a -- a credible fear of prosecution under this

13  subsection for engaging in -- in political speech.  They

14  haven't made any allegation as to, you know, a -- a poll worker

15  trying to remove someone from a polling place or trying to

16  remove someone from a voting location.  That's not an

17  allegation in their complaint.  And I don't think that

18  referencing this Election Procedures Manual is enforcing the

19  law in the way that plaintiffs are talking about it.

20     A -- a citizen -- so, you know, an example is at the

21  airport, the Trans- -- the TSA has, you know, signs that say if

22  you see something, say something.  An unattended bag, say

23  something.

24     That doesn't mean if someone --

25     THE COURT:  So -- so on -- on Scottsdale Road at about

54

1   Thunderbird is the Jewish Community Center, and there's a

2   school called Pardes there.  And right down the street is a

3   Christian church that often serves as a voting location.

4        And to pick up on an example from opposing counsel,

5   what if a group of people walked into that polling place

6   wearing shirts that said, from the river to the sea, Palestine

7   will be free, vote," with red hands, red handprints?

8        Now, presumably a lot of people who go to the J or

9   drop their kids off at Pardes might want to go vote over there,

10  particularly if they live in that neighborhood.

11       Could it be reasonable for an election worker to take

12  action against this group of people wearing those shirts?

13       MR. ARROWSMITH:  Well, it would depend on whether --

14  if they're there to vote, in Section III(A), the one, two --

15  the fourth paragraph down is clear voters and voters'

16  assistants are permitted to wear clothing with political

17  messages.  The only people within the polling place who are not

18  permitted to wear clothes or T-shirts with political messages

19  are the election board members and other election officials.

20  And that's -- this is simply referring to A.R.S. 16-515.

21       So if those individuals are -- wearing those shirts

22  are there to vote, they are expressly permitted to --

23       THE COURT:  But signs might -- if they're carrying

24  signs, that could be a different matter, outside the 75-foot

25  limit?

(56 of 232), Page 56 of 232  Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 56 of 232
Case 2:24-cv-01673-MTL   Document 56   Filed 09/17/24   Page 55 of 86

55

1          MR. ARROWSMITH:  So outside the 75-foot limit --

2     electioneering is expressly permitted outside the 75-foot

3     limit.  I think the -- the examples in Section III(D) are

4     geared toward, you know, when -- helping these lay election

5     workers have a sense of when does something cross over into

6     being intimidating or harassing.

7          But, again, someone -- you know, if a voter comes into

8     the polling place and says, hey, there's some guy in the

9     parking lot yelling at -- at people and following them to their

10    cars, if that person then alerts the marshal and then the

11    marshal contacts law enforcement, that's not -- those people

12    are not enforcing the law or enforcing Section III(D).  They're

13    alerting law enforcement to a potential instance of voter

14    intimidation.  And that's part of their job, to ensure that the

15    loading -- the voting location is safe and secure.  Just as a

16    citizen at the airport who reports an unattended bag is not

17    enforcing the law by reporting that to TSA, a -- a poll worker

18    is not enforcing Section III(D) by relying on an example here

19    to determine whether they should let the marshal know to

20    contact law enforcement.

21          THE COURT:  Okay.  It's 10:30.  Let's take a break.

22    And then when we come back, I'd like plaintiffs to argue their

23    motion for preliminary injunction.  I know there are two of

24    them, so just -- are you going to do that, Mr. Ensign, or are

25    you splitting that up?

(57 of 232), Page 57 of 232  Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 57 of 232
Case 2:24-cv-01673-MTL    Document 56    Filed 09/17/24    Page 56 of 86

56

1    MR. ENSIGN:  I am, Your Honor.  And I'm -- I can do

2    them completely or together sequentially, however you'd like.

3    THE COURT:  Your co-counsel --

4    MR. GOULD:  Your Honor, for the record, I've noticed

5    Mr. Ensign has been incredibly lazy around the office, so I've

6    tasked him with taking care of this hearing today.

7    THE COURT:  Oh, well, listen to that.  I don't know.

8    I think Mr. Ensign might outrank you at the firm, though --

9    MR. GOULD:  I don't think so.

10    THE COURT:  -- in terms of --

11    MR. GOULD:  That's --

12    THE COURT:  No?

13    MR. GOULD:  -- an impossibility.

14    THE COURT:  Oh, it's the other way around?

15    MR. ENSIGN:  I do not.

16    THE COURT:  Okay.  Can we do that?  We'll do the

17    motions for preliminary injunction and then the defendants'

18    responses.  I understand there will be a -- not only the

19    opposition to the motion for preliminary injunction, but some

20    motion to dismiss arguments mixed in there.  And then I'll give

21    the plaintiffs the last word.

22        And if we take like a five- to ten-minute break, if

23    you could do 20 minutes, 20 minutes, ten minutes, so that'll

24    get us to 50 minutes for an hour, and then a few extra minutes

25    just in case.

(58 of 232), Page 58 of 232   Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 58 of 232
Case 2:24-cv-01673-MTL    Document 56    Filed 09/17/24    Page 57 of 86

57

1              Can we do that?

2              MR. ARROWSMITH:  Sure.

3              THE COURT:  Okay.  Thanks, everybody.

4              MR. ENSIGN:  Yes, Your Honor.

5              THE COURT:  We're at recess.

6         (Recess from 10:30 a.m. to  10:44 a.m.)

7              THE COURT:  Be seated, please.

8              Mr. Ensign.

9              MR. ENSIGN:  Thank you, Your Honor.

10              Do you have a preference as to which claim I address

11    first?

12              THE COURT:  Nope.  Just stay within 20 minutes,

13    please.

14              MR. ENSIGN:  Thank you, Your Honor.

15              Let me turn to the speech restriction first.  And I

16    think the constitutional merits here, I think -- I don't know

17    that there's a lot of dispute about this.  I think almost

18    everything turns on whether or not this is an enforceable

19    prohibition.

20              There's only a couple other aspects, and I'll

21    certainly weigh in on, but I think the central question is, is

22    the speech restriction a binding prohibition enforceable by

23    some coercive power by the state or not?  And that will

24    ultimately determine the merits of the constitutional claims.

25              And I think -- you know, right before we had a recess,

(59 of 232), Page 59 of 232 Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 59 of 232
Case 2:24-cv-01673-MTL   Document 56   Filed 09/17/24   Page 58 of 86

58

1    I think you had essentially an admission that it is an

2    enforceable prohibition.  I believe opposing counsel said that

3    poll workers could look at the examples in the speech

4    restriction and, based on their -- their reference to that

5    speech restriction, ask people to stop and, if necessary, to

6    leave voting locations.

7         Now, asking -- the government asking a private citizen

8    to ask -- to leave a place that they have a right to be is the

9    application of coercive force.  It has more effect than that,

10   too, because the voter may be there to vote.  So the ejection

11   from the polling place may, in fact, also deny them their right

12   to vote.

13        But there is not a division within the First Amendment

14   that only criminal prohibitions violate the First Amendment.

15   As we talked about earlier, denying someone a driver's license

16   based on their speech would also violate the First Amendment.

17   And we've pled that any prohibition based on the speech

18   restriction violates the First Amendment.

19        So I think that's the key thing.  And based on it

20   being a binding prohibition, we think the speech restriction

21   violates the First Amendment in five distinct ways:

22        The first is that it -- it has no mens rea

23   requirement.  The -- the Supreme Court has made clear that

24   for -- to charge people with a crime or to otherwise enforce

25   against them speech that is intimidating or harassing, there

1   must be a mens requirement -- mens rea requirement of at least

2   recklessness.  And that's the *Counterman* case.

3        In this particular instance, the defendants do raise

4   one additional argument beyond it not -- purportedly not being

5   enforceable, and that is that they say that the speech

6   restriction did not, in fact, meet out the mens rea

7   requirements.  But the fact that it uses -- and this is the

8   first sentence of the speech restriction -- uses the language

9   that liability can be premised on, quote, intent or effect, end

10  quote, necessarily dispenses with mens rea entirely.  It's --

11  basing liability and based -- the prohibition purely on a

12  effect by definition is a strict liability prohibition.  And so

13  it violates the Supreme Court's decision in *Counterman*.

14       Second, the speech restriction purports to ban speech

15  based on mere offensiveness.  And that's one of the specific

16  examples that's provided on page 182.  And so by doing so, it

17  violates numerous Supreme Court authority, but in particular

18  *FCC vs. Pacifica*, *Cohen vs. California* as well.  And so the

19  fact they have in there examples that speech can be banned

20  simply because it's considered offensive, which we've heard

21  today, that poll workers would be entitled to look at and use

22  to enforce, that also violates the First Amendment.

23       Third, and fairly relatedly, because the speech

24  restriction is a content and viewpoint-based regulation of

25  speech, because it regulates things based on the -- like

1    offensiveness as well as whether or not it's insulting

2    language.  That violates the First Amendment as well, and a

3    very good example of that is the Supreme Court's decision in

4    *Matal*.

5            And the fourth and fifth violations are kind of a

6    tandem because to the extent that the speech restriction

7    applies to both public and nonpublic forms, it violates the

8    First Amendment's demands as to both of them.

9            As to public forums, it violates it because the First

10   Amendment.  That is because its content-based and doesn't

11   satisfy strict scrutiny.  It further violates the First

12   Amendment because it doesn't allow adequate alternative

13   channels for communication because it has no geographic

14   limitation.  Because it applies to the whole state, there are

15   no alternative locations where it does not apply.

16           And as to nonpublic locations, such as polling

17   stations, you have to have two things.  And the Supreme Court

18   made this clear in the *Mansky* case.  It can't be

19   viewpoint-based, which we think it is and we've alleged.  And

20   their only real response is this isn't a binding prohibition,

21   so we're kind of back on that.  And it also has to be capable

22   of reasoned application.

23           The Supreme Court specifically said that in the *Mansky*

24   case, which was a ban on political attire.  And Minnesota was

25   unable to articulate where the lines were, what's political,

(62 of 232), Page 62 of 232 Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 62 of 232
Case 2:24-cv-01673-MTL    Document 56    Filed 09/17/24    Page 61 of 86

61

```
1      what's not, and to show that it would be enforced in the -- you

2      know, in a consistent way because it wasn't capable of reasoned

3      application.

4            They have never even argued that the speech

5      restriction is capable of reasoned application, and nor have

6      they ever cited or engaged with the Mansky case.  So if this is

7      a binding prohibition, it violates the First Amendment and

8      is -- essentially there's no defense.

9            So we think for all five of those reasons the speech

10     restriction violates the First Amendment if it's a binding

11     prohibition.  And for all the reasons we've explained in the

12     prior -- you know, prior discussion, it is.  It applies to any

13     person, and it specifically says that activities by them that

14     fall within its scope are prohibited.

15           And whether or not that's enforced criminally or

16     through other uses of coercive force, like telling people that

17     they have to leave and can't vote, it doesn't matter.  The

18     First Amendment prohibits any application of state coercive

19     power based on what people are saying, as long as it's

20     protected speech, which -- which this is.

21           So I'll shift to the vote nullification provision

22     unless you have questions on that.

23           THE COURT:  I do not.

24           MR. ENSIGN:  So I think it is worth returning to the

25     stakes here.  The Secretary admits that if the vote
```

1    nullification provision were ever triggered, it would impose a

2    severe burden on the right to vote.  Under *Anderson-Burdick*

3    doctrine, if there's a severe burden, the state regulation has

4    to satisfy strict scrutiny.  The Secretary has never even

5    attempted to argue that the vote nullification provision

6    satisfies strict scrutiny.  Its briefs don't use the word

7    "compelling interest."  It doesn't use the word "narrow

8    tailoring."  I don't believe it uses "strict scrutiny" at any

9    point.

10            So if the -- if this provision is ever triggered, it

11   is concedingly unconstitutional.  And so their only defense is

12   not that it wouldn't be unconstitutional if it were ever

13   applied.  It seems to be that their defense is that the burden

14   is not currently severe because it's not yet applied.

15            The Secretary, thus, argues the burden should be

16   discounted now based on the possibility that it will never be

17   imposed.  But the case law that the Secretary has scrupulously

18   and repeatedly ignored makes clear that no such probabilistic

19   discount is available.

20            For example, the risk that any particular voter in *Lee*

21   would be disenfranchised due to the signature matching

22   requirement was well less than 1 percent.  But despite that,

23   the Eleventh Circuit had no trouble at all holding that the

24   burden was, quote, at least a -- a serious burden, end quote,

25   by evaluating the burden, you know, in the context of when it

(64 of 232), Page 64 of 232   Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 64 of 232
Case 2:24-cv-01673-MTL   Document 56   Filed 09/17/24   Page 63 of 86

63

1   was being imposed, not in some sort of abstract probabilistic

2   discounted way.  And that's 915 F.3d at 1321.

3          Similarly, in *Husted*, the challenged policy only

4   affected a small number of voters, less than .5 percent of

5   voters.  But the Sixth Circuit also evaluated the burden for

6   purposes of Anderson-Burdick by looking to the burden as when

7   it was imposed rather than having some sort of probabilistic

8   discount, because 99.5 plus percent of voters would never

9   encounter that burden.  And that -- in that case, the Sixth

10  Circuit held that the challenged policy imposed, quote, a

11  substantial burden, end quote.

12         And that's --

13         THE COURT:  Can you give me one -- one moment,

14  Mr. Ensign.

15      (The Court and the court reporter confer.)

16         THE COURT:  Okay.  Can you speak a little slower

17  for --

18         MR. ENSIGN:  Yes, Your Honor.

19         THE COURT:  -- the court reporter.  I know I put a

20  time pressure on you, but she needs to be able to type at a

21  reasonable speed.

22         MR. ENSIGN:  I appreciate it, Your Honor.  Your --

23  Your Honor's not the first to tell me that.

24         So -- but although plaintiffs cited both *Lee* and

25  *Husted* in their motion and then noted in their reply brief that

1    they ignored them, the Secretary still refused to engage in

2    those cases in the reply brief.  The Secretary, thus, provides

3    no basis for distinguishing those cases or explanation of why

4    it would not be fatal for his arguments for this Court to

5    follow the approach of the Sixth and Eleventh Circuits.

6         So there simply is not case law that supports this

7    probabilistic discount that they seem to be saying.  The

8    question is, when -- if and when the speed -- the vote

9    nullification provision is enforced, would it impose a severe

10   burden?

11        And the Secretary has conceded on page 10 of his reply

12   brief that if it's ever triggered, it will impose a severe

13   burden.  And so in that posture, and without a defense that the

14   vote nullification provision can satisfy strict scrutiny,

15   then -- then it's conceded that it's unconstitutional.

16        And so, you know, as a straightforward application of

17   that, we think that the vote nullification provision is

18   unconstitutional, and this Court should enjoin it.

19             THE COURT:  Okay.  Thank you.

20             MR. ENSIGN:  Thank you, Your Honor.

21             THE COURT:  How does counsel for defendants want to

22   handle this?  Are you going to split up time, or is somebody

23   going to take both?

24             MR. ARROWSMITH:  Yeah.  Excuse me, Your Honor.  Yes,

25   we'll split time.  I'll just --

(66 of 232), Page 66 of 232 Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 66 of 232
Case 2:24-cv-01673-MTL    Document 56    Filed 09/17/24    Page 65 of 86

65

1          THE COURT:  Okay.

2          MR. ARROWSMITH:  -- address the speech restriction

3    first.

4          THE COURT:  Thank you, Mr. Arrowsmith.

5          MR. ARROWSMITH:  Thank you, Your Honor.

6          So I -- there's a lot to cover.  I just -- I want to

7    start with just I don't understand why the plaintiffs won't

8    just accept the -- a unconstitutional reading of the -- the EPM

9    that eliminates their fear.

10         And we've sort of heard Mr. Ensign move away from

11   what's pleaded in their complaint, which is a fear of

12   prosecution.  And he was now talking about, you know, coercive

13   power of -- of the government, and that's not an allegation

14   that's in their complaint.  If it were, we would have some

15   serious ripeness issues.  All of those situations of voter

16   being removed from a -- a polling location for engaging in --

17   in speech are -- are far too speculative for -- to create a

18   controversy at this time.

19         And I'm -- I want to also note that in terms of -- of

20   standing, the Court is not bound to accept plaintiffs'

21   interpretation.  In interpreting the statute or -- excuse me --

22   interpreting the EPM is not considering the merits.  The *Lopez*

23   case that we've cited is clear that a plaintiff has not

24   established an injury where the statute clearly fails to cover

25   his conduct.  And for a pre-enforcement challenge, courts look

(67 of 232), Page 67 of 232   Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 67 of 232
Case 2:24-cv-01673-MTL    Document 56    Filed 09/17/24    Page 66 of 86

66

1    to whether the challenged law even applies to the plaintiff.

2    That -- that determination is for the Court to make.  The Court

3    need not accept plaintiffs' reading of the statute.  And,

4    again, plaintiffs' reading of the EPM is -- leads to a number

5    of absurd results.

6         Again, so plaintiffs are -- are arguing that because

7    of 16-452(C) that -- that any -- that they or their members

8    are -- are potentially subject to criminal prosecution.  They

9    aren't challenging underlying criminal statutes that -- that

10   criminalize voter intimidation or harassment.  They are not

11   challenging 16-1013 or 16-1017 or any provision of Title 13.

12   They're saying that this sentence in Section III(D), which is

13   on the -- the top page of page number 195 of the handout,

14   they're saying that that sentence subjects them to -- to

15   criminal prosecution under 16-452(C), and that's an absurd

16   result.

17        The Secretary of State does not have the authority to

18   promulgate a criminal restriction that applies everywhere in

19   Arizona all the time every day of the year.  Plaintiffs note in

20   their complaint, paragraph 37, that the Arizona Legislature has

21   delegated limited authority to the Secretary.  They note the

22   topics on which he's authorized to promulgate rules.  The

23   Secretary also doesn't have the authority to amend or expand

24   criminal statutes.

25        We're not disputing that the Secretary does not have

1    that authority.  In order to get to plaintiffs' reading, the

2    Court would have to conclude that he does, and that's an absurd

3    result that must be avoided.

4        I also want to touch on some additional points as to

5    the preliminary injunction.  Just a moment.

6        So, again, we think plaintiffs are -- are unable to

7    meet their burden to show likelihood of success on the merits

8    because the -- the -- the plain language of the EPM

9    Section III(D) does not regulate plaintiffs or does not

10   regulate members of the public.  Again, it is directed to

11   election officials, and it -- if the EPM regulates anyone at

12   any point, it is election officials.

13       Turning to irreparable harm, plaintiffs have not met

14   their burden on irreparable harm.  And I will note that should

15   the Court consolidate the -- the hearing today with -- with

16   trial on the merits, plaintiffs' burden is even higher.  At the

17   preliminary injunction stage, they must make a clear showing of

18   standing and a -- a clear showing that irreparable harm is

19   likely in the absence of an injunction.  If the Court

20   consolidates the hearing with trial on the merits, that burden

21   is even higher, and plaintiffs have not met that burden.

22       I just also want to touch on the contents of Purcell

23   and laches.  And we think that those are -- are clear examples

24   of how the balance of hardships tips toward the government.

25       First the *Purcell* principle, of course, is that

1    federal courts should not change the rules of an election on

2    the eve of an election, should not cause judicially created

3    confusion.  And that's what we think would be the clear result

4    of an injunction here, especially given that there is currently

5    an injunction in the state court case.  There's no need for an

6    overlapping injunction here.

7         And laches is relevant because, again, this language

8    that they focus on, that -- that very first sentence of

9    Section III(D), was in the 2019 EPM.  And it has been in the

10   EPM since 2019.  You know, they referenced a letter from

11   President Petersen and Speaker Toma.  That was a lengthy letter

12   that contained a number of -- of complaints about the EPM, and

13   it was submitted as a public comment during a public comment

14   period.

15        I'm sure the Court is aware that when agencies receive

16   public comments, they can't respond to or address all of them.

17   And that doesn't -- the fact that President Petersen and

18   Speaker Toma think something could be interpreted in a certain

19   way does not mean that it should be interpreted in that way or

20   that that reading is reasonable.  Even that reading would

21   assume that the Secretary has authority that he doesn't have

22   and that he has not purported to exercise.

23        So, again, laches is relevant because that -- that

24   provision has been in the EPM since 2019, at least one

25   plaintiff in this case is part of the state case.  The amended

1   complaint in that case was filed on April 15th.  The

2   preliminary injunction in that motion in that case was filed on

3   May 28th.  This case was not filed until July 8th, and then the

4   preliminary injunction motion was filed ten days later.

5        Plaintiffs don't offer any explanation for that delay,

6   nor do they offer any evidence of any harm that has occurred as

7   a result of this provision of the EPM from 2019 to the present.

8   And that's relevant to their burden on the preliminary

9   injunction.

10       I want to make sure that Ms. Hartman-Tellez has enough

11   time, unless the Court has other questions.

12       THE COURT:  No.  Thank you, Mr. Arrowsmith.

13       MR. ARROWSMITH:  Okay.

14       MS. HARTMAN-TELLEZ:  Thank you, Your Honor.  I will do

15   my best to be brief here.

16       I'd like to respond at the outset to something that

17   plaintiffs argued.  And it's possible that this was an argument

18   that they made during the standing section.  But with respect

19   to the -- the injury and -- and the sort of discussion of vote

20   dilution, they asserted that the Secretary cited only the

21   *Burdick* case to say that that vote dilution is not a cognizable

22   injury.

23       In our reply, we cited a case that was decided

24   two weeks ago by the Ninth Circuit, the *Election Integrity*

25   *Project California* case.  So this is binding authority on this

(71 of 232), Page 71 of 232   Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 71 of 232
Case 2:24-cv-01673-MTL    Document 56    Filed 09/17/24    Page 70 of 86

70

1    Court.  And it essentially says that vote dilution is not a

2    cognizable claim outside of the redistricting context.  And we

3    do not have that here.

4        Plaintiffs have further argued that that the Secretary

5    has admitted that the application of the canvass provision,

6    were it to require that votes of a county not be included --

7    included in the final canvass -- statewide canvass, would be a

8    severe burden.

9        We agree that not including the votes of a group of

10   a -- after an entire county's voters in the final canvass, in

11   the final results, would be a severe burden, but that doesn't

12   mean that we've agreed that it's unconstitutional.  There are

13   compelling interests on the other side, and those --

14       THE COURT:  I just want to be clear here.  It's --

15   it's the position of the Secretary of State that if two of the

16   three members of the Cochise County Board of Supervisors do not

17   canvass, the Secretary of State excludes Cochise County voters,

18   all of them, that's constitutional?

19       Is that the Secretary's position?

20       MS. HARTMAN-TELLEZ:  It's -- you know, it's difficult,

21   Your Honor, because that is, again, a --

22       THE COURT:  Yes or no?

23       MS. HARTMAN-TELLEZ:  No, but it's a hypothetical, and

24   there are other concerns.

25       THE COURT:  But it's a hypothetical that your client

1    forsees.  And your client has made the determination that he

2    has to have the authority to disenfranchise every single voter

3    in the state of Arizona if the counties don't canvass, that is

4    your client's decision, when your client has mandamus available

5    to it and mandamus proved to be effective.

6          So yes or no?  Does your client think that this

7    ultimate remedy, if he chooses to exercise it, is that

8    constitutional or not?

9          I need an answer from you.

10         MS. HARTMAN-TELLEZ:  Your Honor, it's -- if the choice

11   is between disenfranchising the -- every single voter in

12   Arizona or some of the voters in Arizona, it -- I -- it --

13         THE COURT:  So let's pick --

14         MS. HARTMAN-TELLEZ:  -- would be crucial --

15         THE COURT:  -- Santa Cruz County or La Paz County.  I

16   think that's the smallest county.  One of them.

17         MS. HARTMAN-TELLEZ:  Greenlee.

18         THE COURT:  Okay.  Go with Greenlee.

19         If Secretary Fontes decides he has to skip or throw

20   out, whatever verb you want to use, the voters of Greenlee

21   County, is that constitutional?

22         MS. HARTMAN-TELLEZ:  If -- if the -- because the only

23   other -- the -- the option is that is --

24         THE COURT:  No.

25         MS. HARTMAN-TELLEZ:  -- is that none of the votes are

(73 of 232), Page 73 of 232 Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 73 of 232
Case 2:24-cv-01673-MTL    Document 56    Filed 09/17/24    Page 72 of 86

72

```
 1    counted, then I believe it would be constitutional.

 2          But I want to make sure that the record is clear that

 3    the Secretary has committed that he will do everything within

 4    his power, including filing a mandamus action seeking other

 5    court intervention, to avoid that result.

 6          THE COURT:  It seems like a nuclear bomb.  It seems

 7    like --

 8          MS. HARTMAN-TELLEZ:  Your Honor --

 9          THE COURT:  -- like it --

10          MS. HARTMAN-TELLEZ:  -- it --

11          THE COURT:  It just seems to me to be totally

12    unnecessary when mandamus is available and effective.

13          MS. HARTMAN-TELLEZ:  And, Your Honor, I -- I -- I

14    don't disagree that mandamus is the -- is the way to solve this

15    problem, but this -- that's what the -- the -- the plaintiffs,

16    then, are asking this Court to issue an advisory opinion

17    crafting a state law remedy.

18          We don't have -- that isn't the situation here.

19    Plaintiffs are not entitled to a preliminary injunction just by

20    resting on the allegations of their complaint.  They have to

21    show an immediate threatened injury.  And that immediacy they

22    cannot do.  This has never happened before.  It didn't happen.

23          THE COURT:  It didn't have to.

24          MS. HARTMAN-TELLEZ:  It didn't --

25          THE COURT:  It almost happened.
```

(74 of 232), Page 74 of 232  Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 74 of 232
Case 2:24-cv-01673-MTL    Document 56    Filed 09/17/24    Page 73 of 86

73

1          MS. HARTMAN-TELLEZ:  It didn't happen because the

2    Secretary --

3          THE COURT:  But you --

4          MS. HARTMAN-TELLEZ:  -- obtained -- obtained relief.

5          THE COURT:  That's my point.  And don't you think that

6    the fact that the Secretary feels he needs to include this

7    nuclear bomb in his arsenal of -- of tools, don't you think

8    that that shows that he thinks that this is something that

9    might happen?

10         MS. HARTMAN-TELLEZ:  It's -- I have represented

11   election officials for a long time, and one thing that I have

12   learned about them is that they are incredibly comprehensive

13   planners.  They try to determine every possible thing that

14   could go wrong and plan for it.  And that's what you have here.

15   You have a plan -- plan that no one wants to ever put into

16   action.

17         THE COURT:  But here's some other alternatives:  He

18   can get legislation from the legislature.  That gives him a

19   direct action in the Arizona Supreme Court with the direction

20   of the Arizona Supreme Court that they must hear and rule on

21   within a certain amount of time.  He could go to the Arizona

22   Supreme Court and ask for a rule change.  There is an expedited

23   election review rule, as you're well familiar with.  And

24   whenever that was, ten, 12 years ago, the Arizona Supreme Court

25   gladly adopted that rule change.

(75 of 232), Page 75 of 232  Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 75 of 232
Case 2:24-cv-01673-MTL    Document 56    Filed 09/17/24    Page 74 of 86

74

1          There's so many different things that he could have

2     done in order to accomplish this objective of planning.  And

3     instead, he wishes to have a tool in his arsenal that would

4     disenfranchise voters.  I just can't -- I can't make sense of

5     that.

6          MS. HARTMAN-TELLEZ:  I -- Your Honor, I understand

7     your -- your discomfort with that.  And all of those other

8     things that you have proposed -- and plaintiffs gave, like, a

9     list of them in their papers -- are -- are things that the

10    Secretary might be able to do, or depending on the situation,

11    could put into practice.  The Secretary has said that he will

12    do that.

13         The -- I'm sorry.  I mean, he -- he has specifically

14    told the plaintiffs that he will use the tools at his disposal

15    to avoid what the Court has called the nuclear bomb.

16         THE COURT:  Uh-huh.  And I think he will.  I trust

17    that he will.  And I trust the Arizona court system.  And I

18    trust your boss -- your ultimate boss to do what's right.  It's

19    just very hard for me to reconcile that this is necessary.

20         MS. HARTMAN-TELLEZ:  Your Honor, I understand that

21    completely, and I -- but I really do think that this is a

22    matter of sort of state election administration and that the --

23    any remedy should be fashioned by the state courts should the

24    nuclear bomb be armed.

25         THE COURT:  Okay.  Dr. Strangelove.  You've seen that

(76 of 232), Page 76 of 232  Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 76 of 232
Case 2:24-cv-01673-MTL    Document 56    Filed 09/17/24    Page 75 of 86

75

1  one?

2          MS. HARTMAN-TELLEZ:  Yeah.  So if the Court has no

3  further questions --

4          THE COURT:  I do not.  Thank you --

5          MS. HARTMAN-TELLEZ:  Thank you.

6          THE COURT:  -- Ms. Hartman-Tellez.

7          MR. ENSIGN:  Thank you, Your Honor.  I'll try to keep

8  it brief.

9          On the vote nullification provision, just three quick

10  things:

11          First, they refer to the Ninth Circuit's -- I think

12  it's *EPICa* case.  Here's what that says.  "A vote dilution

13  claim requires a showing of disproportionate voting power for

14  some voters over others."

15          Now, if voters of a particular county are completely

16  disenfranchised and voters in other counties are not

17  disenfranchised, that is a disproportionate effect on them and

18  readily satisfies that requirement.  So unless the vote

19  nullification provision were triggered in all 15 states [sic]

20  it by definition will impose a disproportionate burden every

21  single time it is ever invoked.

22          Second, you know, they refer to the other

23  alternatives, but I heard no discussion of just certifying the

24  unofficial results.  And so if we're in a situation where an

25  alternative is throwing out all votes, potentially millions of

(77 of 232), Page 77 of 232 Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 77 of 232
Case 2:24-cv-01673-MTL    Document 56    Filed 09/17/24    Page 76 of 86

76

1    votes if it were Maricopa County, there's no explanation of

2    just why not using the somewhat imperfect unofficial results

3    would be -- would be, you know, constitutionally inferior to

4    throwing outs all votes, potentially hundreds of thousands or

5    millions of them.

6         And, finally, we're here alleging that this violates

7    the federal constitution.  It absolutely is the province of

8    this Court to enforce a federal remedy for a violation of the

9    federal constitution.  And it's, frankly, kind of bizarre that

10   they think that this Court would do anything otherwise if it

11   thought it violated the Constitution.

12        Turning to the speech restriction.  And just quickly

13   circling back to what this Court raised at the beginning, I do

14   think consolidation is appropriate here.  As you've heard

15   today, basically everything turns on what the speech

16   restriction means and whether it's a binding prohibition.

17   Everything flows from that.  I think that's a pure question of

18   law that this Court is well suited to adjudicate on the current

19   papers, and there's no reason to prolong things here.

20        You know, I further think the admissions here that

21   they intend to enforce the examples of the speech restrictions

22   at polling locations makes that very easy, that there's no

23   disavowal here.  And, in fact, there's all but a commitment to

24   enforce these examples at polling locations and to use the

25   coercive force of the state in an escalating manner if people

(78 of 232), Page 78 of 232 Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 78 of 232
Case 2:24-cv-01673-MTL   Document 56   Filed 09/17/24   Page 77 of 86

77

1    don't abide by these examples.  So we think that sets forth a

2    clear violation.

3           If you'll excuse me for just a second.

4           You know, that's made clear by the Secretary's

5    comments, who's made multiple comments indicating that he

6    believes this is a binding prohibition.  You know, he said the

7    state court's injunction, quote, put nonprotected harassment

8    intimidation speech versus First Amendment rights of voters to

9    peaceably assemble.

10          I mean, there -- there is his entertainment that this

11   regulates speech.  He accused our clients of wanting people

12   to -- or trying to create chaos and disorder, and he wants

13   people -- and that we desire that people can, quote,  can get

14   yelled at and screamed at by wackos.

15          You know, a completely nonbinding prohibition.  An

16   injunction of that cannot result in any substantive effect in

17   the world.  The only reason that he thinks that people are

18   going to be yelled at and screamed at by wackos as a result of

19   the state court injunction is precisely because he does believe

20   this is a binding prohibition, and he's made multiple

21   statements to that effect.  So we think that's -- we think

22   that's quite clear.

23          You know, finally, I think the Attorney General had

24   repeated a phrase of why are we here.  I think that question

25   can easily be turned back to them.  It's very clear that the

 1    text of the speech restriction does not match their intent.  At

 2    either point, either responding to the leaders or entire

 3    pendency of this case, they could amend the speech restrictions

 4    to say what they say it says.  They've steadfastly refused to

 5    do so and, instead, they've -- you know, from our perspective,

 6    they've played games with us as to whether or not they're going

 7    to enforce this and how.

 8         You know, and, finally, just as to whether or not this

 9    is a binding prohibition and whether or not the Secretary can

10    do it, under Section 542(C), the violation of any rule in the

11    EPM is a Class 2 misdemeanor.  The speech restriction

12    specifically says that anything that falls within its scope,

13    any activity by a person within its scope, is prohibited.  So

14    that's a violation of the EPM.  1013 does not give the

15    Secretary any rulemaking power to say anything about 1013.

16         THE COURT:  Now, let me ask you this:  So just because

17    the Secretary or the Attorney General won't prosecute, that

18    doesn't mean that a county attorney would -- would refuse to

19    prosecute.  A county attorney can make an independent decision,

20    Pima County, Pinal County, et cetera; is that right?

21         MR. ENSIGN:  That's absolutely correct, Your Honor.

22    And, notably, the -- the Attorney General's response to our

23    request that she disavow enforcement specifically noted that

24    the county attorneys could specifically do so.  And we think

25    because of the plain text reading of the speech restriction,

(80 of 232), Page 80 of 232 Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 80 of 232
Case 2:24-cv-01673-MTL   Document 56   Filed 09/17/24   Page 79 of 86

79

1   there's no reason to believe that they would read it as the

2   Secretary -- as the Attorney General does, which, you know, at

3   times seems to admit that reading it under his plain text is

4   absurd.

5          You know, they seem to call that absurd.  They even

6   put plain text in scare quotes in their reply brief.  But

7   that's the only way to read those words.  And if they didn't

8   like that result, it's their text.  They can amend it.  They've

9   refused to do so precisely because they presumably want it to

10  be enforced.  And the examples in their briefs make clear that

11  they do want it to be enforced if only, perhaps, not

12  criminally.

13         THE COURT:  Okay.  Anything else?

14         MR. ENSIGN:  No, Your Honor.  That's it.

15         THE COURT:  Okay.  Thanks.

16         We have the abstention motion.  Do you want to say a

17  few words about that, Mr. Arrowsmith?  Is that your --

18         MR. ARROWSMITH:  Yes.

19         THE COURT:  Okay.  Thank you.

20         MR. ARROWSMITH:  On that, Your Honor, I'll just be

21  very brief.  And we filed, I believe, yesterday just a notice

22  from the Arizona Court of Appeals.

23         THE COURT:  I did get it with Judge Gass' -- did he

24  set a briefing schedule --

25         MR. ARROWSMITH:  Yes.

1          THE COURT:  -- on the -- your client's motion to stay?

2          MR. ARROWSMITH:  Yes, that's correct.

3          THE COURT:  Okay.  So we, again, think if the -- you

4    know, as we set forth in our papers, if the Court is not

5    inclined to dismiss for lack of standing, that the Court should

6    abstain as to Count 2.  And I think that that -- you know, the

7    briefing schedule on the -- the motion for state pending appeal

8    illustrates that the -- you know, the case is -- is before the

9    Arizona Court of Appeals.  The Arizona Court of Appeals will be

10   determining what Section III(D) and A.R.S. Section 1252 mean in

11   context.  And, you know, part of the inquiry is whether, you

12   know, there's a -- a reason -- you know, that the

13   interpretation is doubtful.

14          Plaintiffs' interpretation is doubtful for the reasons

15   that I've articulated earlier.  And we think because, you know,

16   that case is, you know, now at the Arizona Court of -- Court of

17   Appeals, this isn't like we're saying, you know, go back to

18   state court.  The -- the very issue that they're asking you to

19   rule on is currently being litigated in state court by one of

20   the same parties and will soon be considered by the Arizona

21   Court of Appeals.  And we think that that's an important reason

22   for this Court to consider abstention.

23          THE COURT:  Okay.

24          MR. ARROWSMITH:  And that's all I'll add on that.

25          THE COURT:  All right.  Thank you --

(82 of 232), Page 82 of 232  Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 82 of 232
Case 2:24-cv-01673-MTL    Document 56    Filed 09/17/24    Page 81 of 86

81

1          MR. ARROWSMITH:  Thank you.

2          THE COURT:  -- Mr. Arrowsmith.

3          Anything to say in response, Mr. Ensign?

4          MR. ENSIGN:  I'll try one minute or less, Your Honor.

5          It -- *Pullman* abstention is strongly disfavored and

6   almost never appropriate for the First Amendment context.

7   There's no reason to make an exception here.  We think they

8   fail on all three factors.  They haven't established that this

9   is a sensitive issue on social policy.  In fact, the First

10  Amendment is a unique area of federal concern.

11         Second, we don't think -- we think that their

12  interpretation is not doubtful.  It's clear, as we've

13  discussed.

14         And, third, it's now clear that *Pullman* abstention

15  will not resolve this controversy, because they intend to

16  enforce this even if the state courts resolve the statutory

17  interpretation issue in their favor.  I mean, we've heard under

18  their interpretation they think this is a binding prohibition

19  that can be enforced, apparently just not criminally.  So that

20  third *Pullman* factor no longer applies either.

21         THE COURT:  Thank you.

22         MR. ENSIGN:  Thank you, Your Honor.

23         THE COURT:  Would you like to say anything in

24  rebuttal?  I know your brief, Mr. Arrowsmith, you go through a

25  lot of cases where --

(83 of 232), Page 83 of 232 Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 83 of 232
Case 2:24-cv-01673-MTL    Document 56    Filed 09/17/24    Page 82 of 86

82

1          MR. ARROWSMITH:  Yes.

2          THE COURT:  -- you dispute the infrequency of -- of

3     *Pullman* abstention.

4          MR. ARROWSMITH:  I don't think we dispute the

5     infrequency, but we do note that it -- it has happened.

6          THE COURT:  That's a -- that's a better way to put it,

7     I suppose.

8          MR. ARROWSMITH:  And I just -- I would just push back

9     on this idea that we intend to enforce anything.  Again, our

10    position is that this text is guidance and instruction for

11    election officials, and it does not modify or change the, you

12    know, applicable criminal statutes.

13         THE COURT:  Okay.  Thank you.

14         I want to thank you all for the work you did on these

15    briefs.  You all did a very nice job.  I thought that the

16    writing and the analysis was very good, particularly given the

17    very short time frames you all had.  So you should be very

18    happy with your work product.

19         And I thought you all did a very nice job today as

20    well on your oral -- oral argument.  And, you know, we see just

21    a little bit of all the work and the preparation that goes into

22    arguing important motions like this.  And I'm sure you all

23    worked very hard to get to today.

24         So I'm going to take the motions under advisement.  I

25    do want to get a decision out as quickly as I can.  And I just

83

1    can't really give you -- maybe within two weeks.  That's what

2    I'm hoping to do, but -- but don't hold me to it.

3         Is there any pressing issue that I should know about?

4    For example, I'm -- I'm aware that early voting will start

5    sometime in early October.  I'm aware that there will be voting

6    locations operating throughout the state.  And my

7    understanding, at least in Maricopa County, they're voting

8    centers so that somebody can go in and vote at any polling

9    location, if they wish, regardless of precinct.  I might be

10   wrong on that.

11        But what I'm getting at is I -- I think that, you

12   know, if the harm that plaintiffs are complaining about were to

13   happen on at least the Election Procedures Manual speech side

14   of it, it might start whenever early voting begins.  And then,

15   of course, the -- the canvassing provision would be -- would

16   come later, a few weeks after election day.

17        So do I -- do I have the timing pinned down at least

18   in a -- in an accurate way?

19        Ms. Hartman-Tellez.

20        MS. HARTMAN-TELLEZ:  You do, Your Honor.  Early voting

21   starts on October 9th.  And the -- the first day for boards of

22   supervisors to canvass would be November 11th.  And the last

23   day for them to canvass -- for the counties to canvass is

24   November 21st.  And November 25th is the Secretary's mandatory

25   canvass deadline.

(85 of 232), Page 85 of 232  Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 85 of 232
Case 2:24-cv-01673-MTL    Document 56    Filed 09/17/24    Page 84 of 86

84

```
 1          THE COURT:  Okay.  And I do understand I'm not the
 2   last stop, that there's potential for somebody to appeal.  And,
 3   you know, I want to be able to respect the Court of Appeal's
 4   time to thoroughly consider the issue if somebody does wish to
 5   appeal.  So that's why I'm giving myself an internal deadline.
 6          So does about two weeks sound okay for you all?  If I
 7   could get it done quicker than that, I certainly will.
 8          MR. ENSIGN:  It certainly does for plaintiffs, Your
 9   Honor.
10          THE COURT:  Okay.
11          MS. HARTMAN-TELLEZ:  Yes, Your Honor.
12          THE COURT:  Okay.
13          MR. ARROWSMITH:  Yes.  Same for us.
14          THE COURT:  Okay.  Very good.  Thank you.
15          Will somebody tell Mr. Barton I'm sorry that I -- I
16   read his amicus brief, so you could share that as well.
17          MS. HARTMAN-TELLEZ:  Yes, Your Honor.  Mr. Barton has
18   asked me to call him after the hearing, so we'll get it
19   straightened out.
20          THE COURT:  Like I said, I saw his email at
21   6:00 o'clock last night, and I saw that he was coming.  And
22   I'll just leave it at that.
23          MS. HARTMAN-TELLEZ:  I will relay that to Mr. Barton.
24          THE COURT:  All right.  Thank you.  I appreciate that
25   very much.
```

(86 of 232), Page 86 of 232 Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 86 of 232
Case 2:24-cv-01673-MTL    Document 56    Filed 09/17/24    Page 85 of 86

85

```
 1              Do either -- any of you -- I should say any of you
 2   have anything that you want to bring to my attention before we
 3   adjourn?
 4              MR. ENSIGN:  Nothing from plaintiffs, Your Honor.
 5              MS. HARTMAN-TELLEZ:  Nothing from the Secretary of
 6   State, Your Honor.
 7              MR. ARROWSMITH:  And nothing from the Attorney
 8   General.  Thank you, Your Honor.
 9              THE COURT:  Okay.  Thank you.
10              You all had courtside seats.  I hope -- it's nice to
11   see you.
12              MS. KARLSON:  Yes.  Nice to see you.
13              THE COURT:  Been a long time.
14              Okay.  Court is adjourned.
15        (Proceedings conclude at 11:24 a.m.)
16                        ---oOo---
17
18
19
20
21
22
23
24
25
```

(87 of 232), Page 87 of 232 Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 87 of 232
Case 2:24-cv-01673-MTL    Document 56    Filed 09/17/24    Page 86 of 86

86

1

2

3

4

5                    **C E R T I F I C A T E**

6

7         I, CATHY J. TAYLOR, do hereby certify that I am duly

8    appointed and qualified to act as Official Court Reporter for

9    the United States District Court for the District of Arizona.

10        I FURTHER CERTIFY that the foregoing pages constitute

11   a full, true, and accurate transcript of all of that portion of

12   the proceedings contained herein, had in the above-entitled

13   cause on the date specified therein, and that said transcript

14   was prepared under my direction and control.

15        DATED at Phoenix, Arizona, this 17th day of

16   September, 2024.

17

18

19                              */s/ Cathy J. Taylor*

20                              Cathy J. Taylor, RMR, CRR, CRC

21

22

23

24

25

UNITED STATES DISTRICT COURT

**ER-138**

# EXHIBIT D

Andrew Gould (No. 013234)
Drew C. Ensign (No. 025463)
Dallin B. Holt (No. 037419)
Brennan A.R. Bowen (No. 036639)
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
2575 East Camelback Road, Suite 860
Phoenix, Arizona 85016
(602) 388-1262
agould@holtzmanvogel.com
densign@holtzmanvogel.com
dholt@holtzmanvogel.com
bbowen@holtzmanvogel.com
minuteentries@holtzmanvogel.com

Michael D. Berry (*pro hac vice forthcoming*)
Jessica H. Steinmann (*pro hac vice forthcoming*)
Richard P. Lawson (*pro hac vice forthcoming*)
Patricia Nation (*pro hac vice forthcoming*)
AMERICA FIRST POLICY INSTITUTE
1001 Pennsylvania Ave., N.W., Suite 530
Washington, D.C. 2004
(813) 952-8882
mberry@americafirstpolicy.com
jsteinmann@americafirstpolicy.com
rlawson@americafirstpolicy.com
pnation@americafirstpolicy.com

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| American Encore, an Arizona non-profit corporation; Karen Glennon, an Arizona individual; America First Policy Institute, a non-profit corporation,<br><br>                Plaintiffs,<br><br>vs.<br><br>Adrian Fontes, in his official capacity as Arizona Secretary of State; Kris Mayes, in her official capacity as Arizona Attorney General; Katie Hobbs, in her official capacity as Governor or Arizona,<br><br>              Defendants. | Case No.: 2:24-CV-01673-MTL<br><br>**CATHARINE CYPHER'S DECLARATION ON BEHALF OF AMERICA FIRST POLICY INSTITUTE** |

1      I, Catharine Cypher, declare as follows:

2          1.      I am the Deputy Chief of Staff at America First Policy Institute ("AFPI"),

3  which is a 501(c)(3) non-profit organization. I am authorized to make these statements on

4  behalf of AFPI.

5          2.      I am competent to testify as to the matters contained herein and make this

6  declaration based on my own personal knowledge and AFPI's records created in the

7  normal course of business.

8          3.      I have reviewed AFPI's pleadings, as well as other pleadings in the case, and

9  am generally familiar with their contents.

10         4.      AFPI works in Arizona on issues related to legislation and public policy;

11  promoting voting in elections; and raising voter awareness on important issues, including

12  issues that are on the ballot for any given election.

13         5.      AFPI has about 300,000 members nationwide, who are widely dispersed

14  throughout the United States. Individuals can elect to become members by specifically

15  signing up as members through AFPI's website and through other channels.

16         6.      Individuals who elect to become members through AFPI's website use a

17  form that can be found at https://americafirstpolicy.com/about. The form is titled "Join the

18  Movement" and specifically indicates that "By providing your information, you become

19  a member of America First Policy Institute[.]" Anyone who completes the form thus

20  affirmatively indicates their intention to become a member of AFPI.

21         7.      AFPI regards all such individuals that sign up through AFPI's website as

22  members of the organization.

23         8.      AFPI has approximately 2640 active members in Arizona. AFPI's members

24  are distributed throughout the State and reside in all of Arizona's 15 counties.

25         9.      A substantial portion of AFPI's members are registered voters. Although

26  AFPI does not track such information, based on my experiences with AFPI's members, I

27  conservatively estimate that, as a general matter, approximately more than half of AFPI's

28  members are registered voters. The true number is most likely much higher.

10. All of AFPI's members in Arizona that are registered voters face potential disenfranchisement under the Vote Nullification Provision. All such members also suffer injury from having their right to vote being made contingent on whether their county board of supervisors certifies election results.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 2nd day of August 2024.

By: _____
Catharine Cypher, Deputy Chief of Staff
America First Policy Institute

# EXHIBIT A

Andrew Gould (No. 013234)
Drew C. Ensign (No. 025463)
Dallin B. Holt (No. 037419)
Brennan A.R. Bowen (No. 036639)
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
2575 East Camelback Road, Suite 860
Phoenix, Arizona 85016
(602) 388-1262
agould@holtzmanvogel.com
densign@holtzmanvogel.com
dholt@holtzmanvogel.com
bbowen@holtzmanvogel.com
minuteentries@holtzmanvogel.com

Michael D. Berry *(pro hac vice forthcoming)*
Jessica H. Steinmann (*pro hac vice forthcoming*)
Richard P. Lawson (*pro hac vice forthcoming*)
Patricia Nation *(pro hac vice forthcoming)*
AMERICA FIRST POLICY INSTITUTE
1001 Pennsylvania Ave., N.W., Suite 530
Washington, D.C. 2004
(813) 952-8882
mberry@americafirstpolicy.com
jsteinmann@americafirstpolicy.com
rlawson@americafirstpolicy.com
pnation@americafirstpolicy.com

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| American Encore, an Arizona non-profit corporation; Karen Glennon, an Arizona individual; America First Policy Institute, a non-profit corporation, | Case No.: 2:24-CV-01673-MTL |
| Plaintiffs, | **DECLARATION OF BRENNAN A.R. BOWEN** |
| vs. | |
| Adrian Fontes, in his official capacity as Arizona Secretary of State; Kris Mayes, in her official capacity as Arizona Attorney General; Katie Hobbs, in her official capacity as Governor or Arizona, | |
| Defendants. | |

1    I, Brennan Bowen, declare as follows:

2    1.    I am counsel of record for Plaintiffs American Encore, America First Policy

3 Institute, and Karen Glennon in this matter. I make this Declaration in this capacity and

4 in support of the Plaintiffs' Motion for Preliminary Injunction.

5    2.    Except as otherwise stated, I make this Declaration based on my personal

6 knowledge as to the matters set forth herein.

7    3.    After the 2022 general election, the Cochise County Board of Supervisors

8 refused to certify the election results for Cochise County in a timely manner, which

9 resulted in a delay of the Secretary's certification. *See* Jonathan J. Cooper, *Republican-*

10 *Controlled Arizona County Refuses To Certify 2022 Election*, Arizona PBS (Nov. 28,

11 2022)    https://www.pbs.org/newshour/politics/republican-controlled-arizona-county-

12 refuses-to-certify-2022-election (attached hereto as Attachment 1).

13    4.    However, the Cochise County Board eventually certified the results, and the

14 Secretary did as well. *See* Musadiq Bidar, *Last Arizona County Certifies Election Results*,

15 CBS News (Dec. 1, 2022) https://www.cbsnews.com/news/2022-midterm-elections-

16 cochise-county-arizona-election-results-certification/ (attached hereto as Attachment 2).

17    5.    Since then, the Arizona Attorney General has criminally indicted two of the

18 Cochise County Supervisors—Tom Crosby and Peggy Judd—for their role in delaying

19 the certification. *See* Jen Fifield, *Two Cochise County Supervisors Indicted For Refusing*

20 *To    Certify    Midterm    Election*,    Votebeat    (Nov.    29    2023)

21 https://www.votebeat.org/arizona/2023/11/29/arizona-cochise-county-supervisors-

22 indicted-refusing-certify-2022-election/ (attached hereto as Attachment 3).

23    6.    To my knowledge, the Arizona Attorney General is still pursuing that case.

24 *See Attorney General Mayes Releases Statement On Rulings in Cochise County Election*

25 *Interference Case*, Arizona Attorney General Kris Mayes (Jun. 18, 2024)

26 https://www.azag.gov/press-release/attorney-general-mayes-releases-statement-rulings-

27 cochise-county-election ("While the defendants are innocent until proven guilty, as are all

28 defendants in our criminal justice system, my office is prepared to move forward with this

1     case and pursue justice for the people of Arizona.") (attached hereto as Attachment 4).

2          Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

3     is true and correct.

4          Executed on this 2nd day of August 2024.

5

6                                        By: */s/ Brennan A.R. Bowen*
                                            Brennan A.R. Bowen

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Attachment 1



# Republican-controlled Arizona county refuses to certify 2022 election

**Politics**   Nov 28, 2022 1:37 PM EDT

PHOENIX (AP) — Republican officials in a **rural Arizona county** refused Monday to certify the 2022 election ahead of the deadline amid pressure from prominent Republicans to reject a vote count that had Democrats winning for U.S. Senate, governor and other statewide races.

State election officials have vowed to sue Cochise County if the board of supervisors misses Monday's deadline to approve the official tally of votes, known as the canvass. The two Republican supervisors delayed the canvass vote until hearing once more about concerns over the certification of ballot tabulators, though election officials have repeatedly explained that the equipment is properly approved.

Democratic election attorney Marc Elias vowed on Twitter to sue the county. Sophia Solis, a spokeswoman for **Secretary of State Katie Hobbs,** did not immediately comment. Hobbs's office has previously vowed to sue the county if it misses the **deadline.**

Republican supervisors in Mohave County postponed a certification vote until later Thursday after hearing comments from residents angry about problems with ballot printers in Maricopa County.
Election results have largely been certified without issue in jurisdictions across the country. That's not been the case in Arizona, which was a focal point for efforts by former President Donald Trump and his allies to overturn the 2020 election and push false narratives of fraud.

Arizona was long a GOP stronghold, but Democrats won most of the highest profile races over Republicans who aggressively promoted Trump's 2020 election lies. **Kari Lake,** the GOP candidate for governor who lost to Hobbs, and Mark Finchem, the candidate for secretary of state, have refused to acknowledge their losses. They blame Republican election officials in Maricopa County for a problem with some ballot printers.

**READ MORE: Post-election misinformation targets Arizona and Pennsylvania**

Navajo County, a rural Republican-leaning county, voted unanimously to certify after the county attorney warned supervisors they could be sued if they didn't. In conservative Yavapai County, residents cited problems in Maricopa County in urging the Board of Supervisors not to approve the election results. The meeting was ongoing.

Republican supervisors in Mohave County said last week that they would sign off Monday but wanted to register a protest against voting issues in Maricopa County. In Cochise County, GOP supervisors had demanded that the secretary of state prove vote-counting machines were legally certified before they will approve the election results.

State Elections Director Kori Lorick has said the machines are properly certified for use in elections. She wrote in a letter last week that the state would sue to force Cochise County supervisors to certify, and if they don't do so by the deadline for the statewide canvass on Dec. 5, the county's votes would be excluded. That move threatens to flip the victor in at least two close races — a U.S. House seat and state schools chief — from a Republican to a Democrat.

Lake has pointed to problems on Election Day in Maricopa County, where printers at some vote centers produced ballots with markings that were too light to be read by on-site tabulators. Lines backed up amid the confusion, and Lake says an unknown number of her supporters

may have been dissuaded from voting as a result.

She filed a public records lawsuit last week, demanding the county produce documents shedding light on the issue before voting to certify the election on Monday. Republican Attorney General Mark Brnovich has also demanded an explanation ahead of the vote.

The county responded on Sunday, saying nobody was prevented from voting, and 85 percent of vote centers never had lines longer than 45 minutes. Most vote centers with long lines had others nearby with shorter waits, county officials said.

The response blamed prominent Republicans, including party chair Kelli Ward, for sowing confusion by telling supporters on Twitter not to place their ballots in a secure box to be tabulated later by more robust machines at county elections headquarters.

The county said that just under 17,000 Election Day ballots were placed in those secure boxes and all were counted. Only 16 percent of the 1.56 million votes cast in Maricopa County were made in-person on Election Day. Those votes went overwhelmingly for Republicans.

The Republican National Committee and the GOP candidate for Arizona attorney general, Abraham Hamadeh, filed an election challenge in his race, which is slated for an automatic recount with Hamadeh trailing by 510 votes.

Ward has urged supporters to push their county supervisors to delay a certification vote until after an afternoon scheduling hearing in the Hamadeh case.

*By —* Jonathan J. Cooper, Associated Press

# Attachment 2

CBS NEWS

U.S. World Politics HealthWatch MoneyWatch Entertainment Crime Sports Essentials

POLITICS

## Last Arizona County certifies election results

By Mandy Weior
December 1, 2022 / 6:48 PM EST / CBS News

f X 🔖

Officials in Cochise County, Arizona, on Thursday certified the results of the county's 2022 midterm elections during an emergency meeting, after a superior court judge ordered the board of supervisors to meet and certify the results immediately.

The board of supervisors voted 2-0 to accept the results of the election, despite initially delaying the certification earlier this week and missing Monday's deadline. Ann English, a Democrat, and Peggy Judd, a Republican, voted in favor of certification but the board's third member, Republican Tom Crosby did not attend the meeting.

The court order came days after Republicans on the board voted Monday to not certify the results in a move that risked the exclusion of more than 47,000 Arizona voters from the state's final tally. That prompted lawsuits from the secretary of state's office and an advocacy group.

## Arizona Governor Election

Updated: Dec 30, 8:14 AM   99% in   Exit Poll +



**Katie Hobbs (D)** ●
# 50.3%
Votes
1,287,891



**Kari Lake (R)**
# 49.6%
Votes
1,270,774

Full Governor Results ›

Democratic Governor-elect Katie Hobbs, in her capacity as Secretary of State, sued the county to certify the vote so her office can complete the statewide canvass by Dec. 8, the last possible day allowed under state law.

"We have an obligation to see that our elections are fair and good," said Peggy Judd, the Republican vice-chair of the board of supervisors, during Thursday's meeting. The second GOP board member Tom Crosby was not present at the meeting.

Judd said she was both "comfortable" and "uncomfortable" following the judge's order to move forward with certification of the results. "I feel I must because of a court ruling and because of my own health and situations that are going on in our life, I feel like I must follow what the judge asked us to do."



Ad

Save up to 30% and Earn Double ALL Points

Check Rates

In a tweet, Hobbs said the court decision "was a win for Arizona's democracy and ensures that all Arizonans will have their votes counted." She added that the state certification will begin as scheduled on Monday.

Hobbs defeated Republican Kari Lake during the November general election by 17,116 votes. Lake, who pushed lies that the 2020 election was stolen from Donald Trump on the campaign trail, has already filed lawsuits alleging election laws were broken in Arizona.

Lake has signaled that she will pursue further legal campaign action. She is scheduled to speak at a conservative event in Phoenix later this month. Meanwhile, Hobbs announced on Wednesday that her public inauguration as the next governor of Arizona will take place on Jan. 5, 2023.

## More from CBS News

Kari Lake wins GOP primary for closely watched Arizona Senat... 

Vance tours U.S.-Mexico border in Arizona, hitting Harris on... 

Trial judge retakes control of Trump 2020 election case after... 

Harris to campaign with VP pick in battleground states next week 

# Attachment 3



*ARIZONA*

Communities    Topics    About Us

Become a Votebeat sponsor

Sign Up          Donate

ELECTION LAWS     ELECTION MISINFORMATION

# Two Cochise County supervisors indicted for refusing to certify midterm election

Arizona Attorney General Kris Mayes announced a state grand jury has indicted Republican Cochise County Supervisors Tom Crosby and Peggy Judd with two felony charges of conspiracy and election interference.

By Jen Fifield | November 29, 2023, 11:54am MST | Updated: November 29, 2023, 4:38pm MST

REPUBLISH

Privacy - Terms



*An Arizona grand jury has indicted Cochise County Supervisors Peggy Judd (left) and Tom Crosby (right) for refusing to certify the county's 2022 election. The third supervisor, Ann English (center), was not indicted after voting to certify.  |*
(Image courtesy of Cochise County Government)

*Votebeat is a nonprofit news organization reporting on voting access and election administration across the U.S. Sign up for our free newsletters here.*

*This article has been updated throughout with reactions and additional details.*

Attorney General Kris Mayes on Wednesday announced that an Arizona grand jury has indicted Cochise County Supervisors Tom Crosby and Peggy Judd for conspiracy and interference with an election officer, both felonies.

Crosby and Judd, the two Republicans on the three-member board of the southern Arizona county, both refused to certify, or canvass, the county's election by the Nov. 28, 2022 deadline in state law, twice voting against the canvass.

The Nov. 27 indictments in Maricopa County Superior Court came after the supervisors were ordered to appear at a state grand jury hearing on Nov. 13, under

subpoenas issued by Mayes' office in October. Judd's subpoena was first reported by Votebeat.

The indictment alleges that on or between Oct. 11, 2022 and Dec. 1, 2022, Judd and Crosby "conspired to delay the canvass of votes cast" and "knowingly interfered with the Arizona Secretary of State's ability to complete the statewide canvass," according to a news release from the Attorney General's Office.

"The repeated attempts to undermine our democracy are unacceptable," Mayes wrote. "I took an oath to uphold the rule of law, and my office will continue to enforce Arizona's elections laws and support our election officials as they carry out the duties and responsibilities of their offices."

Judd and Crosby did not immediately respond to calls for comment Wednesday. But lawyer Dennis Wilenchik, who is representing Crosby, told Votebeat that the indictment has no basis to it and is "political and part of the democratic party playbook to win elections and target conservative republicans."

"It is not based in fact, would never be brought in a fair and objective AG office, and was brought for some obvious purpose having nothing to do with any legitimate enforcement of the law by the AG that I can see," Wilenchik wrote in an email.

As the 2024 election approaches, many Cochise residents and voting rights groups such as All Voting is Local said they are hoping this serves as a deterrent for any county supervisors across the state who would consider attempting to interfere with the election.

Become a Votebeat sponsor

"This sends a message that you will not be held harmless," said All Voting is Local's Arizona director Alex Gulotta. "I really believe it may change people's behavior."

Cochise residents who were concerned about the certification fight in November celebrated that the supervisors were being held accountable.

Elisabeth Tyndall, chair of the Cochise County Democratic Party, praised Mayes, also a Democrat, for launching the investigation. She said it wasn't clear in November if anyone in the state would protect voters, who were afraid the certification delay meant their votes wouldn't be counted.

"When this first happened a lot of us felt very helpless because there was nowhere to go with this," Tyndall said. "I think people just have a really huge sense of relief that there is someone else out there that is watching and paying attention."

Conspiracy and interference with an election officer are both class 5 felonies in Arizona, punishable with up to two and a half years in jail.

Along with refusing to certify the election, Crosby and Judd also voted to fully hand-count the county's election results through its post-election audit, which a judge blocked after finding that was illegal. The efforts put the rural county in the national media spotlight and caused the elections director to eventually resign citing harassment. Those efforts may have been one of the topics of the investigation but were not part of Wednesday's indictments.

## Mayes investigates at the request of Secretaries of State

Shortly after the supervisors refused to certify the election last November, Kori Lorick, then the state elections director working for former secretary of state and now Gov. Katie Hobbs asked Attorney General Mark Brnovich to investigate. When now-Secretary of State Adrian Fontes took office, he made the same request to Mayes, according to a letter obtained by Votebeat.

"My office considers their failure to do their non-discretionary statutory duty to canvass the election a matter of utmost importance for future elections," Fontes wrote.

On Wednesday, he sent a one-word tweet about the indictments: "Good."

In a statement to Votebeat he said that "Accountability is crucial in matters concerning our democracy."

Become a Votebeat sponsor

Former Attorney General Terry Goddard, a Democrat, and former Maricopa County Attorney Rick Romley, a Republican, also wrote Brnovich and Cochise County Attorney Brian McIntyre asking them to investigate, writing that the supervisors' actions threatened "to undo the proper administration and integrity of elections, disenfranchise thousands of voters and potentially even alter the results of some races."

Cochise was the only county to bend to pressure from GOP leaders and activists from across the state who immediately after Election Day began claiming the results were inaccurate and asking county supervisors not to certify the election. Lawsuits from three Republican statewide candidates — gubernatorial candidate Kari Lake, attorney general candidate Abraham Hamadeh, and secretary of state candidate Mark Finchem — challenging the election results were eventually dismissed due to lack of evidence.

The indictment says that Crosby and Judd "knowingly interfered with the efforts" of then-Secretary of State Katie Hobbs, now governor, to complete the canvass of the election by preventing the board from canvassing within the time period required by law.

For the conspiracy charge, the indictment says that Judd and Crosby agreed with "one or more persons," who aren't named in the indictment, that at least one of them would delay the canvass and the transmission of the canvass to the Secretary of State's Office.

Under Arizona law, county supervisors must vote to certify, or canvass, their county's election within 20 days of a general election. It's a ministerial act, which

means supervisors have no discretion as to whether to approve the results. The only exception is if there are any missing returns among polling place results — and even that only warrants a temporary postponement. The secretary of state, in turn, is required to certify the statewide election on the fourth Monday after the election.

Crosby and Judd initially voted to postpone the county's canvass until the Nov. 28 deadline, after residents spread unfounded claims that ballot tabulation machines used throughout the state were not properly certified. Kori Lorick, the state elections director, then personally provided documentation to the supervisors showing the machines were certified.

When the final deadline of Nov. 28 arrived, Crosby and Judd voted against certification. They did so against the advice of the County Attorney's Office, which had explained to them that they had a non-discretionary duty.

The Secretary of State's Office, at the time run by Hobbs, then sued the supervisors, who had to rely on private counsel to represent them on the matter because they had acted against the county attorney's advice. Their attorney did not appear in court. The trial court judge then forced them to reconvene and vote to certify.

They did, but the vote was still 2-0: Crosby did not show up.

*Jen Fifield is a reporter for Votebeat based in Arizona. Contact Jen at jfifield@votebeat.org.*



## The Latest



### Some partisan votes in Michigan's August primary election may never get counted

Absentee voters are most likely to be affected, but many will never find out about it.

By Hayley Harding | Today, 11:59am MST

# Attachment 4

# Attorney General Mayes Releases Statement On Rulings in Cochise County Election Interference Case

*Tuesday, June 18, 2024*

**PHOENIX –** Attorney General Kris Mayes released the following statement in response to rulings in the election interference case brought against Cochise County Supervisors Peggy Judd and Tom Crosby:

*Today, Maricopa County Judge Geoffrey Fish denied motions by Cochise County Supervisors Tom Crosby and Peggy Judd to dismiss the charges against them or to send the matter back to the Grand Jury in the state's ongoing case against the defendants for allegedly engaging in felony conspiracy and election interference after the 2022 election.*

*This is a serious case, and the charges have merit. Today's ruling by the court supports that. While the defendants are innocent until proven guilty, as are all defendants in our criminal justice system, my office is prepared to move forward with this case and pursue justice for the people of Arizona.*

Motions to Dismiss: Judd (https://azag.us5.list-manage.com/track/click?u=cc1fad182b6d6f8b1e352e206&id=74ad9d9f40&e=b0dbe1a1e5), Crosby. (https://azag.us5.list-manage.com/track/click?u=cc1fad182b6d6f8b1e352e206&id=9f6b91377e&e=b0dbe1a1e5) Motions to Remand: Judd (https://azag.us5.list-manage.com/track/click?u=cc1fad182b6d6f8b1e352e206&id=504e6ec3e9&e=b0dbe1a1e5), Crosby (https://azag.us5.list-manage.com/track/click?u=cc1fad182b6d6f8b1e352e206&id=599b99186f&e=b0dbe1a1e5).

---

PRESS CONTACT

**Richie Taylor**
*Communications Director*

2005 N Central Ave.
Phoenix, AZ 85004

**Richie.Taylor@azag.gov** (mailto:Richie.taylor@azag.gov)
**MediaRequests@azag.gov** (mailto:MediaRequests@azag.gov)

PRESS RELEASE ARCHIVE

2024 (/press-releases/archive/2024) (78)
2023 (/press-releases/archive/2023) (121)
2022 (/press-releases/archive/2022) (225)
2021 (/press-releases/archive/2021) (181)
2020 (/press-releases/archive/2020) (178)

**ER-160**

# EXHIBIT C



**OFFICE OF THE ARIZONA ATTORNEY GENERAL**

**KRIS MAYES**
ATTORNEY GENERAL

**STATE GOVERNMENT DIVISION**
**AGENCY COUNSEL SECTION**

**KAREN J. HARTMAN-TELLEZ**
SENIOR LITIGATION COUNSEL
DIRECT PHONE 602-542-8326
KAREN.HARTMAN@AZAG.GOV

July 31, 2024

VIA EMAIL

Andrew Gould
Holtzman Vogel Baran
Torchinsky & Josefiak PLLC
2555 East Camelback Road, Suite 280
Phoenix, Arizona 85016
agould@holtzmanvogel.com

      Re:    2023 Elections Procedures Manual Canvassing Provision Challenged in *American Encore v. Fontes*, No. CV-24-01673-PHX-MTL

Dear Mr. Gould:

      As you know, I represent Arizona Secretary of State Adrian Fontes in the above-referenced litigation. In that capacity, I write in response to your July 18, 2024 letter addressed to Secretary Fontes.

      First, with respect to your request that Secretary Fontes "unequivocally and specifically disavow all enforcement of" the portion of the provision in Chapter 13, Section III.B(2) of the 2023 Arizona Elections Procedures Manual that you challenged in the *American Encore* case (the "Canvass Provision"), your letter omits and ignores relevant provisions of Arizona law. In particular, on February 9, 2024, the Governor signed H.B. 2785. 2024 Ariz. Sess. Laws ch. 1 (56th Leg. 2d Reg. Sess.). H.B. 2785 amended several provisions of Title 16, article 11 relating to the official canvass of elections. *See id.* at §§ 13-16. As relevant here, it established new deadlines by which county boards of supervisors and the Secretary must carry out their respective nondiscretionary duties to canvass. *See* A.R.S. § 16-642(A); *see also* A.R.S. § 16-648.

      The amendments make clear that a county board of supervisors cannot postpone its canvass. *See* A.R.S. § 16-642(C). And by amending A.R.S. § 16-648 to remove subsection (C), the bill eliminated any allowance for postponement of the state canvass, which the Secretary "shall" complete "on the third Monday following a general election." A.R.S. § 16-648(A). Accordingly, the Secretary has a nondiscretionary statutory duty to canvass without delay, which

July 31, 2024
Page 2

the Canvass Provision reflects.   Your letter in effect asks the Secretary to disavow this nondiscretionary statutory duty, which the Secretary cannot and will not do.

Second, your letter also asks the Secretary to "commit to some other mechanism for ascertaining the vote counts of a county whose results are not certified."  To the extent your letter asks the Secretary to take a position on what the law would permit or require or to commit to taking a specific action in a hypothetical future situation, those issues are not ripe.  The Secretary is unable to take what would be a fact-dependent position based on factual circumstances that are unknown and may never arise.  But to be clear, the Secretary is committed to enfranchising all Arizona voters and intends to use all lawful means to do so as the circumstances require, including seeking judicial remedies if a county fails to timely carry out its duty to canvass.

Very truly yours,

/s/ *Karen J. Hartman-Tellez*

Karen J. Hartman-Tellez

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| **American Encore, et al.,** | ) |
| | ) No. 2:24-cv-01673-MTL |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) Phoenix, Arizona |
| **Adrian Fontes, et al.,** | ) July 19, 2024 |
| | ) 9:07 a.m. |
| Defendants. | ) |
| _____ | ) |

**BEFORE:  THE HONORABLE MICHAEL T. LIBURDI, JUDGE**

<u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

<u>**STATUS CONFERENCE**</u>

Official Court Reporter:
**Cathy J. Taylor, RMR, CRR, CRC**
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 31
Phoenix, Arizona 85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

(114 of 232), Page 114 of 232 Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 114 of 232
Case 2:24-cv-01673-MTL   Document 21   Filed 07/22/24   Page 2 of 49

2

1                          **A P P E A R A N C E S**

2

For the Plaintiff:
3       HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK, PLLC
        By:  **Mr. Drew C. Ensign, Esq.**
4            **Mr. Dallin Brockbank Holt, Esq.**
        2575 East Camelback Road, Suite 860
5       Phoenix, Arizona  85016

6  For the Defendant Adrian Fontes:
        OFFICE OF THE ATTORNEY GENERAL
7       By:  **Ms. Karen J. Hartman-Tellez, Esq.**
        2005 North Central Avenue
8       Phoenix, Arizona  85004

9  For the Defendant Kris Mayes:
        OFFICE OF THE ATTORNEY GENERAL
10      By:  **Mr. Nathan T. Arrowsmith, Esq.**
        2005 North Central Avenue
11      Phoenix, Arizona  84004

12 For the Defendant Katie Hobbs:
        COPPERSMITH BROCKELMAN, PLC
13      By:  **Mr. David Andrew Gaona, Esq.**
        2800 North Central Avenue
14      Phoenix, Arizona  84004

15 For the Movants Alfred Lomahquahu, Stephanie Stephenson, and
   Arizona Alliance for Retired Americans
16      BARTON MENDEZ SOTO, PLLC
        By: **Mr. David Evans Barton, II, Esq.**
17      401 West Baseline Road, Suite 205
        Tempe, Arizona  85283
18
        ELIAS LAW GROUP, LLP (Washington, DC)
19      By:  **Ms. Julie Zuckerbrod, Esq.**
        250 Massachussetts Avenue NW, Suite 400
20      Washington, DC  20001

21

22

23

24

25

UNITED STATES DISTRICT COURT

**ER-165**

1                        **P R O C E E D I N G S**

2        (Court was called to order by the courtroom deputy.)

3        (Proceedings commence at 9:07 a.m.)

4           THE COURTROOM DEPUTY:  Civil Case 24-1673, American

5    Encore, and others, vs. Adrian Fontes, and others.  This is the

6    time set for status conference.

7           Please announce your presence for the record starting

8    with the plaintiff.

9           MR. ENSIGN:  Drew Ensign for plaintiffs.  With me is

10   Dallin Holt.

11          THE COURT:  Good morning.

12          MR. HOLT:  Good morning, Your Honor.

13          MS. HARTMAN-TELLEZ:  Good morning, Your Honor.  Karen

14   Hartman-Tellez on behalf of Secretary of State, Adrian Fontes.

15          THE COURT:  Good morning.

16          MR. ARROWSMITH:  Good morning, Your Honor.  Nathan

17   Arrowsmith on behalf of Attorney General Kris Mayes.

18          THE COURT:  Good morning.

19          MR. GOANA:  Good morning, Your Honor.  Andy Goana on

20   behalf of Governor Katie Hobbs.

21          THE COURT:  Okay.  Good morning.

22          You're technically not in the case, Mr. Barton.  Just

23   want to make sure you know that.  But -- so that means you

24   can't sit on this side of the well.

25          Okay.  Well, I wanted to have this status conference

UNITED STATES DISTRICT COURT

```
 1    to see a little bit more about the claims in this case.  I had

 2    no idea that there was pending state court litigation, so maybe

 3    you could get me up to speed on that.  And I also would like to

 4    know if there's going to be a need to expedite the briefing

 5    schedule on the motion for preliminary injunction.  And then I

 6    think at the end I'll hear the proposed intervenors and hear

 7    what the other parties have to say about their motion.

 8            So we'll go with you first, Mr. Ensign.  I want to

 9    begin with this:  I was looking through your filings to see

10    if -- if you -- if I could read the actual attached -- or the

11    actual attached language, and I don't think you gave me the

12    sections of the Election Procedures Manual that you're

13    challenging.  And I certainly could have missed it.  Why don't

14    you point me to those.

15            MR. ENSIGN:  Your Honor, I -- I believe those are in

16    the complaint.  We'd be happy to file a notice with the Court

17    either pointing the Court to that or correcting any omissions

18    that there may be in providing that to you, if that would be

19    helpful.

20            THE COURT:  Well, did you attach the actual documents?

21            MR. ENSIGN:  Your Honor, I -- candidly, I don't know

22    right now.  I'm happy to check.

23            THE COURT:  I don't think you did.  I mean, it would

24    be helpful to have them.  You're asking me to overrule

25    or enjoin certain provision of the Elections Procedures Manual,
```

UNITED STATES DISTRICT COURT

(117 of 232), Page 117 of 232    Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 117 of 232
Case 2:24-cv-01673-MTL    Document 21    Filed 07/22/24    Page 5 of 49

5

1    but you didn't give me them.

2            MR. ENSIGN:  Your Honor, I certainly agree with that

3    proposition.  And, you know, to the extent that it's been

4    omitted, we will correct that problem.

5            THE COURT:  Okay.  I'd like you to file something as

6    soon as possible with them.  And, like I said, I read your

7    motion for preliminary injunction, and I would have expected

8    that to be attached to the motion for preliminary injunction,

9    and they weren't.  So can somebody get on that right away?

10           MR. ENSIGN:  Absolutely, Your Honor.

11           THE COURT:  Okay.  All right.  Now, you are

12   challenging two parts of the Elections Procedures Manual.  Why

13   don't you tell me a little bit about them.  Why don't you tell

14   me how they were promulgated and explain to me the nature of

15   your challenge.  And then I need to know how this compares to

16   the litigation that's going on in state court.

17           MR. ENSIGN:  Yes, Your Honor.  May I approach?

18           THE COURT:  You may.

19           MR. ENSIGN:  So, Your Honor, this provision -- this

20   lawsuit challenges two provisions of the 2023 Election

21   Procedure Manual, both under -- purely as a matter of federal

22   law.  The first provision on which we've sought a PI we've

23   called the speech restriction, which provides that all activity

24   that falls within its ambit is prohibited.  And under Arizona

25   law, anything -- any conduct by any person that violates a

(118 of 232), Page 118 of 232 Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 118 of 232
Case 2:24-cv-01673-MTL    Document 21    Filed 07/22/24    Page 6 of 49

6

1   provision of the EPM is a Class 2 misdemeanor.  And so we

2   believe that provision violates the First Amendment of the

3   United States Constitution for multiple reasons, including that

4   it reads out -- it does not require any mens rea requirement,

5   which violates the Supreme Court's recent decision in

6   *Counterman*.  It also is a content- and viewpoint-based

7   restriction of speech that can't satisfy such scrutiny.  It's

8   an improper regulation of speech in both public and private

9   forums.  And for all of those reasons, we think the speech

10  restriction is invalid under the First Amendment.

11          The second claim relates to a provision in -- that we

12  have called the -- the vote nullification provision, which

13  provides that if a county fails or refuses to certify their

14  election results, the Secretary will throw out all votes from

15  that county, and the votes of all voters in that county will

16  not be counted.  We believe that's an unconstitutionally severe

17  burden on the right to vote of the affected voters in this

18  case.

19          THE COURT:  Right.  And isn't there a state -- isn't

20  there a state law remedy for that?  Isn't it called mandamus?

21          MR. ENSIGN:  A potentially -- that may be available as

22  a different --

23          THE COURT:  Well, I'm, in a way, dovetailing off of

24  what you just said.  Let's say that some election -- let's say

25  the board of supervisors of some county decides they're not

(119 of 232), Page 119 of 232 Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 119 of 232
Case 2:24-cv-01673-MTL   Document 21   Filed 07/22/24   Page 7 of 49

7

 1    going to certify an election.  Isn't the remedy that either the

 2    Attorney General or some voters in that county bring a mandamus

 3    in state court to require that they certify the election?

 4         I mean, for Lord's sake, the Constitution and the

 5    statutes can't grow arms and sign these documents.  That's why

 6    Governor Ducey signed the certification in 2020, even though

 7    some people had issues with that.  It was his duty to sign it,

 8    and he did.

 9         Do you understand what I'm saying?

10         MR. ENSIGN:  I -- I do, Your Honor, and I think that

11    actually illustrates the nature of the federal constitutional

12    violation here, because there are state law remedies that the

13    Secretary and Attorney General could employ to overcome an

14    intransigeant or otherwise problematic county board.  The fact

15    that they resorted to disenfranchising people is part of the

16    constitutional violation.

17         THE COURT:  I think I understand that argument.  Okay?

18         And I'm going to expect counsel on this side to

19    address that alternative remedy, which seems, to me, to not

20    disenfranchise an entire county if some intransigeant board of

21    supervisors doesn't want to certify an election.

22         Okay.  Tell me a little bit more about this speech

23    issue.

24         MR. ENSIGN:  Certainly, Your Honor.  And let me see if

25    I can pull that language.

1          So the speech restriction -- and I apologize -- would

2    be -- provides, roughly paraphrasing, any activity by any

3    person that threatens, intimidates, or coerces voters within or

4    inside our outside of the 75-foot limits of polling stations is

5    prohibited.  So what it does is because any violation of the

6    EPM is a Class 2 misdemeanor, under Arizona law we believe that

7    is a universal prohibition that applies to all people within

8    Arizona's territory given that it expressly says inside or

9    outside the 75-foot limit, you know, is a matter of basic

10   reading comprehension.  That is the entire territory of

11   Arizona.

12          THE COURT:  Okay.

13          MR. ENSIGN:  There is no --

14          THE COURT:  And so if I had the Election Procedure

15   Manual, I'd want to know if there were definitions of these

16   terms, like what is harassment, what is intimidation.

17          Are these terms defined?

18          MR. ENSIGN:  They are not defined, Your Honor, but

19   they do provide examples which themselves are extremely

20   problematic.  They say raising one's voice may be a violation.

21   They say that using offensive or insulting language --

22          THE COURT:  How do you determine raising voice?  Are

23   election workers going to have decibel readers there to measure

24   a voice?  Is there going to be some sort of a standard that

25   some decibel is raised or others are not?

(121 of 232), Page 121 of 232 Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 121 of 232
Case 2:24-cv-01673-MTL    Document 21    Filed 07/22/24    Page 9 of 49

9

1          I'm just trying to understand this.

2          MR. ENSIGN:  Your Honor, that is not defined, and

3     that's actually part --

4          THE COURT:  Okay.

5          MR. ENSIGN:  -- of another claim that we brought, that

6     the provision is void for vagueness, because it says such

7     things and then doesn't define them, and it, therefore, fails

8     to provide people of ordinary intelligence fair notice as to

9     what is actually criminally prohibited.

10         THE COURT:  Is there a risk that perhaps some election

11    workers would interpret that differently than other election

12    workers such that if voters are voting in one precinct in

13    Maricopa County, that some election workers can decide they're

14    going to be a little bit more strict in their interpretation

15    vis-a-vis somebody working, perhaps, in Yavapai County?  Is

16    that a risk?

17         MR. ENSIGN:  Your Honor, we believe that's a risk that

18    is absolutely manifest here.  And it's something that's shown

19    in the Supreme Court's recent decision in the *Mansky* case.

20    There Minnesota had a prohibition on wearing political attire

21    to voting locations, and the Supreme Court found that the

22    complete arbitrariness and inability to define that in a

23    sensible way practically invited, you know, differential

24    enforcement and arbitrary and perhaps, you know, selective

25    enforcement.

10

```
 1              And so we think that is absolutely a risk presented

 2    here, and we think that's an additional reason why this is a

 3    violation of the First Amendment.

 4              THE COURT:  Okay.  Are you aware of any laws that

 5    might have been passed by the Arizona Legislature in recent

 6    years that might have protected people wearing T-shirts, so

 7    that sort of thing, in polling locations?

 8              MR. ENSIGN:  Your Honor, I'm not aware offhand.  I'm

 9    certainly happy to look at that.  I think it's a -- it --

10    you -- that raises an important point, too, that we should

11    clarify with our claim, which is that the speech restriction

12    purports to implement a criminal prohibition of Arizona

13    Statutory Law, A.R.S. 16-1013.  We are not seeking to enjoin

14    enforcement of that statute itself, which prohibits

15    intimidation or coercion of voters in connection with inducing

16    them to vote or not vote.

17              So we have no -- we take no objection to the

18    underlying criminal prohibition that would still exist, but we

19    think that the speech restriction, which purports to implement

20    that provision, actually violates the First Amendment multiple

21    times over.

22              THE COURT:  Okay.  How did this Election Procedures

23    Manual come to be?

24              MR. ENSIGN:  Your Honor, the -- it -- it was proposed

25    as a draft in either -- I believe -- in, I believe, July or
```

(123 of 232), Page 123 of 232 Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 123 of 232
Case 2:24-cv-01673-MTL    Document 21    Filed 07/22/24    Page 11 of 49

11

1    August of 2023.  The Secretary provided 14 days to comment on

2    it.  The Senate President and House Speaker both jointly filed

3    comments objecting to the draft EPM, specifically raising these

4    First Amendment concerns, among other concerns.

5         In response, the -- the defendants made no changes

6    whatsoever to the EPM, and it instead was finalized by the

7    Secretary on December 30th and received the requisite approval

8    of both the Attorney General and the Governor on the same day,

9    becoming effective on that day.

10        I believe the EPM was -- there was some clerical

11   amendments to it as well in the following month, but none to

12   the affected provisions here.

13        THE COURT:  Okay.  Tell me about the state court

14   litigation.

15        MR. ENSIGN:  Certainly, Your Honor.  The state court

16   litigation is brought by somewhat different parties.  There is

17   one overlapping party, AFPI, but otherwise the parties are

18   different.  Every claim in the state action is purely under

19   state law.  No federal claims were raised in the state action.

20        THE COURT:  So there's no need for me to consider an

21   abstention?

22        MR. ENSIGN:  We don't believe so, Your Honor.  The --

23   all state law claims are in state court.  All federal claims

24   are in federal court.  Each court has the law before them that

25   is their unique competence, and we're not asking a Court to,

1    you know, construe the law of a different sovereign.

2         In addition -- so the vote nullification provision is

3    not challenged in the state court litigation; the speech

4    restriction is.  In addition, there are probably, I would say,

5    maybe six to eight additional state law claims challenging such

6    things as the mailing of -- of evol ballots outside of the

7    state which we believe violate state statutory law and -- and

8    claims such as that.  There's a PI pending on both the speech

9    restriction and that out-of-state mailing of -- of evol ballots

10   in the teeth of a prohibition and Arizona statutory law.

11        That case is almost fully briefed.  I believe the

12   final brief is due today, although that may move, and it is set

13   for a hearing on July 29th.

14        THE COURT:  Who's the judge?

15        MR. ENSIGN:  I am blanking on her name at the -- at

16   the moment, Your Honor.

17        THE COURT:  Okay.  Okay.  Do you feel like we need to

18   expedite briefing in this case, or do you think a two week, one

19   week, and then I could set a hearing sometime maybe at the end

20   of August or early September?

21        Do you think that would be appropriate, or do you

22   suggest something else?

23        MR. ENSIGN:  Your Honor, I think that would be -- that

24   would work.  We would have concerns with extensions to the

25   briefing schedule, and particularly for the -- this PI, because

```
 1   the speech restriction has been briefed in the state court

 2   action.  We think that two weeks should give defendants a

 3   sufficient amount of time to respond to the PI.

 4        So we would have concerns about an extension, but we

 5   are okay with the default two weeks, one week, and then setting

 6   a hearing, you know, if possible, perhaps -- you know, perhaps,

 7   you know, in August 20 to 30 or so would be ideal so that this

 8   Court could consider it in advance of the general election.

 9   But that schedule, you know, sounds good to us.

10        THE COURT:  Okay.  Is there any concern over

11   certification of the primary election, or is -- or is this just

12   focused on the general election?

13        MR. ENSIGN:  Your Honor, we are not going to be

14   seeking relief with respect to the primary election just given

15   the timetable.

16        THE COURT:  Okay.  Have you spoken to counsel for

17   defendants about a proposed briefing schedule?

18        MR. ENSIGN:  I have not, Your Honor, though I'm happy

19   to do so.

20        THE COURT:  Okay.  I might actually -- I want to hear

21   what they have to say about that, but I think ultimately if

22   there's disagreement, I'll want you all to confer about that.

23        MR. ENSIGN:  Certainly, Your Honor.

24        And there's one other thing I'd like to make the Court

25   aware of, if -- if that's okay?
```

14

1        THE COURT:  Yes.

2        MR. ENSIGN:  As to the vote nullification provision,

3   at the same time that we filed our preliminary injunction

4   motion, we sent a letter to the Secretary asking him to disavow

5   enforcement to the vote nullification provision.  You know, to

6   our minds, it was -- it was certainly not outside the realm of

7   possibility after reviewing our complaint he could conclude

8   that, given the violation of Anderson-Burdick Doctrine, he

9   would agree not to enforce that provision.

10        We've asked for a response for that by a week from

11   today.  If he were not to -- if he refuses to disavow

12   enforcement of that provision, we would certainly consider

13   seeking a preliminary injunction on that.  But we wanted to

14   exhaust that -- exhaust that and make sure that we were not

15   burdening the Court with a preliminary injunction motion if the

16   parties were not, in fact, you know, in disagreement about

17   that.

18        THE COURT:  Okay.  Thank you.

19        Anything else?

20        MR. ENSIGN:  Not from me, Your Honor.

21        THE COURT:  Thank you, Mr. Ensign.

22        Ms. Hartman-Tellez, do you wish to go first or

23   Mr. Arrowsmith?  How do you want to handle that?

24        MS. HARTMAN-TELLEZ:  Your Honor, I think it probably

25   depends on which issues you want to talk about first.

1    Mr. Arrowsmith is focused on the speech restriction issues.  I

2    will be handling the canvass provision.

3          THE COURT:  Well, why don't you come up here on the

4    canvassing provision.  Because I'll be honest with you.  This

5    is pretty troubling.  I think you probably understood what I

6    said with Mr. Ensign.  I don't understand why this is necessary

7    when there's a remedy in state law under mandamus.  And, also,

8    one time in the history of this state, in 110 years, we had a

9    rogue board of supervisors.  So why can't -- why can't your

10   client -- your office, the Attorney General's Office, seek

11   mandamus?

12         Do you understand what I mean?  These statutes are

13   written, and the statutes can't enforce themselves.  The

14   statutes require individuals who are elected to enforce them.

15   Some duties are nondiscretionary and some are discretionary.

16   And I'm going -- I'm just going to go out on a limb here and

17   say certifying an election is a nondiscretionary duty.  And if

18   an elected official who's put in that position refuses to

19   certify an election, then there are remedies of that.  In fact,

20   your office has pursued remedies in another forum.

21         So why don't you tell me, why is this -- why is the

22   threat of disenfranchising an entire county's voters necessary

23   when you can enforce it through these other means?

24         MS. HARTMAN-TELLEZ:  Your Honor, I agree with you

25   100 percent, that there is a state law remedy, and mandamus is

```
 1    the remedy.  And my client has -- or the -- yeah, it was the

 2    Secretary, I believe, in 2022.  I was not representing her.

 3    There were private parties as well who did seek mandamus and

 4    obtained it to require the rogue county to conduct its canvass.

 5    The -- there's sort of, like, a key difference now, and that is

 6    that the statute -- the canvassing statutes have been amended.

 7    There is, like, no leeway whatsoever in -- in -- on time.  It's

 8    sort of a hard deadline.  And so that is -- is the context in

 9    which this provision in the EPM sits.

10          That doesn't -- like, I -- I can't avow to the Court

11    that this is -- like that this would definitely happen, but I

12    am very sure that if we were faced with this situation, like

13    what happened in 2022, you would find us in court as soon as

14    possible to get it -- get the canvass to happen --

15          THE COURT:  And I hope you would.

16          MS. HARTMAN-TELLEZ:  -- on time.

17          THE COURT:  I hope that would happen.

18          MS. HARTMAN-TELLEZ:  Yeah.

19          THE COURT:  And, again, I might be going out on a limb

20    saying that.

21          MS. HARTMAN-TELLEZ:  And --

22          THE COURT:  I think reasonable people would all agree

23    with that.

24          MS. HARTMAN-TELLEZ:  And I think -- and I think -- and

25    my client is a reasonable person.
```

(129 of 232), Page 129 of 232 Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 129 of 232
Case 2:24-cv-01673-MTL   Document 21   Filed 07/22/24   Page 17 of 49

17

1           THE COURT:  I agree.

2           MS. HARTMAN-TELLEZ:  The --

3           THE COURT:  As is your boss, ultimate boss.

4           MS. HARTMAN-TELLEZ:  Indeed.  Indeed.

5           The -- the real -- the -- the -- the sort of issue

6    becomes crucial really only with respect to the -- to the

7    presidential electors.  All the other officers -- like

8    there's -- there's a more timely way, but because of the

9    Electoral Count Reform Act, there's a hard deadline because of

10   a lot of other things going on in Arizona election law with the

11   certification of recounts.  The statutes -- yeah, a lot of the

12   timing statutes were amended in -- in February of this year to

13   try and address these problems, to meet federal deadlines from

14   the primary, to meet the deadline for mailing ballots, to

15   voters who are voting via UOCAVA, and then for the general

16   election for the -- the Safe Harbor deadline for presidential

17   electors.  And that's set -- that's sort of -- that is --

18   that's the context in which we sit.  But I -- you could knock

19   me over with a feather if -- if we have a county that does not

20   do its ministerial duty to canvass the election timely and

21   we're not in court the next day.

22          THE COURT:  I would think that would be the ultimate

23   result.

24          But do you -- do you kind of see how this is playing

25   out here, that the remedy in this -- in this -- in the EPM is

(130 of 232), Page 130 of 232 Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 130 of 232
Case 2:24-cv-01673-MTL    Document 21    Filed 07/22/24    Page 18 of 49

18

1    to disenfranchise voters when the state law remedy is to

2    enfranchise the voters?

3         MS. HARTMAN-TELLEZ:  I think it -- the -- that the --

4    what we have is essentially a choice.  When it comes to

5    elect -- to presidential electors, you have a choice between

6    having a vote that chooses presidential electors that -- that

7    misses, a county that refuses to do its duty, or you have no

8    presidential electors sent because the state doesn't certify

9    its election timely, and so Arizona gets no electoral votes.

10   Obviously, both of those are terrible.

11        THE COURT:  Can't the remedy -- can't the EPM, instead

12   of disenfranchising voters, say something like in the case of a

13   county that -- where the county officials don't certify, the

14   Secretary of State shall be designated to make that

15   certification in place of the county board of supervisors?

16        Wouldn't that be an appropriate remedy?

17        MS. HARTMAN-TELLEZ:  Your Honor, it is possible.  I

18   haven't sort of considered every possible permutation, but

19   we -- but what we have is an Election Procedures Manual that

20   has been issued pursuant to state law that binds the election

21   officials who are subject to it.

22        So right now, you know, the -- the -- counsel for the

23   plaintiffs mentioned that they have sent us this letter asking

24   the Secretary of State to disavow this provision.  And we

25   haven't had a chance to discuss this amongst ourselves, or

(131 of 232), Page 131 of 232 Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 131 of 232
Case 2:24-cv-01673-MTL    Document 21    Filed 07/22/24    Page 19 of 49

19

 1   even I haven't had a chance to review it with my client, but I

 2   have a concern about the Secretary just deciding not to follow

 3   the EPM because the plaintiffs has -- have asked us to.

 4   It's -- you know, it's a different situation if -- if you or

 5   one of your colleagues on the bench orders us to do something

 6   different.  And we don't want to -- don't want to cause -- you

 7   know, don't want to --

 8          THE COURT:  But that would come with a lot of

 9   embarrassment to your -- to your client.  And can't -- an idea

10   could be that you kind of agree to -- look, I guess I don't

11   want to go down there at this point, but you know what I mean.

12          So what else, Ms. Hartman-Tellez?

13          MS. HARTMAN-TELLEZ:  Well, really briefly just on the

14   scheduling --

15          THE COURT:  Yeah.

16          MS. HARTMAN-TELLEZ:  -- the -- right now under the

17   sort of, you know, deadlines set by the -- by the Rules of

18   Civil Procedure, the defendants' deadline to file a response to

19   the complaint, I expect they will be motions to dismiss, is

20   August 5th, where the PI response deadline is August 1st.  We

21   would ask that that --

22          THE COURT:  You want to consolidate --

23          MS. HARTMAN-TELLEZ:  Yes.

24          THE COURT:  -- that?

25          Okay.

```
 1              MS. HARTMAN-TELLEZ:  Yeah.

 2         And I think -- I mean, I have -- I'm happy to discuss

 3    other things, and I -- I would just -- I would maybe make one

 4    point with respect to the speech restriction regarding

 5    something that you said to plaintiffs' counsel regarding a --

 6    there being a need for abstention.  Or, I mean, you said is

 7    there -- so there's no need for abstention.

 8              THE COURT:  Oh, your position is there's no

 9    abstention --

10              MS. HARTMAN-TELLEZ:  Well, I --

11              THE COURT:  -- for it?

12              MS. HARTMAN-TELLEZ:  -- just want to make one point,

13    and then I'm -- I will hand off to my --

14              THE COURT:  Okay.

15              MS. HARTMAN-TELLEZ:  -- my colleague for further

16    discussion on the speech restriction issue.

17         Right now we are -- we're sort of at the point where

18    state court is being asked to determine whether a provision of

19    state law complies with the free speech provisions of the

20    Arizona Constitution.  I'm sure you're well aware that those

21    are, you know, at least as strong -- you know, they're --

22    they're as strong or stronger than the First Amendment

23    protections.

24              THE COURT:  At least there was a point in our history

25    where the Supreme Court of Arizona took that position, and I
```

(133 of 232), Page 133 of 232   Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 133 of 232
Case 2:24-cv-01673-MTL   Document 21   Filed 07/22/24   Page 21 of 49

21

1    don't know --

2              MS. HARTMAN-TELLEZ:  But --

3              THE COURT:  -- if they still believe in that.

4              MS. HARTMAN-TELLEZ:  But I think would it sort of --

5    it goes a long way to -- if the -- if the superior court in

6    its -- and it's Judge Jennifer Ryan-Touhill is the judge in

7    superior court.

8              THE COURT:  Okay.

9              MS. HARTMAN-TELLEZ:  If that Court decides -- you

10   know, finds a constitutional construction of the language at

11   issue, I think that should inform this Court's decision.

12             And with that, I will cede the podium to my colleague.

13             THE COURT:  Okay.  Thank you.  Nice to see you.

14             MS. HARTMAN-TELLEZ:  Nice to see you.

15             MR. ARROWHEAD:  Good morning, Your Honor.

16             THE COURT:  Good morning.  So you have this -- you

17   have the speech part of this?

18             MR. ARROWHEAD:  Yes.  We've -- in the state court

19   litigation, the Solicitor General's Office, who is representing

20   the Attorney General, has focused on that portion, while the

21   Secretary has focused on other claims in that case --

22             THE COURT:  Okay.

23             MR. ARROWHEAD:  -- so --

24             THE COURT:  So it just seems very ambiguous --

25             MR. ARROWHEAD:  Well --

22

1          THE COURT:  -- and open to different interpretation

2     and inconsistent enforcement.

3          MR. ARROWHEAD:  So, Your Honor, I think, as noted in

4     the complaint, the counsel for plaintiffs -- well, one of the

5     parties overlaps America First Policy Institute.  They sent a

6     letter to our office asking the Attorney General to disavow

7     enforcement.  And we did send a letter on May 31st clarifying

8     that the provision, which they label as a speech restriction,

9     is guidance for election workers.  The Attorney General does

10    not view it as expanding the scope of criminal -- criminal

11    liability.  Any prosecutions for any sort of voter intimidation

12    or harassment would be brought under A.R.S. 16-1013, 16-1017,

13    or applicable criminal statutes, not under the 16-452 related

14    to a violation of the EPM, if the Attorney General also

15    clarified that the EPM is applicable to election workers, not

16    to the general public.

17         And so we've continued to engage in the state court

18    case with plaintiffs on, you know, whether that letter was

19    satisfactory or whether we -- there's anything else we can say

20    to allay their concerns.  Those discussions are ongoing, but we

21    have not had those discussions with respect to this case.  We

22    were just served on -- on Monday, and we received the notice of

23    this hearing on Wednesday.

24         THE COURT:  Right.  Are you aware of -- and I'm just

25    going to kind of tell you why I asked that question to

(135 of 232), Page 135 of 232    Case 2:24-cv-01673-MTL    Document 21    Filed 07/22/24    Page 23 of 49
Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 135 of 232

23

 1  Mr. Ensign about the T-shirts is -- is I actually represented a

 2  county a long time ago that prohibited T-shirts.  And then I

 3  think the Legislature enacted a statute -- Ms. Hartman-Tellez,

 4  do you know what I'm talking about?

 5          MS. HARTMAN-TELLEZ:  You see me standing?

 6          THE COURT:  Yes.

 7          MS. HARTMAN-TELLEZ:  And in 2010 there was litigation,

 8  and right before the election, in front of Judge Teilborg --

 9          THE COURT:  And it was Coconino County.

10          MS. HARTMAN-TELLEZ:  -- regarding --

11          THE COURT:  Yeah.

12          MS. HARTMAN-TELLEZ:  -- yeah, regarding the wearing of

13  T-shirts.  I don't know that there's been legislation, but the

14  EPM now says that apparel -- that voters, you know,

15  non-election workers, basically, can wear whatever sort of

16  political apparel they -- they desire at a polling place.

17          THE COURT:  Okay.  And so that's in -- that was made

18  in the EPM?

19          MS. HARTMAN-TELLEZ:  It's in the EPM, yes.

20          THE COURT:  Was there a consent judgment in that case,

21  or was it just a settlement?

22          MS. HARTMAN-TELLEZ:  I think there was a ruling on it

23  from the judge.

24          THE COURT:  Okay.

25          MS. HARTMAN-TELLEZ:  This is at district court.  And

24

```
 1      it was -- you know, just it was a TRO a couple of days before

 2      the election.  And I think in future EPMs they reflected

 3      that -- that a -- political apparel was not prohibited.

 4              THE COURT:  Okay.  Thank you.

 5              All right.  What else would you like to say,

 6      Mr. Arrowsmith?

 7              MR. ARROWHEAD:  Just that I would echo

 8      Ms. Hartman-Tellez' request that if we could file a response to

 9      the preliminary injunction and our responsive pleading motion

10      to dismiss on August 5th.  I think, as Mr. Ensign mentioned, we

11      do have a full-day evidentiary hearing on July 29th in the

12      related state case and a number of depositions next week to

13      prepare for that --

14              THE COURT:  Okay.

15              MR. ARROWHEAD:  -- so --

16              THE COURT:  Then I think what would need to happen is

17      if you're going to -- if you're going to file two motions to

18      dismiss, or maybe a combined motion to dismiss, then the other

19      side will need two weeks to respond to that, and then you'll

20      get a reply.

21              Do you think that sequencing would be feasible for you

22      all?

23              MR. ARROWHEAD:  I think so.  We have not discussed it.

24      And we're happy to discuss after the hearing and file something

25      with a proposed briefing schedule --
```

 1            THE COURT:  Okay.

 2            MR. ARROWHEAD:  -- I'm sure we could come up with.

 3            THE COURT:  That might be what I ask you all to do.

 4            MR. ARROWHEAD:  Okay.

 5            THE COURT:  Anything else, Mr. Arrowsmith?

 6            MR. ARROWHEAD:  No, not unless you have any questions.

 7  Your Honor.

 8            THE COURT:  No.

 9            MR. ARROWSMITH:  Thank you.

10            THE COURT:  Thank you.

11            Mr. Goana, you get to speak about all of that.

12            MR. GOANA:  Thank you, Your Honor.

13            I don't have much to add other than to just preview

14  for the Court that the -- we don't believe the Governor's a

15  proper party to this case.

16            THE COURT:  I'm glad you said that, because I was

17  going to ask you.

18            MR. GOANA:  Yes.  So we do intend at this point to

19  file a motion to dismiss to try to get -- to extract the

20  Governor from this case.  The only relief that the complaint

21  seeks as against the Governor, if you look in the prayer for

22  relief, is that, as I read it, after -- if the Court were to

23  grant the plaintiffs' declaratory and injunctive relief barring

24  the enforcement of the two challenged EPM provisions,

25  apparently they want to ask this Court to order -- to also

(138 of 232), Page 138 of 232 Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 138 of 232
Case 2:24-cv-01673-MTL    Document 21    Filed 07/22/24    Page 26 of 49

26

```
 1   order the Secretary of State, Attorney General, and Governor to
 2   approve a new version of the EPM that doesn't have the enjoined
 3   provisions, which we view as completely unnecessary and not a
 4   road that I believe this Court would want to go down if the --
 5            THE COURT:  So let me -- let me save you -- your
 6   client a little bit of time.
 7            MR. GOANA:  Sure.
 8            THE COURT:  I agree with him.  I don't really think
 9   that Governor Hobbs really needs to be in this case, unless I'm
10   missing something.
11            And, Mr. Ensign, I'm going to give you an opportunity
12   to respond to that.  But if the plaintiffs are willing to agree
13   with, perhaps, the Secretary of State defendants, that any
14   relief of -- that they were enable -- that they are able to
15   obtain would be fully enforceable against the Secretary of
16   State defendants, I think we should just let the Governor's
17   Office out.
18            Why don't you -- why don't you tell me a little bit
19   more about your thinking, Mr. Ensign.
20            MR. ENSIGN:  Certainly, Your Honor.
21            Our thinking is mostly directed at -- at remedy,
22   because the speech restriction exists in the EPM.  It is a
23   criminal -- it is criminally prohibited to violate it.  That
24   could be enforced by the county attorneys if left on the books.
25   This is not a case where we're challenging a statute in the
```

(139 of 232), Page 139 of 232   Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 139 of 232
Case 2:24-cv-01673-MTL   Document 21   Filed 07/22/24   Page 27 of 49

27

1  ordinary norm that you just enjoin enforcement of the statute

2  applies.  This is an administrative rule, and the usual norms

3  are that administrative rules that violate are either vacated

4  or, where agency action is unlawful, courts can compel

5  defendants to, you know, promulgate lawful agency action.

6         And so this is -- in addition, this is not a case

7  where legislative immunity applies.  That's why federal courts

8  are often in the position of enjoining enforcement of statutes,

9  because legislative immunity prevents them from enjoining the

10  Legislature to pass particular law.  But that doesn't apply for

11  agency rules.

12         And so -- I mean, we think that the -- that the

13  Governor is a proper party because her approval of the EPM,

14  which is unconstitutional, is a wrongful act and can be

15  challenged under 1983.  And it --

16         THE COURT:  But who enforces?  Who enforces the EPM?

17         MR. ENSIGN:  The -- the Attorney General, the County

18  Attorneys, the Secretaries by making criminal enforcement.  And

19  I think the Governor has the requisite nexus because her

20  approval was a necessary step to bring this into law and to be

21  enforced.

22         THE COURT:  Right.  And I'm -- and I'm aware of that

23  part.  But let's -- so there's two levels to your requested

24  relief, I see.  So the first is you want me to enjoin these two

25  provisions.  The second is you want me to issue a mandatory

(140 of 232), Page 140 of 232 Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 140 of 232
Case 2:24-cv-01673-MTL    Document 21    Filed 07/22/24    Page 28 of 49

28

1    injunction that they promulgate new provisions?  Is that what

2    you're asking me to do?

3         MR. ENSIGN:  Oh, to promulgate an EPM that simply

4    omits the constitutionally offensive provisions.

5         THE COURT:  I don't think that's necessary.  I think

6    that if I were to enjoin these provisions, it's the same as if

7    a judge at either the state or the federal level enjoins the

8    enforcement of a statute.  You don't then tell the Legislature

9    or Congress to excise the statute from the Arizona Revised

10   Statutes or the United States Code.  It's just simply not

11   enforceable.

12        MR. ENSIGN:  Your Honor, that -- that's certainly

13   correct for statutes, and that's how federal courts have

14   proceeded.  And that's partly due to legislative immunity

15   prevents them from doing so, so they do the next best thing

16   of -- of simply enjoining enforcement of it.  But for agency

17   actions, where the -- the parties that created the offending

18   provisions of law are properly before the Court, Courts often

19   take the additional step of, for example, vacating an agency

20   rule.  Not just enjoining the agency from enforcing an unlawful

21   rule, but they'll simply vacate it or, in the case of where

22   they're supposed to do something, directing them to do so.

23        We'll admit that certainly the more typical remedy is

24   an injunction.  But we certainly think that there's dangers of

25   leaving this provision on the books in the EPM.  Like certainly

29

```
 1    poll workers are not necessarily going to be aware of
 2    injunction -- of what courts do, and having that on the books
 3    invites a danger of the enforcement of provision that a court
 4    has meant to enforce.  Now --
 5              THE COURT:  So let's say, then, I do agree with you
 6    ultimately.  And I don't know.  I'm just going to say for the
 7    sake of argument I agree with you.  Can't that then be
 8    accomplished simply by a mandatory injunction to the Secretary
 9    of State?
10              MR. ENSIGN:  Well, in that case, Your Honor, the
11    Secretary -- a mandatory injunction to the Secretary could
12    compel the Secretary to propose a compliant EPM, but the
13    Governor could exercise her right to veto that.  And so that's
14    our concern.  Certainly if the Governor's Office were to agree
15    that they would not veto any -- any remedial EPM required by
16    this Court as part of injunctive relief, we would be happy to
17    let the Governor go.  That is -- that is our main concern.
18              THE COURT:  So why don't you two in the course of,
19    like, a pre-motion to dismiss meet and confer.  Try to find out
20    if you can accomplish that.  Because I just don't think that
21    the Governor's Office needs to be here at this point.  I could
22    change my mind after I read the briefing.  But it just seems to
23    me to be an unnecessary expense for the government to have them
24    here.  As much as Mr. Goana brings to every case he works on, I
25    just don't know.
```

UNITED STATES DISTRICT COURT

(142 of 232), Page 142 of 232 Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 142 of 232
Case 2:24-cv-01673-MTL    Document 21    Filed 07/22/24    Page 30 of 49

30

 1          Do you understand what I'm saying, Mr. Goana?  I just

 2    don't know if the Governor's Office needs to stay and incur

 3    this expense.

 4          MR. GOANA:  Your Honor, I agree with you 100 percent.

 5    The -- as it relates to the merits of the case, the Governor is

 6    going to defer to the Secretary and the Attorney General, who

 7    will ably defend those laws in the way that -- or the EPM, I

 8    should say, in the way that they see fit.  But we don't

 9    anticipate taking a position on the merits of those other than

10    wanting to file the motion to dismiss to extricate the Governor

11    from this case.

12          Everything I heard Mr. Ensign say about enforcement

13    has nothing to do with the Governor.  If he's concerned about

14    the county attorneys enforcing this law, well, maybe they're

15    proper parties, but that has nothing -- the Governor has no

16    authority to direct the county attorneys not to prosecute

17    something.  She also doesn't prepare the canvass of the -- of

18    the election.  She used to do that in her old job.  Not

19    anymore.  That's now Secretary Fontes' job.

20          And the other thing I would add, Your Honor, on this

21    point -- and, to be clear, I've already engaged both with

22    Mr. Gould and with Mr. Ensign about -- on this precise issue.

23    I don't think we're going to be able to reach an agreement, but

24    I'm not ruling it out at this point, to -- to get the Governor

25    out of the case entirely.  But the State of Arizona has

(143 of 232), Page 143 of 232   Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 143 of 232
Case 2:24-cv-01673-MTL   Document 21   Filed 07/22/24   Page 31 of 49

31

1    operated with provisions of the EPM that were declared

2    unenforceable by courts.  It did so for years.  In the *McKenna*

3    case and the *Leach* case in 2021, where the Arizona Supreme

4    Court held that various provisions of the EPM were

5    unenforceable, that was it.  You know, they were declared

6    unenforceable.  There was an annotated version of the EPM that

7    basically -- I'm sorry -- showed elections officials which

8    provisions had been affected by court orders, but the EPM

9    remained in -- the balance of the EPM remained effective and

10   enforceable at that point.  What we didn't do is go back and

11   simply excise provisions that have been declared unenforceable

12   for whatever reason.  That was for lack of statutory authority

13   in the two cases that I -- that I mentioned.

14          So I -- I don't think that on top of an injunction

15   that would prohibit enforcement, also asking the Court to take

16   the extreme step, and mandatory injunctions, of course, being

17   disfavored by federal courts, to take that additional step,

18   that would be unnecessary and involve the Court ordering state

19   officials to do things under state law that are -- would not be

20   required because of the effect of the Court's prior orders.

21          THE COURT:  And I'm generally uncomfortable doing that

22   if -- you know, if there's reason to do it, I would.  But,

23   generally speaking, I have a little bit of discomfort in that

24   regard.

25          Well, I hope you two can talk it out and work it out.

1    I -- generally speaking, I feel like, Mr. Ensign, you and

2    Mr. Goana can craft some sort of a stipulation where the

3    Governor agrees to be bound by any relief that might be ordered

4    against the Secretary of State and let her out, but I'll let

5    you all discuss it.

6            MR. GOANA:  Yes.

7            THE COURT:  Okay.  So, Mr. Goana, do you have any

8    other recommendation as to a briefing schedule?

9            MR. GOANA:  No, Your Honor.  We'll -- we would agree

10   with consolidating the briefs.  And we're happy to work with

11   everybody else on a schedule that makes sense so that we can

12   get the Governor's motion to dismiss teed up as soon as

13   possible.

14           THE COURT:  Okay.  Do you have anything else that you

15   want to bring to my attention, Mr. Goana?

16           MR. GOANA:  No, Your Honor, other than to say that

17   Ms. Hartman-Tellez is right.  It wasn't her that filed the

18   mandamus action against Cochise County.  It was me that did

19   that on behalf of Secretary Hobbs.  And I can tell you from

20   that experience, just to give some color to the discussion that

21   the Court was having with counsel, that I think the concern

22   from the Secretary's perspective in particular is one of

23   timing.  And I agree with Ms. Hartman-Tellez that it's

24   particularly acute with respect to the presidential election.

25   But the concern that we had at the time -- and we were able to

(145 of 232), Page 145 of 232 Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 145 of 232
Case 2:24-cv-01673-MTL    Document 21    Filed 07/22/24    Page 33 of 49

33

1    get an emergency hearing, mandamus relief.  There was no

2    appeal, so everything happened in the normal course.  The

3    concern was when the county statutory duties ran up against the

4    Secretary's, then statutory duties under law to get the canvass

5    and get it done in a particular time.  And there was a letter

6    sent in the Cochise County litigation to the Cochise County

7    Supervisor saying:  We are trying to help you.  We want to

8    enfranchise you, but if you don't do your -- if you don't

9    fulfill your statutory duty by this date certain that you're

10   required to by law, that's going to run up against the

11   Secretary's duties.

12           And in that instance, the prior administration also

13   said:  You're going to leave us in the difficult position of

14   having to omit Cochise from the canvass if we -- if those

15   things collide.

16           I agree with you.  It's -- it's a wonderful thing that

17   we didn't get there and that we were able to successfully get a

18   writ of mandamus requiring that canvass to be completed so that

19   everything went off without a hitch.  But there's a lot of

20   timing concerns, and I -- I do agree that they're particularly

21   acute in the context of a presidential election.

22           So -- but that's not to take a position of the merits

23   on anything, but just to give the Court some context to the

24   litigation that happened in 2022 with a rogue Arizona county.

25           THE COURT:  Right.  And you lived it, and I just read

(146 of 232), Page 146 of 232 Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 146 of 232
Case 2:24-cv-01673-MTL    Document 21    Filed 07/22/24    Page 34 of 49

34

1   about it from the bleachers.  So I appreciate that background.

2          Now, what about my suggestion that instead of throwing

3   out a county's votes that you have a -- you have a mechanism

4   whereby perhaps the Secretary of State steps in and then the

5   Secretary of State -- and you could even do it with whatever

6   the canvassing board is at the state level, like the Governor,

7   the AG, the Secretary of State, that canvassing board, you

8   know, the -- if there's a recalcitrant county, then that just

9   gets elevated to the state board?

10          And the reason being is, is it's a ministerial duty.

11  They were executing the law as it's written.

12          MR. GOANA:  Your Honor, I obviously haven't had more

13  than a few months to think about that potential alternative in

14  the EPM.  The one thing I would flag, though, is the Speaker --

15  the current Speaker and current President have taken issue with

16  a lot of provisions of the EPM, and I suspect there might be

17  some conflicts between the branches if the Secretary were to

18  try to, through the -- through the EPM, without the statutory

19  authority to do so, to put a provision like that giving the

20  Secretary power to effectively canvass on behalf of a county.

21          So I would anticipate some likely conflict between the

22  branches if that were -- if a provision, as posed by the

23  Court's hypothetical, were to be included in the EPM.

24          THE COURT:  Okay.  And that's simply a hypothetical.

25          MR. GOANA:  Correct.

1           THE COURT:  That's all.

2           Okay.  Anything else, Mr. Goana?

3           MR. GOANA:  No, Your Honor.  Thank you.

4           THE COURT:  Thank you.

5           Mr. Ensign, did you want to say something?

6           MR. ENSIGN:  Perhaps two quick clarifications, Your

7    Honor.

8           THE COURT:  Okay.

9           MR. ENSIGN:  On the vote nullification provision,

10   there is a separate provision of the EPM that we have not

11   challenged that makes absolutely clear that the duty to canvass

12   is nondiscretionary.  So under that, we believe that one of the

13   remedies available to the Secretary would be to seek mandamus,

14   as this Court has suggested, and which -- which just makes

15   disenfranchising people all the more gratuitously unnecessary.

16          THE COURT:  Do you agree -- you agree with me, though,

17   that the duties of a board of supervisors to canvass an

18   election is a nondiscretionary duty?

19          MR. ENSIGN:  That is certainly what the EPM says

20   directly and has not been challenged.  So it is a Class 2

21   misdemeanor to decline to do so.

22          THE COURT:  Okay.  And then there was -- was there a

23   second clarification?

24          MR. ENSIGN:  Just quickly on the speech restriction.

25          The Attorney General said that she views it as a

36

 1    nonbinding guidance purely for coworkers.  But, certainly, we

 2    do not read the language that way.  The language says, "Any

 3    activity by a person with the intent or effect of threatening,

 4    harassing, intimidating, or coercing voters ... is prohibited."

 5            It's stated as a universal prohibition on the conduct

 6    of any person, which we think is any person.  And so that -- we

 7    disagree with it.  We recognize that the Attorney General has

 8    made a disavowal, but we think that's ineffective because it's

 9    premised on manifest errors of law.

10            And we will also note that we asked the Secretary to

11    disavow enforcement, and he refused to do so.

12            THE COURT:  Okay.  Thank you, Mr. Ensign.

13            MR. ENSIGN:  Thank you, Your Honor.

14            THE COURT:  All right.  Let's do this now.  I want to

15    hear from Mr. Barton on his motion to intervene.  I've had a

16    chance to read it ahead of time.  I don't know if either of you

17    have had a chance to read it.

18            But I just want to hear what you have to say,

19    Mr. Barton.

20            MR. BARTON:  Good morning, Your Honor.

21            THE COURT:  Good morning.

22            MR. BARTON:  I will say that Julie Zuckerbrod is here.

23    She has filed a motion for pro hac vice that, of course, hasn't

24    been granted yet.  But if the Court was interested in sort of

25    provisionally granting her motion, I think she would be a

37

```
 1    person who would be able to be helpful in answering questions
 2    about the motion to intervene --
 3            THE COURT:  Okay.
 4            MR. BARTON:  -- if you'd like.
 5            THE COURT:  That sounds fine.  Thank you, sir.
 6            Ms. Zuckerbrod, why don't you come on up.
 7            MS. ZUCKERBROD:  Good morning, Your Honor.
 8            THE COURT:  Good morning.  Welcome to Phoenix.
 9            MS. ZUCKERBROD:  Thank you so much.  Enjoying the
10    weather.
11            THE COURT:  I think -- I -- between Phoenix and
12    Washington, D.C., in July, I don't know which to pick.
13            MS. ZUCKERBROD:  I --
14            THE COURT:  It's a hard choice.
15            MS. ZUCKERBROD:  I'm also unable to make a choice
16    there.
17            THE COURT:  Yeah.
18            MS. ZUCKERBROD:  Your Honor, my name is Julie
19    Zuckerbrod.  I'm here on behalf of the proposed intervenors
20    Alfred Lomahquahu, a member of the Hopi Tribe and registrar for
21    the Hopi Elections Office; Stephanie Stephenson, a Cochise
22    County voter; and the Arizona Alliance for Retired Americans.
23            Your Honor, our motion to intervene lays out that we
24    meet all four requirements of intervention as a right and also
25    suggest that if the Court disagrees with that, it should also
```

(150 of 232), Page 150 of 232 Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 150 of 232
Case 2:24-cv-01673-MTL    Document 21    Filed 07/22/24    Page 38 of 49

38

 1    grant us permissive intervention.

 2         THE COURT:  So what -- let's focus on this:  How is it

 3    that your clients, or the individuals, stand to be

 4    disadvantaged by this litigation?

 5         I really couldn't tell that from your brief.  I know

 6    you talked a lot about litigation going on in the state, but

 7    how is it that these individuals are affected by a speech

 8    restriction and a potential disenfranchisement of county votes?

 9         MS. ZUCKERBROD:  Your Honor, with the -- the speech

10    restriction, which we would refer to as the voter intimidation

11    guidance, protects voters because it gives county election

12    officials more guidance than they previously had about what

13    constitutes voter intimidation.  And, as we saw in 2022, there

14    was a problem with voter intimidation, particularly at drop

15    boxes.  And that type of intimidation had a -- had a

16    disproportionate effect on certain voters.

17         THE COURT:  Yeah, and I'm aware of that litigation,

18    but the key there was what was a real threat, and because you

19    have to balance First Amendment rights of the speaker with the

20    rights of individuals to participate in voting.  So the

21    struggle there was how do you determine what is a real threat

22    and what is real intimidation.  And here I just don't know if

23    that's defined well.

24         MS. ZUCKERBROD:  Well, Your Honor, if the -- if the

25    question is how this litigation could impair my clients'

```
 1   interests --

 2            THE COURT:  Right.

 3            MS. ZUCKERBROD:  -- it's because the -- the additional

 4   guidance that was added to the EPM gave -- gave election

 5   officials more robust ability to identify and deter the type of

 6   behavior that was interfering with client -- with individuals

 7   like my clients', elderly individuals, members of the Native

 8   American community, other minorities, right to vote.  So the

 9   interest that stands to be impaired here is the fundamental

10   right to vote like voters like my clients.

11            THE COURT:  And how is it that your clients can't be

12   adequately represented by the Secretary of State's Office and

13   the Governor, if she's -- if she remains in the case?

14            MS. ZUCKERBROD:  Well, as Your Honor just mentioned,

15   the free speech analysis and the -- the undue burden on the

16   right to vote analysis will require the Court to balance the --

17   the burdens on individuals' rights against the state interests.

18   And, as we heard from -- from the state defendants earlier

19   today, the state interests have a lot to do with administrative

20   concerns.  And my clients' concerns are much more focused on

21   the individual rights, their fundamental right to vote.  So my

22   clients seek to add an important perspective of how enjoining

23   the EPM provisions that plaintiffs challenge would impact their

24   fundamental right to vote.

25            And, you know, we trust that -- that the state
```

40

1    defendants, the current defendants, have that in mind, but my

2    clients would also offer a more specific perspective on a --

3    particularly how these restrictions affect the elderly

4    community and minority communities, like Native Americans.

5         THE COURT:  Okay.  Anything else, Ms. Zuckerbrod?

6         MS. ZUCKERBROD:  Yes.  I would just like to say that

7    if we are permitted to intervene, we will -- we're prepared to

8    abide by whatever schedule this Court sets.  We will not delay

9    the proceedings.  And we would defer to the current defendants

10   on their preferred briefing schedule.

11        THE COURT:  Okay.  Thank you.

12        MS. ZUCKERBROD:  Thanks.

13        THE COURT:  Mr. Ensign, do you have a position?

14        MR. ENSIGN:  We do, Your Honor.  You know, obviously

15   we'd like to set forth that position more robustly in a brief,

16   but a few quick responses are in order.

17        You know, we think that their interests are adequately

18   represented by the -- by the existing governmental defendant --

19   defendants.  There's a presumption.  Their representation is

20   adequate.  We see no reason that that presumption would be

21   defeated here.  We would further note that there have been

22   recent denials of intervention on precisely those grounds.  In

23   the state court litigation, also involving the speech

24   restrictions, AARA was one of the attempted intervenors.  The

25   superior court denied intervention.  More recently my firm has

41

```
 1    an NVRA challenge pending before Judge Lanza.  AARA also sought

 2    to intervene in that case.  Judge Lanza found that the existing

 3    governmental defendants adequately represented their interests.

 4    We think the same result should obtain here.

 5         We also don't understand how proposed intervenors

 6    would have a protectable interest in seeing that their own

 7    members are disenfranchised or themselves are disenfranchised

 8    under the nullification provision.  I don't understand how you

 9    could have a protectable interest in seeing yourself

10    disenfranchised or your members disenfranchised.  So I don't

11    think that satisfies the protectable interest requirement

12    either.

13         But -- and, finally, all of that said, you know,

14    perhaps participation by amicus might be something more

15    appropriate in this instance.

16         THE COURT:  Thank you.

17         MR. ENSIGN:  Thank you, Your Honor.

18         THE COURT:  Ms. Hartman-Tellez, does the Secretary of

19    State have a position?

20         MS. HARTMAN-TELLEZ:  Your Honor, I'd still need to

21    discuss it with my client.  I'm sorry.  We -- we just got the

22    motion to intervene last night at about 9:00 p.m.  So I don't

23    have an answer for you yet.  But I could tell you that in other

24    litigation, the Secretary has not objected to this -- the --

25    one of these parties and -- intervening.  So --
```

42

1              THE COURT:  Mr. Goana?

2              MS. HARTMAN-TELLEZ:  -- no.

3              MR. GOANA:  Your Honor, the Governor takes no position

4    on the intervention.

5              THE COURT:  Okay.  Okay.  All right.  So here's what

6    we're going to do:  I want counsel for the parties to confer.

7    And by the end of the day today, please file a proposed

8    briefing schedule.  I can set an oral argument now in

9    September, or I can look at your briefing schedule and then

10   just set it.  But the risk is if I give you a date that doesn't

11   work for you, then we've got to regroup.

12             So what should we do?  Should we just set the hearing

13   on the forthcoming motions to dismiss and preliminary

14   injunction and then you could all work around that?  What --

15             MR. ENSIGN:  That's certainly acceptable to

16   plaintiffs, Your Honor.

17             THE COURT:  Okay.  Ms. Hartman-Tellez?

18             MS. HARTMAN-TELLEZ:  Yes, Your Honor, that -- that

19   works for us.  You could -- if you get on the calendar first,

20   then you -- then -- then we're good.

21             THE COURT:  Okay.

22             MS. HARTMAN-TELLEZ:  We don't need any more.

23             THE COURT:  And, Mr. Goana, are you okay with that?

24             MR. GOANA:  Yes, Your Honor.

25             THE COURT:  Okay.  One moment.

(155 of 232), Page 155 of 232 Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 155 of 232
Case 2:24-cv-01673-MTL   Document 21   Filed 07/22/24   Page 43 of 49

43

```
 1        (The Court and the courtroom deputy confer.)

 2             THE COURT:  How long do you think you need?  Are we

 3   going to have an evidentiary hearing, or are we just going to

 4   consider what's been submitted on the briefs?

 5             MR. ENSIGN:  Your Honor, plaintiffs would be fine with

 6   just an oral argument and not an evidentiary hearing.

 7             MR. ARROWHEAD:  That would be fine with us, as far as

 8   I know right now without having seen -- without having

 9   discussed with them if they have any other additional evidence.

10             THE COURT:  Okay.  Mr. Goana?

11             MR. GOANA:  Same, Your Honor.

12        (The Court and the courtroom deputy confer.)

13             THE COURT:  How about the afternoon of Wednesday,

14   September 4th?  Does that give you all enough time?  And then

15   understand that the last brief needs to be filed with enough

16   time for me to read it and study it.  So I'd need about a week.

17             Would that be enough time to give you all for the

18   sequencing of these briefs?

19             MR. ENSIGN:  That works for plaintiffs, Your Honor.

20   September 4th works.  And then we would make sure that the --

21   all briefing is completed by August 28th, one week prior of

22   that, if that is acceptable.

23             THE COURT:  That would be helpful.

24             How about counsel for defendants?

25             MS. HARTMAN-TELLEZ:  Certainly, Your Honor, we can
```

44

```
 1   make that work.  I think maybe building another -- if your
 2   schedule permits, maybe another week out might be better.
 3          THE COURT:  Okay.  Let me -- let me -- that'd be fine.
 4   Let me look to see what I have going on on the week of
 5   September 9th.
 6      (The Court and the courtroom deputy confer.)
 7          THE COURT:  How about September 11?  That's a
 8   Wednesday.  We could do 2:00 o'clock or 2:00 -- how about we do
 9   2:30, and then I'll just block the afternoon.
10          Mr. Ensign?
11          MR. ENSIGN:  Your Honor, co-counsel has a conflict on
12   that day.  Actually, Ninth Circuit oral argument downstairs.
13          THE COURT:  Okay.
14      (The Court and the courtroom deputy confer.)
15          THE COURT:  All right.  The 13 -- Friday the 13th?
16   Ominous.
17          MR. ENSIGN:  Not quite as ominous as September 11th,
18   Your Honor.
19          THE COURT:  You're right.
20          MR. ENSIGN:  That's acceptable to plaintiffs.
21          THE COURT:  You're right.
22          MS. HARTMAN-TELLEZ:  The 13th works for us.
23          THE COURT:  All right.  Let's do -- go ahead.
24          MR. ARROWHEAD:  Your Honor, I will note that I am
25   traveling to a wedding on that date.  I anticipate someone else
```

(157 of 232), Page 157 of 232    Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 157 of 232
Case 2:24-cv-01673-MTL    Document 21    Filed 07/22/24    Page 45 of 49

45

1    from my office can cover the hearing, but I do not have access

2    to their calendar at this moment.

3            THE COURT:  All right.  I could probably do the 12th,

4    if that works.

5            MR. ARROWHEAD:  I think it would be fine to do the

6    13th.  I just want to flag that I can't confirm whether one of

7    my colleagues is available at -- without access to their

8    calendar.

9            THE COURT:  Are you in the SG's Office?

10            MR. ARROWHEAD:  Yes.

11            THE COURT:  I'm sure there's somebody who could cover

12    it for you.

13            MR. ARROWHEAD:  I think so, but --

14            THE COURT:  All right.  Let's do the 13th in the

15    morning.

16            Mr. Goana, does that work for you, sir?

17            MR. GOANA:  Your Honor, I hope to not be there, but,

18    yes, that will work for us.

19            THE COURT:  Yeah, I hear you.

20            Okay.  Let's do 9:00 a.m. on the 13th so that we don't

21    ruin your afternoon.

22            And please -- so by the end of the day, please give me

23    a briefing schedule.

24            And I -- I need to have those documents, Mr. Ensign.

25    Okay?

UNITED STATES DISTRICT COURT

1          MR. ENSIGN:  Absolutely, Your Honor.

2          THE COURT:  Just file it as a supplement to your

3     motion for preliminary injunction.

4          Now, I feel like I have what I need to rule on this

5     motion to intervene.

6          I am going to deny the motion to intervene because I

7     just don't think that there's a protectable interest here that

8     is not adequately represented by the Secretary of State's

9     Office.  I feel like they're the ones who promulgate the

10    Elections Procedures Manual.  They're the ones following state

11    law.  And doing so, there's a process for them to do it.  And

12    they take comment when they promulgate the manual, and I feel

13    like they -- just based on my conversation with them today,

14    they're adequately prepared to represent the voters' interests

15    as well as their office's interests.

16         And I would further say that adding additional parties

17    really, I think, is unnecessary to adjudicate these issues, and

18    it simply could slow it down.  And there's a need to expedite

19    the process.  So that's why I'm going to deny the motion to

20    intervene.

21         But I will grant leave to the proposed intervenor

22    defendants, Arizona Alliance of Retired Americans and Stephanie

23    Stephenson and Mr. -- is it's Loma- -- Mr. Barton, can you help

24    me?

25         MR. BARTON:  Lomahquahu.

1          THE COURT:  -- Lomahquahu to submit an amicus brief.

2          So, Mr. Barton, I'd ask you to confer with counsel to

3   find a deadline to submitting an amicus brief.  But I do want

4   to give you a tip.  Don't just copy -- you know, don't just

5   repeat what the defendants say.  It's helpful to me to have a

6   different argument.  Because if it's simply repeating their

7   arguments, I might not even read it.  Okay?

8          MR. BARTON:  Understood, Your Honor.

9          THE COURT:  Okay.  Thank you.

10          And I'm doing that and just noting that, Mr. Ensign,

11   you had mentioned to me that you don't have any objection to

12   them participating as amicus.

13          MR. ENSIGN:  That's correct, Your Honor.

14          THE COURT:  Okay.  Okay.  Well, thank you all very

15   much for coming at such short notice, but I did want to get

16   ahead of this issue.

17          Does anybody have anything else that they wish to say

18   before I adjourn?

19          MR. ENSIGN:  Nothing from plaintiffs, Your Honor.

20          MS. HARTMAN-TELLEZ:  Nothing for the Secretary of

21   State, Your Honor.

22          MR. ARROWHEAD:  Nothing else for the Attorney General.

23   Thank you.

24          MR. GOANA:  Nothing from the Governor, Your Honor.

25          THE COURT:  Okay.  Thank you, everybody.

UNITED STATES DISTRICT COURT

**ER-210**

(160 of 232), Page 160 of 232 Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 160 of 232
Case 2:24-cv-01673-MTL    Document 21    Filed 07/22/24    Page 48 of 49

48

1          Court is adjourned.

2      (Proceedings conclude at 10:08 a.m.)

3                     ---oOo---

UNITED STATES DISTRICT COURT

**ER-211**

(161 of 232), Page 161 of 232
Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 161 of 232
Case 2:24-cv-01673-MTL    Document 21    Filed 07/22/24    Page 49 of 49

49

1

2

3

4

5                    **C E R T I F I C A T E**

6

7         I, CATHY J. TAYLOR, do hereby certify that I am duly

8    appointed and qualified to act as Official Court Reporter for

9    the United States District Court for the District of Arizona.

10        I FURTHER CERTIFY that the foregoing pages constitute

11   a full, true, and accurate transcript of all of that portion of

12   the proceedings contained herein, had in the above-entitled

13   cause on the date specified therein, and that said transcript

14   was prepared under my direction and control.

15        DATED at Phoenix, Arizona, this 22nd day of July,

16   2024.

17

18

19                              /s/ Cathy J. Taylor

20                              Cathy J. Taylor, RMR, CRR, CRC

21

22

23

24

25

UNITED STATES DISTRICT COURT

**ER-212**

# EXHIBIT B

# Holtzman Vogel

**HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK** PLLC

July 18, 2024

Adrian Fontes
Office of the Secretary of State
1700 W. Washington St Fl 7
Phoenix AZ 85007-2808

     *Re:  Enforcement of Elections Procedures Manual's Vote Nullification Provision*

Dear Secretary Fontes:

We write to you on behalf of our clients, American Encore, Karen Glennon, and Arizona Free Enterprise Club ("Free Enterprise") (collectively, "Clients"), who have filed suit against your office regarding the 2023 Elections Procedures Manual ("EPM"). *See American Encore v. Fontes*, No. 2:24-cv-01673-MTL (D. Ariz. filed July 8, 2024). We are writing to you regarding Chapter 13, Section III.B(2) of the 2023 EPM, pp. 252 ("Vote Nullification Provision"), which is one of the provisions challenged in that suit. The Vote Nullification Provision provides that "[i]f the official canvass of any county has not been received by [the] deadline, the Secretary of State must proceed with the state canvass without including the votes of the missing county." *Id.*

We request that you unequivocally and specifically disavow all enforcement of the Vote Nullification Provision for the 2024 general election. That provision violates the U.S. Constitution under the *Anderson-Burdick* doctrine, as set forth in our Complaint. We ask that you instead commit to some other mechanism for ascertaining the vote counts of a county whose results are not certified, such as asking for a court to resolve the dispute or appointing an independent auditor. *See, e.g.*, Complaint ¶147 (setting forth alternatives to disenfranchising the votes of voters in the affected county).

As set forth in our Complaint, the Vote Nullification Provision cannot be constitutionally enforced. We therefore request that you unequivocally disavow all enforcement of it for the 2024 election cycle by 5pm on Friday, July 26, 2024. If you are unable or unwilling to do so, we will take that as evidence that your office intends to enforce the Vote Nullification Provision for the 2024 general election.

We look forward to your correspondence. If you have any questions, please do not hesitate to contact us.

**ER-214**

Respectfully,

/s/ Andrew Gould
**HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC**
Andrew Gould
2555 East Camelback Road,
Suite 280
Phoenix, Arizona 85016
(602) 388-1262
agould@holtzmanvogel.com

cc:   Nathan Arrowsmith, Counsel for Attorney General Mayes
      Andrew Gaona, General Counsel for Governor Katie Hobbs

# Addendum 1

## Challenged Provisions of 2023 EPM

**Speech Restriction:**

2023 EPM, Chapter 9, § III(D)

D. Preventing Voter Intimidation

Any activity by a person with the intent or effect of threatening, harassing, intimidating, or coercing voters (or conspiring with others to do so) inside or outside the 75-foot limit at a voting location is prohibited. A.R.S. § 16-1013. The officer in charge of elections has a responsibility to train poll workers and establish policies to prevent and promptly remedy any instances of voter intimidation.

The officer in charge of elections should publicize and/or implement the following guidelines as applicable:

- The inspector must utilize the marshal to preserve order and remove disruptive persons from the voting location. The inspector and/or marshal must use sound judgment to decide whether to contact law enforcement, and any higher-level decisions should be raised through the officer in charge of elections.

- Persons who witness problems at a voting location should not speak to or accost a voter in an attempt to "enforce" the law, but rather inform the inspector or marshal to allow them to resolve the issue.

- Private citizens are prohibited from bringing weapons into a polling place (including the 75-foot limit), even if the voter is properly licensed to carry such weapons. Openly carrying a firearm outside the 75-foot limit may also constitute unlawful voter intimidation, depending on the context. In order to keep voting locations safe and free of potential intimidation, therefore, observers at voting locations should leave weapons at home or in their vehicles. A.R.S. § 13-3102(A)(11) (exceptions apply for military and peace officers in the performance of official duties, *see* A.R.S. § 13-3102(C)).

In addition to the potentially intimidating conduct outlined above, the following may also be considered intimidating conduct inside or outside the polling place:

- Aggressive behavior, such as raising one's voice or taunting a voter or poll worker;

- Using threatening, insulting, or offensive language to a voter or poll worker;

- Blocking the entrance to a voting location;

- Disrupting voting lines;

- Following voters or poll workers coming to or leaving a voting location, including to or from their vehicles;

- Intentionally disseminating false or misleading information at a voting location, such as flyers or communications that misstate the date of the election, hours of operation for voting locations, addresses for voting locations, or similar efforts intended to disenfranchise voters;

- Impersonating a law enforcement officer or otherwise wearing clothing, uniforms or official-looking apparel intended to deter, intimidate, or harass voters (*see also* A.R.S. § 26-170, prohibiting unauthorized wearing of national guard or U.S. armed forces uniform);

- Directly confronting, questioning, photographing, or videotaping voters or poll workers in a harassing or intimidating manner, including when the voter or poll worker is coming to or leaving the polling location;

- Asking voters for "documentation" or other questions that only poll workers should perform;

- Raising repeated frivolous voter challenges to poll workers without any good faith basis, or raising voter challenges based on race, ethnicity, national origin, language, religion or disability; or • Posting signs or communicating messages about penalties for "voter fraud" in a harassing or intimidating manner.

*See* A.R.S. § 16-1013(A); A.R.S. § 16-1017.

**Vote Nullification Provision:**

2023 EPM, Chapter 13 § II(B)(2)

2. Scope of Duty to Canvass

The Secretary of State may postpone the canvass on a day-to-day basis for up to three days if the results from any county are missing. A.R.S. § 16-648(C). All counties must transmit their canvasses to the Secretary of State, and the Secretary of State must conduct the statewide canvass, no later than 30 days after the election. A.R.S. § 16-648(C). If the official canvass of any county has not been received by this deadline, the Secretary of State must proceed with the state canvass without including the votes of the missing county (i.e., the Secretary of State is not permitted to use an unofficial vote count in lieu of the county's official canvass).

The Secretary of State has a non-discretionary duty to canvass the returns as provided by the counties and has no authority to change vote totals, reject the election results, or delay certifying the results without express statutory authority or a court order.

\* Plaintiffs only challenge shaded portion

# EXHIBIT B

(170 of 232), Page 170 of 232
Case: 24-6703, 01/06/2025, DktEntry: 7.3, Page 170 of 232
Case 2:24-cv-01673-MTL Document 14-2 Filed 07/18/24 Page 2 of 18

1   Andrew Gould (No. 013234)
    Drew C. Ensign (No. 025463)
2   Dallin B. Holt (No. 037419)
    Brennan A.R. Bowen (No. 036639)
3   HOLTZMAN VOGEL BARAN
    TORCHINSKY & JOSEFIAK PLLC
4   2575 East Camelback Road, Suite 860
    Phoenix, Arizona 85016
5   (602) 388-1262
6   agould@holtzmanvogel.com
    densign@holtzmanvogel.com
7   dholt@holtzmanvogel.com
    bbowen@holtzmanvogel.com
8   minuteentries@holtzmanvogel.com
9
    Michael D. Berry (pro hac vice forthcoming)
10  Jessica H. Steinmann (pro hac vice forthcoming)
    Richard P. Lawson (pro hac vice forthcoming)
11  Patricia Nation (pro hac vice forthcoming)
12  AMERICA FIRST POLICY INSTITUTE
    1001 Pennsylvania Ave., N.W., Suite 530
13  Washington, D.C. 2004
14  (813) 952-8882
    mberry@americafirstpolicy.com
15  jsteinmann@americafirstpolicy.com
    rlawson@americafirstpolicy.com
16  pnation@americafirstpolicy.com
17  Attorneys for Plaintiffs

18                  **IN THE UNITED STATES DISTRICT COURT**

19                    **FOR THE DISTRICT OF ARIZONA**

20  American Encore, an Arizona non-profit
    corporation; Karen Glennon, an Arizona       Case No.: 2:24-CV-01673-MTL
21  individual; America First Policy Institute, a
    non-profit corporation,                      **CATHERINE CYPHER'S**
22                                               **DECLARATION ON BEHALF**
                        Plaintiffs,              **OF AMERICA FIRST POLICY**
23  vs.                                          **INSTITUTE**
24  Adrian Fontes, in his official capacity as
    Arizona Secretary of State; Kris Mayes, in her
25  official capacity as Arizona Attorney
    General; Katie Hobbs, in her official capacity
26  as Governor or Arizona,
27                      Defendants.
28

I, Catherine Cypher, declare as follows:

1.      I am the Deputy Chief of Staff at America First Policy Institute ("AFPI"), which is a 501(c)(3) non-profit organization. I am authorized to make these statements on behalf of AFPI.

2.      I am competent to testify as to the matters contained herein and make this declaration based on my own personal knowledge and AFPI's records created in the normal course of business.

3.      AFPI works in Arizona on issues related to legislation and public policy; promoting voting in elections; and raising voter awareness on important issues, including issues that are on the ballot for any given election.

4.      AFPI trains volunteers and poll watchers on election integrity laws and issues at polling locations before election day. As a part of that effort, AFPI trains individuals on how to be poll watchers, which requires credentialing and training on specific election processes and procedures.

5.      AFPI has conducted poll-watcher training sessions in Arizona in the past and intends to conduct at least two additional sessions in 2024.

6.      As a part of these trainings, AFPI trains poll watchers on how to comply with applicable law in Arizona.

7.      AFPI's training and compliance costs have been increased because it must design and conduct new trainings specific to, and in compliance with, Arizona's 2023 Elections Procedures Manual ("2023 EPM").

8.      In particular, AFPI will have to spend additional time and resources training prospective poll-watchers on how to comply with the speech restrictions contained in Chapter 9, Section III.D, at pages 181–83, of the EPM ("Speech Restrictions").

9.      For AFPI, training and compliance with the 2023 EPM will be extremely difficult, because its Speech Restrictions are unclear and vague. This is particularly true with respect to its prohibitions on "raising one's voice," or using "insulting, or offensive language." Notably, those terms are not defined and left to the individual discretion of

1    election officials and, ultimately, prosecutors. Training our employees, volunteers, and
2    poll-watchers on how to navigate these broad speech prohibitions is necessarily difficult
3    given the substantial ambiguities, which results in additional training costs.

4        10.    This lack of clarity is exacerbated by the fact that, under the subject Speech
5    Restrictions, speech directed at voters and poll-workers need only have the "effect" of
6    offending or insulting someone to trigger criminal liability. *See* 2023 EPM at 181-82.

7        11.    Furthermore, the Speech Restrictions do not require prohibited speech to
8    produce "offense" or be considered "insulting" to a reasonable observer or listener. *See*
9    *id.* Thus, by its plain terms, the Speech Restrictions appear to criminalize speech if it
10   produces the "effect of threatening, harassing, intimidating, of coercing voters," including
11   through "raising one's voice" or "[u]sing … insulting, or offensive language" — even if
12   no reasonable observer would interpret the speech as harassing, offensive, insulting, or
13   unreasonably loud. In other words, as a practical matter, the Speech Restrictions appear
14   to extend to whatever the most sensitive individual might consider "offensive" or
15   "insulting" or whatever such individuals might consider a "rais[ed] … voice." *Id.* Training
16   employees, volunteers, and poll-watchers as to how to avoid giving offense to any voter
17   they may encounter is a difficult and costly task, especially given that what is "offensive"
18   is often inherently subjective and substantially divergent between individuals.

19       12.    Neither the Secretary nor the Attorney General has promulgated any
20   guidance about how the 2023 EPM will be interpreted and/or enforced. Nor has either of
21   them published any limiting construction or guidelines that narrow the Speech
22   Restrictions to assist AFPI in its efforts to train and comply with the 2023 EPM.

23       13.    As a direct result of the breadth of the Speech Restrictions' prohibitions, as
24   well as the vagueness of its provisions, AFPI will incur additional costs (1) attempting to
25   ascertain what the Speech Restrictions regulate or prohibit, (2) modifying its training to
26   account for the Speech Restrictions' broad and vaguely defined prohibitions, and (3) in
27   actually training volunteers and poll-watchers. AFPI will also incur additional compliance
28   costs in the form of reviewing and potentially modifying its own statements in Arizona to

ascertain whether they might run afoul of the Speech Restrictions' prohibitions on speech. AFPI will also necessarily have to self-censor some of its speech to avoid incurring potential criminal liability under the Speech Restrictions.

14. Based on the 2023 EPM Speech Restrictions, it is virtually impossible for AFPI to know what statements or speech will have the "effect" of insulting or offending someone. All of the following are examples of language that AFPI is concerned might have the effect of offending someone, particularly those who disagree with AFPI's policy preferences:

    A.    An "All Lives Matter" hat;

    B.    A shirt that says "Vote to Protect Unborn Children";

    C.    A pin that reads "I support the Second Amendment";

    D.    A banner that states, "Don't Tread on Me";

    E.    A person shouting, "Vote!"; and

    F.    A hoody that reads "Israel has a right to exist" or "Never forget October 7th."

15. Based on the Speech Restrictions, AFPI is gravely concerned that all of these constitutionally protected, politically relevant statements may now be subject to criminal liability, especially because there is no mental state required for a speaker to violate the Speech Restrictions. Thus, AFPI is concerned that one of its volunteers or poll-workers might, in genuine good faith, say something that a reasonable person would not find offensive, but if it has the "effect" of offending someone—even the most easily offended person—they might now be subject to criminal prosecution in Arizona.

16. As a result of the vagueness of the Speech Restrictions, and the broadness of conduct that it might now criminalize, AFPI must instruct volunteers and poll-watchers to restrict and self-sensor their speech to avoid criminal liability under the 2023 EPM. In doing so, AFPI will necessarily incur compliance costs that would not exist but for the Speech Restriction.

17. This censorship does not stop at people AFPI trains and instructs. In addition

to AFPI's trainings, it also conducts grassroots workshops about election related issues. Indeed, AFPI has done so in Arizona in the past and intends to do so in 2024. These workshops involve AFPI communicating with Arizona voters. For example, in January of this year, AFPI conducted a workshop on ranked choice voting in Mesa, Arizona.

18.     As AFPI continues to hold workshops with voters, and communicate with voters, it must now be cautious to avoid expressing an "offensive" idea with those voters—especially because the 2023 EPM's Speech Restrictions are not limited to election day or polling locations. As a result, in its normal course of business, AFPI must now chill its own speech to avoid offense—and thereby criminal liability—in Arizona.

19.     This has already resulted in AFPI restricting much of its speech because many of its positions and policies might offend people who disagree with them politically. Thus, AFPI has had to alter how it conducts its operations and communications in Arizona to avoid potential 2023 EPM violations, which it has not had to do in other states.

20.     Moreover, AFPI has about 300,000 members, who are widely dispersed throughout the United States. Many of those members routinely advocate for governmental policies, including voters in Arizona. Those members also face a risk of enforcement under the 2023 EPM's Speech Restrictions because those restrictions are not limited to election day or polling locations.

21.     Therefore, AFPI and its members face a real threat of prosecution for engaging in protected political speech. This is an ongoing cost to AFPI and a continuing controversy for how it must conduct itself in Arizona to comply with the 2023 EPM.

22.     AFPI's fear of enforcement is bolstered by the Secretary's refusal to amend the Speech Restriction even after its constitutional infirmities were called to his attention. Specifically, the Speaker of the Arizona House and the President of the Arizona Senate expressly objected to the Speech Restrictions in the draft 2023 EPM in a letter dated August 14, 2023. A copy of that letter is attached as Exhibit A.

23.     The legislative leaders' letter expressly notified the Secretary that the Speech Restrictions were "facially overbroad" and urged the Secretary to "to excise from this

provision all content that does not bear a direct and immediate textual nexus to the plain terms of A.R.S. § 16-1013 or other applicable statutes." *See* Ex. A at 6-7.

24.    The Secretary was thus on notice that the Speech Restrictions might raise constitutional free speech concerns. But in response to the legislative leaders' comments, the Secretary does not appear to have made any material changes to the Speech Restrictions in the draft Election Procedure Manual.

25.    Additionally, the Attorney General, who also received the legislature's letter (*see* Ex. A) approved the Speech Restrictions as written despite their obvious legal infirmities.

26.    The Secretary's failure to modify or remove the 2023 EPM Speech Restrictions in the draft Election Procedure Manual over the protest of the legislative leaders shows that he intends to make criminal referrals for alleged violations of the Speech Restrictions.

27.    Similarly, if the Arizona Attorney General did not intend to enforce the full breath of the Speech Restrictions in the 2023 EPM, she could have insisted on narrowing it as a condition of obtaining her approval. Instead, she granted her unconditional assent to the Speech Restrictions (as well as the remainder of the 2023 EPM). In doing so, she signaled her intent to enforce the Speech Restrictions as drafted, rather than narrowing it to more constitutionally defensible bounds.

28.    In AFPI's view, the 2023 EPM Speech Restrictions are an unacceptable restriction of its protected political speech under the free speech provisions of both the Arizona and federal constitutions.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 18th day of July, 2024.

By: */s/ Catherine Cypher*
Catherine Cypher, Deputy Chief of Staff
America First Policy Institute

# Exhibit A



KORY LANGHOFER
Managing Attorney
(602) 382-4078
kory@statecraftlaw.com

August 14, 2023

The Honorable Adrian Fontes
Arizona Secretary of State
1700 West Washington Street, Seventh Floor
Phoenix, Arizona 85003
elections@azsos.gov

**Re:      Public Comments on Draft 2023 Elections Procedures Manual**

Secretary Fontes:

On behalf of Arizona Senate President Warren Petersen and Speaker of the Arizona House of Representatives Ben Toma, enclosed please find comments concerning various provisions of the draft 2023 Elections Procedures Manual published by your office.

Please do not hesitate to contact us should you have any questions.

Respectfully,

*/s/ Kory Langhofer*
Kory Langhofer

*/s/ Thomas Basile*
Thomas Basile

649 North Fourth Avenue
Phoenix, Arizona 85003
www.statecraftlaw.com

# Arizona State Legislature

### 1700 West Washington
### Phoenix, Arizona 85007

August 14, 2023

The Honorable Adrian Fontes
Arizona Secretary of State
1700 West Washington Street, Seventh Floor
Phoenix, Arizona 85007

**Re:     Public Comments on the Draft 2023 Elections Procedures Manual**

Dear Secretary Fontes:

We write in response to the draft 2023 Elections Procedures Manual ("EPM") that your office has published for public comment. Preliminarily, we believe that your truncated 14-day comment period fails to afford Arizonans a meaningful opportunity to digest and debate such a consequential and voluminous compendium of regulatory dictates. This timetable is far more compressed than the public comment period allotted for the 2019 iteration of the EPM, and significantly shorter than the 30-day comment period that attends a typical agency rulemaking. *See generally* A.R.S. § 41-1023(B). We are concerned that this highly abbreviated window for public input may bespeak an indifference to Arizona voters' views and perspectives on the legal infrastructure of our constitutional republic.

In any case, we have catalogued below various provisions of the draft EPM that we believe either (1) conflict with or misstate a controlling statute or (2) exceed the parameters of any rulemaking authorization provided by Arizona law. As you know, the Arizona Supreme Court has on multiple occasions admonished that the Secretary may not, under the EPM's auspices, act as a roving arbiter of all facets of the electoral process, *see McKenna v. Soto*, 250 Ariz. 469, 473, ¶ 20 (2021), or arrogate the exclusively judicial power of interpreting controlling laws, *see Leibsohn v. Hobbs*, 254 Ariz. 1, ¶ 22 (2022) ("[A]n EPM regulation that contradicts statutory requirements does not have the force of law. Further, it is this Court's role, not the Secretary's, to interpret [a statute's] meaning." (citation omitted)).

With these principles in mind, we respectfully urge you to review the following comments and revise the relevant EPM provisions accordingly.

## I.     **Chapter 1: Voter Registration**

Nothing in Arizona law authorizes the Secretary to regulate voter registration processes or procedures in the EPM. We accordingly believe that all or substantially all of Chapter 1 is *ultra vires* and invalid. *See Leach v. Hobbs*, 250 Ariz. 572, 576, ¶ 21 (2021) ("[A]n EPM regulation that exceeds the scope of its statutory authorization . . . does not have the force of law.").

## A. Section II(A): Citizenship Requirement

Contrary to the EPM's suggestion that the County Recorder or his/her designee may merely "visually inspect[]" and "not make a copy of" an applicant's documentary proof of citizenship (*see* pp. 5, 11), A.R.S. § 16-166(F)(3) and (J) clearly contemplate that the Recorder must retain a copy of such documentation for a period of at least two years.

## B. Section VII(C): Voter Registration Deadline

The notion that the Secretary may unilaterally extend the voter registration deadline if "the closure of state or federal offices would cause a method of registration to be unavailable within the 30-day period preceding the next election" egregiously mischaracterizes both Arizona law and the National Voter Registration Act ("NVRA"). The relevant provisions of the NVRA state that, if an applicant submits a "valid" registration form "not later than the lesser of 30 days, or the period provided by State law,[1] before the date of the election," he or she must be permitted to vote in that election. 52 U.S.C. § 20507(a)(1)(A)-(D). By its plain terms, the NVRA accedes to Arizona law; it does not require a state to adjust its own statutory registration deadline. Indeed, the district court opinion that the draft EPM cites in support of its curious construction of the NVRA—*i.e.*, *Arizona Democratic Party v. Reagan*, No. CV-16-03618-PHX-SPL, 2016 WL 6523427, at *13 (D. Ariz. Nov. 3, 2016)—has since been largely repudiated by the Ninth Circuit. *See Isabel v. Reagan*, 987 F.3d 1220, 1230 (9th Cir. 2021) (rejecting argument that, if the state deadline falls on a weekend or holiday, "the NVRA imposes an affirmative duty on states to ensure that persons who register to vote later than the deadline are registered to vote in the upcoming election").

## II.    Chapter 2: Early Voting

### A. Section I(A): One-Time Requests to Receive a Ballot-by-Mail

The draft EPM's summary statement that "[a]ny election in Arizona . . . must provide for early voting, which includes no-excuse ballot-by-mail" (p. 47) elides important qualifications. While Arizona law broadly permits voting by mail, *see* A.R.S. §§ 16-542(C), 16-544, that method of early voting is unavailable to Federal Form registrants who have failed to furnish adequate documentary proof of United States citizenship or documentary proof of Arizona residency. *See id.* § 16-121.01(E). A more precise formulation would provide that "Any election in Arizona . . .must provide for early voting, which, subject to certain limitations, includes no-excuse ballot-by-mail."

Separately, while the draft EPM correctly notes that voters who qualify under the Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. § 20310, *et seq.* ("UOCAVA") may permissibly submit early ballot requests more than 93 days prior to an election (p. 48), it neglects

---

[1] Arizona law requires applicants to submit a valid registration no later than 29 days prior to an election if they wish to cast a ballot in that election. *See* A.R.S. § 16-120(A). While the statute permits an automatic adjustment of this deadline if it falls on a weekend or holiday, *see id.* § 16-120(B), it plainly does not authorize extensions upon the Secretary's say-so.

to state that the same option is available to a voter whose information is protected pursuant to A.R.S. § 16-153. *See* A.R.S. § 16-542(B).

### B. Section I(B): Requests to Be Placed on the Active Early Voting List

Footnote 19 (p. 53) of the draft EPM unlawfully purports to delay the implementation of 2021 Ariz. Laws ch. 359, § 6 ("S.B. 1485"), in contravention of the statute's plain terms. As the draft EPM acknowledges, the enactment provides that, if a voter enrolled on the active early voting list ("AEVL") does not cast any early ballot during two consecutive election cycles, the County Recorder must send a notice to the voter asking him or her to confirm continued participation in the AEVL. If the voter does not respond within 90 days, the voter will be removed from the AEVL. *See* A.R.S. § 16-544(L)-(M).

S.B. 1485 became effective on September 29, 2021. A straightforward application of the statutory text ordains that the County Recorder must, no later than January 15, 2025, send the mandated notice to all AEVL voters who did not cast an early ballot in (1) any election in the 2022 election cycle and (2) any election in the 2024 election cycle.

The draft EPM's position that the notice can be premised only upon the voter's lack of participation in the 2024 and 2026 election cycles defies the statutory text and confounds common sense. Assume that an AEVL voter chooses not to cast an early ballot in any election in the 2022 cycle (to include the statewide primary election held on August 2, 2022 and the statewide general election held on November 8, 2022) or any election in the 2024 cycle. The notice sent by the County Recorder in January 2026 necessarily is predicated on the voter's actions (or lack thereof) taken *after* S.B. 1485's effective date.[2] Indeed, the draft EPM's spurious conception of retroactivity would, for all practical purposes, suspend S.B. 1485 until January 1, 2023—more than a year after the statute's actual effective date.

### C. Section I(C): Creation and Preparation of Early Ballots

Earlier this year, the Legislature approved, and the Governor signed, Senate Bill 1273, which requires that the instructions provided to voters casting early ballots must explicitly advise of Arizona's prohibition on illegal ballot harvesting. *See* A.R.S. § 16-513(E) (as amended by 2023 Ariz. Laws ch. 119, § 1). The draft EPM hence must incorporate this provision in its formulation of ballot instructions (pp. 58-59).

### D. Section I(D): Mailing Ballots-by-Mail

We believe this provision of the draft EPM is afflicted with three errors of varying magnitude.

---

[2] The draft EPM's professed concern with retroactive application is further discredited by the fact that merely refraining from returning an early ballot during two election cycles does not, by itself, have any effect whatsoever on an AEVL voter's ability to participate in the electoral process. Rather, the only consequence of the voter's inactivity is the issuance of a notice, which the voter may, in his or her discretion, either answer (and thereby maintain AEVL enrollment) or ignore.

First, it correctly states that a UOCAVA voter may select his or her preferred secured method of receiving a ballot (p. 59), but it fails to designate a default transmittal mechanism "[i]f no means of communication is designated" by the voter, as A.R.S. § 16-543(A) requires.

Second, the allowance of "replacement ballots by mail" (p. 61) lacks any discernible textual nexus to the statutory provisions it cites. A.R.S. § 16-542(E) does not authorize the issuance of multiple replacement ballots, and A.R.S. § 16-558.02 is codified in Article 8.1 of Title 16, which applies only to special district mail ballot elections.

Third, and perhaps most significantly, you appropriate to the Secretary a novel authority to extend the early voting period for UOVACA voters in the event of an "emergency" (p. 62). To be sure, the Legislature has allowed the Secretary to devise "procedures" that facilitate the issuance and return of UOCAVA ballots if unforeseen exigencies affect the voting process. The mandate that all ballots must be received by the County Recorder no later than 7:00 p.m. on Election Day, however, is a categorical and foundational pillar of Arizona election law. *See* A.R.S. §§ 16-547(D), 16-551(C), 16-565(A). Whether, when and under what conditions any variance from this absolute temporal benchmark may be permitted is solely a matter of legislative judgment. Even assuming *arguendo* that this prerogative could be assigned to the Secretary, any such delegation would have to be imparted in express and unequivocal terms. A limited ministerial authority to set UOCAVA voting "procedures" does not empower the Secretary to unilaterally change explicit statutory deadlines.

### E. Section I(I): Ballot Drop-Off Locations and Drop-Boxes

The draft EPM maintains and entrenches the 2019 iteration's allowance of ballot "drop boxes." This innovation, however, is untethered from Arizona's election code. The Legislature has constructed specific and discrete channels for early voting—to wit, the submission of early ballots via the United States Postal Service, A.R.S. §§ 16-542(A), 16-547(D), at in-person early voting locations (or, if eligible, through special election boards), *id.* §§ 16-542(H), 16-549, or by direct delivery to a "polling place" or "the office of" the County Recorder or other elections official, *id.* §§ 16-547(D), 16-548(A). There is no statutory warrant for the EPM's creation of new, extra-textual modes and locations for transmitting and collecting ballots. While drop boxes may serve legitimate convenience interests, the amassing of voted ballots in public places inevitably entails security risks and can conduce illicit ballot harvesting. Whether and how to calibrate these competing considerations is a quintessential policy judgment that is reserved to the Legislature.

The draft EPM ventures even farther beyond the governing statutes by purporting to authorize each County Recorder to "establish and implement additional local procedures for ballot drop-off locations," to include "restrict[ing] activities that interfere with the ability of voters and/or staff to access the ballot drop-off location free from obstruction or harassment" (p. 65). Preliminarily, whatever rulemaking authority A.R.S. § 16-452(A) confers is lodged jointly in the Secretary, Attorney General, and Governor alone. Indeed, the EPM's express purpose is to establish "uniformity" in election procedures across the entire state. A.R.S. § 16-452(A). The notion that the EPM can spawn open-ended sub-delegations to county officials is not only unmoored from statutory text but also constitutionally unworkable. Valid provisions of the EPM carry the force

of criminal law. *See* A.R.S. § 16-452(C). The EPM cannot preemptively place this significant imprimatur on hypothetical third-party directives that do not yet exist.

Arizona law already comprehensively prohibits interference with the voting process or improper tampering with ballots or other election equipment. *See, e.g.*, A.R.S. §§ 16-1003, 16-1004(A)-(B), 16-1013, 16-1016. Local law enforcement and prosecutors can and should enforce these critical safeguards. But the County Recorders cannot—through an amorphous and attenuated chain of purported statutory delegations—effectively legislate new or additional regulations for a mode of ballot submission that itself is not recognized by any Arizona law.

### F. Section VI(A): Processing and Tabulating Early Ballots - County Recorder Responsibilities

The draft EPM correctly states that early ballots cast in-person or through a special election board "must be signature-verified by the County Recorder" (p. 72). It proceeds, however, to explicitly undermine this statutory directive by opining that "early ballots cast in person should not be invalidated based solely on an allegedly inconsistent signature absent other evidence that the signatures were not made by the same person." In adding a voter identification requirement as a supplementary safeguard during in-person early voting, however, the Legislature deliberately left the signature verification criterion intact. As the draft EPM itself acknowledges, *all* early ballots must undergo signature validation. *See* A.R.S. § 16-550(A). The EPM cannot by fiat effectively repeal or abridge this independent statutory mandate.

### G. Section VI(B): Early Ballot Board Responsibilities

The EPM's acknowledgment that each early ballot board must "consist[] of an inspector and two judges (the two judges must be from different political party preferences)" (p. 73) is correct, but the provision also should make clear that there must be "an equal number of inspectors . . . who are members of the two largest political parties," A.R.S. § 16-531(A).

### III.   Chapter 8: Pre-Election Procedures

### A. Section I(D): Consolidation of Polling Places Based on Lack of Candidates

The draft EPM provides that, if a Board of Supervisors consolidates polling places, it must ensure that "[a]ll affected voters receive information on early voting, which includes information on how to make a one-time early ballot request" (p. 123). The controlling statute, however, mandates that voters must be provided with the actual "*application* used to request an early voting ballot," A.R.S. § 16-411(C)(3) [emphasis added]—not merely information about how to obtain such an application.

### B. Section I(G): Polling Place/Vote Center Emergency Designation

The draft EPM states that a County Recorder "may" designate polling places or vote centers on an emergency basis if certain circumstances exist (p. 125). This discretionary formulation, however,

is at odds with the applicable statute, which specifies that the County Recorder "shall" make such designations if the requisite conditions are in place, *see* A.R.S. § 16-411(I).

### C. Section II(A): Election Board Duties

The draft EPM's announcement that "[t]he officer in charge of elections may allocate . . . duties among different [election] board members as deemed appropriate" (p. 127) is invalid and *ultra vires* to the extent it purportedly authorizes the reassignment of duties that governing statutes vest specifically in a designated election board member. *See, e.g.*, A.R.S. §§ 16-534, 16-535.

Additionally, footnote 38 opines that "[i]f it is impossible to sufficiently staff the [election] boards with members of differing political parties, the officer in charge of elections shall, at minimum, exercise best efforts to utilize board members with no party affiliation or from differing unrecognized parties" (p. 127). We agree in principle that, if it truly is "impossible" to attain partisan balance on an election board, the responsible officials should employ all feasible methods to mitigate the asymmetry. But this narrow proviso cannot subsume or dilute the statutory commitment to full equal representation on election boards. *See* A.R.S. § 16-531(A). For this reason, the EPM should clarify that its "impossibility" exception would apply only if (1) the county chair of a political party committee refused or failed to identify a sufficient number of party members to staff election boards and (2) despite using their best efforts, county officials were unable to recruit the necessary number of volunteers from the underrepresented political party.[3]

### D. Section III(A): Designation of Political Party and Other Observers – Appointment Process

The draft EPM recognizes political parties' statutory right to appoint observers at polling locations but adds that "[t]he County Recorder or officer in charge of elections may require reasonable deadlines for advance notice of appointments" (p. 133). The underlying statute, however, provides that a county party chairman may appoint observers simply by issuing an appointment that is "addressed to the election board." A.R.S. § 16-590(A). While we agree that political party committees should work cooperatively with county officials to ensure an efficient credentialing process, the draft EPM provision is inconsistent with controlling law to the extent its vague "reasonableness" criterion authorizes county officials to decree arbitrary and inconsistent appointment deadlines—particularly if such deadlines fall many weeks in advance of the election, before political party committees can feasibly recruit a full roster of observers. *See* A.R.S. § 16-452(A) (EPM must provide for "uniformity" in election procedures).

## IV.  Chapter 9: Conduct of Elections/Election Day Operations

### A. Section III: Preserving Order and Security at the Voting Location

In an extraordinary expropriation of the legislative power, the draft EPM purports to criminalize wide swaths of speech and conduct that you speculate might be "considered intimidating," to

---

[3] This comment likewise extends to the draft EPM's provisions regarding the staffing of the Central Counting Place Boards (p. 194) and Electronic Adjudication Boards (p. 201).

include using "offensive language" (whatever that means) at a polling location, "[f]ollowing" individuals at a polling location (which, it bears emphasis, is a public place) or disseminating even truthful information about "voter fraud," if done in a manner that is, to your sensibilities, "harassing or intimidating."

Three significant interrelated flaws afflict this troubling provision of the draft EPM.

First, the definitional ambit of criminal voter intimidation or electoral interference begins and ends with the plain text of the controlling statutes. Recognizing the danger that fraudulent or coercive tactics pose to the franchise, the Legislature long ago codified clear and robust protections for voters. *See* A.R.S. § 16-1013. Whether any given act or statement is illegal, however, necessarily is a highly fact-sensitive and context-dependent judgment that must be made by local law enforcement and prosecutorial authorities, and (if pursued) reviewed by the courts. A.R.S. § 16-452 does not—and never could—empower the Secretary to effectively ban specific categories of speech or behavior that the Legislature has never prohibited.

Second, even assuming *arguendo* that the EPM could augment criminal statutes, the draft provision is facially overbroad. *See generally State v. Kaiser*, 204 Ariz. 514, 519, ¶ 17 (App. 2003) ("An overbroad [law] is one designed to burden or punish activities which are not constitutionally protected, but ... includes within its scope activities which are protected by the First Amendment." (citation omitted)). While the draft provision may encompass some conduct that A.R.S. § 16-1013 does in fact prohibit, it sweeps far beyond the statutory scope. Consider, for example, the purported proscription of "offensive language to a voter or poll worker." Putting aside the (constitutionally significant) vagueness that inheres in the notion of "offensiveness," not all speech that might wound a listener's feelings—for example, criticism of poll workers' job performance or disparagement of a fellow voter's perceived political leanings—is even remotely threatening or intimidating. *See In re Nickolas S.*, 226 Ariz. 182, 188, ¶ 26 (2011) ("The addressee's personal disagreement with or anger over words said to him does not, by itself, mean that the words can be punished . . . First Amendment protections should not dissolve merely because words are spoken to a particularly sensitive or combative addressee."). While we hope and expect that all Arizonans will exhibit decorum and civility during the voting process, the executive branch cannot dictate to them a code of etiquette.

Third, the provision's elastic terms are exacerbated by their ambiguous ostensible legal import. Perhaps recognizing its extra-statutory character, the provision intersperses among its instructions qualifiers (*e.g.*, "should," "guidelines") that customarily connote non-binding advisories. But every adopted provision of the EPM necessarily assumes the status of a criminal law. *See* A.R.S. § 16-452(C). The draft's confused (and confusing) admixture of advisory terms and criminal enforcement mechanisms leaves citizens without fair notice not only of what speech or expression is purportedly prohibited, but also whether supposed infractions are punishable at all. *See generally F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) ("A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required.").

We accordingly urge you to excise from this provision all content that does not bear a direct and immediate textual nexus to the plain terms of A.R.S. § 16-1013 or other applicable statutes.

## B. Section VII: Challenges to a Voter [*sic*] Eligibility to Vote

Although Arizona law undisputedly permits "[a]ny qualified elector of the county" to challenge a putative voter's eligibility, *see* A.R.S. § 16-591, the draft EPM commands that "[t]o prevent harassment and intimidation of the challenged voter, the person making the challenge may not speak to the challenged voter" (p. 187). It requires no great facility with the First Amendment, however, to recognize the obvious truism that the government cannot forbid a citizen from addressing another citizen simply because the government is worried about what the speaker might say. To be clear, any person who actually threatens or coerces a voter can and should be held to account. *See* A.R.S. § 16-1013. But the executive branch cannot prescribe polling location speech codes or dictate who may talk to whom in a public place.

## V.    **Chapter 11: Hand Count Audit**

The draft EPM decrees that "[a] county lacks the discretion to conduct a hand count of all ballots cast at precincts or early voting centers located in that county. Likewise, a county lacks the discretion to hand count all early ballots cast in that county" (p. 213, n.56). The draft EPM's sole source of ostensible authority for this proposition, however, is a non-binding Attorney General opinion of dubious validity. Arizona law authorizes the Attorney General to provide an opinion only upon the request of certain elected officials. *See* A.R.S. § 41-193(A)(8); *see also State v. Deddens*, 112 Ariz. 425, 428 (1975) (such opinions "are not a legal determination of what the law is at any certain time"). Opinion I22-004 (R22-010), by contrast, was issued *sua sponte* and for the sole purpose of repudiating an opinion that the office had properly published just a few months earlier. Nothing in Arizona law permits the Attorney General either to issue unsolicited advisory opinions or to haphazardly nullify prior opinions out of ideological spite. *See generally State ex rel. Brnovich v. Ariz. Bd. of Regents*, 250 Ariz. 127, 130, ¶ 8 (2020) ("[T]he Attorney General has no inherent or common law authority . . . [T]he authority of the Attorney General must be found in statute.").

In addition, it appears the Arizona Court of Appeals may disagree with both the Attorney General and the draft EPM on this point. *See Court to Hear Arguments on Cochise Hand-Count Appeal*, E. ARIZ. COURIER, Jul. 16, 2023, *available at* https://www.eacourier.com/news/state/court-to-hear-arguments-on-cochise-hand-count-appeal/article_11b116f0-2459-11ee-a1e6-3bed20d039e4.html ("At least one appellate court judge appears ready to let Cochise County do a full hand count of its early ballots.").[4] It is, at the very least, inappropriate for the draft EPM to purport to preemptively adjudicate a live legal dispute pending before the courts. This footnote accordingly should be removed.

*       *       *

---

[4] The courts have already rebuffed previous attempts by the Attorney General to gratuitously interfere in Cochise County's election administration operations. *See Judge Sides Against Mayes on Cochise County Election Administrator*, ARIZ. DAILY STAR, Apr. 18, 2023, *available at* https://tucson.com/news/government-and-politics/judge-sides-against-mayes-on-cochise-county-election-administrator/article_4d5bcfac-de44-11ed-b68e-ab70812f8c75.html.

Thank you for your consideration of the foregoing comments. We appreciate the work your office has done to prepare this initial draft, and hope that you will take the steps necessary to ensure that the version submitted to the Governor and Attorney General is properly confined to matters within the plain scope of applicable statutory delegations and aligns in all respects with controlling law.

Respectfully,

Ben Toma
Speaker of the Arizona House of Representatives

Warren Petersen
President of the Arizona Senate

# EXHIBIT C

Andrew Gould (No. 013234)
Drew C. Ensign (No. 025463)
Dallin B. Holt (No. 037419)
Brennan A.R. Bowen (No. 036639)
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
2575 East Camelback Road, Suite 860
Phoenix, Arizona 85016
(602) 388-1262
agould@holtzmanvogel.com
densign@holtzmanvogel.com
dholt@holtzmanvogel.com
bbowen@holtzmanvogel.com
minuteentries@holtzmanvogel.com

Michael D. Berry *(pro hac vice forthcoming)*
Jessica H. Steinmann (*pro hac vice forthcoming*)
Richard P. Lawson (*pro hac vice forthcoming*)
Patricia Nation *(pro hac vice forthcoming)*
AMERICA FIRST POLICY INSTITUTE
1001 Pennsylvania Ave., N.W., Suite 530
Washington, D.C. 2004
(813) 952-8882
mberry@americafirstpolicy.com
jsteinmann@americafirstpolicy.com
rlawson@americafirstpolicy.com
pnation@americafirstpolicy.com

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| American Encore, an Arizona non-profit corporation; Karen Glennon, an Arizona individual; America First Policy Institute, a non-profit corporation, | Case No.: 2:24-CV-01673-MTL |
| Plaintiffs, | **DECLARATION OF KAREN GLENNON** |
| vs. | |
| Adrian Fontes, in his official capacity as Arizona Secretary of State; Kris Mayes, in her official capacity as Arizona Attorney General; Katie Hobbs, in her official capacity as Governor or Arizona, | |
| Defendants. | |

I, Karen Glennon, declare as follows:

1.      I am an individual domiciled in Apache County, Arizona.

2.      I am competent to testify as to the matters contained herein and make this declaration based on my own personal knowledge.

3.      I am registered to vote in Arizona.

4.      I am an active voter and intend on voting in the upcoming 2024 elections.

5.      I regularly discuss politics, voting, and many government-related topics with people. The bulk of these discussions occur more than 75 feet from voting locations. I intend to continue to have these discussions surrounding the 2024 elections, including during early voting and on Election Day.

6.      I also canvass and volunteer for various candidates and groups in encouraging people to vote a certain way. I intend to continue to engage in this behavior in the upcoming 2024 elections, including during early voting and on Election Day.

7.      Based on the Speech Restrictions in the 2023 EPM, this political and election-related speech that I regularly engage in is now subject to criminal prosecution. Such prosecution will be based on the arbitrary and discriminatory decisions of the government officials who are enforcing the vague terms of the Speech Restrictions.

8.      This fear of prosecution has, and will, cause me to second guess and restrict what I say to anyone surrounding politics or elections for fear of offending someone and subjecting myself to possible criminal prosecution. There are things I have not, and will not, say, that I otherwise would be comfortable saying, but for the Speech Restrictions in the 2023 EPM.

9.      I have thus already self-censored my speech because of the Speech Restriction. If the Speech Restriction were to be enjoined, I would no longer engage in that self-censorship.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

1

Executed on this 17th day of July 2024.

2

3

By: */s/ Karen Glennon*

Karen Glennon

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT D

1    Andrew Gould (No. 013234)
     Drew C. Ensign (No. 025463)
2    Dallin B. Holt (No. 037419)
     Brennan A.R. Bowen (No. 036639)
3    HOLTZMAN VOGEL BARAN
     TORCHINSKY & JOSEFIAK PLLC
4    2575 East Camelback Road, Suite 860
5    Phoenix, Arizona 85016
     (602) 388-1262
6    agould@holtzmanvogel.com
7    densign@holtzmanvogel.com
     dholt@holtzmanvogel.com
8    bbowen@holtzmanvogel.com
     minuteentries@holtzmanvogel.com
9
10   Michael D. Berry *(pro hac vice forthcoming)*
     Jessica H. Steinmann *(pro hac vice forthcoming)*
11   Richard P. Lawson *(pro hac vice forthcoming)*
     Patricia Nation *(pro hac vice forthcoming)*
12   AMERICA FIRST POLICY INSTITUTE
     1001 Pennsylvania Ave., N.W., Suite 530
13   Washington, D.C. 2004
     (813) 952-8882
14   mberry@americafirstpolicy.com
15   jsteinmann@americafirstpolicy.com
     rlawson@americafirstpolicy.com
16   pnation@americafirstpolicy.com

17   *Attorneys for Plaintiffs*

18              **IN THE UNITED STATES DISTRICT COURT**

19                **FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| American Encore, an Arizona non-profit corporation; Karen Glennon, an Arizona individual; America First Policy Institute, a non-profit corporation,<br><br>                 Plaintiffs,<br>vs.<br><br>Adrian Fontes, in his official capacity as Arizona Secretary of State; Kris Mayes, in her official capacity as Arizona Attorney General; Katie Hobbs, in her official capacity as Governor or Arizona,<br><br>                 Defendants. | Case No.: 2:24-CV-01673-MTL<br><br>**DECLARATION OF SEAN NOBLE ON BEHALF OF AMERICAN ENCORE** |

20
21
22
23
24
25
26
27
28

I, Sean Noble, declare as follows:

1. I am the President of American Encore, which is a 501(c)(4) nonprofit organization. I am authorized to make these statements on behalf of American Encore.

2. I am competent to testify as to the matters contained herein and make this declaration based on my own personal knowledge and American Encore's records created in the normal course of business.

3. American Encore is based in Arizona and is regularly involved in election-related activity in Arizona. American Encore defends freedom, promotes free markets, works to expand economic opportunity and makes the case for the American ideals of liberty and democracy.

4. American Encore advances its mission by supporting and opposing political candidates, policies, and initiatives. American Encore does this by engaging in electioneering communications, including in Arizona.

5. As part of these electioneering communications, American Encore regularly speaks with voters through advertising and person-to-person contact.

6. American Encore will continue to engage in voter contact in Arizona for the upcoming 2024 election cycle and beyond.

7. American Encore has incurred, and will continue to incur, additional legal and other costs to ensure compliance with the 2023 EPM, specifically, but not limited to the Speech Restrictions.

8. If the 2023 EPM had not included the broad and undefined provisions governing forms of voter contact that it typically engages in, American Encore would not have had to incur these additional compliance costs.

9. For example, I estimate that American Encore has billed an additional 6 hours to its legal counsel to provide guidance specific to the Speech Restrictions. This has already cost American Encore approximately $4,800 in additional legal fees.

10. But for the inclusion of the Speech Restrictions in the 2023 EPM, American Encore would not have incurred these additional legal fees. I also anticipate that American

Case 2:24-cv-01673-MTL   Document 14-4   Filed 07/18/24   Page 4 of 4

1    Encore will continue to incur additional legal fees into the immediate future that it would

2    otherwise not have incurred but for the inclusion of the Speech Restrictions in the 2023

3    EPM.

4         11.    In addition to legal fees, as part of American Encore's additional compliance

5    costs, American Encore has trained, and will continue to train, volunteers and others who

6    will assist with contacting voters in Arizona to ensure compliance with the Speech

7    Restrictions contained in the 2023 EPM.

8         12.    The vast majority of American Encore's voter contact in Arizona takes place

9    more than 75 feet from voting locations.

10        Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

11   is true and correct.

12        Executed on this __17__ day of July 2024.

16   By: _____

          Sean Noble
17        President, American Encore

1  Andrew Gould (No. 013234)
   Drew C. Ensign (No. 025463)
2  Dallin B. Holt (No. 037419)
   Brennan A.R. Bowen (No. 036639)
3  HOLTZMAN VOGEL BARAN
   TORCHINSKY & JOSEFIAK PLLC
4  2575 East Camelback Road, Suite 860
   Phoenix, Arizona 85016
5  (602) 388-1262
   agould@holtzmanvogel.com
6  densign@holtzmanvogel.com
   dholt@holtzmanvogel.com
7  bbowen@holtzmanvogel.com
   minuteentries@holtzmanvogel.com
8
9
   Michael D. Berry *(pro hac vice forthcoming)*
10 Jessica H. Steinmann (*pro hac vice forthcoming*)
   Richard P. Lawson (*pro hac vice forthcoming*)
11 Patricia Nation *(pro hac vice forthcoming)*
   AMERICA FIRST POLICY INSTITUTE
12 1001 Pennsylvania Ave., N.W., Suite 530
   Washington, D.C. 2004
13 (813) 952-8882
   mberry@americafirstpolicy.com
14 jsteinmann@americafirstpolicy.com
   rlawson@americafirstpolicy.com
15 pnation@americafirstpolicy.com
16

17 *Attorneys for Plaintiffs*

18                **IN THE UNITED STATES DISTRICT COURT**

19                **FOR THE DISTRICT OF ARIZONA**

| 20 | American Encore, an Arizona non-profit corporation; Karen Glennon, an Arizona individual; America First Policy Institute, a non-profit corporation, | Case No.: |
|---|---|---|
| 21 22 | | **COMPLAINT** |
| 23 | Plaintiffs, vs. | |
| 24 25 26 27 | Adrian Fontes, in his official capacity as Arizona Secretary of State; Kris Mayes, in her official capacity as Arizona Attorney General; Katie Hobbs, in her official capacity as Governor or Arizona, | |
| 28 | Defendants. | |

Plaintiffs bring this Complaint against Defendant Adrian Fontes, in his official capacity as Arizona Secretary of State (the "Secretary"); Kris Mayes, in her official capacity as Arizona Attorney General (the "Attorney General"); and Katie Hobbs, in her official capacity as Governor of Arizona (the "Governor") (collectively, "Defendants" or the "State") and allege as follows:

## INTRODUCTION

1.     This suit challenges two provisions of Arizona election law, both of which are included in the 2023 Arizona Election Procedure Manual ("2023 EPM" or "EPM"). The EPM governs how elections are conducted and has the force of law in Arizona. Any violation of a provision of the EPM by any person is a class-two misdemeanor. *See* A.R.S. § 16-452(C) ("A person who violates any rule adopted pursuant to this section is guilty of a class 2 misdemeanor."); *Arizona Pub. Integrity All. v. Fontes*, 250 Ariz. 58, 63 ¶ 16 (2020) ("Once adopted, the EPM has the force of law; any violation of an EPM rule is punishable as a class two misdemeanor.")

2.     The first challenged regulation, the "Vote Nullification Provision," is a vote-nullification provision that *mandates* that *all votes* cast *by all voters* in a county will *not be counted* (*i.e.*, will be thrown out and not included in the statewide totals) if the Board of Supervisors for that county fails or refuses to certify the canvas election results for that county. The Vote Nullification Provision thus provides that "[i]f the official canvass of any county has not been received by [the] deadline, the Secretary of State must proceed with the state canvass *without including the votes of the missing county*." EPM, Chpt. 13, § II(B)(2) (emphasis added).

3.     The second challenged provision, the "Speech Restriction," is a broad curtailment of speech. It purports to criminalize "*any activity*" taken "with the intent *or effect* of threatening, harassing, intimidating or coercing voters." EPM Chpt. 9, § III(D) (emphasis added). The Speech Restriction further makes clear that this criminal prohibition reaches actions as ubiquitous as simply "raising one's voice" or "using . . . insulting or offensive language to a voter." EPM at 182.

2

4.      The Speech Restriction is nearly unrestrained in its application. There is no temporal limitation: it applies equally on election day and all other 365 days of the year. *Id.* There is also no geographic limitation: it applies both "inside *or outside* the 75-foot limit [of electioneering activity] at … voting location[s]," *id.* (emphasis added)—*i.e.*, on every square inch of territory within Arizona's borders. It further does not require any connection of the allegedly offending speech to voting.

5.      As explained below, both the Vote Nullification Provision and Speech Restriction violate the United States Constitution. The former is an unconstitutionally severe burden on the right to vote under the Supreme Court's *Anderson-Burdick* framework.  The latter is an egregious violation of the First and Fourteenth Amendments.

### LEGAL BACKGROUND

6.      Every odd-numbered year, the Secretary has the statutory responsibility to "prescribe rules" for administering federal and state elections in Arizona. A.R.S. § 16-452. The rules are meant "to achieve and maintain the maximum degree of correctness, impartiality, uniformity[,] and efficiency on the procedures for early voting and voting, and of producing, distributing, collecting, counting, tabulating[,] and storing ballots." *Id.*

7.      These rules are then outlined in "an official instructions and procedure manual"—*i.e.*, the EPM or Elections Procedures Manual.

8.      Violation of any provision of the EPM is a criminal act under Arizona law. Specifically, "[a] person who violates any rule adopted pursuant to this section is guilty of a class 2 misdemeanor." A.R.S. § 16-452(C).

9.      Because of the EPM's unconstitutional restrictions on Free Speech, parties like Plaintiffs—who participate in elections and election activities—must chill (and have chilled) their otherwise lawful speech to comply with the EPM.

10.     Moreover, Plaintiffs and similarly situated Arizonans risk having their votes diluted (or nullified) if county boards of supervisors trigger the EPM's Vote Nullification Provision—which, as alleged in ¶¶ 50-52, *infra*, would only require the exact circumstances of the 2022 election to reoccur.

3

### THE PARTIES

11.     Plaintiff American Encore is a 501(c)(4) nonprofit organization that is based in Arizona. American Encore is regularly involved in election-related activity in Arizona. American Encore defends freedom, promotes free markets, works to expand economic opportunity and makes the case for the American ideals of liberty and democracy.

12.     American Encore advances its mission by supporting and opposing political candidates, policies, and initiatives. American Encore does this by engaging in electioneering communications—including in Arizona.

13.     As part of these electioneering communications, American Encore regularly speaks with voters through advertising and person-to-person contact.

14.     American Encore will continue to engage in voter contact in Arizona for the upcoming 2024 election cycle and beyond.

15.     American Encore has incurred and will continue to incur additional legal and other costs to ensure compliance with the 2023 EPM, specifically, but not limited to, the Speech Restriction.

16.     If the 2023 EPM had not included the broad and undefined provisions governing forms of voter contact that it typically engages in, American Encore would not have had to otherwise incur these additional compliance costs beyond what it typically incurs.

17.     As part of these additional compliance costs, American Encore has trained, and will continue train, volunteers and others who will assist with contacting voters in Arizona to ensure compliance with the Speech Restriction of the 2023 EPM.

18.     The vast majority of American Encore's voter contact in Arizona takes place more than 75 feet from voting locations.

19.     Plaintiff Karen Glennon is an individual domiciled in Apache County, Arizona, registered to vote, and who plans on voting in the 2024 elections.

20.     Plaintiff Glennon's vote is now open to disqualification through no fault of her own, based solely on the discretion of the Apache County Board of Supervisors to

decide whether to canvas and certify the election results in the timeframe imposed by statute and the EPM.

21.     Plaintiff Glennon is harmed by the Vote Nullification Provision because her right to vote is now subject to qualifications that are wholly outside of her control.

22.     Plaintiff Glennon is also harmed by the Speech Restriction because her otherwise protected political speech is now subject to criminal penalty based on the arbitrary and discriminatory decisions of the government officials who are enforcing its vague terms.

23.     Plaintiff America First Policy Institute ("AFPI") is a 501(c)(3) non-profit organization. The organization works at the state level to advance or oppose legislation, which necessarily involves promoting elections and raising awareness of issues at elections.

24.     AFPI trains volunteers and poll workers on how to focus on election integrity at polling locations before and during election day, how to be poll watchers, etc., which requires credentialing and specific processes.

25.     AFPI has conducted poll-worker training sessions in Arizona in the past and intends to conduct at least two additional sessions in 2024.

26.     Unless the provisions of the EPM regulating speech are enjoined or otherwise invalidated, AFPI will be forced to include in those training sessions about how to comply with the EPM's speech provisions. In doing so, AFPI will incur compliance costs as a result of its need to design and conduct EPM-specific training.

27.     AFPI has also conducted grassroots workshops about election related issues in Arizona in the past and intends to do so in the future. In doing so, AFPI engages in communications with Arizona voters. For example, AFPI conducted a workshop on ranked-choice voting in Mesa in January 2024.

28.     As part of its policy objectives, AFPI regularly communicates with adults throughout Arizona—many of whom are voters.[1] Many of those adults/voters are supportive of AFPI's policy positions. Others may oppose AFPI's positions and may even be offended by AFPI's messages about them, particularly in this recent era known for an increasingly easily offended populace and strategic weaponization of offense to silence opposing viewpoints. As a result of the EPM's provisions, AFPI has had to alter how it conducts its operations and communications in Arizona to avoid potential EPM violations, and further, has had to do so in a manner that is not required in other states.

29.     AFPI also has about 300,000 members, who are widely dispersed throughout the United States. Many of those members routinely advocate for governmental policies to their peers, including in Arizona. Those members also face a risk of enforcement from the EPM's provisions.

30.     Therefore, AFPI faces a real threat and controversy with the 2023 EPM because of how it directly conflicts with the Free Speech guarantee of the U.S. Constitution.

31.     Defendant Adrian Fontes is the Secretary of State and is named in this action in his official capacity only. The Secretary is a constitutional officer who is part of the Executive Branch of the State of Arizona. His primary address is in Maricopa County.

32.     Under A.R.S. § 16-452, the Secretary is responsible for promulgating an EPM every two years, which, upon approval by the Governor and the Attorney General, has the force of law. In addition, the Secretary is the chief state election officer. *See* A.R.S. § 16-142(A)(1).

33.     Defendant Kris Mayes is the Attorney General and is named in this action in her official capacity only. The Attorney General is a constitutional officer who is part of the Executive Branch of the State of Arizona. She has her primary address in Maricopa County. The Attorney General has the statutory authority to enforce and prosecute election

---

[1]  Although America First regularly communicates with individuals in Arizona, many of whom are registered voters, it does not advocate for the election of specific candidates or adoption or rejection of particular ballot measures.

6

violations found in Title 16 under A.R.S. § 16-1021. She is also statutorily tasked with approving the final EPM. *See* A.R.S. § 16-452(B).

34.     Defendant Katie Hobbs is the Governor of Arizona and is named in this action in her official capacity only. The Governor is a constitutional officer who is the head of the Executive Branch of the State of Arizona. She has her primary address in Maricopa County. She is statutorily tasked with approving the final EPM. *See id.*

## JURISDICTION AND VENUE

35.     This Court has subject matter jurisdiction because this case alleges violations of the United States Constitution. 28 U.S.C. §1331.

36.     Venue is proper because a substantial part of the events or omissions giving rise to the claims occurred in this County and because Defendants "reside" here. 28 U.S.C. §1391.

## GENERAL ALLEGATIONS

37.     The Arizona Legislature has delegated limited authority to the Secretary to "prescribe rules to achieve and maintain the maximum degree of correctness, impartiality, uniformity[,] and efficiency on the procedures for early voting and voting, and of producing, distributing, collecting, counting, tabulating[,] and storing ballots." A.R.S. § 16-452(A).

38.     The EPM must be "issued not later than December 31 of each odd-numbered year immediately preceding the general election." § 16-452(B).

39.     Before issuing the EPM, the Secretary must submit a draft to the Governor and the Attorney General, and each must approve it. *Id.*

40.     "Once adopted, the EPM has the force of law; any violation of an EPM rule is punishable as a class two misdemeanor." *Fontes*, 250 Ariz. 63 ¶ 16 (citing § 16-452(C)).

41.     In Arizona, the officer in charge of elections for each county—usually a county recorder—is responsible for tabulating votes, and sending those unofficial county election returns to their respective county board of supervisors. *See generally* A.R.S. §§ 16-621, 16-622, 16-624.

7

42.     In turn, the county boards are tasked with conducting an official canvas, declaring results, and certifying those results. *See generally* A.R.S. §§ 11-251(3), 16-642, 16-645, 16-646(C), 16-647.

43.     The Secretary then uses those official certifications from county boards to certify the results for the statewide elections. *See generally* A.R.S. §§ 16-642(A)(3), 16-643; 16-645, 16-648.

### THE 2022 COCHISE COUNTY BOARD OF SUPERVISOR'S ELECTION CERTIFICATION DELAY

44.     Events surrounding the 2022 election impacted the provisions that the State included in the 2023 EPM.

45.     For example, following the 2022 election, the Cochise County Board of Supervisors refused to certify the election results for Cochise County for a time, resulting in a delay for the Secretary's certification. *See* Jonathan J. Cooper, *Republican-Controlled Arizona County Refuses To Certify 2022 Election*, Arizona PBS (Nov. 28, 2022) https://www.pbs.org/newshour/politics/republican-controlled-arizona-county-refuses-to-certify-2022-election.

46.     Eventually, the Cochise County Board certified the results, as did the Secretary. *See* Musadiq Bidar, *Last Arizona County Certifies Election Results*, CBS News (Dec. 1, 2022) https://www.cbsnews.com/news/2022-midterm-elections-cochise-county-arizona-election-results-certification/.

47.     Since then, the Arizona Attorney General has indicted two of the Cochise County Supervisors for their alleged role in delaying the certification. *See* Jen Fifield, *Two Cochise County Supervisors Indicted For Refusing To Certify Midterm Election*, Votebeat (Nov. 29 2023) https://www.votebeat.org/arizona/2023/11/29/arizona-cochise-county-supervisors-indicted-refusing-certify-2022-election/.

### THE 2023 EPM

48.     On or around July 31, 2023, the Secretary published a 268-page draft EPM for public comment.

8

49.   The Secretary permitted only 14 days to provide comments on the draft EPM. Despite that limited time for review, individuals and organizations submitted comments opposing provisions of the draft EPM.

50.   In particular, on August 14, 2023, Ben Toma, Speaker of the Arizona House of Representatives, and Warren Peterson, President of the Arizona Senate, submitted comments opposing provisions of the draft EPM. A copy of the Legislature's comments is attached as Exhibit A. Among other comments, the legislative leaders argued that the Speech Restriction violated Arizona statutory law, the First Amendment, and the Free Speech and Due Process Clauses of the Arizona Constitution. *See* Ex. A at 6–7.

51.   After receiving public comment, the Secretary published an updated draft EPM and transmitted the same to the Governor and the Attorney General for their review and approval under § 16-452.

52.   The Speech Restriction of Chapter 9, § III(D), was not changed in response to the statutory and constitutional concerns raised by the legislative leaders.

53.   By refusing to make any changes to the Speech Restriction in response to the comments objecting to it, the Secretary has refused to disavow enforcement of the provision as written.

54.   On January 11, 2024, the Secretary published an updated "final" EPM, which corrected and added dates in Chapter 15. This "final" EPM, however, still did not change the Speech Restriction. This is the EPM at issue, and which the Secretary and Attorney General seek to enforce.

### THREAT OF ENFORCEMENT OF SPEECH RESTRICTION

55.   The constitutional violations occasioned by the Speech Restriction are not mere drafting accidents, but rather intentional policy choices made by the Secretary and approved by the Governor and Attorney General. In addition to the Secretary's retention of the Speech Restriction as written after the Legislature specifically raised First Amendment concerns, a subsequent letter exchange with the Secretary and Attorney

General further confirms that Plaintiffs face a credible threat of enforcement of the Speech Restriction against them.

56.     Specifically, the Secretary and Attorney General were sent a letter on May 21, 2024, asking them to disavow enforcement of the Speech Restriction. A copy of that letter is attached as Exhibit B.

57.     In his May 31 response, the Secretary did not address the request that "Secretary Fontes provide a binding and unequivocal commitment to forego making any criminal referrals for alleged violations of the 2023 EPM's Speech Restriction under any circumstances," Ex. B at 1. A copy of the Secretary's May 31, 2024 response is attached as Exhibit C.[2]

58.     In doing so, the Secretary made clear that he intends to make referrals for criminal prosecution to the Attorney General and Arizona County Attorneys for violations of the Speech Restriction. Such a refusal to disavow enforcement strongly supports Plaintiffs' standing here. *See*, *e.g.*, *California Trucking Ass'n v. Bonta*, 996 F.3d 644, 653 (9th Cir. 2020) (holding that "the state's refusal to disavow enforcement of [the challenged law] against [plaintiffs] during this litigation is strong evidence that the state intends to enforce the law and that [plaintiff's] members face a credible threat" of enforcement.)

59.     In contrast, the Attorney General issued a purported disavowal of enforcement of the Speech Restriction. A copy of her May 31, 2024 response is attached as Exhibit D.

60.     The Attorney General's attempt to disavow is flawed on multiple levels. *First*, it expressly notes that County Attorneys could still enforce the Speech Restriction. Specifically, her letter expressly "note[s] that county attorneys may also enforce provisions of Title 16 and Title 13 as they relate to voting and elections." Ex. D at 2. The Attorney

---

[2]  Plaintiffs contest the accuracy of many of the assertions in the Secretary and Attorney General's letters. They are attached solely to support Plaintiffs' claim that they face a credible threat of enforcement of the Speech Restriction

10

General's letter thus implicitly recognizes that Plaintiffs here face a threat of enforcement even after her putative (and, as explained next, ineffective) disavowal of enforcement.

61. *Second*, the putative disavowal of enforcement is based on errors of law that are so patent that no person could reasonably rely upon them. For example, Attorney General Mayes's letter claims that the Speech Restriction "does not itself restrict or criminalize anything."

62. Specifically, although the Attorney General claims that the Speech Restriction "does not itself restrict … anything," it clearly does. By its terms, it provides: "Any activity by a person with the intent or effect of threatening, harassing, intimidating, or coercing voters … *is prohibited*." EPM at 181 (emphasis added). And to "prohibit" speech is to "restrict" it. *See*, *e.g.*, *Prohibit*, Cambridge Dictionary Online, https://dictionary.cambridge.org/us/dictionary/english/prohibit (last visited June 18, 2024) (defining "prohibit," in relevant part, as "to officially stop something from being done by making rules or laws that do not allow it"). The Attorney General's contrary contention that the Speech Restrictions does not "restrict[] anything …" is squarely contrary to the Speech Restriction's plain text.

63. Similarly, the Attorney General's contention that the Speech Restriction "does not … criminalize anything" is incorrect. Arizona statutory law explicitly provides that "[a] person who violates any rule adopted pursuant to this section is guilty of a class 2 misdemeanor." Thus, to violate the explicit *prohibitions* of the Speech Restriction is necessarily to commit a class 2 misdemeanor under state law. A.R.S. § 16-452(C); *see also Arizona Pub. Integrity All. v. Fontes*, 250 Ariz. 58, 63 ¶ 16 (2020) ("Once adopted, the EPM has the force of law; *any violation of an EPM rule is punishable as a class two misdemeanor*." (emphasis added)).

64. The Attorney General's position that the EPM "does not … criminalize anything" is incompatible with Arizona statutory law.

65. The Attorney General's assertion appears to be premised on her view that the Speech Restriction is only "for the benefit of local elections officials, such as a polling

11

place inspector and marshal" and does not apply to private individuals. Ex. D at 1. But A.R.S. § 16-452(C), by its terms, is squarely to the contrary: it explicitly provides that "[a] person who violates any rule adopted pursuant to this section is guilty of a class 2 misdemeanor." An ordinary citizen is equally as much "a person" as "local election officials." And the Speech Restriction is stated as a universal *prohibition* on the conduct of *everyone*—not just election officials. It expressly applies to "[*a]ny activity* by *a person*" without limitation and provides that such conduct "is prohibited." EPM at 191 (emphasis added). The Attorney General's assertion that the Speech Restriction only applies to local election officials and not other members of the public is thus indefensible.

66.     *Third*, the Attorney General's assertion that she "does not view the EPM as broadening the scope of conduct criminally prohibited under A.R.S. §§ 16-1013, 1017 or relevant and applicable criminal statutes," Ex. D at 2, is equally untenable.

67.     The Speech Restriction notably "broadens the scope of conduct criminally prohibited under A.R.S. §§ 16-1013, 1017" in at least three ways.

68.     *First*, the Speech Restriction unlawfully eliminates the *mens rea* requirement adopted by the Legislature. Specifically, A.R.S. § 16-1013 prohibits only acts that are taken "knowingly …" *See* A.R.S. § 16-1013 ("It is unlawful for a person *knowingly*:…" (emphasis added)). Similarly, § 16-1017 requires *knowing* violations. *See* A.R.S. § 16-1017 ("A voter *who knowingly commits* any of the following acts is guilty of a class 2 misdemeanor:…" (emphasis added). The Speech Restriction, however, purports to criminalize actions that have *either* "the intent *or effect* of threatening" voters. In doing so, the Speech Restriction creates a new strict-liability crime where actions are prohibited without any requirement of *mens rea*—even ordinary negligence—as long as they have the "effect" at issue.

69.     *Second*, the Speech Restriction unlawfully adds a prohibition against harassing speech into the prohibition of A.R.S. § 16-1013. By its terms, § 16-1013 prohibits only the actual (1) "use of force, violence or restraint," (2) "threaten[ing to] inflict[] … injury, damage, harm or loss," (3) "intimidation," or (4) use of "abduction, duress or any

12

forcible or fraudulent device or contrivance." Completely absent from § 16-1013 is any concept of verbal "harassment," which instead was added whole cloth by the Secretary. Similarly, § 16-1017 does not include "harassment" either.

70. *Third*, the Speech Restriction eliminates any requirement that the threatening, harassing, or intimidating actions have any actual nexus to voting itself. Section 16-1013 specifically prohibits only actions that are taken "to induce or compel such person *to vote or refrain from voting* for a particular person or measure at any election provided by law, or on account of such person *having voted or refrained from voting* at an election" or "to impede, prevent or otherwise interfere with the *free exercise of the elective franchise* of any voter, or to compel, induce or to prevail upon a voter either *to cast or refrain from casting his vote* at an election, or *to cast or refrain from casting his vote* for any particular person or measure at an election." A.R.S. § 16-1013 (emphasis added) (hereinafter, "Voting-Nexus Requirement"). Similarly, all of the prohibitions of § 16-1013 involve voting. But the EPM's Speech Restriction dispenses with this Voting-Nexus Requirement entirely, and simply makes it a crime to raise one's voice or use offensive or insulting language concerning *any subject* to *any voter anywhere* in the State.

71. The Attorney General's contention that she would not enforce the Speech Restriction is thus based on a flawed legal construction as to how that legal provision, by its terms, operates. And, because her disavowal of enforcement of the Speech Restriction is not premised the express terms of the Restriction, it is ineffective to dispel Plaintiffs' credible threat of enforcement. Rather, because the Attorney General is ultimately obliged to enforce Arizona law as *actually written*, Plaintiffs cannot rely on her disavowal of prosecution since it is premised on an erroneous construction of the law.

72. The Attorney General and Secretary's refusal to amend the Speech Restriction in response to the First Amendment objections raised to it and their subsequent May 31 responses thus demonstrate that Plaintiffs face a credible threat of enforcement under the Speech Restriction.

73.     Further, apart from the Attorney General's purported disavowal of enforcement, she herself notes that the County Attorneys could still prosecute violations of the Speech Restriction.

74.     Moreover, the Secretary specifically refused to disavow making criminal referrals, including to the County Attorneys, despite the May 21, 2024 (Ex. 2) letter asking him to do so. That refusal further underscores the credible threat of enforcement that Plaintiffs face here.

75.     "[T]he 'credible threat of prosecution' is a 'quite forgiving' requirement that sets up only a 'low threshold' for a plaintiff to surmount" to establish standing. *Antonyuk v. Chiumento*, 89 F.4th 271, 334 (2d Cir. 2023) (citation omitted). "Courts have not placed the burden on the plaintiff to show an intent by the government to enforce the law against it but rather presumed such intent in the absence of a disavowal by the government." *Id.* (cleaned up); *see also California Trucking Ass'n*, 996 F.3d at 653 ("Here, the state's refusal to disavow enforcement is strong evidence that the state intends to enforce the law and that the plaintiffs face a credible threat." (cleaned up)).

76.     Moreover, by providing their assent to the Secretary's EPM, the Attorney General and Governor made a determination that the 2023 EPM complied with federal and Arizona law notwithstanding the objections made to it.

77.     Because the Attorney General and Governor could have exercised a veto over the EPM's publication if they had deemed its provisions to violate the Constitution, their approval of the EPM signals that they believe that the EPM is lawful and that the Attorney General intends to enforce its provisions.

78.     Additionally, the Attorney General's grant of consent to the EPM notwithstanding its legal infirmities constitutes a "refusal to disavow enforcement" of the EPM. *California Trucking Ass'n*, 996 F.3d at 653.

### VOTE NULLIFICATION PROVISION

79.     The final 2023 EPM also includes two provisions regarding canvassing elections results that are likely intended to addresses the issues that arose in 2022 with

14

Cochise County (*see supra*, ¶¶ 50-52): (1) the EPM imposes on County Boards of Supervisors "a nondiscretionary duty to canvass the returns as provided by the County Recorder or other officer in charge of elections" and removes from the County Boards any "authority to change vote totals, reject the election results, or delay certifying results without express statutory authority or court order," EPM Chp. 13, § II(A)(2) ("Mandatory-Board-Certification Provision"); and (2) the EPM also imposes a similar non-discretionary canvassing duty on the Secretary, but also provides that "[i]f the official canvass of any county has not been received by [the] deadline, the Secretary of State must proceed with the state canvass without including the votes of the missing county," EPM Chp. 13, § II(B)(2) ("Vote Nullification Provision").

80. Only the second mandate, the Vote Nullification Provision, is challenged here. That provision *mandates* that *all votes* cast *by all voters* in a county will *not be counted whatsoever* if the Board of Supervisors for that county fails or refuses to certify the canvas election results for that county. The Vote Nullification Provision thus provides that "[i]f the official canvass of any county has not been received by this deadline, the Secretary of State must proceed with the state canvass *without including the votes of the missing county*." EPM at 252 (emphasis added).

81. Thus, where a county Board of Supervisors refuses or fails to certify election results by the applicable deadline, the Vote Nullification Provision mandates the *complete disenfranchisement* of every voter in that county. It does so even where the voters in that county themselves are entirely faultless and have complied with *all* requirements for exercising their constitutional right to vote (*e.g.*, voting before polls close, presenting identification for in-person voting or signing their mail-in ballot etc.). That disenfranchisement extends to every single vote cast by the voter from Presidential Electors all the way down to whether to retain a justice of the peace.

82. The Vote Nullification Provision could potentially even permit Boards of Supervisors to continue to serve indefinitely even when the voters attempt to vote them out of office. By refusing to certify results, there would not be any lawful ballots cast for any

of the offices that are limited to that county—such as that county's Board of Supervisors (as well as its Sheriff, County Attorney, Recorder, Treasurer, etc.). As such the Board of Supervisor positions would presumably be deemed vacant. As a result, the Board of Supervisors—the same one that had just refused to certify the results—would be entitled to fill those vacancies, and could presumably do so with themselves. *See* A.R.S. § 11-213 ("When a vacancy occurs in the office of supervisor, the remaining supervisors … shall fill the vacancy by appointment of a resident of the district in which the vacancy occurred.").

83.    The Vote Nullification Provision would also apply in the case of non-feasance or bad acts of third parties. For example, if the bad actions of third parties prevented a quorum of supervisors from assembling and voting to certify canvassed results by the applicable deadline, every voter in that county would be disenfranchised.

84.    The scale of the potential disenfranchisement that could be wrought by the challenged provision is staggering. Maricopa County, for example, is home to over 2.9 million registered voters—a majority of all voters in the State—and had about 2.1 million ballots cast by voters in 2020. But its Board of Supervisors consists only of five members. So, if three of them refuse or are unable to certify election results, millions of voters will suffer total disenfranchisement as a result. Putting such electoral power in the hands of such a small handful of individuals is as unprecedented as it is unconstitutional.

85.    The power conferred upon Boards of Supervisors under the Vote Nullification Provision is particularly problematic and vast given Arizona's status nationally as both a swing and potentially tipping-point state. If Arizona's electoral votes were decisive in the 2024 elections, one or more Boards of Supervisors would potentially wield the power to determine the next President of the United States simply by sitting on their hands and refusing to come to work for a few days during the canvas process.

86.    This potential disenfranchisement is hardly theoretical. In 2022, the Cochise Board of Supervisors, for a time, refused to certify its election results. Although the standoff was eventually resolved, it could easily recur—particularly as the Vote

16

Nullification Provision (which did not exist in 2022) may now *actively incentivize* Boards of Supervisors to refuse to certify results in order to manipulate electoral winners.

87. Notably, Defendant Mayes has judged the risk of recurrence sufficiently likely that she has obtained criminal indictments of members of the Cochise Board of Supervisors that briefly refused to certify election results as a deterrent and is actively prosecuting those county supervisors.

88. Similarly, Defendant Fontes crafted the Vote Nullification Provision specifically to deter another recurrence of Boards of Supervisors (like Cochise County) refusing to certify results. But the provision that he proposed—and to which Governor Hobbs and Attorney General Mayes provided their necessary approvals—is extreme and unconstitutional.

89. No other state has any remotely equivalent provision. Not a single one of Arizona's 49 sister states judges it necessary to disenfranchise voters *en masse* in order to address the issue of potential refusals or inabilities to certify election results by county officials.

90. The Vote Nullification violates the U.S. Constitution by imposing an unconstitutionally severe burden on the right to vote of U.S. citizens residing in Arizona under the *Anderson-Burdick* doctrine developed by the Supreme Court.

### HARMS CAUSED BY THE VOTE NULLIFICATION PROVISION

91. The Vote Nullification Provision inflicts cognizable injury upon voters by changing the nature of their right to vote and have their vote counted from an unqualified right to one subject to potential disqualification by the actions of governmental officials.

92. Without the Vote Nullification Provision voters have an essentially absolute right to vote—and have those votes counted—so long as they comply with applicable rules. For example, before the 2023 EPM, so long as in-person voters showed voter identification, followed ballot instructions, and casted a ballot by the close of polls, their right to have that vote counted was unconditional.

93.     Similarly, mail-in voters that signed their ballot, followed ballot instructions, and ensured receipt of their ballots by the close of polls, had a near-absolute right to have their vote counted.

94.     Although voters' ballots might be disqualified if their signature did not appear to match, Arizona law gives them the right to cure such a mismatch for up to five business days after the election. *See* A.R.S. § 16-550(A). Indeed, failure to provide such opportunities for curing mismatches—and thus rendering voters' right to vote subject to potential wrongful disqualification at the hands of election officials—has routinely given rise to Article III standing to challenge the failure to provide adequate mismatch curing opportunities. *See*, *e.g.*, *Democratic Exec. Comm. v. Detzner*, 347 F. Supp. 3d 1017, 1024-25 (N.D. Fla. 2018) *aff'd* 915 F.3d 1312 (11th Cir. 2019); *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1333-35 (N.D. Ga. 2018); *Frederick v. Lawson*, 481 F. Supp. 3d 774, 786-90 (S.D. Ind. 2020); *see also Ariz. Democratic Party v. Hobbs*, 485 F. Supp. 3d 1073, 1085-87 (D. Ariz. 2020) *rev'd* on other grounds 18 F.4th 1179, 1193 (9th Cir. 2021) (same for failure to provide opportunity to cure missing signatures post-election).

95.     Similarly, citizens who have lost their right to vote due to a felony-disenfranchisement statute have standing to challenge that statute even though their right to vote could potentially be restored by the governor as a matter of discretionary clemency. *See*, *e.g.*, *El-Amin v. McDonnell*, No. 3:12-cv-00538-JAG, 2013 U.S. Dist. LEXIS 40461, at *15 (E.D. Va. Mar. 22, 2013) ("While El-Amin is correct that Virginia has deprived him of his voting rights, this injury permits him only to challenge the deprivation itself, which he does in Count I. Since he has not applied for restoration of his voting rights, he has suffered no denial, or other injury, that would allow him to challenge the reinstatement process as well.") (holding that plaintiff disenfranchised by felony-disenfranchisement law that had not applied for restoration of voting rights by the governor had standing to challenge the felony-disenfranchisement statute but not the procedures for restoration of the right to vote by the governor); *Williams v. Taylor*, 677 F.2d 510, 517 (5th Cir. 1982) (holding that disenfranchised felon lacking standing to challenge "pardon procedure" that

could restore voting rights because he had not "tried to procure a pardon from the governor" but considering challenges to felony-disenfranchisement procedures on the merits because standing was sufficiently obvious not to warrant discussion).

96.     Thus, because a felony-disenfranchisement statute transformed the plaintiffs' right to vote from (1) an unqualified right so long as voting requirements were met to (2) a qualified right, subject to the discretion of the governor, felony disenfranchisement statutes inflict cognizable injury establishing Article III standing to challenge them.

97.     The Vote Nullification Provision inflicts the same sort of injury: *i.e.*, it transforms voters' unqualified right to vote so long as they comply with applicable requirements, into a qualified right that is subject to potential disqualification and disenfranchisement at the hands of governmental officials. As a result, it inflicts cognizable injury upon Plaintiff Glennon as a voter, as well Plaintiffs AFPI and American Encore's supporters and/or sympathetic voters and Plaintiff AFPI's members who are also voters.

98.     This injury is imminent: Plaintiff Glennon, as well Plaintiffs AFPI and American Encore's supporters and/or sympathetic voters and Plaintiff AFPI's members will vote in the upcoming July 30, 2024 primary, where their votes will be subject to potential disqualification by the actions of County Boards of Supervisors under the Vote Nullification Provision. This potential disenfranchisement thus downgrades their right to vote from unconditional to being subject to disqualification by the actions of third parties.

99.     Plaintiff Glennon, as well Plaintiffs AFPI and American Encore's supporters and/or sympathetic voters and Plaintiff AFPI's members similarly will cast votes in the November 5, 2024 general election, where there right to vote will likewise be downgraded from unconditional to qualified/subject to potential disqualification by actions of governmental officials. *See also Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1319 (11th Cir. 2019) (recognizing cognizable injury under *Anderson-Burdick* doctrine because a statute "subjects vote-by-mail and provisional *electors to the risk of disenfranchisement*" (emphasis added)).

19

100.    Plaintiffs' injuries here are similarly akin to those occasioned when a state or local government imposes a permit requirement to exercise free speech rights. By changing the character of the speech from being unconditionally allowed to, now, contingent upon the actions of governmental actors granting a permit, a permitting requirement inflicts cognizable injury establishing Article III standing to challenge the permit requirement. *See*, *e.g.*, *Taniguchi v. Schultz*, 303 F.3d 950, 957 (9th Cir. 2002) (Ninth Circuit precedents recognize that plaintiffs "have standing to challenge a permit requirement, even though they did not apply for permits, because applying for a permit would have been futile" (cleaned up)); *Stewart v. San Francisco*, No. 22-16018, 2023 U.S. App. LEXIS 3811, at *2 n.3 (9th Cir. Feb. 17, 2023) (recognizing Article III standing to challenge statute that "establishe[d] a permit requirement in advance of public speech and ban[ned] an instrumentality of speech absent a permit.'" (citation omitted)).

101.    Similarly, by changing an unconditional right for a vote to be counted to one contingent on how governmental officials act, the Vote Nullification Provision establishes Plaintiffs' standing here.

102.    Plaintiffs also have standing because there is a credible threat that the Vote Nullification Provision will be enforced in a manner that disenfranchises them. Notably, Cochise County did refuse to certify election results for a time in 2022, which would have triggered the Vote Nullification Provision if one of the supervisors had not backed away from the ledge at the eleventh hour.

103.    Indeed, Defendant Fontes judged the risk of recurrence to be so sufficiently high that, upon information and belief, specifically drafted the Vote Nullification Provision as a reaction to the events in 2022 and the likelihood that they could recur in 2024 or subsequent elections.

104.    The risk is even greater now because the Vote Nullification Provision actively incentivizes Boards of Supervisors *not* to certify election results because (unless invalidated) it ensures that any efforts by them to manipulate vote counts by refusals to certify *will be effective*.

20

105.   The risk of enforcement is further underscored by the fact that the Secretary is not merely the officer charged with enforcing the Vote Nullification Provision, but also is *its author*. The Secretary would not have drafted the Vote Nullification Provision if he did not intend to enforce it.

106.   To the extent that they apply here, prudential considerations strongly favor resolving Plaintiffs' claim now, rather than waiting until a crisis arrives when a Board of Supervisors refuses to certify an election. In that posture, there will be a severe time crunch that could prevent thoughtful resolution of the issues presented, as well as potentially dueling opinions from state and federal courts that could create electoral chaos.

107.   In addition, by resolving this claim now, this Court can do so in a posture where the outcome of an election will not directly turn on the ruling here.

### THE 2023 EPM'S VIOLATIONS OF THE UNITED STATES CONSTITUTION

### The Vote Nullification Provision is a Severe and Unconstitutional Burden on Arizonans' Right to Vote

108.   Violations of the right to vote implicate the First and Fourteenth Amendments. *See Anderson v. Celebrezze*, 460 U.S. 780, 787 n.7 (1983) (collecting cases).

109.   Constitutional challenges to electoral statutes and regulations that allege an unconstitutional burden are governed by the *Anderson-Burdick* framework. *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 189–91 (2008).

110.   Under this framework, "a court evaluating a constitutional challenge to an election regulation [must] weigh the asserted injury to the right to vote against the precise interests put forward by the State as justifications for the burden imposed by its rule." *Id.* at 190 (quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)) (quotation marks omitted).

111.   And "an election regulation that imposes a severe burden is subject to strict scrutiny." *Nader v. Brewer*, 531 F.3d 1028, 1035 (9th Cir. 2008).

112.   The Vote Nullification Provision imposes a severe burden on the right to vote—indeed, it is the severest possible burden: nullification of a citizen's vote through no fault of that citizen and doing so for every voter in a given county. Indeed, when it becomes operative, *all voters* in the affected county are *completely disenfranchised*. For the voters

1   of the affected county, no more severe burden on their right to vote is even conceivable or
2   possible.

3       113.    Indeed, the Vote Nullification Provision imposes a more severe burden than
4   other election regulations that have been struck down as overly severe burdens on the right
5   to vote. For example, in *Harper v. Virginia State Bd. of Elections*, the Supreme Court
6   invalidated a $1.50 poll-tax, reasoning that "wealth or fee paying has, in our view, no
7   relation to voting qualifications; the right to vote is too precious, too fundamental to be so
8   burdened or conditioned." 383 U.S. 663, 670 (1966). Similarly, here, the votes of an entire
9   county are nullified by no fault of voters with no relation to their voting qualifications.

10      114.    Again, in *Illinois State Bd. of Elections v. Socialist Workers Party*, the
11  Supreme Court struck down an impermissibly severe burden on the right to vote because
12  the election regulation had the effect of barring a political party from the ballot. 40 U.S.
13  173, 183–84 (1979). Here, under the Vote Nullification Provision's mandatory
14  nullification of an entire county's electorate, all political parties are effectively barred from
15  the ballot in that county. Thus, the burden here is even more severe than the one struck
16  down by the Supreme Court in *Illinois State Bd. of Elections*.

17      115.    When, as here, the right to vote is "subjected to 'severe' restrictions, the
18  regulation must be 'narrowly drawn to advance a state interest of compelling importance.'"
19  *Burdick*, 504 U.S. at 434 (citation omitted); *see also Nader*, 531 F.3d at 1035.

20      116.    Although the State has an interest in orderly election procedures and
21  producing timely results, literal disenfranchisement of every voter in the affected county
22  for *all* races is not remotely narrowly tailored to serve those interests.

23      117.    More narrowly tailored options are obvious. The EPM could, for example,
24  have simply required the Secretary to go to state court if there was a county failure to certify
25  results and ask the court to ascertain what results from that county should be included in
26  the statewide totals. Similarly, the EPM could have instead directed the Secretary to
27  appoint an auditor to determine the correct results in that county. Or the EPM could have

28

22

directed the Secretary to include the unofficial results unless a court order directs him to do otherwise.

118.    Any one of these options would adequately address the issue of non-certification of county results without the need to completely disenfranchise the votes of all residents in the county. Nor is the threat of such total disenfranchisement necessary—or even remotely appropriate—as a deterrent to misconduct.

119.    Indeed, not only is such a "remedy" completely disproportionate to the problem it is attempting to "solve," it may *actively encourage* the very sort of electoral misconduct that it purports to deter. Although styled as a punishment, the Vote Nullification Provision effectively is a back-door grant of authority to disenfranchise voters. After all, unless the Vote Nullification Provision is enjoined or repealed, it ensures that if a Board of Supervisor *wants* to disenfranchise its own voters, its attempt to do so *will be effective* as long as the Board never certifies election results—something readily in its power to accomplish.

120.    The Vote Nullification Provision is particularly unnecessary because the EPM already purports to criminalize a Board of Supervisor's refusal to certify election results. Specifically, the EPM provides that "[t]he Board of Supervisors has a non-discretionary duty to canvass the returns as provided by the County Recorder or other officer in charge of elections and has no authority to change vote totals, reject the election results, or delay certifying the results without express statutory authority or a court order." 2023 EPM at 248. Violation of the EPM by "a person" is a class-two misdemeanor. *See* A.R.S. § 16-452(C) ("A person who violates any rule adopted pursuant to this section is guilty of a class 2 misdemeanor.").

121.    Criminalizing refusals to certify election results should be sufficient to deter misconduct and Defendants have *never* explained why the additional putative deterrence of the Vote Nullification Provision is necessary to prevent such refusals.

122.    In short, the Vote Nullification Provision is far broader than necessary to achieve its purpose. And it results in numerous harmful unintended consequences.

123.   Thus, the Vote Nullification Provision fails strict scrutiny, is overly burdensome under the *Anderson-Burdick* framework, and therefore violates the Fourteenth Amendment.

124.   This Court should enjoin its use and require the Secretary to promulgate a new, more narrowly tailored provision.

### The Speech Restriction is Unconstitutional

125.   The First Amendment states that government "shall make no law ... abridging the freedom of speech."

126.   And the Fourteenth Amendment's Due Process Clause requires that a statute which criminalizes speech or conduct must "provide a person of ordinary intelligence fair notice of what is prohibited," and not be "so standardless that it authorizes or encourages seriously discriminatory enforcement," otherwise it "fails to comport with due process." *United States v. Williams*, 553 U.S. 285, 304 (2008).

127.   The Speech Restriction contained in Chapter 9, section III(D), of the 2023 EPM violates the First Amendment and the Due Process Clause.

128.   That provision purports to ban "[a]ny activity by a person with the intent *or effect* of threatening, harassing, intimidating, or coercing voters (or conspiring with others to do so) *inside or outside the 75-foot limit* at a voting location." (emphasis added).

129.   The Speech Restriction appears in Chapter 9 of the EPM, which addresses "Conduct of Elections/Election Day Operations." Although other provisions in Chapter 9 are explicitly limited to election days, there are no such temporal limitations in the Speech Restriction. The Speech Restriction thus applies on all days, and not merely election days.

130.   The Speech Restriction also has no geographic limitation. It explicitly applies to "any activity . . . inside *or outside* the 75-foot limit at a voting location." (emphasis added). The combination of all spaces inside *or outside* those perimeters is of course the entire universe of land within Arizona's borders.

131.   The Speech Restriction purports to limit or ban many activities that would otherwise be lawful under the First Amendment, claiming that it would constitute

"intimidating conduct." For example, it lists all the following as conduct that "may also be considered intimidating conduct inside or outside the polling place":

- "Aggressive behavior, *such as raising one's voice* or taunting a voter or poll worker";
- "Using threatening, *insulting, or offensive* language to a voter or poll worker";
- "Posting signs or communicating messages about penalties for 'voter fraud' in a harassing or intimidating manner."

2023 EPM at 181–82.

132. But these prohibitions reach a broad swath of activities that are protected under the First Amendment.

133. Indeed, the Speech Restriction the Secretary crafted is patently unconstitutional because it violates both the Free Speech Clause of the First Amendment (as incorporated against the States under the Fourteenth Amendment) and the Due Process Clause of the Fourteenth Amendment.

134. The violations of the First Amendment are numerous and multi-faceted here. *First*, the U.S. Supreme Court has squarely held "the First Amendment … requires proof that the defendant had some subjective understanding of the threatening nature of his statements." *Counterman v. Colorado*, 143 S. Ct. 2106, 2111 (2023). "The State [thus] must show that the defendant consciously disregarded a substantial risk that his communications would be viewed as threatening violence." *Id.* at 2111-12

135. But the Speech Restriction eliminates the "knowingly" *mens rea* requirements of §16-1013 and §16-1017, and instead makes actions criminal purely based on their "effect"—without any proof of *mens rea* at all. Indeed, by making liability turn on whether an action has the "*effect* of threatening, harassing, intimidating, or coercing voters," even a voter *unreasonably* construing speech to be "harassing" or "intimidating" would now be criminalized. By dispensing with any requirement of *mens rea*, the Speech Restriction violates the First Amendment. *Counterman*, 143 S. Ct. at 2111.

136. *Second*, the State lacks authority to criminalize speech simply because voters might find it "offensive": "the fact that society may find speech offensive is not a sufficient

reason for suppressing it. Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection." *FCC v. Pacifica Foundation*, 438 U.S. 726, 745-46 (1978); *see also United States v. Williams*, 553 U.S. 285, 306 (2008) ("[W]e have struck down statutes that tied criminal culpability to whether the defendant's conduct was 'annoying' or 'indecent.'"). But the Speech Restriction does just that, purporting to prohibit "[u]sing … offensive language to a voter or poll worker." EPM at 182. And that prohibition is not limited to polling places or election day, but instead applies year round and both "inside or outside the 75-foot limit at a voting location." *Id.* at 181-82.

137.    *Third*, by purporting to ban "insulting or offensive speech," EPM at 182, the Speech Restriction is an unlawful content-based and viewpoint-based restriction on speech. *See*, *e.g.*, *Matal v. Tam*, 582 U.S. 218, 249 (2017) (holding that when a restriction "reflects the Government's disapproval of a subset of messages it finds offensive… [it] is the essence of viewpoint discrimination."). "Giving offense is a viewpoint." *Id.* at 2240. And "[b]y mandating positivity, [speech restrictions] might silence dissent and distort the marketplace of ideas." *Id.*

138.    *Fourth*, even as applied to non-public forums such as voting locations, the Speech Restriction violates the First Amendment because it is not reasonable and is not "capable of reasoned application." *Minnesota Voters All. v. Mansky*, 585 U.S. 1, 23 (2018); *accord Center for Investigative Reporting v. SEPTA*, 975 F.3d 300, 315 (3d Cir. 2020) ("According to *Mansky*, a prohibition on speech is unreasonable if it fails to 'articulate some sensible basis for distinguishing what may come in from what must stay out.'" (quoting *Mansky*, 585 U.S. at 29)).

139.    The Speech Restriction's use of amorphous, open-ended terms like "insulting or offensive language" and "harassing" do not provide reasonable guidance that would distinguish permissible and impermissible speech. For example, would wearing a MAGA hat, an "All Lives Matter" button, or a "I Support the Second Amendment" T-shirt constitute "offensive speech" or be considered "harassing" to a voter that sees them? The

EPM does not provide any guidance as to how to apply its indeterminate terms and thus cannot be justified if the Speech Restriction were limited purely to the non-public forums of voting locations (instead of applying everywhere else in the State, as it does by its plain terms).

140.    The Speech Restriction also violates the Due Process Clause by violating fair notice principles. As an initial matter, by imposing liability directly contrary to § 16-1013's and § 16-1017's actual texts, the Speech Restriction violates due process. States cannot provide citizens notice of a criminal prohibition's elements and requirements by statute and then—having lulled citizens into the belief that the statute only prohibits what, by its terms, it states it actually prohibits—impose liability on a *far broader* basis.

141.    In addition, the Speech Restriction is void on vagueness grounds because it "'fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits'" and because "'it authorizes or even encourages arbitrary and discriminatory enforcement.'" *Johnson v. United States*, 576 U.S. 591, 612, (2015) (quoting *Hill* v. *Colorado*, 530 U.S. 703, 732 (2000)).

**COUNT I – VOTE NULLIFICATION PROVISION**
**Violations of the First and Fourteenth Amendments Under the *Anderson-Burdick* Doctrine**
**Asserted Under 42 U.S.C. § 1983**
**(Declaratory and Injunctive Relief)**

142.    Plaintiffs incorporate the paragraphs above as if stated here.

143.    The Vote Nullification Provision has the effect of disenfranchising every voter in any county that does not timely certify its election results with the Secretary.

144.    The Secretary's duty to disenfranchise these voters is mandatory under the Vote Nullification Provision.

145.    The Provision is a severe burden on the right to vote—preventing votes from counting through no fault of the voter.

146.    Additionally, it is not narrowly tailored to protect the government's interests in orderly, timely, and legislative elections.

27

147.   A requirement that the Secretary (1) appoint an auditor, (2) initiate a court action to ascertain the correct results or (3) use the unofficial results would serve the same governmental interests without the need to disenfranchise voters *en masse* as a result of the action/inaction of third-party county board members for which individual voters are blameless.

148.   Thus, the Vote Nullification Provision imposes an unconstitutionally severe burden on the right to vote.

**COUNT II – SPEECH RESTRICTION**
**Violations of the First and Fourteenth Amendments**
**Asserted Under 42 U.S.C. § 1983**
**(Declaratory and Injunctive Relief)**

149.   Plaintiffs incorporate the paragraphs above as if stated here.

150.   The 2023 EPM criminalizes otherwise protected free speech inside or outside a 75-foot limit of a voting location through its Speech Restriction.

151.   Plaintiffs face a real threat of prosecution because the Attorney General and Governor approved this version of the 2023 EPM, meaning that there is a threat of prosecution for violations of the 2023 EPM.

152.   Despite being asked to do so, neither the Attorney General, nor the Secretary have unequivocally disavowed enforcing the Speech Restriction.

153.   Plaintiffs engage in election activities that would otherwise be lawful under the First and Fourteenth Amendment.

154.   But under the current 2023 EPM, such conduct would be considered criminal. Therefore, Plaintiffs' members face an actual threat of prosecution from the Attorney General for actions that are otherwise lawful under the United States Constitution.

155.   Organizations like AFPI have standing to assert their own respective free speech rights as well as that of their respective members.

156.   In sum, the Speech Restriction is unconstitutional because it: (1) requires no proof of *mens rea* for criminal conduct, (2) purports to ban speech based purely on alleged offensiveness, (3) is a viewpoint-based restriction on speech; (4) is overboard, containing

28

a limitless geographic and temporal scope, and (5) is so vague as to not provide proper notice of the conduct that it criminalizes.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court provide the following expedited relief:

A. A declaratory judgment providing that that the 2023 EPM provisions challenged in this action violate the First and Fourteenth Amendments of the U.S. Constitution;

D. A preliminary and permanent injunction prohibiting the Secretary and Attorney General from enforcing or implementing the challenged provisions of the 2023 EPM;

E. An injunction against the Secretary directing him to promulgate—and the Governor and Attorney General to approve—an EPM that complies with the First and Fourteenth Amendments;

F. An award of Plaintiffs' reasonable attorneys' fees and costs in accordance with applicable law, including 42 U.S.C. § 1988; and

G. Any other relief as the court deems necessary, equitable, proper, and just.

RESPECTFULLY SUBMITTED this 8th day of July, 2024.

HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC

By: */s/ Andrew Gould*
    Andrew Gould
    Drew C. Ensign
    Dallin B. Holt
    Brennan A.R. Bowen
    2575 E. Camelback Road, Suite 860
    Phoenix, AZ 85016

    *Attorneys for Plaintiffs*

29

# EXHIBIT C



**OFFICE OF THE ARIZONA ATTORNEY GENERAL**

**STATE GOVERNMENT DIVISION**
**VANESSA P. HICKMAN, DIVISION CHIEF COUNSEL**

**AGENCY COUNSEL SECTION**

**KRIS MAYES**
**ATTORNEY GENERAL**

**KYLE CUMMINGS**
**ASSISTANT ATTORNEY GENERAL**
**DIRECT PHONE NO. 602-542-8323**
**KYLE.CUMMINGS@AZAG.GOV**

May 31, 2024

*VIA EMAIL*

Andrew Gould, Partner
Holtzman Vogel Baran
Torchinsky & Josefiak, PLLC
2575 East Camelback Road, Suite 860
Phoenix, Arizona 85016
agould@holtzmanvogel.com

Re:     "Enforcement of Elections Procedures Manual's Speech Provision" Letter

Dear Justice Gould,

I write in response to your letter to Arizona Secretary of State Adrian Fontes dated May 21, 2024.  My colleagues Kara Karlson, Karen Hartman-Tellez, and I represent Secretary Fontes in *Arizona Free Enterprise Club v. Fontes, et al.*, No. CV2024-002760 (Ariz. Super. Ct. Maricopa Cnty.).

As you are aware, Arizona Attorney General Kris Mayes' counsel in this matter sent you a letter responding to your May 21 letter.  In light of the Attorney General's letter and because the Secretary does not enforce criminal laws, the Secretary views the concerns raised in your May 21 letter as having been addressed.

Sincerely,

*s/ Kyle Cummings*

Kyle Cummings
Assistant Attorney General
Arizona Attorney General's Office

# EXHIBIT D



**OFFICE OF THE ARIZONA ATTORNEY GENERAL**

**SOLICITOR GENERAL'S OFFICE**

**KRIS MAYES**
**ATTORNEY GENERAL**

Nathan Arrowsmith
Unit Chief Counsel
(602) 542-3333

May 31, 2024

*VIA EMAIL*

Andrew Gould, Partner
Holtzman Vogel Baran
Torchinsky & Josefiak, PLLC
2575 East Camelback Road, Suite 860
Phoenix, Arizona 85016
(602) 388-1262
agould@holtzmanvogel.com

      *Re:    Enforcement of Elections Procedures Manual's Speech Provision*

Dear Justice Gould,

      I am in receipt of your letter dated May 21, 2024.  As you know, I represent Attorney General Kris Mayes in the *Arizona Free Enterprise Club ("AZFEC") v. Fontes* case (No. CV2024-002760), in which your clients raise certain challenges to the 2023 Election Procedures Manual ("EPM").

      Your letter asks that "Attorney General Mayes provide a binding and unequivocal commitment to not prosecute anyone for alleged violations of the 2023 EPM's Speech Restriction under any circumstances."  Your letter goes on to clarify: "For avoidance of doubt, we are requesting that all relevant prosecutions for alleged threatening, harassing, intimidating, or coercing conduct as it relates to voting would be brought under A.R.S. §§ 16-1013 and -1017 or other applicable statutes, and not under A.R.S. § 16-452(C) for alleged violations of the 2023 EPM's Speech Restriction."

      First, your letter does not identify any specific conduct in which your clients wish to engage.  It is difficult to make disavowals without any specific context.

      That said, your letter is premised on a fundamental misunderstanding of the EPM and A.R.S. § 16-452.  The EPM provides rules and guidance for local elections officials to assist with their implementation of election laws.  The portion of the EPM that you label as the "Speech Restriction," EPM, Chapter 9, section III.D, does not itself restrict or criminalize anything.  That section provides a *list of examples* of conduct that *may* be considered "intimidating conduct inside or outside the polling place," EPM at 182-83, for the benefit of local elections officials, such as a polling place inspector and marshal.  Chapter 9, section III.D does not amend or otherwise expand

Mr. Andrew Gould
May 31, 2024
Page 2 of 2

A.R.S. § 16-1013.

Accordingly, as to the Attorney General's Office, I can confirm that the Attorney General does not view the EPM as broadening the scope of conduct criminally prohibited under A.R.S. §§ 16-1013, 1017 or relevant and applicable criminal statutes.  If one of your clients plans to do something outside the scope of a criminal statute, then this office would not prosecute.  I will note that county attorneys may also enforce provisions of Title 16 and Title 13 as they relate to voting and elections.

So, to answer your specific request:  Yes, all relevant prosecutions by our office of people who are not election officials for the conduct you describe–alleged threatening, harassing, intimidating, or coercing conduct as it relates to voting–would be brought under A.R.S. §§ 16-1013 and -1017 or other applicable statutes, and not under A.R.S. § 16-452(C) for alleged violations of what you refer to as the 2023 EPM's "Speech Restriction."

Please let me know if you have additional questions.

Sincerely,

Nathan Arrowsmith
Unit Chief Counsel

# EXHIBIT B

# Holtzman Vogel

**HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK** PLLC

May 21, 2024

Adrian Fontes
Office of the Secretary of State
1700 W Washington St Fl 7
Phoenix AZ 85007-2808

Kris Mayes
Office of the Arizona Attorney General
2005 North Central Avenue
Phoenix, Arizona 85004-1592

*Re:  Enforcement of Elections Procedures Manual's Speech Provision*

Dear Secretary Fontes and Attorney General Mayes:

We write to you on behalf of Plaintiffs Arizona Free Enterprise Club ("Free Enterprise"), Phillip Townsend, and America First Policy Institute ("AFPI") (collectively, "Plaintiffs"), who have currently filed suit against your respective offices regarding the 2023 Elections Procedures Manual ("2023 EPM"). *See Arizona Free Enterprise Club v. Fontes*, No.  CV2024-002760 (Maricopa Cnty. Sup. Ct. 2024). We are writing to you regarding Chapter 9, Section III.D of the 2023 EPM, pp. 181–83 ("Speech Restriction"), which is one of the provisions challenged in that suit.

Specifically, we are writing to request that both of your offices unequivocally and specifically disavow all enforcement of the Speech Restriction, which—in our view–violates the state and federal constitutions, and exceeds the bounds of the Arizona statutes that it purports to implement. To be clear, we are *not* requesting that you disavow enforcement of the underlying criminal statutes that the Speech Restriction purports to implement—*i.e.*, A.R.S. §§ 16-1013 & -1017. We are instead requesting that (1) Secretary Fontes provide a binding and unequivocal commitment to forego making any criminal referrals for alleged violations of the 2023 EPM's Speech Restriction under any circumstances, and (2) Attorney General Mayes provide a binding and unequivocal commitment to not prosecute anyone for alleged violations of the 2023 EPM's Speech Restriction under any circumstances. For avoidance of doubt, we are requesting that *all* relevant prosecutions for alleged threatening, harassing, intimidating, or coercing conduct as it relates to voting would be brought under A.R.S. §§ 16-1013 and -1017 or other applicable statutes, and not under A.R.S. § 16-452(C) for alleged violations of the 2023 EPM's Speech Restriction.

The Secretary and Attorney General have been notified that the Speech Restriction may raise constitutional free speech concerns. Notably, the Speaker of the Arizona House and the President of the Arizona Senate specifically objected to the Speech Restriction in the draft EPM in a letter dated August 14, 2023. That letter explicitly contended that the Speech Restriction was "facially overbroad" and urged the Secretary to "to excise from this provision all content that does not bear a direct and immediate textual nexus to the plain terms of A.R.S. § 16-1013 or other applicable statutes." But the Secretary does not appear to have made any material changes to the Speech Restriction in response to the legislative leaders' comments. And the Attorney General approved the Speech Restriction as written despite its obvious legal infirmities.

Given that the Secretary had the authority and constitutional duty to narrow the Speech Restriction, his retention of the provision as originally drafted appears to constitute clear evidence that he intends to enforce the provision as drafted by him. Similarly, because the Attorney General could have objected to the proposed 2023 EPM Speech Restriction on the basis of the potential free speech concerns and demanded a narrowing of the provision, her refusal to do so indicates her intent to enforce the provision as drafted and approved by her.

It bears emphasis that Plaintiffs stand against voters being harassed, intimidated, threatened, attacked, or otherwise prevented from freely and fairly casting their votes. Sections 16-1013 and -1017 were enacted to prohibit such conduct, and provide sufficient enforcement mechanisms to achieve their ends. Those statutes, which include the critical (1) *mens rea* requirement imposed by the Legislature and (2) a requisite nexus to voting/refraining from voting, can and should be enforced as written.

However, the Speech Restriction, as drafted and approved by your offices, is unconstitutional in several ways, including that it: (1) requires no proof of *mens rea*, despite the fact that §§ 16-1013 and 16-1017 both mandate a *mens rea* of "knowingly" as a material element for criminal liability; (2) purports to ban speech based purely on alleged offensiveness, which it does not define; (3) is a viewpoint-based restriction on speech; (4) impermissibly prohibits speech in public forums, including on the basis of content; (5) impermissibly regulates speech in polling places because it is viewpoint-based and incapable of reasoned application, and (6) is so vague that it violates due process.

In short, the 2023 EPM Speech Restrictions cannot be constitutionally enforced. We therefore request that you unequivocally disavow all enforcement of it by 5pm on Friday, May 31, 2024. Similarly, to the extent that either the Secretary and/or Attorney General intend to enforce a more limited construction of the Speech Restriction than its actual text provides, we ask that you provide a definitive version of that narrower construction by 5pm on Friday, May 31, 2024.

We look forward to your response. If you have any questions, please do not hesitate to contact us.

Respectfully,

/s/ Andrew Gould

**HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK PLLC**
Andrew Gould
2575 East Camelback Road,
Suite 860
Phoenix, Arizona 85016
(602) 388-1262
agould@holtzmanvogel.com

cc: Sambo Dul, General Counsel for Governor Katie Hobbs