**Case No. 24-6703**

---

## THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

AMERICAN ENCORE, *et al.*,

*Plaintiffs-Appellees,*

*v.*

ADRIAN FONTES, *et al.*,

*Defendants-Appellants.*

---

On Appeal from the United States District Court
for the District of Arizona

No. 2:24-cv-01673-MTL

---

### APPELLANTS' EXCERPTS OF RECORD – VOLUME 3 OF 5

---

Nathan T. Arrowsmith (No. 031165)     Karen J. Hartman-Tellez (No. 021121)
Joshua M. Whitaker (No. 032724)       Kara Karlson (No. 029407)
Luci D. Davis (No. 035347)            Kyle Cummings (No. 032228)
Nathan.Arrowsmith@azag.gov            Karen.Hartman@azag.gov
Joshua.Whitaker@azag.gov              Kara.Karlson@azag.gov
Luci.Davis@azag.gov                   Kyle.Cummings@azag.gov
ACL@azag.gov                          AdminLaw@azag.gov

*Attorneys for Defendant/Appellant*     *Attorneys for Defendant/Appellant*
*Arizona Attorney General*              *Arizona Secretary of State*
*Kristin K. Mayes*                      *Adrian Fontes*

OFFICE OF THE ARIZONA
ATTORNEY GENERAL (Firm #14000)
2005 North Central Ave.
Phoenix, Arizona 85004
(602) 542-3333



IN THE

# COURT OF APPEALS

STATE OF ARIZONA

DIVISION ONE

DIVISION ONE
FILED: 09/27/2024
AMY M. WOOD,
CLERK
BY: AMI

| | |
|---|---|
| ARIZONA FREE ENTERPRISE CLUB, et al., | Court of Appeals Division One No. 1 CA-CV 24-0667 |
| Plaintiffs/Appellees, | |
| v. | Maricopa County Superior Court No. CV2024-002760 |
| ADRIAN FONTES, et al., | |
| Defendants/Appellants. | DEPARTMENT D |

**ORDER GRANTING STAY IN PART, DENYING STAY IN PART**

The Court, Presiding Judge Michael S. Catlett, Judge Jennifer M. Perkins, and Vice Chief Judge Randall M. Howe, has considered Appellants' Motion for Stay Pending Appeal, or, Alternatively to Expedite Briefing Schedule, the response, and reply.

A party seeking a stay must establish (1) a strong likelihood of success on the merits, (2) irreparable harm if the stay is not granted, (3) the harm to the appellants outweigh the harm to appellees, and (4) public policy favors granting the stay. *Smith v. Ariz. Citizens Clean Elections*, 212 Ariz. 407, 410, ¶¶ 9-10 (2006).

Based on the parties' arguments and review of the record, in the exercise of the court's discretion,

**ER-285**

**IT IS ORDERED** that the motion for stay pending appeal is granted in part.

**IT IS FURTHER ORDERED** that the superior court's preliminary injunction is stayed pending appeal as to the following portions of Chapter 9, Section III(D), of the Election Procedures Manual:

- First paragraph, second sentence.
- Second paragraph in its entirety (including the three bullet point subsections).

**IT IS FURTHER ORDERED** that the foregoing stay pending appeal shall remain in place until further order of the Court.

**IT IS FURTHER ORDERED** that the motion for stay pending appeal is otherwise denied.

The court has also considered Appellants' alternative request to expedite the briefing schedule.

**IT IS FURTHER ORDERED** denying the request without prejudice to the parties filing briefs as quickly as they wish before the due dates.

_____/s/_____
Michael S. Catlett, Presiding Judge

A copy of the foregoing
was sent to:

Andrew W. Gould
Drew Curtis Ensign
Dallin B Holt
Brennan AR Bowen
Daniel Tilleman
Timothy A LaSota
Richard P Lawson
Jessica H Steinmann
Patricia Nation
Michael Berry
Karen J Hartman-Tellez
Kara Karlson
Kyle R Cummings
Nathan Arrowsmith
Joshua M Whitaker
Clinten N Garrett
Luci Danielle Davis
Lalitha D Madduri
Justin Baxenberg
Julie Zuckerbrod
Tyler Bishop
Roy Herrera
Daniel A Arellano
Jillian Andrews
Austin T Marshall
Matthew R Koerner
Alexis E Danneman
John S. Bullock
Brandon Delgado

# Exhibit B

Order Clarifying Ruling, dated August 8, 2024

*Arizona Free Enterprise Club et al. v. Fontes et al.*,

CV 2024-002760 (Maricopa County Superior Court)

1 **KRISTIN K. MAYES**
2 **ATTORNEY GENERAL**
  (Firm State Bar No. 14000)
3
  Nathan T. Arrowsmith (No. 031165)
4 Joshua M. Whitaker (No. 032724)
5 Shannon Hawley Mataele (No. 029066)
  Office of the Arizona Attorney General
6 2005 North Central Avenue
7 Phoenix, Arizona 85004-1592
  (602) 542-3333
8 Nathan.Arrowsmith@azag.gov
  Joshua.Whitaker@azag.gov
9 Shannon.Mataele@azag.gov
10 ACL@azag.gov

11 *Attorneys for Arizona Attorney General*
   *Kristin K. Mayes*
12
13
14                **SUPERIOR COURT OF ARIZONA**

15                   **MARICOPA COUNTY**

16
   ARIZONA FREE ENTERPRISE CLUB,      Case No. CV2024-002760
17 an   Arizona   non-profit  corporation;
   PHILLIP  TOWNSEND,  an  Arizona      **FORM OF ORDER**
18 individual; AMERICA FIRST POLICY
19 INSTITUTE, a non-profit corporation,   (Assigned to the Hon. Jennifer
                                          Ryan-Touhill)
20                     Plaintiffs,
21        vs.
22 ADRIAN   FONTES,  in  his  official
23 capacity as Arizona Secretary of State;
   and  KRIS  MAYES,  in  her  official
24 capacity as Arizona Attorney General,
25                     Defendants.
26
27
28
                        **ER-289**

1    Plaintiffs filed a First Amended Complaint on April 15, then moved for a
2    preliminary injunction on May 28. Defendants moved to dismiss on May 31. The Court
3    held argument and an evidentiary hearing on July 29, then issued its ruling on August 5.

4    This order incorporates the August 5 ruling, but clarifies the scope of the ruling on
5    Plaintiffs' constitutional claims. The ruling was intended to address what Plaintiffs refer
6    to as the "Speech Restriction," which they defined as chapter 9, § III(D) of the 2023 EPM
7    (pgs. 181-83). *See* Plaintiffs' First Amended Complaint, ¶ 1; Plaintiffs' Motion for
8    Preliminary Injunction, pg. 1.

9    The Court clarifies that the declaratory relief and preliminary injunction as to
10   Plaintiffs' constitutional claims in the August 5 ruling are limited to chapter 9, § III(D) of
11   the 2023 EPM, not § III(A), (B), or (C), which Plaintiffs did not challenge. The August 5
12   ruling is accordingly revised as follows (revisions underlined):

13   • Striking the sentence on page 18 "**IT IS ORDERED** declaring chapter 9, section
14      III(A)-(D) of the 2023 EPM unenforceable" and replacing it with "**IT IS ORDERED**
15      declaring chapter 9, section III(D) of the 2023 EPM unenforceable."

16   • Striking the sentence on page 18 "**IT IS FURTHER ORDERED** Defendants are
17      enjoined from enforcing the restrictive speech provisions during the pendency of this
18      litigation" and replacing it with "**IT IS FURTHER ORDERED** Defendants are
19      enjoined from enforcing chapter 9, section III(D) of the 2023 EPM during the
20      pendency of this litigation."

21   Otherwise the August 5 ruling remains the same. That ruling and this order resolve
22   Plaintiffs' motion for a preliminary injunction and Defendants' motions to dismiss. *Further,*
23   *the court expressly determines there is no just*
24   *reason for delay and this judgment, incorporating*
     DATED this ___ day of August, 2024. *the courts aug. 5, 2024,*
25   *ruling, is entered*
26   *under Rule 54(b).*
27   By _____
28   The Honorable Jennifer Ryan-Touhill

1

ER-290

Exhibit A

Ruling dated August 5, 2024

*Arizona Free Enterprise Club et al. v. Fontes et al.*,

CV 2024-002760 (Maricopa County Superior Court)

Clerk of the Superior Court
*** Electronically Filed ***
08/06/2024 8:00 AM

<div align="center">

## SUPERIOR COURT OF ARIZONA
## MARICOPA COUNTY

</div>

CV 2024-002760                                                08/05/2024


                                                CLERK OF THE COURT
HONORABLE JENNIFER RYAN-TOUHILL                      A. Meza
                                                      Deputy



ARIZONA FREE ENTERPRISE CLUB, et al.        DANIEL W TILLEMAN

v.

ADRIAN FONTES, et al.                       KARA MARIE KARLSON


                                            NATHAN T ARROWSMITH
                                            DAVID ANDREW GAONA
                                            ROY HERRERA
                                            TIMOTHY A LASOTA
                                            ALEXIS E DANNEMAN
                                            JOHN S BULLOCK
                                            JUDGE RYAN-TOUHILL


<div align="center">

## RULING

</div>

Before the Court is Plaintiffs' May 28, 2024, *Motion for Preliminary Injunction,* Defendant Attorney General's (AG) June 17, 2024, *Response to Plaintiffs' Motion for Preliminary Injunction*, and Plaintiffs' July 1, 2024, *Reply In Support of Plaintiffs' Preliminary Injunction Motion*. Also before the Court is AG's May 31, 2024, *Motion to Dismiss* (MTD), Arizona Secretary of State's (Secretary) May 31, 2024, *Motion to Dismiss and Joinder in Arizona Attorney General's Motion to Dismiss* (MTD), Plaintiffs' July 1, 2024, *Consolidated Response to Defendants'* MTD *and Reply in Support of Plaintiffs' Preliminary Injunction Motion*, AG's July 19, 2024, *Reply in Support of* [MTD], and Secretary's July 22, 2024, *Reply in Support of* [MTD].

On July 29, 2024, the Court held oral argument on the motions to dismiss and an evidentiary hearing on the request for a preliminary injunction. The Court now rules.

### 2023 Elections Procedures Manual

The Legislature, acting within its authority, delegated to the Secretary the authority and responsibility to create rules and procedures for voting. A.R.S. § 16-452. Subsection A provides:

<div align="center">

**ER-292**

</div>

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2024-002760                                          08/05/2024

> After consultation with each county board of supervisors or other officer in charge
> of elections, the secretary of state shall prescribe rules to achieve and maintain the
> maximum degree of correctness, impartiality, uniformity and efficiency on the
> procedures for early voting and voting, and of producing, distributing, collecting,
> counting, tabulating and storing ballots. The secretary of state shall also adopt rules
> regarding fax transmission of unvoted ballots, ballot requests, voted ballots and
> other election materials to and from absent uniformed and overseas citizens[.]

The statute further provides "[a] person who violates any rule adopted pursuant to this section is
guilty of a class 2 misdemeanor." A.R.S. § 16-452(C). "Once adopted, the EPM has the force of
law[.]" *Ariz. Pub. Integrity All. v. Fontes*, 250 Ariz. 58, 63 ¶ 16 (2020).

In 2023, the Secretary of State, Adrian Fontes, led a review and modification of the prior
EPM to address, in part, "unprecedented scrutiny in an atmosphere of increased threats and
intimidation by those with a vested interest in sowing doubt about our elections." September 30,
2023, letter from Secretary Fontes to Governor Hobbs and Attorney General Mayes. After
receiving approved from both the Governor Hobbs and AG Mayes, the Secretary issued the
Arizona 2023 Elections Procedure Manual (EPM) in December 2023. P. Ex. 4. Lawsuits
followed.[1]

The EPM is written to "ensure election practices are consistent and efficient throughout
Arizona." *McKenna v. Soto*, 250 Ariz. 469, 473 ¶ 20 (2021). The Secretary has the authority to
prescribe rules to achieve this result. *Id*.; *see* A.R.S. § 16-452(A). "The EPM also contains
guidance on matters outside these specific topics, including candidate nomination petition
procedures[.] These other topics, however, fall outside the mandates of § 16-452 and do not have
any other basis in statute." *Id*. "Accordingly, [these directives do] not have the force of law, and
simply act[ ] as guidance." *Id*. Contrast this with statutes themselves: "[E]lection statutes are
mandatory, not 'advisory,' or else they would not be law at all. If a statute expressly provides that
non-compliance invalidates the vote, then the vote is invalid." *Miller v. Picacho Elementary
School Dist. No. 33*, 179 Ariz. 178, 180 (1994).

### **Amended Complaint**

Three Plaintiffs exist: Arizona Free Enterprise Club, Philip Townsend, and America First
Policy Institute. Two Defendants exist: Adrian Fontes, Arizona Secretary of State, and Kris Mayes,
Arizona Attorney General. In their *First Amended Complaint* (FAC), filed April 15, 2024,
Plaintiffs alleged Defendants violated the Arizona Constitution and Arizona statutes.

---

[1] CV2024-001942, CV2024-050553, and CV2024-002760.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2024-002760                                                08/05/2024

Plaintiff Arizona Free Enterprise Club is an Arizonan non-profit organization that "is regularly involved in election activity in Arizona." FAC, p. 9 ¶ 33. The group includes registered voters. Plaintiff Philip Townsend is a registered voter who lives in Yuma County, Arizona. *Id.* at ¶ 38. Plaintiff America First Policy Institute is a non-profit organization that "works at the state level to get legislation enacted or stopped[.]" *Id.* at ¶ 39. This non-profit also trains poll workers, conducts workshops, and operates throughout the United States. Both Defendants are part of the Executive branch of government.

Plaintiffs first allege that the EPM's newest terms on speech restrictions "contains some of the most onerous restrictions on speech" and "is breathtakingly broad in its application." FAC, p. 2 ¶¶ 1-2. Not only should the Court reject the speech restrictions for overbreadth, the Court should also reject the EPM's speech restrictions for conflicting with, and revising, the applicable criminal code associated with voter intimidation. A.R.S. § 16-1013. Plaintiffs contend the EPM changes the *mens rea* of the conduct, adds "harassment" into the law, and removes any correlation between the violative actions (e.g., threatening) and the act of voting. FAC, pp. 2-3 ¶¶ 5-6. Per Plaintiffs, the Secretary has violated the separation of powers by rewriting the law. Moreover, the EPM's speech restriction is unconstitutional because it violates our Constitution.

Plaintiffs also take issue with the EPM's permission for sending out absentee ballots beyond what A.R.S. § 16-544(B) allows (e.g., in the military or otherwise qualifies pursuant to the absentee voting act), for changing a status from "cancellation" to "inactive," and its modifications of signature verification rules.[2] *See* FAC, generally. The scope of the FAC encompasses violations of the Arizona Constitution and statutes, and does not assert any claim under federal law or the United States Constitution. *Id.*

Finally, Plaintiffs allege the EPM illegally exceeds its authority by addressing voter registration, violates an effective date for a new law regarding active voter lists, facilitates mailing temporary ballots outside of Arizona in violation of law, improperly vests with the secretary the power to extend deadlines in case of emergency, changes procedures for inaccurate signatures, and misstates (changes) circulator registrations. FAC, generally.

Defendants have not filed answers to the FAC but instead seek dismissal of the lawsuit.

## Preliminary Injunction

Plaintiffs sought a preliminary injunction on May 28, 2024; Defendants oppose. In that request, Plaintiffs request an interim order finding the speech restrictions unconstitutional and unenforceable and an order enjoining the State from sending out one-time out-of-state ballots. Just

---

[2] Plaintiffs later withdrew this claim.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2024-002760                                            08/05/2024

like the FAC, Plaintiffs argue they have standing to make these requests, they are likely to prevail, irreparable injury will result, and preventing the State from enforcing or implementing their disputed provisions serves both public policy and public interests.

Defendants filed responses in opposition to Plaintiffs' request, arguing Plaintiffs fail to meet the four-factor test for an injunction, Plaintiffs lack standing, the issue(s) is (are) not ripe, no serious questions exist necessitating the Court's involvement, and, ultimately, Plaintiffs have no likelihood of success on the merits. Defendants also argue that Plaintiffs failed to analyze all elements of a preliminary injunction and this omission is fatal to Plaintiffs' claims.

## **Motions to Dismiss**

Arizona law disfavors 12(b)(6) motions to dismiss. Ariz. R. Civ. P.; *Acker v. CSO Chevira*, 188 Ariz. 252 (Ct. App. Div. 1 1997); *State ex rel. Corbin v. Pickrell*, 136 Ariz. 589, 594 (1983). The narrow question before this Court is whether Plaintiffs' alleged facts are sufficient to allow Plaintiffs to prevail. *Coleman v. City of Mesa*, 230 Ariz. 352, 363 ¶ 46 (2012)(citation omitted). The Court must "assume the truth of the well-pled factual allegations and indulge all reasonable inferences therefrom." *Cullen v. Auto-Owners Ins. Co.,* 218 Ariz. 417, 419 ¶ 7 (2008). After consideration of Plaintiff's allegations and assuming the truth therein, this Court finds that Defendants are and are not entitled to dismissal "as a matter of law, on any interpretation of the facts." *Id*.

## **Jurisdiction, Legal Theories**

### Separation of Powers

Our constitution allocates power between three branches of government. Article 3 of the Arizona Constitution states:

> The powers of the government of the State of Arizona shall be divided into three separate departments, the Legislative, the Executive, and the Judicial; and, except as provided in this Constitution, such departs shall be separate and distinct, and no one of such departments shall exercise the powers properly belonging to either of the others.

The Legislature has the power to enact "laws to secure the purity of elections and guard against abuses of the elective franchise." Ariz. Const. art. 7, § 12. "The legislature has the exclusive power to declare what the law should be." *State v. Prentiss*, 163 Ariz. 81, 85 (1989).

The judiciary has judicial power but is prohibited from exercising executive or legislative powers. Ariz. Const. arts. 3, 6, § 1. "[L]ong ago we recognized that courts as an institution are not involved in the wisdom of legislation. [The courts'] sole interest is focused on whether the

## SUPERIOR COURT OF ARIZONA
### MARICOPA COUNTY

CV 2024-002760                                          08/05/2024

legislation runs contrary to constitutional guarantees and whether it is arbitrary and unreasonable." *State v. Prentiss*, 163 Ariz. at 85.

The Legislature, at times, grants powers to the Executive branch to implement the necessary rules for voting. A.R.S. § 16-452(A)(e.g., "the secretary of state shall prescribe rules. . . on the procedure for early voting and voting [and for] ballots."). The delegation is specific and limited to statutory provisions. *See State v. Ariz. Mines Supply Co.,* 107 Ariz. 199, 205-06 (1971). The Executive branch may enact rules to further legislative intent (e.g., maintain uniformity and efficiency for voting procedures) and those rules may restrict behavior inconsistent with the legislative purpose. However, the Executive branch may not go beyond the authority given to it. EPM regulations that exceed the scope of "statutory authorization or contravene[ ] an election statute's purpose does not have the force of law." *Leach v. Hobbs*, 250 Ariz. 572, 576 ¶ 21 (2021).

The Secretary's authority in promulgating rules is not only limited by the Legislature's specific delegation, it is also limited by our Constitution. If the Secretary acts beyond the scope of his authority, he may be enjoined from performance of those acts.

<u>Special Action, Preliminary Injunction</u>

A party may seek judicial remedy via a special action when a party has no "equally plain, speedy, and adequate remedy by appeal[.]" Ariz. R. P. Spec. Act. 1(a). A court has special action jurisdiction when presented with any of three questions:

(a) Whether the defendant has failed to exercise discretion which he has a duty to exercise; or to perform a duty required by law as to which he has no discretion; or (b) Whether the defendant has proceeded or is threatening to proceed without or in excess of jurisdiction or legal authority; or (c) Whether a determination was arbitrary and capricious or an abuse of discretion.

Ariz. R. P. Spec. Act. 3. Mandamus is premised on equitable principles. A court retains discretion to determine what relief, if any, should be granted.

The superior court has jurisdiction over special actions pursuant to Arizona Constitution Article 6, § 18, A.R.S. §§ 12-123 ("[t]he superior court shall have original and concurrent jurisdiction as conferred by the constitution[.]"), 12-1831 (courts "shall have power to declare rights, status, and other legal relations whether or not further relief is or could be claimed."), and 12-2021 (the superior court may issue a writ of mandamus to compel another "when there is not a plain, adequate and speedy remedy at law. . .").

A court applies the traditional criteria used to decide preliminary injunctions to requests for a stay. *Smith v. Ariz. Citizens Clean Elections Comm'n*, 212 Ariz. 407, 410-11 (2006). The

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2024-002760                                    08/05/2024

moving party bears the burden of establishing need for a stay. *Clinton v. Jones*, 520 U.S. 681, 708 (1997). The moving party must show (1) a strong likelihood of success on the merits, (2) possible irreparable injury if relief is not granted, (3) a balance of hardship favors the moving party, and (4) public policy favors granting an injunction. *Shoen v. Shoen*, 167 Ariz. 58, 63 (App. 1990). Alternatively, a party may show either (1) probable success on merits and possible irreparable injury or (2) the presence of serious questions and the balance tips sharply in favor of the moving party. *Smith* at 212 Ariz. 407. "The scale is not absolute, but sliding." *Id*. at 410, ¶ 10. In 2021, the Supreme Court considered the conjunctive pairings of success on merits and possible irreparable harm versus presence of serious questions and balance of hardships. *Fann v. State*, 251 Ariz. 425, 432, ¶ 16 (2021). "Although the two tests contain different wording, the difference in wording does not change the analysis because the standard is [sliding]." *City of Flagstaff v. Arizona Department of Administration*, 255 Ariz. 7 ¶ 16 (App. 2023). "[The courts] analyze those factors on a sliding scale and do not inflexibly count them." *Toma v. Fontes,* 2024 WL 3198827 *3, ---P.3d--- (App. 2024)., *ref. Smith v. Ariz. Citizens Clean Elections Comm'n*, 212 Ariz. 407, 410 ¶¶ 9-10 (2006).

Harm is irreparable when it is "not remediable by damages." *Shoen v. Shoen*, 167 Ariz. 58, 63 (App. 1992). An underlying claim for declaratory relief cannot result in money damages—if money may remediate the problem, the harm is not irreparable. A.R.S. § 12-1831 *et seq*. "Ordinarily, *ongoing* constitutional violations cannot be remedied through money damages, rendering the harm caused by such a violation irreparable." *Toma v. Fontes,* 2024 WL 3198827 *14, ---P.3d--- (App. 2024)(emphasis in original, citation omitted).

The Court has discretion whether to grant or deny a request for a stay and a preliminary injunction.

<u>Standing</u>

A plaintiff establishes standing by alleging "a distinct and palpable injury." *Sears v. Hull*, 192 Ariz. 65, 69 ¶ 16 (1998). "[A] generalized harm shared by all or by a large class of people is generally insufficient." *Mills v. Ariz. Bd. Of Technical Registration*, 253 Ariz. 415, 423 ¶ 24 (2022). Plaintiffs are not required to be injured before the Court may address the claims. "The key inquiry in the absence of actual injury is whether an actual controversy exists between the parties." *Mills* 253 Ariz. at 424 ¶ 29. Plaintiffs argue they have standing for all the claims raised in their pleadings.

Defendants argue against standing, challenging multiple arguments raised by Plaintiffs, along with addressing various legal theories supporting dismissal. For the reasons stated in this Ruling, the Court finds Plaintiffs do and do not have standing for various claims.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2024-002760                                                 08/05/2024

Ripeness

The ripeness doctrine requires a situation in which a party has suffered an injury or if an actual controversy exists between the parties. *Arizona Downs v. Turf Paradise, Inc.,* 140 Ariz. 438, 444-45 (App. 1984); *Brush & Nib*, 247 Ariz. 269, 280 ¶ 36 (2019)("Ripeness is a prudential doctrine that prevents a court from rendering a premature decision on an issue that may never arise.")(Citation omitted).  Prudence and judicial restraint affect the Court's application of the ripeness doctrine.  *Fann v. State*, 251 Ariz. 425, 432 ¶ 11 (2021).

Defendants argue the alleged controversy is not ripe and should not be before this Court. Defendants assert Plaintiffs' requests do not identify any specific action Plaintiffs may take that could violate the EPM and, consequently, impact Plaintiffs' rights.  Plaintiffs argue to the contrary. Plaintiffs contend they have incurred an injury (e.g., chilling free speech) and the case is ripe. *Brush & Nib Studio, LC v. City of Phoenix*, 247 Ariz. 269, 280 ¶ 36 (2019).  For the reasons stated in this Ruling, the Court is unpersuaded to dismiss any claims based upon the ripeness doctrine.

Laches

The trial court has discretion over the question of laches.  *Cyprus Bagdad Copper Corp. v. Arizona Dept. of Revenue*, 196 Ariz. 5, 8 ¶ 9 (App. 1999).  "In order to bar a claim on the basis of laches, a court must find more than mere delay in the assertion of the claim.  'The delay must be unreasonable under the circumstances, including the party's knowledge of his or her right, and it must be shown that any change in the circumstances caused by the delay has resulted in prejudice to the other party sufficient to justify denial of relief.'"  *Id*., quoting *Mathieu v. Mahoney*, 174 Ariz. 456, 459 (1993).  Laches is an affirmative defense.  Ariz. R. Civ. P. 8(d)(1)(J).

The doctrine of laches only applies after consideration of the circumstances resulting in an alleged delay.  *Day v. Estate of Wiswall*, 93 Ariz. 400 (1963).  Fundamental fairness is at the heart of the laches doctrine, and will be considered by the Court.  *See, e.g., Harris v. Purcell*, 193 Ariz. 409 (1998).  Finally, even if a party delays in filing, that is not an excuse for failure to comply with the law.  *Ariz. Pub. Integrity All. v. Fontes*, 250 Ariz. 58, 65 ¶ 30 (2020).  For the reasons stated in this Ruling, the Court is unpersuaded to dismiss any claims based upon laches.

**Analysis**

The Court analyzes both MTD and addresses Plaintiffs' request for a preliminary injunction.  When considering those requests for relief, the Court also recognizes Plaintiffs' request for a stay, writ of mandamus, and declaratory relief.  The Court understands it must analyze each subject (alleged violation) request separately, along with separate consideration of standing for both the MTD and the preliminary injunction.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2024-002760                                                  08/05/2024

In argument, Defendants argue the FAC "is almost entirely comprised of legal conclusions and legal arguments and contains few, if any, factual allegations." AG MTD, p. 1 ¶ 4. Defendants provide multiple reasons for dismissal: failure to provide a basis for special action jurisdiction, lack of standing, and insufficient facts. The Court declines to dismiss the case in its entirety upon a purported technicality and instead analyzes arguments presented.

**Conduct of Elections and Election Operations**

At the outset, the Court declines to waive any standing requirement as urged by Plaintiffs. The Court will analyze standing, and all other relevant considerations, for all claims and especially for what this Court finds to be the paramount issue in the litigation: chapter 9, conduct of elections.

Chapter 9 contains law, rules, guidance, and instructions that encompass topics including setting up voting locations, opening (and closing) locations, assisting voters, and early ballot tabulation, among others. Much of the content in the chapter comports with the law, is helpful, and is necessary. Some of the chapter content goes too far. Plaintiffs are not likely to succeed on a request to eliminate the entire Chapter 9 of EPM but, frankly, this is not Plaintiffs' request. Moreover, the Court recognizes that parts of the rule (i.e., EPM) can operate without an unconstitutional restriction on freedom of speech. *See, e.g., Randolph v. Groscost*, 195 Ariz. 423, 427 ¶ 15 (1999).

Chapter 9's Audience

Defendants claim, both in pleadings and in argument, that the EPM is not directed at anyone but those poll workers, volunteers, or other professionals involved in elections. The Court admitted difficulty in understanding Defendants' arguments, pointing out that the EPM not only tells poll workers what they can and cannot do, it encompasses acts pertaining to members of the public. Upon conclusion of argument and reconsideration of pleadings, the Court is no more persuaded that the EPM only applies to poll workers, etc., versus the public.

Page 175 of the EPM belies Defendants' own argument: section (I)(A)(1) is entitled, "Instructions to Voters and Election Officers." That section focuses upon both polling works and the general public. The next page sets out content that is directed towards the public, including the words "your," "you," and "the election officers." (Citation omitted.)[3]   Page 177 informs the public about their rights for a provisional ballot, while page 178 directs a voter on how to mark a ballot. Section II is directed towards poll workers, telling them when to arrive, confirm equipment readiness, etc. Obviously that section does not pertain to the public at large—it includes clarifying

---

[3] Hereafter the Court declines to continue to say "citation omitted" when referencing chapter 9.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2024-002760                                    08/05/2024

references to "the election board" and "officer in charge." Similarly to these examples, section III regarding order and security specifically mentions voters and "a person."

**THE COURT FINDS** the EPM applies to all Arizonans, not just those professionally involved with elections or volunteering to assist in election operations.

<u>Problematic Language</u>

The Court is troubled by section III, "preserving order and security at the voting location." From pages 180 to 183, the EPM contains what this Court finds to be speech restrictions in violation of our Arizona Constitution, misstates or modifies our statutes, and fails to identify any distinction between guidance and legal mandates. The Court will highlight those portions of chapter 9 it finds troubling, impermissible or, in context, authorizes impermissible limitations on the public:

- [N]o electioneering may take place outside the 75-foot limit if it is audible from a location inside the door to the voting location.[4]
- Any activity by a person with the intent or effect of [ ] harassing, [ ] (or conspiring with others to do so) inside or outside the 75-foot limit at a voting location is prohibited.
- The officer in charge of elections has a responsibility to train poll workers and establish policies to prevent and promptly remedy any instances of voter intimidation.
- The officer in charge of elections should publicize and/or implement the following guidelines as applicable:
  - The inspector must utilize the marshal to preserve order and remove disruptive persons from the voting location.
  - Openly carrying a firearm outside the 75-foot limit may also constitute unlawful voter intimidation, depending on the context.
- Aggressive behavior, such as raising one's voice or taunting a voter or poll worker.
- Using [ ] insulting [ ] or offensive language to a voter or poll worker.
- Disrupting voting lines.
- Following voters or poll workers coming to or leaving a voting location, including to or from their vehicles.
- Intentionally disseminating false or misleading information at a voting location. . . .
- Directly confronting, questioning, photographing, or videotaping voters or poll workers in a harassing [ ] manner, including when the voter or poll worker is coming to or leaving the polling location.

---

[4] If a separate statute makes this a law, no party referenced that statute and it is not listed in the EPM.

Docket Code 926                    Form V000A                    Page 9

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2024-002760                                          08/05/2024

- Asking voters for "documentation" or other questions that only poll workers should perform.
- Raising repeated frivolous voter challenges to poll workers without any good faith basis, or raising voter challenges based on race, ethnicity, national origin, language, religion or disability.
- Posting signs or communicating messages about penalties for "voter fraud" in a harassing or intimidating manner.

<u>Standing</u>

Plaintiffs "must allege a distinct and palpable injury" to gain standing. *Sears v. Hull*, 192 Ariz. 65, 69, ¶ 16 (1998). "However, we apply a more relaxed standard for standing in mandamus actions." *Ariz. Pub. Integrity All. v. Fontes*, 250 Ariz. 58, 62 ¶ 11 (2020). A.R.S. § 12-2021 provides standing for a person who is "beneficially interested" in a performance of a legal duty, including "an action to compel a public official to perform an act imposed by law." *Id.* The intent is "to promote the ends of justice." *Id.* (citation omitted).

Vague allegations of harm are insufficient to confer standing. "[A] generalized harm shared by all or by a large class of people is generally insufficient." *Mills v. Ariz. Bd. Of Technical Registration*, 253 Ariz. 415, 423 ¶ 24 (2022). Plaintiffs allege they have standing to challenge the EPM due to a "credible threat of prosecution." FAC, p. 13 ¶ 70 (quotation and citation omitted). "Standing does not turn on the *merits* of a party's arguments. We instead accept a plaintiff's allegations and then analyze whether there is standing." *Toma v. Fontes,* 2024 WL 3198827 *5, --P.3d--- (App. 2024)(emphasis in original); *Brewer v. Burns*, 222 Ariz. 234, 238 ¶ 14 (2009).

Plaintiffs are not required to be injured before the Court may address the claims. Here, for example, Plaintiffs have alleged they fear prosecution if they violation the speech restrictions contained in the EPM and have alleged increased costs and cumbersome implementation measures if the speech restrictions remain in place. Plaintiffs allege they have "a real and present need to know whether the [EPM] is constitutional and can therefore" result in possible prosecution and/or increased costs to adhere to restrictions. *Id*. at 425 ¶ 30. Plaintiffs request relief under Arizona's Uniform Declaratory Judgments Act, A.R.S.§ 12-1831 to -1846 (UDJA). The act provides that "[a]ny person. . . whose rights, status or other legal relations are affected by a statute. . . may have determined any question of construction or validity arising under the [statute] and obtain a declaration of rights, status or other legal relations thereunder." A.R.S § 12-1832. If rights are affected by a statute, a plaintiff "need not demonstrate past injury or prejudice so long as the relief sought is not advisory." *Ariz. Sch. Bds. Ass'n, Inc. v. State*, 252 Ariz. 219, 224 ¶ 16 (2022)(citation omitted). "Although a declaratory judgment action is remedial and should be 'liberally construed

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2024-002760                                          08/05/2024

and administered,' a plaintiff must have 'an actual or real interest in the matter for determination.'"
*Id.* (citation omitted).

The 2024 election cycle has begun; while the EPM remains in effect, Plaintiffs contend they have incurred compliance costs. *Response* to MTD p. 13 ¶ 5. Additionally, beyond costs incurred, Plaintiffs point to allegations that the Secretary modified statutory language for criminal referrals and the AG approved the proposed language, demonstrating both Defendants will seek to enforce those provisions when violated. *Id.* at p. 14 ¶ 2. (Later, the AG has indicated disavowal of enforcement provisions but Plaintiffs argue the legal analysis is incorrect, thus provided Plaintiffs with no reassurance that their members will avoid prosecution.[5]) Finally, Plaintiffs contend their speech is chilled by the EMP and, thus, it is unconstitutional. For the reasons stated in this Ruling, the Court finds an actual controversy exists between the parties.

Scot Mussi testified for Plaintiff Free Enterprise Club; Mr. Mussi explained that the organization engages in many activities, including going to polling places on election day to hand out flyers. Depo. Scot Mussi, 10:22. Mr. Mussi admitted that he does not know of anyone arrested, prosecuted, or threatened with prosecution for handing out flyers or any other "violation" of the EPM. Depo. Scot Mussi, 13:19. But Mr. Mussi expressed concerns about prosecution, along with confusion about the speech restrictions in the EPM. The witness opined the EPM's language was "vague and ambiguous" about election activities and, despite assurances from the AG, a threat of prosecution remains. Depo. Scot Mussi, 17:25. Mr. Mussi explained that the organization would "have to make sure that we're properly educating and training our employees to make sure that they comply with it. . . . We're going to have to get consistent legal guidance to comply with all this. It's going to cost a lot of money." Depo. Scot Mussi, 22:12-18. Mr. Mussi further testified that some of the EPM's prohibitions "could be interpreted differently by different people." Depo. Scot Mussi, 31:8. He explained, "What people consider threatening, harassing, or intimidating— those are terms that, you know, you know, that we use the wrong word on a flyer, they might think that it's threatening or harassing and would give an election official the ability to force us to have to leave or can lead to other consequences." Depo. Scot Mussi, 39:17-22.

The Court heard from Phillip Townsend, a Yuma resident. Mr. Townsend reported concern about speech restrictions beyond the 75-foot limit, testifying "that has a potential to curtail my speech, my free speech, because I'm concerned about being prosecuted potentially for whatever somebody might decide they want to prosecute me for." Depo. Phillip Townsend, 10:11-14. Mr. Townsend expressed his passion for politics and stated, "I speak loudly oftentimes, but somebody maybe could misconstrue as being aggressive, but it's just passion." Depo. Phillip Townsend, 15:14-15. He testified, "So in reviewing [the EPM] and knowing about this, I am attempting to

---

[5] Plaintiffs also argue the County Attorney's Office may choose to prosecute.

Docket Code 926                         Form V000A                         Page 11

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2024-002760                                              08/05/2024

curtail my speech so as I'm not offensive, I'm not loud, I'm not intimidating to people. So I feel like this is chilling my right to speak out as I normally would." Depo. Phillip Townsend, 15:20-24. Like Mr. Mussi, Mr. Townsend testified he has not been threatened with prosecution for anything he's said. But Mr. Townsend provided specific examples of instances wherein he self-censored because of the EPM. For example, during interviews, the witness stated the EPM caused him "to not be perhaps as frank and aggressive as I would have normally been." Depo. Phillip Townsend, 17:18-19. Throughout his testimony, Mr. Townsend had many examples of circumstances at which he tempered his speech and future situations in which it may occur.

Catharine Cypher testified on behalf of the America First Policy Institute. The Plaintiff does not have a specific membership but rather a "grassroots network of people that we work with." Depo. Catharine Cypher, 8:5-6.[6] Ms. Cypher testified to the vagueness of the EPM, which creates difficulty in educating people on what is acceptable on election day. She stated the organization "need[s] to make sure that we are abiding by the laws of that state and we're not telling people—influencing people to do things that are against the law[.]" Depo. Catharine Cypher, 23:14-17. Ms. Cypher talked about the organization's costs related to trainings, opining that the organization has to conduct additional training for the general election in November 2024, but at the same time, acknowledging that training materials are revised in standard practice.

With respect to Plaintiffs' claims of speech infringement, Ms. Cypher testified that the EPM required additional training and will "incredibly suppress turnout to the trainings and individuals wanting to participate." Depo. Catharine Cypher, 59:11-13. Ms. Cypher testified that the EPM's restrictions resulted in the organization's reticence or unwillingness to sell or distribute merchandise to participants, not knowing how to comply with the EPM. The witness testified, "[W]hat defines these acts that we've been discussing[?] And I'm not seeing anywhere that, you know—if somebody wears a shirt that upsets another person, I mean, what—how do you mitigate that?" Depo. Catharine Cypher, 74:15-17.

Plaintiffs alleged the EPM contains multiple instances of speech restriction, which are unconstitutional. Plaintiffs contend the "harassment provision" violates Arizona's Free Speech Clause. FAC, p. 16 ¶ 84. Defendants' inclusion of language in the EPM that bans "[a]ny activity by a person with the intent or effect of threatening, harassing, intimidating, or coercing voters (or conspiring with others to do so) inside or outside the 75-foot limit at a voting location is prohibited" is likewise unconstitutional. FAC, p. 17 ¶ 90, quoting EPM Chapter 9, section 3(D)(emphasis omitted). Plaintiff alleges Defendants have violated the Free Speech Clause by criminalizing protected speech. FAC, p. 19 ¶ 101. That criminalization is also unlawful for improperly amending a criminal statute. FAC at ¶ 102. The improper amendment, per Plaintiffs, not only

---

[6] She later testified that the word "membership" is applicable to the organization. Depo. Catharine Cypher, 52.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2024-002760                                      08/05/2024

violates a person's free speech but also violates the Due Process Clause for failure to provide notice to the public of a change in the law.  FAC, p. 9 ¶¶ 104-106.

Defendants not only dispute Plaintiffs' interpretation of chapter 9, Plaintiffs argue that the doctrine of laches should prevent Plaintiffs from moving forward in this case.  The Court is unpersuaded. Although Defendants reference prior EPMs that contain the same or strikingly similar language, this does not mean that Plaintiffs (1) knew of the language or, pertaining to Plaintiff America First, (2) the organization existed when prior EPMs were issued.  Moreover, simply because time has passed between the first instance when the Secretary used this language (e.g., 2019) and now, that by itself fails to show how Defendants relied upon the passage of time to their detriment.  Finally, regardless of when Plaintiffs filed suit, laches is not a defense to an unconstitutional act.

Defendants likewise fail on their ripeness argument: because Plaintiffs claim they have incurred an injury (e.g., chilling free speech), the case is ripe.  *Brush & Nib Studio, LC v. City of Phoenix*, 247 Ariz. 269, 280 ¶ 36 (2019).  Defendants ignore "the fact that [Plaintiffs] challenge[ ] the constitutionality of" the speech restrictions contained in the EPM.  *Fann v. State*, 251 Ariz. 425, 432 ¶ 13 (2021).  Because the EPM has the force of law, because the EPM went into effect at the end of December 2023, and because it affects Plaintiffs, "[t]he case is ripe for decision." *Id*. at ¶ 14.  Moreover, because Plaintiffs allege the EPM affects their freedom of speech, Plaintiffs claim they have suffered a constitutional injury.

Even if Plaintiffs are not defeated by either a laches or ripeness argument, Defendants argue that Plaintiffs lack standing because Plaintiffs have misunderstood or misinterpreted the issues presented in this case.  What Defendants fail to recognize is that their alternative legal theories and interpretations—even if correct—do not defeat standing.  *Toma v. Fontes,* 2024 WL 3198827 *6, ---P.3d--- (App. 2024).  As previously stated by our courts, "[D]efendants cannot defeat standing merely by assuming victory." *Id*. (quoting *Brewer v. Burns*, 222 Ariz. 234, 238 ¶ 14 (2009).  Regardless of whether Plaintiffs have organizational harm or identified particularized harm to any member, the Court finds that Plaintiffs have standing because of the presence of a serious question and, pertaining to Phillip Townsend, actualized harm.  Mr. Townsend asserts his free speech is chilled because of the EPM and provided specific facts that he believes supports his claim—this is an (alleged) injury.  *See, e.g., Brush & Nib Studio, LC v. City of Phoenix*, 247 Ariz. 269 (2019).

<u>Speech Restrictions</u>

Arizona has a law that protects voters: A.R.S. § 16-1013.  It is unlawful for a person to knowingly do any of the following:

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2024-002760                                            08/05/2024

1.  Directly or indirectly, to make use of force, violence or restraint, or to inflict or
threaten infliction, by himself or through any other person, of any injury, damage,
harm or loss, or in any manner to practice intimidation upon or against any person,
in order to induce or compel such person to vote or refrain from voting for a
particular person or measure at any election provided by law, or on account of such
person having voted or refrained from voting at an election.

2.  By abduction, duress or any forcible or fraudulent device or contrivance
whatever, to impeded, prevent or otherwise interfere with the free exercise of the
elective franchise of any voter, or to compel, induce or to prevail upon a voter either
to cast or refrain from casting his vote at an election, or to cast or refrain from
casting his vote for any particular person or measure at an election.

§ (A)(1) and (2).  Likewise, Arizona has a law that defines "attempt" and when it may apply:
A.R.S. § 13-1001(A).  Title 13, arguably, has other provisions that can be used in conjunction with
A.R.S. § 16-1013, including solicitation, conspiracy, and facilitation.  All of these laws apply to
all people in Arizona, including those who may seek to knowingly intimidate voters or do, in fact,
intimidate voters.  Nowhere in A.R.S. § 16-1013 is the word "harassment" used.  This has a very
specific legal (criminal) definition:

A.  A person commit harassment if the person knowingly and repeatedly commits
an act or acts that harass another person or the person knowingly commits any one
of the following acts in a manner that harasses:

1.  Contacts or causes a communication with another person. . . .

2.  Continues to follow another person in or about a public place after being asked
by that person to desist.

3.  Surveils or causes a person to surveil another person.

. . .

E.  For the purposes of this section, "harass" means conduct that is directed at a
specific person and that would cause a reasonable person to be seriously alarmed,
annoyed, humiliated or mentally distressed. . . .

A.R.S. § 13-2921.

These laws apply everywhere—a person cannot intimidate or threaten another voter,
regardless of where the act occurs.  Likewise, a person cannot harass another, regardless of where
the act occurs.  Problematically, the EPM not only changes the *mens rea* of these crimes but also

Docket Code 926                    Form V000A                         Page 14

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2024-002760                                        08/05/2024

inserts a subjective impression (i.e., "or effect").  Although the EPM raises the burden (from knowingly to intentional), the change remains impermissible.  The Secretary has no authority to change a *mens rea*, regardless of the objective of the language.  Moreover, neither law allows for a subjective belief of the alleged target of the crime but rather focuses upon the acts of the criminal (e.g., force, violence, infliction) or the victim ("a reasonable person").  The relevant EPM language is also impermissible.  Contrasting this terminology in the EPM with the handout provided to law enforcement, the handout cites the actual law, not the Secretary's interpretation or expansion of same.  D. Ex. 7.

        The Secretary can include the word "harassment" in the EPM—it is against the law to harass another.  However, the Secretary did not reference the correct statute but, instead, included the term when citing A.R.S. § 16-1013.  Moreover, the EPM's examples focus upon the actor, not a "reasonable person" who may be seriously alarmed, annoyed, etc.  (E.g., "aggressive behavior, such as raising one's voice. . ." or "using. . . offensive language to a voter or poll worker.")  Contrary to Defendants' arguments, the EPM is expanding criminal liability for acts that may not otherwise fall under A.R.S. § 13-2921.  And even in those situations where criminal liability is not a realistic outcome (e.g., a county attorney declines to prosecute), a person may nevertheless be removed from the polling location and unable to cast their ballot.  Regarding prosecution, the Court is unpersuaded by Defendants' argument that no one has been prosecuted and no one will likely be prosecuted for these crimes in a voting context, and, therefore, this basis for standing is inapplicable.  It does not matter whether someone was prosecuted in the past or if one law enforcement official has promised not to prosecute in the future; the threat of prosecution remains and argument during a contested court case is no guarantee of future (in)action.

        Defendants urge this Court to apply *U.S. v. Rumely*: "[I]t is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided."  345 U.S. 41, 45 (1953).  If this Court can avoid such it should do so and find that "in the choice of fair alternatives that one construction may raise serious constitutional questions avoided by another." *Id.*  Our Supreme Court acted consistently with this position by finding that when there is a reasonable basis for a statute, even when debatable, "we will uphold it unless it is clearly unconstitutional." *Fann v. State*, 251 Ariz. 425, 433 ¶ 23 (2021).  However, "a statute cannot circumvent or modify constitutional requirements[.]" *Id.* at ¶ 24.

        The Court is unpersuaded by Defendants' argument that the EPM does not restrict speech.  "[W]hen public officials . . . change the law based on their own perceptions of what they think it *should* be, they undermine public confidence in our democratic system and destroy the integrity of the electoral process." *Ariz. Pub. Integrity All. v. Fontes*, 250 Ariz. 58, 61 ¶ 4 (2020)(emphasis in original).  The Court finds that in some instances this is exactly what the EPM does.  For example, the EPM prohibits:

Docket Code 926                    Form V000A                          Page 15

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2024-002760                                          08/05/2024

- Any activity with the effect of harassing another.
- Unspecified "disruptive" behavior.
- Unspecified "aggressive" behavior.
- Raising one's voice.
- Insulting or offensive language.
- Directly questioning voters or poll workers in a harassing manner.
- Raising repeated frivolous voter challenges.
- Posting signs or communicating messages in a harassing or intimidating manner.

EPM (paraphrased). Defendants point to similar language in other situations, asserting the "guidance" is consistent with both Arizona law and protecting the public. For example, Sky Harbor Airport posts information about their "SOAR" security program. D. Ex. 27. As counsel argued, it is the equivalent of "see something, say something." The intent behind the program is laudable and, in today's society, unfortunately necessary. However, the airport's postings contain the words "some examples of suspicious activity" and advises people to contact law enforcement, the TSA, or an airport employee. The EPM fails to delineate portions of chapter 9 with the words "guidance," "examples," or concrete, legal prohibitions on conduct. Additionally, while suspicious behavior at an airport may get a person removed from the premises (or arrested), a person does not have a constitutional right to fly in an airplane. A person has a constitutional right to vote.

The EPM's language has restricted what the Secretary finds acceptable regarding behavior, both speech and acts. Our state constitution guarantees a right to speak freely and is only restricted for an abuse of that right. *Brush & Nib Studio, LC v. City of Phoenix*, 247 Ariz. 269, 281 ¶ 45 (2019). "Thus, by its terms, the Arizona Constitution provides broader protections for free speech that the First Amendment." *Id.* Pure speech is protected and "includes written and spoken words, as well as other media. . . [that] express thoughts, emotions, or ideas." *Id.*, 247 at 284 ¶ 58 (citation omitted). Therefore, words and pictures "qualify as pure speech when they are used by a person as a means of self-expression." *Id.*, 247 at 285 ¶ 60 (citation omitted). Using the same example discussed in court, a person could wear a t-shirt to vote that another voter or poll workers finds "offensive." That "offensive" content, having the effect of causing another to be offended or harassed, could result in either a call to law enforcement or, possibly, ejection from the polling place, which would bar the actor's vote. Likewise, a person's conduct *may* be protected if that conduct passes the "Spence-Johnson test." *Id.,* at ¶ 61 (2019). Here, the Court declines to analyze the EPM's proposed restrictions on conduct; as stated elsewhere in this Ruling, this Court is not tasked with rewriting the EPM to save it.

Docket Code 926                    Form V000A                    Page 16

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2024-002760                                           08/05/2024

        Plaintiffs' speech is not protected when it violates the law—members of the organizations
are legally prohibited from saying many things (e.g., "vote for this person or else"-type of threats)
and doing many things (e.g., electioneering within 75 feet of a polling place).  But many of the
prohibitions listed in the EPM are free speech and protected by both the Arizona Constitution and
the U.S. Constitution.  What, for example, constitutes a person communicating about voter fraud
in a harassing manner?  Or, for that matter, "posting" a sign in an intimidating manner?  How does
a person either do this behavior—whatever it means—or avoid it?  And what content printed on a
t-shirt might be offensive or harassing to one and not another?  What if the t-shirt says, "I have a
bomb and I intend to vote!"?  Where does the Secretary draw the line?

        If chapter 9 of the EPM is necessary to regulate speech and is content-neutral, and if the
Secretary has the authority to provide these regulations pursuant to A.R.S. § 16-452 ("to achieve
and maintain the maximum degree of correctness . . . on the procedures for early voting and
voting"), then it is justified only if furthers a governmental interest, that interest is unrelated to the
suppression of free speech, and any restrictions are not greater than necessary to further the
government's interests.  *Brush & Nib Studio, LC v. City of Phoenix*, 247 Ariz. 269, 292 ¶ 98
(2019)(citation omitted).  Here, the government's interest is to ensure the sanctity and safety of
voting for all eligible citizens and the EPM's intent and focus is not on speech restrictions but,
rather, compliance with our laws and rights.  Problematically, the EPM's restrictions *are* greater
than necessary, vague, overbroad, and serves "as a universal prohibition on conduct."  Plaintiffs'
*Consolidated Response*, p. 5, ¶ 2.

        <u>Injunction</u>

        Plaintiffs' special action request is supported by Plaintiffs' claims of constitutional
violation—impingement on freedom of speech and by alleged facts showing the EPM directly
affected both Plaintiffs' rights and resources.  *Ariz. Sch. Bds. Ass'n, Inc. v. State*, 252 Ariz. 219,
224 ¶ 17 (2022).  This is not a generalized harm insufficient to confer standing but instead specific
harm suffered by Plaintiffs.  Plaintiffs are affected by the EPM because they have to know what
actions, advocacy, etc., is allowable and have an actual or real interest in the matter for
determination.  *Ariz. Sch. Bds. Ass'n, Inc. v. State*, 252 Ariz. 219, 225 ¶ 20 (2022)(citation omitted).
Moreover, irreparable harm exists for constitutional violations.  *Washington v. Trump*, 847 F.3d
1151, 1169 (9th Cir. 2017).

        The Court finds Plaintiffs have proven a strong likelihood of success on the merits for the
reasons stated in this Ruling.  Moreover, even if Plaintiffs have not shown a strong likelihood of
success, Plaintiffs have presented the Court with a serious question and the balance tips sharply in
their favor.  The declaratory relief sought cannot result in money damages and as stated, the harm
is not speculative or remote; the EPM is currently in effect and chilling speech.  Here, the balance

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2024-002760                                      08/05/2024

of hardships and the public interest favor injunctive relief. People have a paramount interest in freedom of expression; a preliminary injunction that narrowly restricts content in the EPM allows other provisions to remain and minimizes harm to Plaintiffs. Moreover, as stated by our courts, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012).

**IT IS ORDERED** declaring chapter 9, section (III)(A)-(D) of the 2023 EPM unenforceable.

**IT IS FURTHER ORDERED** Defendants are enjoined from enforcing the restrictive speech provisions during the pendency of this litigation.

**IT IS FURTHER ORDERED** denying Defendants' MTD Plaintiffs' claims of speech restrictions.

<u>**Voter Registration**</u>

Plaintiffs ask this Court to throw out approximately 54 pages of the EPM because Plaintiffs contend the Secretary acted beyond the scope of his authority; Plaintiffs request the Court declare "[a]ll of chapter 1" in the EPM void. FAC, p. 20 ¶ 110. However, Plaintiffs devote one paragraph in their FAC to voter registration issues. Plaintiffs state that "no Arizona statute authorizes or delegates rule-making authority to the Secretary regarding voter registration. Therefore, the Secretary exceeded his statutory authorization, and this entire chapter should be declared invalid." FAC, p. 20 ¶ 110. In reply to the MTD, Plaintiffs conclude that the Secretary "exceeded his statutory authorization by delving into the waters of voter registration. And the Secretary has failed to point to any applicable statutory authority granting him rulemaking power in the voter registration context." *Consolidated Response*, p. 30 ¶ 4. Plaintiffs argue that if the EPM does not violate the law, they are nonetheless "entitled to a declaration that it is purely non-binding guidance." *Id*. at p. 31 ¶ 3.

Turning first to the law, A.R.S. § 16-452(A) provides: "[T]he secretary of state shall prescribe rules to achieve and maintain the maximum degree of correctness, impartiality, uniformity and efficiency on the procedures for early voting and voting. . . ." Plaintiffs believe because this statute does not contain the word "registration," chapter 1 of the EPM is invalid. Not so. Plaintiffs also argue that a recent appellate court decision necessitates the Court striking chapter 1. However, reliance upon *McKenna* is misplaced: the Court held EPM's references to candidate nominating procedures and petition circulators were guidance because they fell "outside the mandates of § 16-452 and do not have any other basis in statute. Because the statute that authorizes the EPM does not authorize rulemaking pertaining to candidate nominating petitions, those portions of the EPM relied upon by McKenna to invalidate the signatures" do not fall under

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2024-002760                                          08/05/2024

§ 16-452. *McKenna v. Soto*, 250 Ariz. 469, 473 ¶ 20 (2021). Contrast this with the exact language in the statute that requires the Secretary to prescribe rules "on the procedures for . . . voting." A.R.S. § 16-452(A). Registration is part of voting.

A person cannot vote if they are not registered to vote; necessarily, an election employee (or volunteer) must ensure that the person seeking to cast a ballot is allowed to do so. For example, the EPM states: "A minor who is qualified to register to vote is not necessarily a qualified elector for the next election. Although registered, a minor will not be eligible to vote in any elections until they turn 18 years of age as required by Ariz. Const. Art. VII, § 2." EPM, p. 14, section (II)(B). The EPM then discusses how to handle a registered voter that is too young to vote. This example falls squarely under the mandate for the Secretary to implement rules for voting and is authorized by A.R.S. § 16-452(A).

Not only does the Secretary need to ensure compliance with prerequisites to voting (e.g., registration), the Secretary is mandated by law to facilitate a person's access to the necessary paperwork to become a registered voter. *See* Secretary's MTD, p. 7 ¶ 2, *Reply*, p. 5 ¶ 2. Because those legal requirements have a basis in statute, chapter 1 does not conflict with *McKenna*. Even if there may or may not be a portion of chapter 1 that should be advisory, Plaintiffs have failed to identify any provision that is potentially unlawful besides the rule regarding non-residency (juror questionnaires)(discussed elsewhere). Moreover, Plaintiffs have failed to identify any injury they have or will suffer if this Court fails to address chapter 1, either by declaring it invalid or issuing a declaration that the chapter is "guidance" only.

The Court questions if the request for this Court to issue a declaration that chapter 1 of the EPM is "guidance" is, in fact, a request for an advisory opinion. If so, that is impermissible. *Ariz. Sch. Bds. Ass'n, Inc. v. State*, 252 Ariz. 219, 224 ¶ 16 (2022)(citation omitted). Even if Plaintiffs' request is not for an advisory opinion, the Court finds that Plaintiffs have shown no distinct and palpable injury or the presence of an actual controversy that would defeat a motion to dismiss. *Sears v. Hull*, 192 Ariz. 65, 69 ¶ 16 (1998); *Mills v. Ariz. Bd. Of Technical Registration*, 253 Ariz. 415, 424 ¶ 29 (2022). The Court therefore finds that Plaintiffs do not have standing and Defendants are entitled to dismissal as a matter of law.

**IT IS ORDERED** granting Defendants' MTD Plaintiffs' claims regarding voter registration.

<u>**Non-residency Status**</u>

Plaintiffs alleged Defendants have improperly interpreted the "non-residency of juror questionnaire rule" by instructing staff as follows: when a voter has reported to a jury commissioner that they (the voter) are not a resident of the same county in which that person is

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2024-002760                                              08/05/2024

registered, the Recorder's Office shall send written communication to the voter with instructions for completion and failure to complete will result in "inactive" status.  FAC, p. 20 ¶ 111 (rephrased).  Plaintiffs contend this violates A.R.S. § 16-165(A)(9), which directs the Recorder's Office to "cancel a registration" when a voter states they are not a resident of the same county in which that person is registered.  Stated differently, Defendants have changed a mandatory cancellation into a discretionary inactive status.

Defendants contend that A.R.S. § 16-165(A)(9) requiring cancellation without an inactive violates the National Voter Registration Act of 1993 (NVRA) and, consequently, the "EPM provision properly harmonizes county recorders' duties under federal and state law."  Secretary MTD, p. 8 ¶ 2.  Because, per Defendants, the Arizona law conflicts with federal law, Arizona's statute is preempted.

Here, the Court finds an actual controversy exists between the parties because Plaintiffs' rights are affected by the EPM's rules that allegedly conflict with the statute.  The Court declines to analyze this issue further, finding that dismissal at this juncture is unwarranted because Defendants are not entitled to dismissal as a matter of law on any interpretation of the facts.  Therefore,

**IT IS ORDERED** denying Defendants' MTD Plaintiffs' claim regarding non-residency juror questionnaires.

### **Active Early Voting List**

#### Temporary Address

Plaintiffs take issue with Chapter 2, subsection (I)(B)(1), p. 59, where it states, "A voter enrolled in the AEVL may not request that ballots be automatically sent to an out-of-state address for each election unless the voter is also a UOCAVA voter.  However, an AEVL voter may make one-time requests to have their ballot mailed to an address outside of Arizona for specific elections."  Plaintiffs (and Defendants) have no issue with the first sentence; it is the second sentence Plaintiffs find objectionable.  Plaintiffs seek a preliminary injunction prohibiting county recorders from sending these ballots to addresses outside the State of Arizona.

**THE COURT FINDS** Plaintiffs do not have standing for this claim, either for their FAC or for a preliminary injunction (PI).

Addressing the PI first, the Court does not find that Plaintiffs have shown a strong likelihood of success on the merits.  Plaintiffs' claims of harm are vague and unsupported by evidence.  In their request for a PI, Plaintiffs assert the EPM's recitation of the early ballot statutes ae "unlawful and should be enjoined."  *Motion for* [PI], pp. 16-17.  Plaintiffs provide this Court

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2024-002760                                              08/05/2024

with no allegations on how they, specifically, are harmed, instead arguing that a conflict between two statutes requires the Court to pick the more restrictive statute to comport with the law and reassure those Plaintiffs who have concerns about fraud.

In his testimony, Mr. Mussi expressed concerns about mailing ballots out of state because it goes to "the integrity of our election process." Depo. Scot Mussi, 36:25-37:1. He later stated, "Because there's no chain of custody. How do you know the ballot's going out there? So members are very concerned about it and see it as another way that could potentially cause new issues with the election process." 37:14-18. Even though Plaintiffs couch these concerns as cognizable harms, the Court disagrees. The Court also disagrees with Plaintiffs' claims that these mail-in ballots may dilute legitimate votes. The Court finds that argument nonsensical.

Plaintiffs find further support in their arguments from the deposition of Catharine Cypher, specifically pages 65-69 of her testimony. Defendants objected to this testimony, arguing that Plaintiffs failed to provide disclosure ahead of time informing Defendants that Ms. Cypher would present testimony on this issue. The Court took that objection under advisement: the Court now rules.

**IT IS ORDERED** overruling Defendants' objection to Ms. Cypher's disputed testimony. The Court will give the testimony the weight it deserves.

Ms. Cypher testified that allowing out-of-state ballots suppresses the organization's membership by creating a sense of distrust in the election process through nonresidents' votes in Arizona elections. 66:1-10. Ms. Cypher testified this goes to "election integrity" and impacts a free and fair election. 66:16-19. The Court gives this testimony, along with Ms. Cypher's opinions on this issue, little weight. For both witnesses, Plaintiffs' position rests on evidence that is not only vague but exceedingly overbroad. Plaintiffs presented no evidence on how the EPM will dilute votes, how a chain of custody issue even exists, non-residents have voted in Arizona elections, or any other support for their requested relief.

A person who requests and receives a one-time early ballot is an eligible, registered voter. The law proscribes steps that a county recorder must follow to send out an early ballot to *any* address, not just an out-of-state address. (See discussion, below.) The voter, wanting to have their voice heard but for various reasons may not be able to vote in person or from their permanent residence, asks for accommodation. This is the <u>same</u> person with the <u>same</u> vote who will participate in the <u>same</u> election. The identity of the voter has not changed—just the mechanism by which he or she engages in the process. Because the person casting the ballot has not changed, there is no dilution.

Docket Code 926                          Form V000A                              Page 21

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2024-002760                                         08/05/2024

Plaintiffs believe a chain-of-custody issue necessarily causes distrust and room for illegitimate votes but provide no evidence. All ballots are mailed out via the United States Postal Service (USPS)[7]; the destination does not impact the processing. In other words, the USPS has to treat an early ballot the same if it is sent within Arizona as if it was sent outside of Arizona. Plaintiffs fail to explain how election dilution or irreparable harm (of any kind) would *not* occur if a voter went from Phoenix to Flagstaff for a long vacation (and received a temporary ballot in Flagstaff) but dilution or harm *would* occur if the same voter went from Phoenix to Salt Lake City for a long vacation (and received a temporary ballot in Salt Lake). Additionally, the USPS sends ballots out of state frequently to residents with temporary addresses under UOCAVA. Plaintiffs do not contest this provision—is it because the recipient is in the military versus a layperson on vacation? Even so, any chain of custody issues would still exist because the destination is not dispositive.

Regarding allegations that non-residents will then vote in an Arizona election, the Court received absolutely no evidence showing this occurs. The only person who can get an early ballot is an eligible, registered voter. That person has already proven to their county recorder that he or she can vote in Arizona. Presumably there may exist some situation where a non-resident creates a fictional domicile in Arizona in order to not only vote in the election but also cast that ballot from another state. But speculation and supposition are not facts and Plaintiffs have presented no evidence this has ever happened.

The Court agrees with Plaintiffs' admirable desire for free, fair, and transparent elections. That goal is not achieved, however, by prohibiting a large swath of people from exercising their constitutional right to vote because of a temporary address. In 2022, over five thousand people in Maricopa County asked for an early ballot to be mailed to a temporary address outside of Arizona. Def. Ex. 19. Over two thousand people asked for an early ballot for a temporary address inside Arizona. *Id*. While compared to the total number of early ballots mailed out in total during this same time period, the number is small. Def. Ex. 17. But even if one qualified person who wants an early ballot sent to a temporary address—and is denied—may not be able to otherwise cast their vote, it is objectionable and in violation of law.

In addition to failing to show strong likelihood of success, Plaintiffs have also failed to provide evidence showing irreparable injury. While Plaintiffs' organizational members have a strong interest in election integrity, vague and unsupported concerns do not show injury, irreparable or otherwise. Moreover, in balancing the hardships between the parties, the Court finds Defendants would have a greater burden and more significant hardships, including having to notify current, eligible voters that they cannot receive an early ballot at a non-Arizona address, along

---

[7] The EPM states "first class mail."

Docket Code 926                        Form V000A                        Page 22

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2024-002760                                          08/05/2024

with having to change the process by which country recorders handle these requests (since approximately 1991). Not only would the State suffer hardship but so would the public. No public policy is served by granting an injunction preventing one-time, early ballots from going to a registered, eligible voter at a non-Arizona address. If anything, such an injunction would greatly harm those for whom a request was already made or will be made for the upcoming general election.

In addition to the above, the Court finds no presence of a serious question here. To reiterate, the Court finds no chain of custody issues that have merit such that the Court should consider Plaintiffs' requests, no serious question on dilution has been presented to the Court, and Plaintiffs' general, unsupported concerns about election integrity are valuable considerations in dialogue and general advocacy but do not translate to a serious question necessitating the Court's involvement. Even if Plaintiffs presented a serious question, the balance of hardships favors Defendants.

Assuming this Court is wrong in finding that Plaintiffs failed to meet their burden for a preliminary injunction, the Court will analyze the dispute, further.

Per Plaintiffs, a conflict exists between two statutes related to early ballots, and in interpreting the conflict and prescribing rules for same, the Secretary acted beyond the scope of his authority in allowing one-time early ballots to be mailed out of state. Plaintiffs request a temporary injunction on this issue yet Plaintiffs concede that the statutes are, at least, ambiguous. Nevertheless, Plaintiffs request this Court find the express prohibition in one statute applies to both, regardless of content. Defendants argue the opposite, asserting each statute serves a different purpose, and also argue that Plaintiffs' alleged harm of "vote dilution" is not a cognizable claim and should be rejected by this Court. Per Defendants, because Plaintiffs have not suffered a concrete and particularized injury, no harm exists and Plaintiffs' claim fails.

The Court turns first to the plain language of each statute.[8]

A.R.S. § 16-542(A) allows a voter to make a one-time request for an early ballot and provides deadlines for requests and processing. Subsection (C) states the county recorder "shall mail the early ballot and the envelope for its return postage prepaid to the address provided by the requesting elector[.]" Subsection (E) states, "In order to be complete and correct and to receive an early ballot by mail, an elector's request that an early ballot be mailed to the elector's residence or temporary address must include all of the information prescribed by subsection (A). . . ."

Within ninety-three days before any election called pursuant to the laws of this state, an elector may make a verbal or signed request to the county recorder, or

---

[8] All parties agree the controversy here does not include an absent or overseas voter as defined in UOCAVA.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2024-002760                                                   08/05/2024

officer in charge of elections for the applicable political subdivision of this state in
whose jurisdiction the elector is registered to vote, for an early ballot.  In addition
to name and address, the requesting elector shall provide the date of birth and state
or country of birth or other information that if compared to the voter registration
information on file would confirm the identity of the elector.

A.R.S. § 16-542(A).  Subsection (A) contains no restriction or prohibition on out-of-state address,
and neither does (C), (E), or (F).  Subsection (F) states, "Unless an elector specifies that the address
to which an early ballot is to be sent is a temporary address, the recorder may use the information
from an early ballot request form to update voter registration records."

Contrast these provisions with A.R.S. § 16-544(B), which specifically prohibits an out-of-
state address:

In order to be included on the active early voting list, the voter shall make a written
request specifically requesting that the voter's name be added to the active early
voting list for all elections in which the applicant is eligible to vote.  [ ] The
application shall allow for the voter to provide the voter's name, residence address,
mailing address in the voter's county of residence, date of birth and signature and
shall state that the voter is attesting that the voter is a registered voter who is eligible
to vote in the county of residence.  The voter *shall not* list a mailing address that is
outside of this state for the purpose of the active early voting list[.]

(Emphasis added.)

From the Court's review, the statutes are clear and unambiguous.  "[T]he best and most
reliable index of a statute's meaning is the plain text of the statute."  *State v. Christian*, 205 Ariz.
64, 66 ¶ 2 (2003).  When the statute is clear and plain meaning evident, "there is no need to resort
to other methods of statutory interpretation to determine the legislature's intent because its intent
is readily discernable from the face of the statute."  *Id*.; *see also Parsons v. Ariz. Dep't of Health
Servs.,* 242 Ariz. 320, 323 ¶ 11 (App. 2017).  Moreover, to the extent an ambiguity exists, the court
"will not rewrite a statute to save it."  *Fann v. State,* 251 Ariz. 425, 434 ¶ 23 (2021).

A.R.S. § 16-542 has four separate references to "address," and not one of those references
prohibits an out-of-state address for a one-time ballot.  Giving deference to the Legislature, this
Court finds that if the Legislature intended to prohibit one-time, temporary ballots from going to
an elector out-of-state, the Legislature would have said so.  It did not.  Contrasting this with A.R.S.
§ 16-544, the Court finds the Legislature has expressly prohibited an elector (voter) from giving
an out-of-state address to the county recorder when that elector is placed on the active early voting
list (AEVL).  Moreover, A.R.S. § 16-544(B) adds a limitation to the prohibition by saying "for the

Docket Code 926                            Form V000A                                  Page 24

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2024-002760                                                  08/05/2024

purpose of the [AEVL]." This limitation underscores the Legislative intent: the prohibition applies to the AEVL, nothing more.

Even if this Court is in error in finding the statutes clear and unambiguous, the fact remains the Court is extremely concerned about voter disenfranchisement if the Court finds in favor of Plaintiffs' request for a preliminary injunction. For example, as discussed in court, registered voters in Arizona may include college students who temporarily reside out of state to attend school. Those voters—who may or may not be on the AEVL—could call or write to their county recorder and ask for a one-time ballot, mailed to a temporary address, consistent with A.R.S. § 16-542(A). That temporary address may not be their permanent residence; the voter's eligibility turns, in part, on "the individual['s] intent to return [to Arizona] following his absence." A.R.S. 16-101(B). Provided that the college student only remains out of state for school and has the intent to return to Arizona, the student remains eligible to vote in an election and, furthermore, has the right to request a one-time early ballot.

Continuing with this example, if this Court were to decide, now, that a county recorder is legally prohibited from sending early ballots to this group of voters, those voters would have to return to Arizona to, at least, obtain their ballot in order to cast their vote. Nothing would preclude the voter from requesting the early ballot—the prohibition would be on *where* the recorder sends the ballot. At the very least, the voter would have to return to the Arizona residence (albeit temporary or permanent), obtain the one-time early ballot, and then cast their vote from whatever location they chose.

Using another example: what if the voter who requests the one-time, early ballot is a senior citizen who has chosen to take a six-month cruise around the world? That voter has no intent to leave Arizona permanently but, instead, enjoy a long vacation that removes them from the state for 180 days. That voter could seek a one-time early ballot but, according to Plaintiffs, would be prohibited from providing the county recorder with a temporary address outside Arizona at which they could receive the mail-in ballot. The ballot would be mailed to either (1) the voter's permanent address or (2) a temporary address that must be located within the State of Arizona. The voter then has the burden of returning to the state to obtain the ballot in order to have their vote counted.

If Plaintiffs' view is adopted, these examples show a possible practical effect of disenfranchising voters because those eligible voters would not be able to cast their ballot at all if the voter gave an out-of-state address or would place such restrictions on the voter that exercise of their right to vote becomes severely burdensome. *See, e.g., LaChance v. County of Cochise*, 2024 WL 3153610 (June 25, 2024). If the Court were to find in Plaintiff's favor, the Court would have to apply strict scrutiny to the government's action and find the "temporary address" provision

## SUPERIOR COURT OF ARIZONA
### MARICOPA COUNTY

CV 2024-002760                                                08/05/2024

necessitating an in-state address is "narrowly tailored to advance a compelling state interest." *Arizonans For Second Chances, Rehabilitation, and Public Safety v. Hobbs*, 249 Ariz. 396, 409 ¶ 42 (2020). Here, Plaintiffs present no evidence showing why their interpretation of A.R.S. § 16-542(A), which may deprive a person of a constitutional right to vote, is controlling and enforceable. *See, e.g., Anderson v. Celebrezze*, 460 U.S. 780 (1983).

Of course, the law recognizes the need for regulation of elections in order to keep elections fair, honest, and transparent. Arizona, through its Legislature, has done so via enaction of multiple statutes governing elections and, when appropriate, delegating authority to the executive branch. This is because the State has important regulatory interests, including constitutional compliance. If this Court has erred in finding that the examples above demonstrate a more severe restriction on a person's right to vote, the Court nonetheless finds that Plaintiffs' argument is unreasonable.

While not conceding that Plaintiffs' position is a limited burden only, the Court recognizes that such burden only impacts a voter who has voluntarily excused themselves from the state and not, for example, a person compelled to leave because of active military duty. But the basis for a restriction on a temporary address serves no discernable purpose other than to make voting harder for a person who is outside of Arizona but intends to return. *Cf. Burdick v. Takushi*, 504 U.S. 428, 440 (1992). The integrity of the voting process remains, regardless of whether a county recorder sends a one-time ballot to 1234 Main Street, Idaho, or 5678 Smith Street, Arizona. Both mailings require a county recorder to use first class mail, and return of a completed ballot must comply with statutory requirements set forth in our laws. For these reasons,

**IT IS ORDERED** denying Plaintiffs' request for a preliminary injunction on this point.

The Court now analyzes Plaintiffs' standing—under a lesser burden—to bring their claim regarding "temporary" addresses and the AEVL to the Court.

Count I of Plaintiffs' FAC addresses speech restrictions: it has nothing to do with early voting. Count II claims the "2023 EPM has many provisions that are not authorized by Arizona statutes, or directly contradict the relevant statutory provisions that the EPM purports to implement." FAC, p. 28 ¶ 159. Plaintiffs reiterate their fear of prosecution; Plaintiffs also reiterate the harms of increased compliance costs, curtailed activities, and chilled free speech. Finally, Plaintiffs state "many of these statutory problems create issues of diluting votes by allowing others to vote that otherwise would not be allowed to vote [or] counting votes that should otherwise not be valid under Arizona[.]" *Id.* at ¶ 162. The only other reference to this issue is on page 22 of the FAC, wherein Plaintiffs conclusively state, "Section 16-544(B), however, specifically prohibits such out-of-state AEVL ballot mailings[.]" ¶ 122. The Court has found to the contrary.

Docket Code 926                      Form V000A                            Page 26

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2024-002760                                              08/05/2024

Plaintiffs have failed to allege a "distinct and palpable injury." *Sears v. Hull*, 192 Ariz. 65, 69 ¶ 16 (1998). "[A] generalized harm shared by all or by a large class of people is generally insufficient." *Mills v. Ariz. Bd. Of Technical Registration*, 253 Ariz. 415, 423 ¶ 24 (2022). While Plaintiffs do not have to suffer injury before filing suit, there must be an actual controversy between the parties for this Court to have jurisdiction and for Plaintiffs to show standing. *Mills* 253 Ariz. at 424 ¶ 29. Not only do Plaintiffs have no injury, Plaintiffs have failed to show an actual controversy exists. Simply because Plaintiffs allege the EPM violates the law does not make it true.

Plaintiffs correctly assert they have a lower burden for standing to survive Defendants' motions to dismiss. But when analyzing the MTD, the Court must analyze whether Plaintiffs' alleged facts are sufficient to allow Plaintiffs to prevail. *Coleman v. City of Mesa*, 230 Ariz. 352, 363 ¶ 46 (2012)(citation omitted). The Court must "assume the truth of the well-pled factual allegations and indulge all reasonable inferences therefrom." *Cullen v. Auto-Owners Ins. Co.*, 218 Ariz. 417, 419 ¶ 7 (2008). The FAC has scant facts from which the Court could indulge Plaintiff's position: general allegations of unlawfulness and dilution are unsupported by facts that would defeat a motion to dismiss. Plaintiffs have no standing on this issue. Therefore,

**IT IS ORDERED** granting Defendants' MTD for the claim of early ballot/AEVL.

**Effective Date of AEVL**

Defendants seek dismissal of Plaintiffs' claim regarding the effective date of AEVL removal notices. FAC, p. 22. Defendants believe notices shall be mailed in 2027, while Plaintiffs argue notices are due in 2025. The statute provides:

H. After a voter has requested to be included on the active early voting list, the voter shall be sent an early ballot by mail automatically for any election at which a voter at that residence is eligible to vote until any of the following occurs:

. . .

4. The voter fails to vote an early ballot in *all* elections for *two consecutive election cycles*. For the purposes of this paragraph, "election" means any regular primary or regular general election for which there was a federal race on the ballot or for which a city or town candidate primary or first election or city or town candidate second, general or runoff election was on the ballot. . . .

A.R.S. § 16-544(H)(4)(emphasis added). An election cycle is defined as follows:

S. For the purposes of this section, "election cycle" means the two-year period beginning on January 1 in the year after a statewide general election or, for cities

Docket Code 926                        Form V000A                        Page 27

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2024-002760                                      08/05/2024

and towns, the two-year period beginning on the first day of the calendar quarter after the calendar quarter in which the city's or town's second, runoff or general election is scheduled and ending on the last day of the calendar quarter in which the city's or town's immediately following [ ] is designated by the city or town.

A.R.S. § 16-544(S).

The Legislature amended the law in 2021; Plaintiffs argue the new provisions became law on May 11, 2021, when "the 2022 election cycle had not begun yet," and Defendants argue it "took effect on September 29, 2021, nine months into the 2022 election cycle." FAC p. 22 ¶ 118; Secretary's MTD, p. 10 ¶ 2. Governor Doug Ducey signed senate bill 1485 on May 11, 2021; the Legislature closed for business on July 31, 2021. The bill contained no language on when it became effective; because the bill is silent, the bill went into effect 90 days after *sine die* (adjournment). The Court is at a loss regarding both parties' positions on the effective date of the legislation and finds neither party gave the Court any information showing how they arrived at their proposed effective date of the new law.

Regardless of whether it was May or September, the fact remains <u>both</u> dates are after January 1st and the law itself contains no language that clarifies (e.g., "commencing January 1, 2026). Defendants believe the EPM correctly states the eligibility for early voting turns on two "full" election cycles, while Plaintiffs believe the EPM is wrong and the eligibility for early voting turns on lack of voting "during" two election cycles. Needless to say, this dispute could have been avoided if the new law included a start date.

The Court will, in its analysis, attempt to write plainly to not only avoid confusing itself but also to ensure the parties understand the Court's reasoning.

- November 2018: general election.
- January 1, 2019: beginning of a new election cycle.
- (2019-2020, announce, campaign, etc.)
- November 2020: general election.
- January 1, 2021: beginning of a new election cycle.
- (2021-2022, announce, campaign, etc.)
    - Fall 2021, S.B. 1485 goes into effect (the Court believes it is in October 2021).
- November 2022: general election.
- January 1, 2023: beginning of a new election cycle.
- (2023-2024, announce, campaign, etc.)
- November 2024: general election.
- January 1, 2025: beginning of a new election cycle.

Docket Code 926                    Form V000A                         Page 28

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2024-002760                                                08/05/2024

- (2025-2026, announce, campaign, etc.)
- November 2026: general election.
- January 1, 2027: beginning of a new election cycle.

Subsection (S) of the law states the election cycle begins on January first *after* a statewide general election. Because Arizona held a general election in November 2020, the next election cycle began 1/1/2021, per A.R.S. § 16-544(S).

An election cycle is two years. This means the election cycle went from 1/1/2021, to 1/1/2023. The law went into effect in fall 2021, *during* an election cycle. Because the law went into effect during the election cycle, and because the law says it applies after two cycles beginning *after* a statewide general election, the clock didn't start.

The *next* election cycle began on 1/1/2023, per A.R.S. § 16-544(S). It lasts two years, until 1/1/2025. That is the "first" election cycle for per A.R.S. § 16-544(H)(4). The "second" election cycle starts 1/1/2025, and ends on 1/1/2027.

The notices shall be sent out for the election cycle commencing January 1, 2027, consistent with the statute. The statute contains no language for retroactivity; Plaintiffs' arguments fail. Therefore,

**IT IS ORDERED** granting Defendants' MTD for Plaintiffs' claim on the AEVL removal notice start date.

### **Deadline Extension**

Plaintiffs alleged Defendants have promulgated language in the EPM that grants the Secretary "to continue or lengthen the early voting process" for absent military voters or oversea voters. FAC, p. 23 ¶ 123, quoting EPM Chapter 2, section 1(F). Plaintiffs agreed Defendants have the authority to create emergency procedures for early ballots in the event of an emergency, "it does not grant the Secretary the authority to extend the deadlines." FAC at ¶ 124.

A.R.S. § 16-543(C) states:

The secretary of state shall  provide in the instructions and procedures EPM issued [ ] for emergency procedures regarding the early balloting process for persons who are subject to the uniformed and overseas citizens absentee voting act of 1986[.] These emergency procedures may be implemented only on the occurrence of a national or local emergency that makes substantial compliance with the [UOCAVA]

Docket Code 926                        Form V000A                        Page 29

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2024-002760                                           08/05/2024

impracticable, including occurrences of natural disasters or armed conflict or
mobilization of the national guard or military reserves of this state.

The EPM states:

In the event of a national or local emergency that makes substantial compliance
with UOCAVA statute impracticable. . . the following procedures for the early
balloting process shall apply for UOCAVA voters:

- The Secretary of State will issue a press statement for immediate release . . .
  outlining applicable measures that will be taken to continue *or lengthen* the early
  voting process for UOCAVA voters.

(Emphasis added.)  A.R.S. § 16-547(D) includes language to the voter as follows: "In order to be
valid and counted, the ballot and affidavit must be delivered to the office of the county recorder [
] or may be deposited at any polling place in the county not later than 7:00 p.m. on election day."
A.R.S. § 16-551(C) also includes a 7:00 p.m. deadline for processing early ballots.  Relatedly, the
EPM provides:  "A ballot-by-mail (with completed affidavit) must be delivered to the County
Recorder, the officer in charge of elections, an official ballot drop-off site, or any voting location
in the county no later than 7:00 p.m. on Election Day."  EPM, p. 71, section (I)(H)

Defendants argue the Secretary's authorization to create rules for emergency procedures
allows the Secretary to include this language in the EPM and nothing in the language "extends
voting deadlines."  Secretary MTD, p. 13 ¶ 1.  Defendants also argue that because UOCAVA may
require deadline extension, the language is permissible.  *Id.* at ¶ 2.  Finally, Defendants contend
the EPM language is really just the Secretary providing information to voters, not actually
extending deadlines and is necessary to make sure Arizona does not violate UOCAVA.  The Court
disagrees.

Early ballots are due by 7:00 p.m.  The language in the EPM discusses lengthening the
voting process.  Arguably, this is not guidance, this is not a press release, this is not informational
only.  The disputed language in the EPM purports to allow the Secretary to implement measures
*including* extending deadlines.  That is not allowed.

Defendants' argument that the UOCAVA may require such deadlines—and did so in
2018—do not give the Secretary *carte blanche* to "lengthen" the early voting process.  The EPM
itself recognizes this by addressing what might happen if the Secretary cannot comply with the 45-
day UOCAVA ballot transmission deadline.  EPM, p. 69, section (I)(D)(3)(b).  It is up to the federal
government to evaluate and approve extensions, not the Secretary's.  If the federal government

Docket Code 926                          Form V000A                                 Page 30

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2024-002760                                    08/05/2024

approves extensions—and the parties enter into a consent decree—the Secretary can then transmit that information to the public.  At the very least, this provision in the EPM is misleading.

Presently, the Court does not find that Defendants have shown they are entitled to dismissal as a matter of law.  Whether Plaintiffs prevail later, including on ongoing "standing to sue" arguments, will not be decided by the Court now.  Therefore,

**IT IS ORDERED** denying Defendants' MTD on the UOCAVA deadline extension claim.

**<u>Inconsistent Signatures</u>**

Plaintiffs alleged Defendants violated the law when including language that directs staff to consider information beyond an allegedly inconsistent signature.  FAC, p. 23 ¶ 129.  The EPM states, "early ballots cast in-person should not be invalidated based solely on an allegedly inconsistent signature absent other evidence."  *Id*.  Plaintiffs argued the law requires the County Recorder "*not* to accept the ballot, but instead" make efforts to contact the voter, etc.  FAC, p. 23 ¶ 130.

A.R.S. § 16-550(A) states:

[O]n receipt of the envelope containing the early ballot and the ballot affidavit, the county recorder or other officer in charge of elections shall compare the signatures thereon with the signature of the elector on the elector's registration record.  If the signature is inconsistent with the elector's signature on the elector's registration record, the county recorder or other officer in charge of elections shall  make reasonable efforts to contact the voter, advise the voter of the inconsistent signature, and allow to correct or the county to confirm the inconsistent signature.

The relevant portion of the EPM begins on page 82, which outlines responsibilities for signature verification by a county recorder.  The EPM alternates between the words "shall" and "should," indicating some compliance is mandatory (e.g., comparisons of signatures) and other discretionary (e.g., consult other documents in the voter's registration record).  The disputed portion of the EPM states, "[E]arly ballots cast in-person should not be invalidated based solely on an allegedly inconsistent signature absent other evidence that the signatures were not made by the same person."

Here, the Court finds Plaintiffs' argument without merit.  To reiterate, the EPM mandates those actions required by law, e.g., stating all early ballots "must be signature-verified by the County Recorder or other officer in charge of elections."  EPM p. 83, section (VI)(A)(1).  This is consistent with Arizona law ("shall compare the signatures. . .").

Docket Code 926                    Form V000A                         Page 31

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2024-002760                                              08/05/2024

Although the law provides for declining a vote for lack of sufficiency, the law also provides a curing period. If the affidavit is insufficient, "the vote shall not be allowed." A.R.S. § 16-552(B). However, A.R.S. § 16-550(A) allows a voter to fix the problem within a specified timeframe. That means the insufficient affidavit is not *automatically* rejected but, instead, a county recorder must notify the voter of the issue and allow the voter to correct the problem. The EPM does not change or misinterpret the law; rather, the EPM clarifies that a vote—with a sufficiency issue—may be fixed by the voter. The EPM does not mandate acceptance of an insufficient ballot but, instead, reiterates the legal requirement of allowing a voter a chance to fix the problem before a vote is disallowed.

The Court understands that Plaintiffs take issue with Defendants' argument the EPM provides a method by which a voter will "pre-cure" the insufficiency. Secretary MTD, p. 14, ¶ 2. This is, perhaps, a misfortunate word choice. The Court does not agree that an early in-person voter is pre-curing an insufficiency through the disputed EPM language. Rather, the EPM tells poll workers that when person who shows up to vote, early and in person, and casts a ballot that contains an insufficiency, the poll worker should not *automatically* disallow the vote. Rather, the voter should be given an opportunity to cure any defect, including providing documentation to the poll worker that "confirm[s] the inconsistent signature." A.R.S. § 16-550(A). The only reason why Defendants contend this is a "pre-cure" is because the voter <u>must</u> show identification prior to casting their early, in-person ballot. This is a distinction without a difference. In either scenario, if a signature does not match, a poll worker must provide a cure opportunity by law before rejecting (disallowing) the vote for insufficiency.

The Court finds no controversy between the parties exists and, further, Plaintiffs have pointed to no injury they suffer because of the disputed language in the EPM. For these reasons, the Court finds Plaintiffs lack standing. Therefore,

**IT IS ORDERED** granting Defendants' MTD regarding early-voter signature verification claim.

<u>**Circulator Registrations**</u>

Plaintiffs sued Defendants over a portion of chapter 6 of the EPM regarding regulation of petition circulators. Plaintiffs take issue with footnote 58 on page 119. The annotated language is as follows: "The Secretary of State's Office has no obligation to review the substance of circulator registrations to ensure that accurate or proper information has been provided. The circulator remains solely responsible for compliance with all legal provisions.[fn 58]" The footnote then states:

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2024-002760                                    08/05/2024

      The requirement to list certain information on the circulator portal does not mean
that a circulator's signatures shall be disqualified if the circulator makes a mistake
or inconsistency in listing that information (e.g., phone number or email address
that is entered incorrectly; a residential address that doesn't match the residential
address listed on that circulator's petition sheets; etc.).

Plaintiffs argue the language in this footnote directly conflicts with Arizona law. Plaintiffs argue
that inconsistency is not the same thing as a typographical error and this footnote gives broad
authority to the Secretary to determine the nature of the mistake and, consequently, the validity of
the content. Defendants disagree, arguing the footnote is consistent with Arizona law.

      A.R.S. § 19-102.01(A) states, "Constitutional and statutory requirements for statewide
initiative measures must be strictly construed and persons using the initiative process must strictly
comply with those constitutional and statutory requirements." A.R.S. § 19-118(B)(5) requires a
circulator to sign an affidavit that swears "I am eligible to register as a circulator in the state of
Arizona, that all of the information provided is correct to the best of my knowledge and that I have
read and understand Arizona election laws[.]"

      In *Leach v. Hobbs*, our Supreme Court addressed petition validity, in part, by examining
the actions of registered petition circulators. 250 Ariz. 572 (2021). The Court held that a petition
circulator cannot use questionable tactics to evade statutory requirements. Finding registered
circulators important, the Court found, "The circulator is the only person in the process who is
required to make a sworn statement and is, therefore, the person under the greatest compulsion to
lend credibility to the process." *Id*. at 575 ¶ 15 (quoting *W. Devcor, Inc. v. City of Scottsdale*, 168
Ariz. 426, 432 (1991)(internal citations omitted).

      Arizona law governs circulators: A.R.S. § 19-118(A) instructs the Secretary to include in
the EPM a procedure for circulator registration. For example, circulators must provide an address
at which they will accept service of process in case they need to testify regarding disputes over
petitions. A.R.S. § 19-118(B)(4). When doing so, the "circulator must attest to the accuracy of
this information, under criminal penalty, in a notarized affidavit." *Leach v. Hobbs*, 250 Ariz. at
576 ¶ 19; A.R.S. § 19-118(B)(5). In *Leach*, the Court stated, "Although the EPM provides for a
cancellation of a circulator's registration—putting aside for the moment whether the EPM may
abrogate a statutory duty—it does not even purport to discharge a circulator's duty to comply with
[a] statutory obligation[.]" *Id*. at ¶ 20. The Court further stated, "[A]n EPM regulation that exceeds
the scope of its statutory authorization or contravenes an election's statute purpose does not have
the force of law." *Id*. at ¶ 21. In sum, the Court found that deregistering (i.e., a questionable tactic
to avoid a subpoena) is not allowable because "[a]ny other interpretation would vitiate the statute's

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2024-002760                                                 08/05/2024

purpose to foster the integrity" of elections. *Id*. Equivocation, especially related to statutes, is not allowed.

Here, the Court remains unclear on the Secretary's purpose for including footnote 58, even if the Secretary's intent was advisory (guidance). The Court is unprepared to find that Defendants are correct in their position that the footnote complies with Arizona law under any interpretation of the facts or legal argument. Dismissal is unwarranted at this time. Therefore,

**IT IS ORDERED** denying Defendants' MTD on Plaintiffs' claim regarding circulator registration guidance contained in the EPM.

The Court has addressed the issues presented to it. Therefore,

**IT IS ORDERED** denying any other relief sought by the parties not expressly addressed in this Ruling.

ER-325

# Exhibit 4

Minute Entry dated July 29, 2024

*Arizona Free Enterprise Club et al. v. Fontes et al.*,

CV 2024-002760 (Maricopa County Superior Court)

Clerk of the Superior Court
*** Electronically Filed ***
08/01/2024 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2024-002760                                      07/29/2024


                                          CLERK OF THE COURT
HONORABLE JENNIFER RYAN-TOUHILL             A. Meza/M. Dern
                                                 Deputy


ARIZONA FREE ENTERPRISE CLUB, et al.        DANIEL W TILLEMAN

v.

ADRIAN FONTES, et al.                       KARA MARIE KARLSON


                                            NATHAN T ARROWSMITH
                                            DAVID ANDREW GAONA
                                            ROY HERRERA
                                            AMERICA FIRST POLICY INSTITUTE
                                            NO ADDRESS ON RECORD
                                            PHILIP TOWNSEND
                                            NO ADDRESS ON RECORD
                                            TIMOTHY A LASOTA
                                            ALEXIS E DANNEMAN
                                            JOHN S BULLOCK
                                            JUDGE RYAN-TOUHILL



                            MINUTE ENTRY


        Prior to the commencement of these proceedings, Plaintiffs' exhibits 1 through 9 and
Defendants' exhibits 1 through 35 are submitted electronically.

        East Court Building – Courtroom # 414

        10:01 a.m. This is the time set for consolidated Evidentiary Hearing regarding Plaintiffs'
May 28, 2024, *Motion for Preliminary Injunction* and Oral Argument regarding Defendant
Arizona Attorney General's May 31, 2024, *Motion to Dismiss* and Arizona Secretary of State's

Docket Code 020                    Form V000A                              Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2024-002760                                              07/29/2024

May 31, 2024, *Motion to Dismiss First Amended Complaint and Joinder in Arizona Attorney General's Motion to Dismiss*. Plaintiffs, Arizona Free Enterprise Club, Phillip Townsend, and America First Policy Institute, are represented by counsel, Andrew Gould, Brennan A.R. Bowen, and Dallin B. Holt, appearing for counsel of record, Daniel W. Tilleman. Defendant, Adrian Fontes, in his official capacity as Arizona Secretary of State, are represented by counsel, Karen J. Hartman-Tellez and Kyle Cummings, appearing for counsel of record, Kara M. Karlson. Defendant, Kris Mayes, in her official capacity as Arizona Attorney General, is represented by counsel, Joshua M. Whitaker, Shannon H. Mataele, and Nathan T. Arrowsmith. All appearances are in person.

A record of the proceedings is made digitally in lieu of a court reporter.

The Court has reviewed Plaintiffs' *Motion for Preliminary Injunction,* Defendants' respective motions to dismiss, and the parties' July 19, 2024, Lists of Witnesses and Exhibits.

Counsel report that the parties will not call any witnesses, but will present testimony through depositions and will present argument.

The Court notes Plaintiffs' *First Amended Complaint* was filed April 15, 2024. Plaintiffs' May 30, 2024, *Notice of Limited Voluntary Dismissal* dismissed claims in paragraphs 114 through 116, 126 through 128, and 146 through 148 of the *First Amended Complaint*.

Discussion is held regarding the issues to be presented today and the Court's initial inclinations and questions arising from the briefs.

Counsel for Plaintiffs presents oral argument.

10:13 a.m. Court stands at recess.

10:21 a.m. Court reconvenes with all counsel present.

A record of the proceedings is made digitally in lieu of a court reporter.

Upon the stipulation of the parties, Plaintiffs' exhibits 1 through 8, and Defendants' exhibits 1 through 35 are received in evidence.

The parties stipulation to the deposition testimony of Phillip Townsend, Scot Mussi, and Catherine Cypher, with the exception that Defendant Fontes's counsel objects to a certain portion of Catherine Cypher's deposition testimony.

Docket Code 020                        Form V000A                              Page 2

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2024-002760                                                07/29/2024

Oral argument is presented to the Court regarding page 65 line 4 though page 69 line 20 of Catherine Cypher's deposition.

**IT IS ORDERED** taking under advisement Defendant Fontes's objection to the page 65 line 4 though page 69 line 20 of Catherine Cypher's deposition.

Oral argument is presented regarding the issues raised in Plaintiffs' May 28, 2024, *Motion for Preliminary Injunction*.

Portions of the depositions of Phillip Townsend, Scot Mussi, and Catherine Cypher are read to the Court.

12:02 p.m. Court stands at recess.

1:27 p.m. Court reconvenes with counsel present.

A record of the proceedings is made digitally in lieu of a court reporter.

Additional oral argument is presented regarding Plaintiffs' *Motion for Preliminary Injunction*.

Additional portions of the deposition of Scot Mussi are read to the Court.

Plaintiffs' counsel makes an offer of proof regarding page 65 line 4 though page 69 line 20 of Catherine Cypher's deposition.

**THE COURT FINDS** that it took this issue under advisement this morning.

**IT IS ORDERED** permitting Plaintiffs' counsel to present the testimony. If the Court later determines that Defendant Fontes's objections to this portion of the testimony are valid, the Court will disregard that part of the testimony.

Portions of the depositions of Catherine Cypher are read to the Court.

2:53 p.m. Court stands at recess.

3:03 p.m. Court reconvenes with counsel present.

A record of the proceedings is made digitally in lieu of a court reporter.

Docket Code 020                          Form V000A                          Page 3

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2024-002760                                              07/29/2024

Additional oral argument is presented regarding Plaintiffs' *Motion for Preliminary Injunction*.

Discussion is held regarding allotment of time for remaining matters.

**LET THE RECORD REFLECT** due to remaining time constraints, each side shall be allotted 20 minutes for these matters.

Oral argument is presented regarding the issues raised in Defendant Fontes's May 31, 2024, *Motion to Dismiss First Amended Complaint and Joinder in Arizona Attorney General's Motion to Dismiss.*

Based on the testimony heard and arguments made on the record,

**IT IS ORDERED** taking Plaintiffs' May 28, 2024, *Motion for Preliminary Injunction*, Defendant Arizona Attorney General's May 31, 2024, *Motion to Dismiss*, and Defendant Arizona Secretary of State's May 31, 2024, *Motion to Dismiss* [ ] under advisement.

**THE COURT NOTES** its appreciation for the professionalism and courtesy between the parties at today's hearing.

Discussion is held regarding submitting highlighted versions of the depositions to the Court. Parties stipulate to confer and provide said versions as soon as possible.

4:35 p.m. Matter concludes.

**Later:**

FILED:
- Deposition of Catherine Cypher, dated July 24, 2024
- Deposition of Scot Mussi, dated July 24, 2024
- Deposition of Phillip Townsend, dated July 22, 2024

Docket Code 020                         Form V000A                         Page 4

# Exhibit 1

Plaintiffs' First Amended Complaint

*Arizona Free Enterprise Club et al. v. Fontes et al.*,

CV 2024-002760 (Maricopa County Superior Court)

Clerk of the Superior Court
*** Electronically Filed ***
Y. Moralez, Deputy
4/15/2024 3:45:18 PM
Filing ID 17661034

Andrew Gould (No. 013234)
Drew C. Ensign (No. 025463)
Brennan A.R. Bowen (No. 036639)
Daniel Tilleman (No. 037422)
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
2575 East Camelback Road, Suite 860
Phoenix, Arizona 85016
(602) 388-1262
agould@holtzmanvogel.com
densign@holtzmanvogel.com
bbowen@holtzmanvogel.com
dtilleman@holtzmanvogel.com
minuteentries@holtzmanvogel.com

Timothy A. La Sota (No. 020539)
GRAND CANYON LEGAL CENTER
1835 E. Elliot Road, Suite 102
Tempe, AZ 85284
(602) 515-2649
tim@timlasota.com

Richard P. Lawson (*pro hac vice*)
Jessica H. Steinmann (*pro hac vice*)
Patricia Nation (*pro hac vice*)
AMERICA FIRST POLICY INSTITUTE
1001 Pennsylvania Ave., N.W., Suite 530
Washington, D.C. 2004
(813) 952-8882
rlawson@americafirstpolicy.com
jsteinmann@americafirstpolicy.com
pnation@americafirstpolicy.com

*Attorneys for Plaintiff*

## SUPERIOR COURT OF THE STATE OF ARIZONA

### MARICOPA COUNTY

| | |
|---|---|
| ARIZONA FREE ENTERPRISE CLUB, an Arizona non-profit corporation, PHILIP TOWNSEND, an Arizona individual, AMERICA FIRST POLICY INSTITUTE, a non-profit corporation, <br><br> Plaintiffs, <br><br> vs. | Case No.: CV2024-002760 <br><br> **PLAINTIFFS' FIRST AMENDED COMPLAINT** <br><br> (Assigned to the Honorable Jennifer Ryan-Touhill) |

1

2    ADRIAN FONTES, in his official capacity
     as Arizona Secretary of State, KRIS
3    MAYES, in her official capacity as Arizona
     Attorney General,
4
5                    Defendants.

6          Plaintiffs bring this First Amended Complaint against Defendant Adrian Fontes in

7    his official capacity as Arizona Secretary of State (the "Secretary") and Kris Mayes, in her

8    official capacity as Arizona Attorney General (the "Attorney General"), and allege as

9    follows:

10                                   **INTRODUCTION**

11         1.     The Arizona 2023 Elections Procedures Manual ("EPM" or "2023 EPM")[1]

12   contains some of the most onerous restrictions on speech ever adopted by any State in the

13   history of the United States. In particular, one provision purports to criminalize "*any*

14   *activity*" taken "with the intent *or effect* of threatening, harassing, intimidating or coercing

15   voters." EPM Chpt. 9 § 3(D) (pg. 181-83) (hereinafter, "Speech Restriction") (emphasis

16   added). The Speech Restriction further makes clear that this criminal prohibition reaches

17   actions as ubiquitous as simply "raising one's voice" or "using … insulting or offensive

18   language to a voter." *Id* at 182.

19         2.     The Speech Restriction is breathtakingly broad in its application. There is

20   no temporal limitation: it thus applies equally on election day and all other 365 days of

21   2024. *Id.* There is also no geographic limitation: it applies both "inside *or outside* the 75-foot

22   limit [of electioneering activity] at … voting location[s]," *id.* (emphasis added)—*i.e.*, on

23   every square inch of territory within Arizona's borders. It further does not require any

24   connection of the speech to voting. A heated debate about sports with raised voices or in

25   which "insulting or offensive" language is employed is now a class-two misdemeanor in

26   Arizona if the debate participants happen to be voters—which the majority of adults in

27   ─────────────────────

28   [1]  The 2023 EPM is available at https://azsos.gov/elections/about-elections/elections-
     procedures/elections-procedures-manual.

**ER-333** 2

Arizona are. *Id.* And a staggering number of family Thanksgiving dinners could now generate multi-count criminal indictments under the EPM as crafted by the Secretary of State (the "Secretary").

3.      Given its breadth, the Speech Restriction is utterly lawless. It patently violates an impressive number of Arizona statutory and constitutional provisions. It thus merits this Court's decisive rejection.

4.      As a statutory matter, the Speech Restriction is plainly unlawful because it outright rewrites the criminal prohibition that it purports to be "implementing," A.R.S. § 16-1013. It does so in three distinct ways. *First*, the Speech Restriction unlawfully eliminates the *mens rea* requirement adopted by the Legislature. Section 16-1013 prohibits only acts that are taken "knowingly …" *See also id.* ("It is unlawful for a person knowingly:"). The Speech Restriction, however, purports to criminalize actions that have *either* "the intent *or effect* of threatening" etc. voters. In doing so, the Speech Restriction creates a new strict-liability crime where actions are prohibited without any requirement of *mens rea*—even ordinary negligence—as long as they have the "effect" at issue.

5.      *Second*, the Speech Restriction unlawfully shoehorns the concept of harassment into the prohibition of A.R.S. § 16-1013. By its terms, § 16-1013 prohibits only the actual (1) "use of force, violence or restraint," (2) "threaten[ing to] inflict[] … injury, damage, harm or loss," (3) "intimidation," or (4) use of "abduction, duress or any forcible or fraudulent device or contrivance." Completely absent from § 16-1013 is any concept of "harassment," which instead was added wholecloth by the Secretary.

6.      *Third*, the Speech Restriction eliminates any requirement that the threatening/harassing/intimidating actions have any actual nexus to voting itself. Section 16-1013 specifically prohibits only actions that are taken "to induce or compel such person *to vote or refrain from voting* for a particular person or measure at any election provided by law, or on account of such person *having voted or refrained from voting* at an election" or "to impede, prevent or otherwise interfere with the *free exercise of the elective franchise* of any voter, or to compel, induce or to prevail upon a voter either *to cast or refrain from casting his vote* at an

1    election, or *to cast or refrain from casting his vote* for any particular person or measure at an

2    election." A.R.S. § 16-1013 (emphasis added) (hereinafter, "Voting-Nexus Requirement").

3    But the EPM's Speech Restriction dispenses with this Voting-Nexus Requirement entirely,

4    and simply makes it a crime to raise one's voice or use offensive language concerning *any*

5    *subject* to *any voter anywhere* in the State.

6          7.    By rewriting a criminal statute enacted by the Legislature and signed into law

7    by the Governor, the Secretary has violated separation-of-powers principles and unlawfully

8    arrogated lawmaking power to himself. The Secretary has no authority whatsoever to

9    (1) eliminate *mens* rea requirements, (2) add to the list of activities prohibited by statute, or

10    (3) eliminate criminal elements (*i.e.*, the Voting-Nexus Requirement).

11          8.    But even if the Secretary had authority to rewrite the criminal prohibition of

12    § 16-1013 as he purports to do, the Speech Restriction he crafted is patently

13    unconstitutional because it violates both the Free Speech and Due Process Clauses of the

14    Arizona Constitution. *See* Ariz. Const. art. 2, § 6 ("Free Speech Clause"); art. 2, § 4 (Due

15    Process Clause).

16          9.    The violations of the Free Speech Clause are numerous and multi-faceted

17    here. The Free Speech Clause of the Arizona Constitution is *broader* than the First

18    Amendment of the U.S. Constitution. *See*, *e.g.*, *Brush & Nib Studios, LC v. City of Phoenix*, 247

19    Ariz. 269, 281 (2019) ("[T]he Arizona Constitution provides broader protections for free

20    speech than the First Amendment.") (collecting cases). And under First Amendment

21    principles, the Speech Restriction is plainly unconstitutional here for at least four reasons.

22          10.    *First*, the U.S. Supreme Court has squarely held that "the First Amendment

23    … requires proof that the defendant had some subjective understanding of the threatening

24    nature of his statements." *Counterman v. Colorado*, 143 S. Ct. 2106, 2111 (2023). "The State

25    [thus] must show that the defendant consciously disregarded a substantial risk that his

26    communications would be viewed as threatening violence." *Id.* at 2111-12. But the Speech

27    Restriction reads the "knowingly" *mens rea* out of § 16-1013, and instead makes actions

28    criminal purely based on their "effect"—without any proof of *mens rea* at all. By dispensing

with any requirement of *mens rea*, the Secretary has violated the Free Speech Clause.

11.    *Second*, the State lacks authority to criminalize speech simply because voters might find it "offensive": "the fact that society may find speech offensive is not a sufficient reason for suppressing it. Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection." *FCC v. Pacifica Foundation*, 438 U.S. 726, 745-46 (1978); *see also United States v. Williams*, 553 U.S. 285, 306 (2008) ("[W]e have struck down statutes that tied criminal culpability to whether the defendant's conduct was 'annoying' or 'indecent.'").

12.    *Third*, by purporting to ban "insulting or offensive speech," the Speech Restriction is an unlawful content-based and viewpoint-based restriction on speech. *See, e.g.*, *Matal v. Tam*, 582 U.S. 218, 249 (2017) (holding that when a restriction "reflects the Government's disapproval of a subset of messages it finds offensive… [it] is the essence of viewpoint discrimination."). "Giving offense is a viewpoint." *Id* at 243. And "[b]y mandating positivity, [speech restrictions] might silence dissent and distort the marketplace of ideas." *Id* at 249.

13.    *Fourth*, even as applied to non-public forums such as voting locations, the Speech Restriction violates the First Amendment because it is not reasonable and is not "capable of reasoned application." *Minnesota Voters All. v. Mansky*, 585 U.S. 1, 23 (2018); *accord Center for Investigative Reporting v. SEPTA*, 975 F.3d 300, 315 (3d Cir. 2020) ("According to *Mansky*, a prohibition on speech is unreasonable if it fails to 'articulate some sensible basis for distinguishing what may come in from what must stay out.'" (quoting *Mansky*, 585 U.S. at 29)).

14.    The Speech Restriction's use of amorphous, open-ended terms like "insulting or offensive language" and "harassing" do not provide reasonable guidance that would distinguish permissible and impermissible speech. For example, would wearing a MAGA hat, an "All Lives Matter" button, or a "I Support the Second Amendment" T-shirt constitute "offensive speech" or be considered "harassing" to a voter that sees them? The EPM does not provide any guidance as to how to apply its indeterminate terms and thus

1   cannot be justified if the Speech Restriction were limited purely to the non-public forums

2   of voting locations (instead of applying everywhere else in the State, as it does by its plain

3   terms).

4         15.     The Speech Restriction also violates the Due Process Clause of the Arizona

5   Constitution, by violating fair notice principles. As an initial matter, by imposing liability

6   directly contrary to § 16-1013's actual text, the Speech Restriction violates due process.

7   Government cannot provide citizens notice of a criminal prohibition's elements and

8   requirements by statute and then—having lulled citizens into the belief that the statute only

9   prohibits what it actually says it prohibits—impose liability on a *far broader* basis. In addition,

10  the Speech Restriction is void on vagueness grounds because it "'fails to provide people of

11  ordinary intelligence a reasonable opportunity to understand what conduct it prohibits'"

12  and because "'it authorizes or even encourages arbitrary and discriminatory

13  enforcement.'" *Johnson v. United States*, 576 U.S. 591, 612 (2015) (quoting *Hill* v. *Colorado*,

14  530 U.S. 703, 732 (2000)).

15        16.     These legal violations are not mere drafting accidents, but rather intentional

16  policy choices made by the Secretary and approved by the Governor and Attorney

17  General. The Legislature specifically submitted comments to the Secretary on August 14,

18  2023, explicitly telling him that the Speech Restriction in the draft EPM violated the

19  underlying statutes as well as the Free Speech and Due Process Clauses. But the Secretary

20  refused to make any material changes, thereby making clear that he intended to adhere to

21  his chosen policy despite its glaring statutory and constitutional deficiencies—to which the

22  Secretary was made amply aware.

23        17.     Given the severe legal infirmities that pervade the Speech Restriction and the

24  flagrant indifference to legal niceties that produced it, many other provisions of the EPM

25  are similarly (and blatantly) unlawful. This suit challenges several of them.

26        18.     For example, A.R.S. § 16-544(B) specifically precludes mailing an early ballot

27  to "*a mailing address that is outside of this state for the purpose of the active early voting list* unless the

28  voter is an absent uniformed services voter or overseas voter as defined in the uniformed

and overseas citizens absentee voting act." (Emphasis added). But despite this clear prohibition, the 2023 EPM specifically authorizes voters to "make one-time requests to have their ballot mailed to an address *outside of Arizona* for specific elections" without any requirement that they are members of the uniformed services or overseas voters. 2023 EPM chapter 2, § 1(B)(1) (emphasis added).

19.     Similarly, A.R.S. § 16-165(A)(9) mandates that county recorders "*shall cancel a registration*" where a jury questionnaire indicates the voters is not a resident of the county and they do not respond to a notice. (emphasis added). But despite the statute requiring outright cancellation of the registration in mandatory language ("shall cancel"), the 2023 EPM instead directs county recorders merely to have the voter "*put into inactive status.*" 2023 EPM Chapter 1 § 9(C)(1) (emphasis added).

20.     As a final example, for signature verification, A.R.S. § 16-644(C) limits county recorders to verifying "the signature on the request form *with the voter's signature on the voter's registration form.*" (emphasis added). But the 2023 EPM violates this limitation by directing county records to "consult *additional known signatures from other official election documents in the voter's registration record*" for purposes of matching signatures. 2023 EPM Chapter 2 § 6(A) (emphasis added).

21.     The upshot is that the 2023 EPM flouts numerous unequivocal statutory mandates in a manner that is indefensible. It is a thoroughly lawless document that combines a wish list of ideological policy goals with a contempt of legal mandates.

22.     Because the Secretary was unwilling to conform the EPM to statutory and constitutional requirements, and because the Attorney General abdicated her responsibility to ensure that the 2023 EPM complied with those legal mandates, Plaintiffs seek relief from this Court to correct these manifest legal violations.

**LEGAL BACKGROUND**

23.     Every odd-numbered year, the Secretary has the statutory responsibility to "prescribe rules" for administering federal and state elections in Arizona. A.R.S. § 16-452. The rules are meant "to achieve and maintain the maximum degree of correctness,

impartiality, uniformity[,] and efficiency on the procedures for early voting and voting, and of producing, distributing, collecting, counting, tabulating[,] and storing ballots." *Id.*

24.     These rules are then outlined in "an official instructions and procedure manual," also known as the Elections Procedures Manual ("EPM").

25.     "The legislature has the exclusive power to declare what the law shall be." *State v. Prentiss*, 163 Ariz. 81, 85 (1989); *see also* Ariz. Const. art. IV (legislative power is vested in the legislature with people reserving certain legislative powers).

26.     The Legislature has exercised its legislative authority by constructing a detailed statutory scheme governing elections, codified in Titles 16 and 19.

27.     The Legislature delegated limited and specific authority to the Secretary of State to create an EPM on a specified set of topics that, when properly promulgated and approved, has the force and effect of law.

28.     The scope of permissible topics that an EPM may address is generally set forth in A.R.S. § 16-452(A). Specifically, it may issue regulatory provisions relating to "procedures for early voting and voting," as well as "fax transmittal of unvoted ballots, ballot requests, voted ballots and other election materials to and from absent uniformed and overseas citizens" and "internet receipt of requests for federal postcard applications prescribed by section 16-543." In addition, other statutory provisions supplement the permissible topics of an EPM. *See* A.R.S. §§ 16-168(I), 16-246(G), 16-315(D), 16-341(H), 16-411(B)(5)(b), 16-449(A)–(B), 16-543(A)–(C), 16-544(B), 16-579(A)(2), (E), 16-602(B), 16-926(A), 16-938(B), 19-118(A), 19-121(A)(5), 19-205.01(A).

29.     "[A]n EPM regulation that exceeds the scope of its statutory authorization or contravenes an election statute's purpose does not have the force of law." *Leach v. Hobbs*, 250 Ariz. 572, 576 ¶21 (2021).

30.     By creating an EPM that violates Arizona law, the Secretary exceeded his lawful jurisdiction to prescribe procedures pursuant to A.R.S. § 16-452 and other applicable Arizona laws.

31.     This Complaint asserts violations of Arizona statutory and constitutional law.

It does not assert any claim under/arising from the U.S. Constitution or federal statutory law.

32.     Because of the EPM's violations of Arizona constitutional and statutory law, parties like Plaintiffs, who participate in elections and election activities, cannot comply with the Legislature's statutory scheme without violating the EPM.

### THE PARTIES

33.     Plaintiff Arizona Free Enterprise Club ("AFEC") is a nonprofit organization in Arizona that is regularly involved in election activity in Arizona. AFEC advocates for public policy solutions in Arizona, including policies related to election integrity, free speech in the context of elections, and ensuring that government entities abide by their constitutional limitations.

34.     AFEC's members include registered voters who are affected by the threatened unlawful EPM provisions based on their election activities.

35.     AFEC's members, like virtually every U.S. citizen, occasionally raise their voice when speaking to others, including other voters. They similarly may use language at times that might be considered "threatening, insulting, or offensive" and that language may be directed at other voters. While perhaps not ideal conduct if measured against the standards of perfection, it is exceedingly common *human* conduct.

36.     That AFEC's members might use language that could be deemed "offensive," "threatening," or "harassing," is underscored by the bewildering array of speech now deemed to be "microaggressions" by other citizens.

37.     Indeed, "speech is violence" is an increasingly common mantra on college campuses and elsewhere, underscoring that for many people mere words can readily be deemed as threatening as actual violence. *See, e.g.*, Jonathan Turley, *"Your speech is violence': the left's new mantra to justify campus violence, The Hill (June 3, 2023), https://thehill.com/opinion/education/4032778-your-speech-is-violence-the-lefts-new-mantra-to-justify-campus-violence/.*

38.     Plaintiff Philip Townsend is an individual domiciled in Yuma County,

Arizona, registered to vote, and who plans on voting in the 2024 elections.

39. Plaintiff America First Policy Institute ("AFPI") is a 501(c)(3) non-profit organization. The organization works at the state level to get legislation enacted or stopped, which necessarily involves promoting elections and raising awareness of issues at elections.

40. AFPI trains volunteers and poll workers on how to focus on election integrity at polling locations before and during election day, how to be poll watchers, etc., which requires credentialing and specific processes.

41. AFPI has conducted poll-worker training sessions in Arizona in the past and intends to conduct at least two additional sessions in 2024.

42. Unless the provisions of the EPM regulating speech are enjoined or otherwise invalidated, AFPI will be forced to include in those sessions training about how to comply with the EPM's speech provisions. In doing so, AFPI will incur compliance costs as a result of its need to design and conduct EPM-specific training.

43. AFPI has also conducted grassroots workshops about election related issues in Arizona in the past and intends to do so in the future. In doing so, AFPI engages in communications with Arizona voters. For example, AFPI conducted a workshop on ranked-choice voting in Mesa in January 2024.

44. As part of its policy objectives, AFPI regularly communicates with adults throughout Arizona—many of whom happen to be voters.[2] Many of those adults/voters are supportive of AFPI's policy positions. Others may oppose AFPI's positions and may even be offended by AFPI's messages about them, particularly in this recent era known for snowflakes and strategic weaponization of taking offense to silence opposing viewpoints. As a result of the EPM's provisions, AFPI has had to alter how it conducts its operations and communications in Arizona to avoid potential EPM violations (and has had to do so in a manner not required in other states).

---

[2] Although AFPI regularly communicates with individuals in Arizona, many of whom are registered voters, it does not advocate for the election of specific candidates or adoption or rejection of particular ballot measures.

45.     AFPI also has about 300,000 members, who are widely dispersed throughout the United States. Many of those members routinely advocate for governmental policies to other adults, including in Arizona. Those members also face a risk of enforcement from the EPM's provisions.

46.     Therefore, AFPI faces a real threat and controversy with the 2023 EPM because of how it directly conflicts with the Arizona Constitution and Arizona statutes.

47.     Defendant Adrian Fontes is the Secretary of State and is named in this action in his official capacity only. The Secretary is a constitutional officer who is part of the Executive Branch of the government of the State of Arizona. His primary address in Maricopa County.

48.     Under A.R.S. § 16-452, the Secretary is responsible for promulgating an EPM every two years, which, upon approval by the Arizona Governor (the "Governor"), and the Arizona Attorney General, has the force of law. In addition, the Secretary is the chief state election officer. *See* A.R.S. § 16-142(A)(1).

49.     Defendant Kris Mayes is the Attorney General and is named in this action in her official capacity only. The Attorney General is a constitutional officer who is part of the Executive Branch of the government of the State of Arizona. She has her primary address in Maricopa County. The Attorney General has the statutory authority to enforce and prosecute election violations found in Title 16 under A.R.S. § 16-1021.

## JURISDICTION AND VENUE

50.     This Court has jurisdiction over this action pursuant to Article 6, § 14 of the Arizona Constitution and A.R.S. §§ 12-123, 12-1801, 12-1831, 12-2021, 41-1034(A), and Rules 3(a)–(b) and 4(a), Ariz. R. P. Special Actions.

51.     Venue lies in Maricopa County pursuant to A.R.S. §§ 12-401(16), 41-1034(A), and under Rule 4(b), Ariz. R. P. Special Actions because Defendant resides and holds office in Maricopa County and Plaintiff seeks declaratory, special action, and other relief.

52.     Venue is also proper in Maricopa County under Rule 4(b), Ariz. R. P. Special

Actions, A.R.S. 12-401(16), because the Secretary holds office in Maricopa County.

53.    This Court has personal jurisdiction over Defendants, who reside in Maricopa County.

### GENERAL ALLEGATIONS

54.    The Arizona Constitution vests the Legislature with the authority to enact "laws to secure the purity of elections and guard against abuses of the elective franchise." Ariz. Const. art. 7, § 12.

55.    The Legislature did so, and those laws are contained in Titles 16 and 19.

56.    The Legislature also delegated limited authority to the Secretary to "prescribe rules to achieve and maintain the maximum degree of correctness, impartiality, uniformity[,] and efficiency on the procedures for early voting and voting, and of producing, distributing, collecting, counting, tabulating[,] and storing ballots." A.R.S. § 16-452(A).

57.    The Legislature delegated limited authority on other topics to be included in the EPM, as stated by A.R.S. §§ 16-168(I), 16-246(G), 16-315(D), 16-341(H), 16-411(B)(5)(b), 16-449(A)–(B), 16-543(A)–(C), 16-544(B), 16-579(A)(2), (C), 16-602(B), 16-926(A), 16-938(B), 19-118(A), 19-121(A)(5), 19-205.01(A).

58.    These statutory delegations are specific and exhausting, meaning that if a provision of the EPM is not authorized by a statute, then it cannot carry the force of law. *Leach*, 250 Ariz. at 576 ¶ 21.

59.    The EPM must be "issued not later than December 31 of each odd-numbered year immediately preceding the general election." § 16-452(B).

60.    Before doing so, the Secretary must submit a draft to the Governor and the Attorney General, and each must approve it. *Id.*

61.    "Once adopted, the EPM has the force of law; any violation of an EPM rule is punishable as a class two misdemeanor." *Ariz. Pub. Integrity All. v. Fontes*, 250 Ariz. 58, ¶ 16 (2020) (citing § 16-452(C)).

62.    "It is generally agreed that the legislature may provide criminal penalties for

1    the violation of rules and regulations to be enacted by administrative agencies under proper

2    circumstances." *State v. Phelps*, 12 Ariz. App. 83, 85 (1970) (citation omitted).

3        63.    Courts reviewing such administrative rules strictly construe them to ensure

4    that they are "not broadened beyond the clear and express intent of the legislature." *Id.*

5    at 86 (citation omitted).

6                                    **THE 2023 EPM**

7        64.    On or around July 31, 2023, the Secretary published a 268-page draft EPM

8    for public comment.

9        65.    The Secretary only permitted only 14 days to provide comments on the draft

10   EPM. Despite that, individuals and organizations submitted comments opposing provisions

11   in the draft EPM.

12       66.    In particular, on August 14, 2023, Ben Toma, Speaker of the Arizona House

13   of Representatives, and Warren Peterson, President of the Arizona Senate, submitted

14   comments opposing provisions of the draft EPM. Among other comments, the legislative

15   leaders argued that the Speech Restriction violated Arizona statutory law, the First

16   Amendment, and the Free Speech and Due Process Clauses of the Arizona Constitution.

17       67.    After receiving public comment, the Secretary published an updated draft

18   EPM and transmitted the same to the Governor and the Attorney General for their review

19   and approval under § 16-452.

20       68.    The Speech Restriction of Chapter 9, §3(D) was not changed in response to

21   the statutory and constitutional concerns raised by the legislative leaders.

22       69.    By refusing to make any changes to the Speech Restriction in response to the

23   comments objecting to it, the Secretary has refused to disavow enforcement of the provision

24   as written. Indeed, his actions demonstrate that Plaintiffs face a credible threat of

25   prosecution under the Speech Restriction, and the Secretary is likely to make criminal

26   referrals for perceived violations of the Speech Restriction.

27       70.    "[T]he 'credible threat of prosecution' is a 'quite forgiving' requirement that

28   sets up only a 'low threshold' for a plaintiff to surmount" to establish standing. *Antonyuk v.*

1  *Chiumento*, 89 F.4th 271, 334 (2d Cir. 2023) (citation omitted). "Courts have not placed the
2  burden on the plaintiff to show an intent by the government to enforce the law against it
3  but rather presumed such intent in the absence of a disavowal by the government." *Id.*
4  (cleaned up); *see also California Trucking Ass'n v. Bonta*, 996 F.3d 644, 653 (9th Cir. 2021)
5  ("Here, the state's refusal to disavow enforcement is strong evidence that the state intends
6  to enforce the law and that the plaintiffs face a credible threat." (cleaned up)).

7      71.    The day before the deadline for the Secretary to publish the EPM, the
8  Secretary published the final draft, which was now 385 pages, included many provisions
9  not present in the prior drafts.

10     72.    The Governor and the Attorney General provided their assent to the final
11  EPM.

12     73.    By granting her assent to the Secretary's EPM, the Attorney General made
13  a determination that the 2023 complied with federal and Arizona law notwithstanding the
14  objections made to it.

15     74.    Because the Attorney General could have exercised a veto over the EPM's
16  publication if she had deemed its provisions to violate the Arizona Constitution or Arizona
17  statutory law, her approval of the EPM signals that she believes that the EPM is lawful and
18  that she intends to enforce its provisions.

19     75.    The Attorney General's grant of consent to the EPM notwithstanding its legal
20  infirmities constitutes a "refusal to disavow enforcement" of the EPM. *Bonta*, 996 F.3d at
21  653.

22     76.    On January 11, 2024, the Secretary published an updated "final" EPM,
23  which corrected and added dates in Chapter 15. This is the EPM at issue, and which the
24  Secretary seeks to enforce.

25     77.    The 2023 EPM includes several rules and provisions that directly contradict
26  Arizona's constitution and statutes. This Complaint challenges several of those violations.

27  **2023 EPM VIOLATIONS OF THE ARIZONA CONSTITUTION**

28     78.    Chapter 2, section 1, of the 2023 EPM authorizes county recorders and other

election officials to take actions to prohibit "harassment" (hereinafter, "Harassment Provision"). It states that:

> The County Recorder or officer in charge of elections may establish and implement additional local procedures for ballot drop-off locations to protect the security and efficient operation of the ballot drop-off location. For example, the County Recorder or officer in charge of elections may restrict activities that interfere with the ability of voters and/or staff to access the ballot drop-off location free from obstruction or harassment.

79.    The 2023 EPM then gives examples of "harassment" in a footnote without providing any specific definition of "harassment" means:

> Some examples of actions that likely constitute voter intimidation or harassment are: (1) repeatedly entering or staying within 75 feet of a ballot drop box or the entrance to a building where a drop box is located for the purpose of watching or monitoring individuals who are delivering ballots; (2) intentionally following individuals delivering ballots to the drop box when such individuals are not within 75 feet of a drop box; (3) speaking to or yelling at an individual, without provocation, who that person knows is returning ballots to the drop box and who is within 75 feet of the drop box; (4) openly carrying firearms within 250 feet of a ballot drop box or visibly wearing body armor within 250 feet of a ballot drop box. *See* Temporary Restraining Order at 1–2, *Ariz. All. for Retired Ams., et al. v. Clean Elections USA, et al.*, 638 F. Supp. 3d 1033 (D. Ariz. 2022) (No. 2:22CV01823).

2023 EPM at 73-74 & n.40 (ch. 2, § I(I)(10)).

80.    The Harassment Provision violates the Free Speech Clause.

81.    Arizona's constitution guarantees that "[e]very person may freely speak, write, and publish on all subjects," but holds each person "responsible for the abuse of that right." Ariz. Const. art. 2, § 6.

82.    When the government opens property to the public, it cannot "arbitrarily restrict the freedom of individuals, lawfully on the property to exercise their [free speech] rights." *New Times v. Ariz. Bd. of Regents*, 110 Ariz. 367, 371–72 (1974).

83.    And under Arizona's Free Speech Clause, the government can place "time, place, and manner" restrictions, but they must do so with "narrow specificity," *Mtn. States Tel. & Tel. Co. v. Ariz. Corp. Comm'n*, 160 Ariz. 350, 357–58 (1989), keeping in mind that "minor matters of public inconvenience or annoyance cannot be transformed into

substantive evils of sufficient weight to warrant curtailment of liberty of expression by legislative preferences or beliefs." *New Times*, 110 Ariz. at 372.

84.     The Harassment Provision of the 2023 EPM violates Arizona's Free Speech Clause and inflicts injury upon Plaintiffs. For example, AFEC encourages and trains workers and volunteers to watch polls, polling locations, and drop boxes to promote election integrity and to help restore Arizona citizens' confidence in the integrity of elections.

85.     At a minimum, the 2023 EPM will require AFEC to train its workers to avoid violations of the 2023 EPM. Moreover, the combination of the (1) lack of any specific definition of "harassment" with (2) the extremely broad examples constituting harassment (*e.g.*, merely "speaking to … an individual, without provocation, who that person knows is returning ballots to the drop box and who is within 75 feet of the drop box") means that AFEC will have to curtail its planned election integrity efforts to comply with the 2023 EPM. Moreover, the breadth of the EPM's breadth and the indeterminacy of its amorphous "harassment" prohibition means that AFEC and its members face a credible threat of prosecution if it were to carry out its planned election-integrity related activities.

86.     As part of its election integrity efforts, AFEC may at times wish to speak to voters returning ballots to ask them politely questions such as whether they have encountered any issues with voting, were sent any ballots to individuals that do not/no longer reside at their address, etc. But the Harassment Provision bans *all* attempts to speak to voters returning ballots no matter how polite/non-harassing the speech might be.

87.     Indeed, the Harassment Provision would seemingly ban even an "unprovoked" saying "hello" to a neighbor or work colleague that happened to be returning a ballot. While not harassing in any manner, initiation of a conversation by simple "Hi!" would constitute "speaking to … an individual, without provocation" and thus be potentially punishable as a class two misdemeanor.

88.     Similarly, AFPI engages in election-integrity-related efforts in Arizona and other states, including training poll watchers and workers. AFPI will incur compliance costs

1    to train its workers to comply with the requirements of the Harassment Provision. And it

2    will similarly be forced to curtail its planned activities due to the expansive and ill-defined

3    nature of the Harassment Provision, which bans even initiation of social pleasantries to a

4    voter returning a ballot within 75 of a drop box.

5        89.    The Harassment Provision alternatively violates § 16-452(A) by casting a net

6    far wider than necessary for the Secretary to "prescribe rules to achieve the maximum

7    degree of correctness, impartiality, uniformity[,] and efficiency" for Arizona elections.

8        90.    Similarly, the Speech Restriction in chapter 9, section 3(D) of the 2023 EPM

9    violates Arizona's Free Speech Clause. That provision purports to ban "*Any activity* by a

10   person with the intent *or effect* of threatening, harassing, intimidating, or coercing voters (or

11   conspiring with others to do so) *inside or outside the 75-foot limit at a voting location* is prohibited."

12   (emphasis added).

13       91.    The Speech Restriction appears in Chapter 9 of the EPM, which addresses

14   "Conduct of Elections/Election Day Operations." Although other provisions in Chapter 9

15   are explicitly limited to election days, there is no temporal limitations in the Speech

16   Restriction. The Speech Restriction thus applies on all days, and not merely election days.

17       92.    The Speech Restriction also has no geographic limitation. It explicitly applies

18   to "any activity … inside *or outside* the 75-foot limit at a voting location." (emphasis added).

19   The combination of all spaces inside *or outside* those perimeters is of course the entire

20   universe of land within Arizona's borders.

21       93.    The Speech Restriction purports to limit or ban many activities that would

22   otherwise be lawful under Arizona's Free Speech Clause, claiming that it would constitute

23   "intimidating conduct." For example, it lists all of the following as conduct that "may also

24   be considered intimidating conduct inside or outside the polling place":

25   - "Aggressive behavior, *such as raising one's voice* or taunting a voter or poll
26     worker;
     - Using *threatening, insulting, or offensive language* to a voter or poll worker;
27   - Following voters or poll workers coming to or leaving a voting
28     location, including to or from their vehicles;

- • [Q]uestioning, photographing, or videotaping voters or poll workers in a harassing or intimidating manner, including when the voter or poll worker is coming to or leaving the polling location;
- • Posting signs or communicating messages about penalties for "voter fraud" in a harassing or intimidating manner."

94.    But these prohibitions reach a broad swath of activities that are protected under Arizona's Free Speech Clause.

95.    For example, AFEC's and AFPI's members are not only interested in observing activity at drop boxes, but they are also just as interested in conveying a message to others that the drop boxes are being watched and should be watched.

96.    Moreover, AFEC's and AFPI's members are human beings that—like virtually all of citizens—engage in universal human activities. They sometimes raise their voices; they sometimes use language that could be deemed "insulting" or threatening; they sometimes use "offensive language," including occasional expletives. For example, some of Plaintiffs' members sometimes engage in heated discussions about sports—which sometimes might involved raised voices, offensive language, or insults directed at other teams and others' loyalty to such teams. So too with a broad variety of other topics that have nothing to do with voting or even politics or public policy. Such imperfect conduct often occurs with and between other voters. And is now criminalized under the Speech Restriction.

97.    While these activities are perhaps not the pinnacle of ideal human behavior, they are nonetheless extremely common human failings that mark the human condition. As Thomas Jefferson remarked, "If men were angels, no government would be necessary." And while all men were "endowed by their Creator with certain unalienable Rights," they were not simultaneously endowed with the sort of perfect temperaments and absolute self-control that would prevent them from raising their voices or forswearing all expletives for the entirety of their earthly existences. Virtually all Arizona residents—including Plaintiffs' members—have engaged in conduct that would violate the Speech Restriction, and are virtually certain to do so again in the future.

98.     Plaintiffs' members thus face a credible threat of prosecution under the Speech Restriction, particularly as the Secretary and Attorney General approved the Speech Restriction *after* its manifest incompatibility with Arizona's Free Speech Clause was brought to their attention.

99.     Plaintiffs and their members will also have their speech chilled and be compelled to engage in self-censorship due to the Speech Restriction—particularly given its astounding breadth.

100.     In addition, Plaintiffs AFEC and AFPI will incur compliance costs attempting to train their employees and members to avoid liability under the Speech Restriction. Those compliance costs are particularly acute given the indeterminacy of the Speech Restriction's actual parameters, where its key terms are not defined but instead merely discussed with illustrative and strikingly broad examples.

101.     By criminalizing speech that is protected under Arizona's Free Speech Clause, the Speech Restriction violates the Arizona Constitution.

102.     Furthermore, and as explained in more detail below, the Speech Restriction unlawfully amends A.R.S. § 16-1013 by *inter alia*: (1) eliminating the *mens rea* requirement, (2) expanding what conduct is criminal by adding "harassment"—a term found nowhere in §16-1013's actual text, and (3) eliminating the Voting-Nexus Requirement.

103.     The Arizona Constitution states that "[n]o person shall be deprived of life, liberty, or property without due process of law." Ariz. Const. art. 2, § 4.

104.     This Arizona Due Process Clause requires that if the government, including one of its agencies, changes a criminal statute, it must give sufficient notice to the public.

105.     The Speech Restriction violates the Due Process Clause because it attempts to impose criminal liability well beyond what § 16-1013's actual text provides—and thus provides "fair notice" of what is criminally prohibited.

106.     By purporting to impose liability well beyond what § 16-1013's actual text provides, the Speech Restriction violates the fair notice requirements of the Due Process Clause.

107.    The Harassment Provision and Speech Restriction also violate the Due Process Clause under the void-for-vagueness doctrine. Under that doctrine, a criminal prohibition violates due process where it "'fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits'" or "authorizes or even encourages arbitrary and discriminatory enforcement.'" *Johnson*, 576 U.S. at 612 (quoting *Hill*, 530 U.S. at 732).

108.    Here those two provisions do both: their amorphous and indeterminate prohibitions fail to give fair notice as to what conduct is actually prohibited and, as a result, authorize and encourage "arbitrary and discriminatory enforcement." *Id.*

### 2023 EPM VIOLATES ARIZONA STATUTORY LAW

109.    Many provisions of the 2023 EPM either conflict directly with the plain language of Arizona statutes or lack any statutory authorization.

### *Voter Registration*

110.    All of chapter 1 in the 2023 EPM deals with voter registration. However, no Arizona statute authorizes or delegates rule-making authority to the Secretary regarding voter registration. Therefore, the Secretary exceeded his statutory authorization, and this entire chapter should be declared invalid. *See, e.g.*, *Leach*, 250 Ariz. at 576 ¶21 ("[A]n EPM regulation that exceeds the scope of its statutory authorization or contravenes an election statute's purpose does not have the force of law.").

### *Non-Residency of Juror Questionnaire Rule*

111.    In chapter 1, section 9(C)(1), the 2023 EPM states that upon reviewing the summary report from a juror questionnaire and identifying a voter that has indicated that the he or she is not a resident of the county in which he/she is registered:

> [T]he County Recorder shall send the person notice by forwardable mail and a postage prepaid, preaddressed return form requesting the person confirm by signing under penalty of perjury that the person is a resident of the county and is not knowingly registered to vote in another county or another state. The notice shall inform the person that failure to return the form within thirty-five days will result in the person's registration *being put into inactive status* and may ultimately lead to cancelation of their voter registration.

1   (Emphasis added).

2       112.   Section 16-165(A)(9), however, provides that:

3       [A] county recorder *shall cancel a registration* … [w]hen the county
4       recorder receives written information from the person registered that the person has a
    change of address outside the country, including when the county
5       recorder … [r]eceives a summary report from the jury commissioner or jury
    manager pursuant to section 21-314 indicating that the person has stated that
6       the person is not a resident of the county. *Before the county recorder cancels a*
    *registration pursuant to this subdivision*, the county recorder shall send the person
7       notice by forwardable mail and a posted prepaid preaddressed return from
    requesting the person confirm by signing under penalty of perjury that the
8       person is a resident of the county and is not knowingly registered to vote in
    another county or another state. *The notice shall inform the person that failure to*
9       *return the form within third-five days will result in the person's registration being canceled.*
    *If the person fails to return the notice within thirty-five days the county recorder shall cancel*
10      *the person's registration.*

11

12  (Emphasis added)

13      113.   Thus, the 2023 EPM directly conflicts with the language of § 16-165(A)(9).

14  That statute mandates *outright cancellation* of registrations where reports indicate the

15  individual is not a resident and the notice is not returned, but the 2023 EPM unlawfully

16  attempts to change the consequence to being placed in *inactive* status.

17                              ***Investigations of Citizenship Status***

18      114.   In chapter 1, section 9(C)(2)(a), the 2023 EPM states that there are "several

19  ways in which a County Recorder may obtain information pursuant to A.R.S. § 16-165

20  that a registrant is not a U.S. Citizen[, …] third-party allegations of non-citizenship are not

21  enough to initiate this process."

22      115.   Section 16-165(I), however, states that the county recorder should initiate this

23  process when he or she "has reason to believe [the person is] not [a] United States

24  citizen[]."

25      116.   The plain language of § 16-165(I) thus does exclude third-party allegations

26  from supplying the requisite "reason to believe" that an individual is not a U.S. citizen and

27  the 2023 EPM violates § 16-165(I) by categorically barring such information from ever

28  constituting a sufficient "reason to believe."

*Active Early Voting List*

117.   In chapter 2, section 1(B)(7), the 2023 EPM discusses a new statutory requirement in A.R.S. § 16-544(H) that requires the county recorder to send Active Early Voting List ("AEVL") removal notices after the voter fails to vote in any election in two consecutive election cycles.

118.   That requirement came as a result of Senate Bill 1485, which was passed into law when Governor Ducey signed it on May 11, 2021. Therefore, the 2022 election cycle had not begun yet.

119.   The 2023 EPM directs that "[b]ecause the 2022 election cycle began before S.B. 1485 (2022) took effect and S.B. 1485 does not apply retroactively, the first two full election cycles after S.B. 1485's effective date are the 2024 and 2026 election cycles. Therefore, the first AEVL removal notices must be sent out by January 15, 2027 to AEVL voters who vote by early ballot in zero eligible elections in the 2024 and 2026 election cycles." (hereinafter "2027 Effective Date Provision").

120.   This 2027 Effective Date Provision contradicts the statute, however, because § 16-544(H)(4) became effective during the 2022 election cycle, and thus, the registrant's subsequent voting (or non-voting) in the 2022 and 2024 election cycles must be given full effect and the AEVL removal notices must be sent out in 2025. Failure to enforce this section means that more voters will be included in the election than should be, which will dilute Plaintiff's vote.

121.   Additionally, chapter 2, section 1(B)(1) states that "an AEVL voter may make one-time requests to have their ballot mailed to an address outside of Arizona for specific elections."

122.   Section 16-544(B), however, specifically prohibits such out-of-state AEVL ballot mailings, providing that "[t]he voter shall *not list a mailing address that is outside of this state for the purpose of the active early voting list* unless the voter is an absent uniformed services voter or overseas voter as defined in the uniformed and overseas citizens absentee voting act." (Emphasis added).

1

*UOCAVA Deadlines*

2      123.    In chapter 2, section 1(F), the EPM grants the Secretary the ability to

3  "continue or lengthen the early voting process for UOCAVA [Uniformed and Overseas

4  Citizens Absentee Voting Act of 1986] voters," if there is a natural disaster or emergency.

5      124.    While A.R.S. § 16-543(C) allows for the Secretary in creating an EPM under

6  16-452 to create "emergency procedures regarding the early balloting process for persons

7  who are subject to [UOCAVA]," it does not grant the Secretary the authority to extend

8  the deadlines.

9      125.    Extending the deadlines directly conflicts with the deadlines and plain

10  language of A.R.S. §§ 16-551(C), and -565(A).

11                        *Signature Verification*

12      126.    In chapter 2, section 6(A), the 2023 EPM directs the county recorder, "upon

13  receipt of the return envelope with an early ballot and completed affidavit," to "compare

14  the signature on the affidavit with the voter's signature in the voter's registration record,"

15  but also directs the county recorder to "consult *additional known signatures from other official*

16  *election documents in the voter's registration record.*"

17      127.    However, in A.R.S. § 16-644(C), the county recorder is limited to verifying

18  "the signature on the request form *with the voter's signature on the voter's registration form.*"

19      128.    Therefore, the 2023 EPM here directly violates the plain language of § 16-

20  644(C).

21                  *Inconsistent Signatures on Early Ballots*

22      129.    In chapter 2, section 6(A), the 2023 EPM states "early ballots cast in-person

23  should not be invalidated based solely on an allegedly inconsistent signature absent other

24  evidence."

25      130.    However, in A.R.S. § 16-550(A), requires the county recorder *not* to accept

26  the ballot, but instead to "make reasonable efforts to contact the voter, advise the voter of

27  the inconsistent signature[,] and allow the voter to correct or the county to confirm the

28  inconsistent signature."

1    131.    Thus, the 2023 EPM directly violates the plain language of § 16-550(A).

2    ### *Validity of Circulator Registrations Rule*

3    132.    In chapter 6, section 2, the 2023 EPM states that:

4    The requirement to list certain information on the circulator portal does not
5    mean that a circulator's signatures shall be disqualified *if the circulator makes a*
      *mistake or inconsistency in listing that information* (e.g., a phone number or email
6    address that is entered incorrectly; a residential address that doesn't match
      the residential address listed on that circulator's petition sheets; etc.).
7

8    (Emphasis added).

9    133.    However, A.R.S. § 19-118(B) requires that the circulator must submit his or

10   her "full name, residence address, telephone number[,] and email address" and an affidavit

11   that "all of the information provided *is correct* to the best of [his or her] knowledge."

12   (Emphasis added).

13   134.    Thus, not only does this portion of the 2023 EPM directly violate § 19-

14   118(B)'s plain language, it also causes problems because "statutory requirements for

15   statewide initiative measures must be strictly construed and persons using the initiative

16   process must strictly comply with those [] statutory requirements." A.R.S. § 19-102.01(A).

17   Therefore, the 2023 EPM also violates the directly language and requirements of § 19-

18   102.01(A).

19   ### *Redefining Criminal Liability*

20   135.    The Speech Restriction, as already mentioned above, not only bans

21   protected speech inside or *outside* the 75-foot limit, but also invalidly criminalizes

22   significantly more acts than even the statutes that it purports to implement.

23   136.    The Speech Restriction punishes "a person with the intent *or effect* of

24   threatening, *harassing*, intimidating, or coercing voters (or conspiring with others to do so)

25   inside *or outside* the 75-foot limit at a voting location." (Emphasis added).

26   137.    Sections 16-1013 and -1017, however, create a much narrower criminal law

27   than the rule in 2023 EPM. First, § 16-1013 states:

28   A. It is unlawful for a person *knowingly*:

1. Directly or indirectly, to *make use of force, violence or restraint, or to inflict or threaten infliction,* by himself or through any other person, of any injury, damage, harm or loss, or in any manner to practice intimidation upon or against any person, *in order to induce or compel such person to vote or refrain from voting for a particular person or measure at any election provided by law, or on account of such person having voted or refrained from voting at an election.*

2. By abduction, duress or any forcible or fraudulent device or contrivance whatever, to impede, prevent or otherwise interfere with the free exercise of the elective franchise of any voter, or to compel, induce or to prevail upon a voter either to cast or refrain from casting his vote at an election, or to cast or refrain from casting his vote for any particular person or measure at an election.

(Emphasis added).

138.    And § 16-1017 adds this:

A voter who *knowingly* commits any of the following acts is guilty of a class 2 misdemeanor:

…

2. Interferes with a voter *within the seventy-five foot limit* of the polling place as posted by the election marshal or within seventy-five feet of the main outside entrance to an on-site early voting location established by a county recorder pursuant to section 16-542, subsection A.

3. Endeavors while *within the seventy-five foot limit* for a polling place or on-site early voting location *to induce a voter to vote for or against a particular candidate or issue.* …

(Emphasis added).

139.    Thus, this 2023 EPM rule violates these statutes in four separate ways.

140.    *First,* §§ 16-1013 and -1017 have a "knowing" *mens rea,* where the 2023 EPM reduces the *mens rea* to criminal negligence if the person's actions have the "effect of" violating the statute. *See, e.g., State v. Phelps,* 12 Ariz. App. 83, 85-86 (1970) ("It is generally agreed that the legislature may provide criminal penalties for the violation of rules and regulations to be enacted by administrative agencies under proper circumstances…. However, it must be remembered that this being a crime, the statute must be strictly construed and not broadened beyond the clear and express intent of the legislature.").

141.    *Second,* it includes possible conduct that is not included in either statute:

1    harassing, which is unrelated to what the statute is trying to protect against.

2    142.    *Third*, the 2023 EPM is not tied to voters trying to vote, or coercing a voter

3    to vote for a particular candidate or issue.

4    143.    For example, the Speech Restriction would penalize any of the Plaintiffs for

5    simply sitting 150 feet away from a polling location or drop box because it might have the

6    effect of harassing an unreasonably sensible voter.

7    144.    By way of another example, the Speech Restriction would penalize those who

8    would be otherwise lawfully advocating or parading 100 feet away from a polling location

9    or drop box for something completely unrelated to any election measure—perhaps a

10    birthday party—because it might have the effect of harassing those who want to vote in

11    peace.

12    145.    It would also criminalize, for example, a variety of activities that might be

13    deemed "harassing" under that undefined term. For example, wearing an MAGA hat, an

14    "All Lives Matter" button, or a "From the River to the Sea, Palestine Will Be Free" could

15    all be deemed "harassing" under that expansive-yet-undefined term.

### *Duty to Canvass*

16

17    146.    In chapter 13, section 2, the 2023 EPM states that the "Secretary of State has

18    a non-discretionary duty to canvass the returns" but "[i]f the official canvass of any county

19    has not been received by [the] deadline, the Secretary of State must proceed with the state

20    canvass without including the votes of the missing county."

21    147.    Section 16-648(C), however, expressly states that "if the official canvass of

22    any county has not been received on the fourth Monday following the general election, the

23    canvass shall be postponed from day to day, *not to exceed thirty days from the date of the election,*

24    *until canvasses from all counties are received.*" (Emphasis added).

25    148.    Thus, the 2023 EPM directly contradicts the plain language and procedure

26    of § 16-648(C).

27

28

1

2

**COUNT I**
**Violations of Arizona Constitution**
**(Declaratory and Injunctive Relief)**

3

149.    Plaintiffs incorporate the paragraphs above as if stated here.

4

5

6

150.    The 2023 EPM criminalizes otherwise protected free speech inside or outside a 75-foot limit of a voting location through its Harassment Provision and Speech Restriction.

7

8

9

151.    Plaintiffs face a real threat of prosecution because the Attorney General signed off on this version of the 2023 EPM, meaning that there is a threat of prosecution for violations of the 2023 EPM.

10

11

152.    The Attorney General has not disavowed enforcing the Harassment Provision and Speech Restriction.

12

13

153.    Plaintiffs engage in election activities that would otherwise be lawful under Arizona's Free Speech Clause but would violate 2023 EPM.

14

15

16

154.    Organizations like AFEC and AFPI have standing to assert their own respective free speech rights as well as that of their respective members. *Mtn. States Tel. & Tel. Co. v. Ariz. Corp. Comm'n*, 160 Ariz. 350, 356 (1989).

17

18

19

155.    But under the current 2023 EPM, such conduct would be considered criminal. Therefore, Plaintiffs' members face an actual threat of prosecution from the Attorney General for actions that are otherwise lawful under the Arizona Constitution.

20

21

22

156.    Furthermore, the 2023 EPM changed criminal laws by broadening the scope of conduct that would be criminal well beyond what is written in the statutes related to election violations.

23

24

25

157.    The Speech Provision also violates the Due Process Clause because (1) it imposes criminal liability well beyond what § 16-1013 provides fair notice is prohibited and (2) is unconstitutional under the void-for-vagueness doctrine.

26

27

28

1

2

<center>**COUNT II**
**Violations of Arizona Statutes**
**(Declaratory and Injunctive Relief)**</center>

3       158.    Plaintiffs incorporate the paragraphs above as if stated here.

4       159.    The 2023 EPM has many provisions that are not authorized by Arizona

5   statutes, or directly contradict the relevant statutory provisions that the EPM purports to

6   implement.

7       160.    Plaintiffs face a real threat because the Attorney General signed off on this

8   version of the 2023 EPM, meaning that there is a threat of prosecution for violations of the

9   2023 EPM.

10      161.    Plaintiffs are affected by these statutory problems because Plaintiffs (1) will

11  incur compliance costs in training members to comply with the unlawful requirements of

12  the EPM and (2) will be forced to curtail activities they otherwise planned to engage in as

13  a result of the EPM's criminalization of those provisions. Plaintiffs are further harmed

14  because the EPM's broad provisions will chill their planned speech and conduct.

15      162.    Alternatively, many of these statutory problems create issues of diluting

16  Plaintiffs, or the institutional Plaintiffs' members' votes by allowing others to vote that

17  otherwise would not be allowed to vote, counting votes that should otherwise not be valid

18  under Arizona statutes, or extending the deadlines to vote beyond the statutory timeframe.

19  <center>**PRAYER FOR RELIEF**</center>

20          WHEREFORE, Plaintiffs respectfully request that the Court provide the following

21  expedited relief:

22          A.      A declaratory judgment under A.R.S. §§ 12-1831, -1832 and special action

23  relief pursuant to Arizona Rule of Special Action Procedure 3(b) or other applicable law

24  providing that that the 2023 EPM provisions challenged in this action violate article II,

25  sections 2, 4, and 26 of the Arizona Constitution, and thus are void;

26          B.      A declaratory judgment under A.R.S. §§ 12-1831, -1832 and special action

27  relief pursuant to Arizona Rule of Special Action Procedure 3(b) or other applicable law

28  providing that that the 2023 EPM provisions challenged in this action contradict or exceed

<center>**ER-359** 28</center>

1  statutory authority and therefore lack the force of law and are void;

2      C.    A declaratory judgment under A.R.S. §§ 12-1831, -1832 and special action

3  relief pursuant to Arizona Rule of Special Action Procedure 3(b) or other applicable law

4  providing that that A.R.S. § 16-452(C) does not apply to the provisions challenged in this

5  action because they violate either the Arizona Constitution or Arizona statutes and thus

6  are void.

7      D.    A preliminary and permanent injunction pursuant to Ariz. R. Civ. P. 65 or

8  other applicable law prohibiting the Secretary from enforcing or implementing the

9  challenged provisions of the 2023 EPM.

10     E.    Issuance of a writ of mandamus against the Secretary under A.R.S. § 12-

11  2021, directing him to promulgate an EPM that complies with the Arizona Constitution

12  and statutory law.

13     F.    An award of Plaintiffs' reasonable attorneys' fees and costs pursuant to A.R.S.

14  §§ 12-341, 12-348.01, 12-1840, and 12-2030 (the private attorney general doctrine) or any

15  other applicable law.

16     G.    Any other relief as the court deems necessary, equitable, proper, and just.

17     Dated this 15th day of April, 2024.

18                            HOLTZMAN VOGEL BARAN
19                            TORCHINSKY & JOSEFIAK PLLC

20                            By: */s/ Andrew Gould*
21                                 Andrew Gould
                                  Drew C. Ensign
22                                 Brennan A.R. Bowen
                                  Daniel Tilleman
23                                 2575 E. Camelback Road, Suite 860
24                                 Phoenix, AZ 85016
                                  *Attorneys for Plaintiff*
25

26  ORIGINAL of the foregoing electronically
27  filed this 15th day of April, 2024.

28

1 | COPY of the foregoing emailed this
2 | 15th day of April, 2024, to:

3 | Kara Marie Karlson
   | Karen J. Hartman-Tellez
4 | Kyle Cummings
5 | OFFICE OF THE ARIZONA ATTORNEY GENERAL
   | 2005 N. Central Ave.
6 | Phoenix, AZ 85004-1592
7 | Kara.karlson@azag.gov
   | Karen.hartman@azag.gov
8 | Kyle.cummings@azag.gov

9 | *Attorneys for Defendants*

10 | */s/ Lisa Charette*
11 | _____